1    Richard M. Heimann (State Bar No. 063607)      Michael P. Lehmann (State Bar No. 77152)
     Lexi J. Hazam (State Bar No. 224457)                  Christopher L. Lebsock (State Bar No.
2    Robert L. Lieff (State Bar No. 037568) (Of       184546)
     Counsel)                                        HAUSFELD LLP
3    LIEFF, CABRASER, HEIMANN &            44 Montgomery Street, 34th Floor
     BERNSTEIN, LLP                           San Francisco, CA 94104
4    Embarcadero Center West               Telephone: (415) 633-1908
     275 Battery Street, 29th Floor          Facsimile: (415) 358-4980
5    San Francisco, CA 94111-3339
     Telephone: (415) 956-1000
6    Facsimile: (415) 956-1008

7    *Attorneys for Plaintiff and the Proposed Class*

8

     [Additional counsel listed on signature page]

9

10                 UNITED STATES DISTRICT COURT

11                   NORTHERN DISTRICT OF CALIFORNIA

FILED

JUL 2 2 2011

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA   LB

CV 11 3620

| | |
|---|---|
| 12   INTERNATIONAL UNION OF OPERATING ENGINEERS, STATIONARY ENGINEERS LOCAL 39 PENSION TRUST FUND, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> THE BANK OF NEW YORK MELLON CORPORATION, THE BANK OF NEW YORK MELLON, THE BANK OF NEW YORK COMPANY, INC., THE BANK OF NEW YORK, and THE BANK OF NEW YORK MELLON TRUST COMPANY, NATIONAL ASSOCIATION, <br><br> Defendants. | Civil Action No. <br><br> **CLASS ACTION COMPLAINT** <br><br> (1) VIOLATION OF UNFAIR BUSINESS PRACTICES ACT [BUSINESS & PROFESSIONS CODE SECTION 17200, ET SEQ.]; (2) VIOLATION OF BUSINESS & PROFESSIONS CODE SECTION 17500, ET SEQ.; (3) BREACH OF CONTRACT; (4) BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING; (5) VIOLATION OF N.Y. GENERAL BUSINESS LAW SECTION 349 <br><br> **JURY TRIAL DEMANDED** |

1   Plaintiff International Union of Operating Engineers, Stationary Engineers Local

2   39 Pension Trust Fund ("IUOE Local 39" or "Plaintiff"), individually and on behalf of all others

3   similarly situated, for its class action complaint against Defendants The Bank of New York

4   Mellon Corporation, The Bank of New York Mellon, The Bank of New York Company, Inc., The

5   Bank of New York, and The Bank of New York Mellon Trust Company, National Association

6   (collectively, "Defendants"), alleges the following based upon personal knowledge as to itself and

7   its own acts, and upon information and belief or the investigation of counsel as to all other

8   matters:

9   **I.  INTRODUCTION**

10  1.  This is an action to recover damages on behalf of Plaintiff and members of the

11  proposed class, defined below (the "Class"), for harm suffered as a result of Defendants' practice

12  of assigning fictitious foreign currency exchange ("FX") rates to the Class' purchases and sales of

13  foreign securities that were done pursuant to "standing instructions" (as further described below),

14  in violation of California and New York law as well as Defendants' contractual duties to Plaintiff

15  and the Class.

16  2.  Throughout the Class Period (defined below), it has been the regular practice of

17  Defendants' FX traders and transaction desks, working in conjunction with their custody

18  department, to leverage every possible FX transaction done under "standing instructions" for the

19  exclusive pecuniary benefit of Defendants.  Knowing the precise foreign exchange needs of a

20  custody client who has agreed to "standing instructions," Defendants have traded to satisfy the

21  client's obligations on the Interbank market, but then have deceptively charged or credited a

22  fictitious price to the client for the trade.  The fictitious price given to the client has allowed

23  Defendants to keep a significant unlawful and unfair profit on the trade.

24  3.  Defendants have acquired consistent and unlawful profits at the expense of

25  Plaintiff and the Class by consistently charging Plaintiff and the Class for purchases and sales of a

26  foreign currency (under "standing instructions") using FX rates that incorporate hidden and

27  excessive mark-ups or mark-downs relative to the actual market FX rate applicable at the time of

28  the trade.  In so doing, Defendants have reaped consistent windfalls – which can include

-1-

1   thousands of dollars on a single trade – by pocketing the difference between the fictitious and the

2   actual price for the currency obtained or sold for the pension fund client.  Clients such as Plaintiff

3   and the Class have remained unaware of this deceptive practice until the recent unsealing of

4   several whistleblower complaints filed by insiders of one or more of Defendants.

5         4.     On information and belief, Defendants' deceptive practices date back at least ten

6   years, affect similarly-situated customers throughout California and the nation, and may have

7   yielded hundreds of millions of dollars in unlawful profits to Defendants.  Defendants' activities

8   are currently the subject of whistleblower lawsuits being pursued by the Commonwealth of

9   Virginia and the State of Florida, as well as an investigation by the Securities and Exchange

10  Commission ("SEC").

11        5.     Defendants' deceptive, unlawful and unfair practices throughout the Class Period

12  were in breach of their contractual and statutory duties to Plaintiff and the Class, and occurred

13  despite Defendants' repeated representations as to the benefits of their cutting-edge technology,

14  their advanced claims processing procedures, the competitiveness of their FX rates, and the "best

15  execution practices" that Defendants claimed to follow.  Defendants' acts also contravened

16  affirmative representations made to Plaintiff and the Class in Defendants' written FX policies and

17  procedures concerning the terms that Plaintiff and the Class should reasonably expect for FX

18  transactions conducted by Defendants.

19        6.     Plaintiff and the other Class members could not reasonably have detected

20  Defendants' deceptive, unlawful and unfair practices.  Nothing in the FX rates that Defendants

21  actually reported to Plaintiff and the Class indicated that those rates were false and included

22  hidden and unauthorized mark-ups or mark-downs.

23        7.     Plaintiff brings this action as a class action on behalf of all similarly affected

24  employee benefit plans covered by the Employee Retirement Income Security Act of 1974

25  ("ERISA") for whom Defendants provided custodial FX services in order to recover the proceeds

26  that Defendants improperly obtained from Class members through Defendants' deceptive,

27  unlawful and unfair FX trading practices.

28

## II.   JURISDICTION AND VENUE

8.     This Court has subject-matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action, including claims asserted on behalf of a nationwide class, filed under Rule 23 of the Federal Rules of Civil Procedure; there are hundreds, if not thousands, of proposed Class members; the aggregate amount in controversy exceeds the jurisdictional amount or $5,000,000.00; and at least two of the three Defendants are citizens of a State different from that of Plaintiff and the Class.  This Court also has subject matter jurisdiction over Plaintiff's and the proposed Class' claims pursuant to 28 U.S.C. § 1367(a).

9.     Venue in this judicial district is proper pursuant to 28 U.S.C. §§ 1391(b) and (c). Plaintiff is a citizen of the state of California and resides in this district.  A substantial part of the events or omissions giving rise to the claims asserted occurred in this district.  Additionally, Plaintiff's custodial contract with Defendant The Bank of New York Mellon Trust Company, National Association provides that Plaintiff's contractual claims are to be litigated in a court "located within the State of California," and that the parties agree that such courts "are the most convenient forum to resolve" such claims.[1]  *See* Exh. A at § 16(a) – Governing Law; Jurisdiction; Certain Waivers.

## III.   PARTIES

### A.   Plaintiff

10.    Plaintiff International Union of Operating Engineers Local 39 Stationary Engineers ("IUOE Local 39") is an employee benefit plan covered by ERISA with principal offices at 48 Julian Street, San Francisco, California.  IUOE Local 39 provides retirement and survivor benefits to approximately 17,000 members.  IUOE Local 39's holdings include international assets that require FX transactions.  Defendants provided custodial services to Plaintiff during the Class Period, which included executing FX transactions on IUOE Local 39's

---

[1] A copy of the Global Custody Agreement (ERISA) between Plaintiff and The Bank of New York Trust Company, National Association, dated as of February 14, 2006 ("Custody Agreement"), is attached as Exhibit A.

-3-

1   behalf pursuant to "standing instructions." At no time did IUOE Local 39 authorize Defendants

2   to charge IUOE Local 39 the false FX rates as alleged herein.

3       **B.   Defendants**

4       11.    Defendant The Bank of New York Mellon Corporation ("BNY Mellon Corp.") is a

5   Delaware corporation with headquarters at One Wall Street, New York, New York, 10286. BNY

6   Mellon Corp. is the product of the July 1, 2007 merger (the "Merger") of The Bank of New York

7   Company, Inc. and Mellon Financial Corporation ("Mellon"). BNY Mellon Corp. is the parent of

8   Defendant The Bank of New York Mellon. According to BNY Mellon Corp.'s Form 10-K for

9   the year ended December 31, 2010 (filed with the SEC on February 28, 2011) ("BNY Mellon

10  Corp. 2010 10-K"), BNY Mellon Corp. had "$1.17 trillion in assets under management and $25.0

11  trillion in assets under custody and administration as of Dec. 31, 2010." BNY Mellon Corp.'s

12  principal assets and sources of income come from its two principal bank subsidiaries, including

13  Defendant The Bank of New York Mellon. *See* BNY Mellon Corp. 2010 10-K at 4, 25.

14      12.    Defendant The Bank of New York Mellon ("BNY Mellon"), a New York state

15  chartered bank, is one of two principal bank subsidiaries of BNY Mellon Corp., and is the

16  successor entity (post-Merger) to The Bank of New York. According to the BNY Mellon Corp.

17  2010 10-K, BNY Mellon "houses [BNY Mellon Corp.'s] institutional businesses, including Asset

18  Servicing, Issuer Services, Treasury Services, Broker-Dealer and Advisor Services, and the bank-

19  advised business of Asset Management." *Id.* at 4.[2]  BNY Mellon is the principal bank subsidiary

20  of BNY Mellon Corp. responsible, since the Merger, for providing custodial and FX services to

21  institutional investors such as Plaintiff and the Class. There is substantial overlap between BNY

22  Mellon Corp. and BNY Mellon's leadership. According to the BNY Mellon Corp. 2010 10-K (at

23  30-32), every current executive officer of BNY Mellon Corp. also serves as an officer of BNY

24  Mellon.

25      13.    Defendant The Bank of New York Company, Inc., through its Investor & Broker-

26  Dealer Services business segment, provided (prior to the Merger) global custody services,

27  _____

28  [2] The second of BNY Mellon Corp.'s two principal banks, BNY Mellon, National Association
    ("BNY Mellon, N.A."), is described by BNY Mellon Corp. as housing its "Wealth Management
    business," and is not at issue in this case. *Id.*

-4-

securities lending, and FX trading and execution services to institutional investors including Plaintiff and the Class. *See* The Bank of New York Company, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2006 (filed with the SEC on February 22, 2007) ("BNY 2006 10-K") at 14.

14.     Prior to the Merger, the Bank of New York Company, Inc.'s principal subsidiary, Defendant The Bank of New York, served clients throughout the world in five primary businesses: Securities Servicing and Global Payment Services, Private Client Services and Asset Management, Corporate Banking, Global Market Services, and Retail Banking. *See* The Bank of New York Company, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2003 (filed with the SEC on March 10, 2004) ("BNY 2003 10-K") at 2. The Custody Agreement specifically authorized The Bank of New York, described as The Bank of New York Trust Company, National Association's "New York affiliate," to perform or assume any of the duties, obligations or responsibilities of The Bank of New York Trust Company, National Association under the Custody Agreement. *See* Custody Agreement, § 21 – Authorization of The Bank of New York. Among those responsibilities was the provision of foreign exchange services to Plaintiff. *Id.*, § 3(d) – Foreign Exchange Transactions.

15.     Defendants The Bank of New York Company, Inc. and The Bank of New York are referred to collectively herein as "BNY," and at all relevant times were headquartered in New York.

16.     Defendant The Bank of New York Mellon Trust Company, National Association (the "Bank"), which was known prior to July 1, 2008 as The Bank of New York Trust Company, National Association, is a national bank headquartered at 700 South Flower Street, Suite 200, Los Angeles, California 90017. BNY Mellon Corp. describes the Bank as a "primary subsidiary" of BNY Mellon Corp. *See* BNY Mellon Corp. 2010 10-K at Exh. 21.1. The Bank is one of two U.S. trust companies of BNY Mellon Corp. that "house trust products and services across the U.S." *Id.* at 4. Plaintiff entered into the Custody Agreement with the Bank on or about February 14, 2006. The Custody Agreement provided for FX transaction services to be provided by the

Bank, its subsidiaries, or affiliates, including BNY (and, subsequently, BNY Mellon).  *See*

Custody Agreement, §3(d) – Foreign Exchange Transactions.

**IV.    DEFENDANTS' UNLAWFUL SCHEME TO ACQUIRE UNDISCLOSED WINDFALL PROFITS AT THE EXPENSE OF ERISA PLANS**

> **A.    Background on Defendants' Relationship with Plaintiff and the Class**

17.    Defendants provided custodial services for Plaintiff and the other ERISA funds

that constitute the Class during the Class Period.  A "custodian" is an institution that holds

securities on behalf of investors.  The responsibilities entrusted to a custodian include the

guarding and safekeeping of securities, delivering or accepting traded securities, and collecting

principal, interest, and dividend payments on held securities.  Custodians may also perform

ancillary services for their clients.  Custodians are typically used by institutional investors who do

not wish to leave securities on deposit with their broker-dealers or investment managers.  By

separating these duties, the use of custodians – at least in theory – is designed to reduce the risk of

fraud or other misconduct.  An independent custodian ensures that the investor has unencumbered

ownership of the securities other agents represent to have purchased on its behalf.

18.    Defendants, either themselves or through their subsidiaries and affiliates, have

provided custodial services to a large number of pension funds across the country throughout the

Class Period.  Indeed, Defendant BNY Mellon Corp. touts itself as "the world's largest global

custodian," and has $25 trillion in assets under custody.

19.    During the past decade, ERISA pension funds and other institutional investors

have increasingly looked to overseas companies and securities markets in order to diversify their

holdings and maximize investment returns.  The necessity for pension funds, in particular, to

invest in foreign securities in order to properly diversify and meet their funding requirements is

well-known to and appreciated by custodial services providers such as Defendants.

20.    Because foreign investments are bought and sold in the foreign currencies of the

nations in which they are issued, U.S.-based investors necessarily must purchase and sell those

foreign currencies in order to complete the transactions.  A custodial bank's services accordingly

-6-

1  may include undertaking foreign currency exchange transactions necessary to facilitate a client's

2  purchases or sales of foreign securities.

3        21.      Plaintiff and the Class reposed a high degree of trust in Defendants. Plaintiff and

4  the Class depended upon Defendants to both execute and report FX trades honestly and

5  accurately, and generally to carry out the trades in a manner consistent with their respective

6  custodial services contracts – including the associated fee schedules – and other representations in

7  their written FX policies and procedures.

8        22.      Specifically, BNY's written Foreign Exchange Policies & Procedures for ERISA

9  Plans ("FX Procedures"), which were incorporated by the Custody Agreement and were "the

10 exclusive means by which BNY [could] enter into an FX Transaction with a[n ERISA] plan,"

11 promised that "[t]he terms of FX Transactions with any Plan *shall not be less favorable* to the

12 Plan than terms offered by BNY to unrelated parties in a *comparable arm's length* FX

13 Transaction." *See* FX Procedures, rev. 7/23/03 (attached hereto as Exhibit B) (emphases added).

14       23.      BNY's promise to provide terms on FX transactions to ERISA plans that were

15 "not . . . less favorable" than the terms BNY offered to "unrelated parties" in comparable arm's

16 length transactions is echoed in the Employee Retirement Income Security Act ("ERISA") §

17 408(b)(18), which provides a statutory prohibited transaction exemption for FX transactions.

18 Section 408(b)(18) permits FX transactions to be performed for an ERISA-covered plan by a

19 party in interest, such as a custodial bank or its affiliate, provided that "[a]t the time the [FX]

20 transaction is entered into, the terms of the transaction are not less favorable to the plan than the

21 terms generally available in comparable arm's length foreign exchange transactions between

22 unrelated parties or the terms afforded by the bank in comparable arm's length foreign exchange

23 transactions involving unrelated parties." ERISA § 408(b)(18). This statutory exemption, which

24 was enacted as part of the Pension Protection Act of 2006, was preceded by a "class exemption"

25 to the same effect published by the U.S. Department of Labor on November 13, 1998 (known as

26 Prohibited Transaction Exemption 98-54 (or "PTE 98-54")), with relevant portions thereof

27 effective beginning January 12, 1999.

28

24.     In addition, the FX Procedures provided that "all income item conversions" involving foreign currency for ERISA fund clients would be "bundled" and "executed" each day at 11:00 a.m. New York time "*at or within the range* of buy/sell rates in effect at 11:00 a.m. New York time." The FX Procedures further provided that "[t]he bundling of FX Transactions is done to achieve *better rates for the benefit of clients*." (emphases added).

25.     As discussed further below, and contrary both to their written policies and ERISA's mandate, Defendants did not provide terms to Plaintiff and the Class for FX transactions, when performed under "standing instructions," that were as favorable to Plaintiff and the Class as the terms afforded or generally available to unrelated parties in comparable arm's length transactions. Nor did Defendants "achieve better rates for the benefit of clients" through their FX practices as related to income item conversions. Instead, Defendants purposefully manipulated the FX rates charged to Plaintiff and the Class on "standing instructions" FX trades so as to allow for undisclosed risk-free profits to Defendants, at the direct expense of Plaintiff and the Class, in breach of Defendants' contractual duties and of California and New York law.

26.     The profits Defendants have realized through their unfair and deceptive practices have been massive, as Defendants have capitalized on the opportunity provided over the past decade by pension funds' increasing need to diversify their investment holdings by investing in foreign securities, thus leading to an increased demand for FX services. In 2008 alone, for instance, BNY Mellon Corp. reported a record $1.5 *billion* in FX and other trading activity revenue – an increase of $676 million (86%) over the previous year. For the years 2002 to 2008, BNY Mellon Corp. and the banks that merged to form it (including BNY) reported more than $5 billion in FX trading revenue. On information and belief, BNY Mellon Corp.'s FX revenue is a cornerstone of the Bank's annual profits, and serves as a cash generator responsible for funding the annual bonuses of the entire firm. A significant portion of these revenues were acquired at the unknowing and unlawful expense of Class members who permitted Defendants to conduct FX trades for their accounts pursuant to "standing instructions."

B.    **"Standing Instructions"**

27.    Custodial banks that provide FX services to ERISA funds generally do so in one of two ways. The first way is through "direct" or "negotiated" sales or purchases of foreign or domestic currency, in which the investment staff or outside investment manager for the custodial client directly negotiates, at arm's length, the sale or purchase of foreign currency with the custodial FX services provider. In this manner, the ERISA fund's staff (or the ERISA fund's outside investment manager) is involved, in real-time, with the sale or purchase of the particular foreign currency that is necessary for the transaction in a given foreign security to close. The custodial FX services provider quotes a price for the foreign currency to the custodial client or its representative, which the client or client representative accepts, declines, or negotiates against. "Direct" transactions in foreign currency traditionally yield modest profits to the purchaser or seller of the currency in question; it is typical for custodial FX services providers to earn very modest profits (perhaps up 2 to 3 basis points ("bps") of "spread"), per unit of currency, as compared with the Interbank exchange rate applicable to a foreign currency at the time of a direct transaction. A basis point is equivalent to 1/100 of one percentage point (or .0001). This modest spread may be considered a proxy for the "market rate," since it is the product of an arm's length negotiation.

28.    The second way in which a custodial client may purchase or sell foreign currency is pursuant to "standing instructions." Under "standing instructions," also known as the "indirect" method of transacting, a custodial FX services provider acquires foreign or domestic currency on an as-needed basis, whenever a custodial client buys or sells foreign securities or receives a dividend on a foreign security, without the direct involvement of either the custodial client's investment staff or outside investment managers. "Standing instructions" are typically used for income item conversions, such as dividend or interest payments on a foreign investment, or "de minimis" FX transactions of less than a certain dollar amount.

29.    Institutional investors such as Plaintiff and the Class pay a flat fee for custodial FX services that include "standing instructions" FX trade services. Defendants advertised such

1  "standing instructions" FX services as being "free of charge" (apart from whatever the custodial

2  client paid in annual custodial fees).

3      30.     Without directly negotiating the price of an FX transaction, a custodial client has

4  no other information on which to rely for determining whether it received an arm's length market

5  price for its "standing instructions" trades other than a monthly report summarizing such trades

6  provided by the custodian. Plaintiff received such monthly reports during the Class Period.

7      31.     Such monthly reports record the date, amount, and price of an FX transaction, but

8  do not give the times at which such trades were executed. It is accordingly not possible for a

9  custodial client such as Plaintiff to know whether the FX prices have been manipulated in order to

10 create a windfall in profits for the FX services, particularly when the prices of the FX trades

11 reported by the custodian fall within the range of the day's exchange rates for the currency in

12 question. The custodial client accordingly relies on the custodian's good faith execution of its

13 services to the client, as well as the custodian's contractual and statutory duties, for its belief that

14 it is not being deceived into paying exchange rates far in excess of market rates for "standing

15 instructions" FX trades. Plaintiff so relied here.

16      32.     Throughout the Class Period, Defendants purposefully manipulated the FX rates

17 charged or credited to Plaintiff and the Class pursuant to "standing instructions." Rather than

18 market rates, Defendants applied FX rates to "standing instructions" trades that resulted in

19 undisclosed profits that were many multiples greater than those typically achieved on an arm's

20 length basis. As further discussed below, an analysis of Plaintiff's FX transactions for a six-

21 month period during the Class Period shows that Plaintiff's FX trades resulted in profits of *60 bps*

22 or more, on average, for Defendants, when compared to either the daily mid-rate for each relevant

23 currency or the prevailing rate for each currency at 11 a.m. New York time in the Interbank FX

24 market. These profits have no rational basis, in that they were not paid in exchange for a service

25 of like-value by Defendants. Rather, they were unfairly and unlawfully obtained by Defendants

26 at the direct expense of Plaintiff, in exchange for no service of like-value, and contrary both to

27 Defendants' contractual obligations and statutory law.

28

C.    **Defendants' Duties And Representations As To "Standing Instructions"**

33.    The Custody Agreement appointed the Bank as Plaintiff's "Global Custodian," with duties to "maintain one or more accounts . . . for the custody and safekeeping . . . of Securities and non-Cash Distributions which shall from time to time be delivered to or received by" Plaintiff or any of Plaintiff's sub-custodians. *See* Custody Agreement, §2. The Custody Agreement required the Bank to exercise "reasonable care" in the performance of its duties. *Id.*, §6.

34.    The Custody Agreement authorized the Bank to "enter into spot or forward foreign exchange contracts ('FX Transactions')" with Plaintiff, and provided that "such foreign exchange services" may be provided "through [the Bank's] subsidiaries or affiliates. . ." *See* Custody Agreement, §3(d) – Foreign Exchange Transactions. The Custody Agreement also specifically authorized that "any of [the Bank's] powers, duties, obligations and responsibilities under this Agreement may be performed or assumed . . . by [the Bank's] New York affiliate, The Bank of New York or any successor thereto." *Id.*, §21 – Authorization of The Bank of New York.

35.    The FX services provided by Defendants to Plaintiff and the Class are memorialized in the FX Procedures. Pursuant to those Procedures, "standing instructions" were to apply to "income item conversions," such as dividend or interest payments, or "de minimis" FX trades of no more than US $300,000 or the equivalent thereof. The FX Procedures further provided that FX trades "in excess of $300,000" may be treated as "standing instructions" trades (though they would still be termed "direct trades") provided certain conditions were met.

36.    The FX Procedures provided that the terms of all FX transactions, including those done pursuant to "standing instructions," "shall not be less favorable to the Plan [*i.e.*, customer or Class member] than terms offered by BNY to unrelated parties in a comparable arm's length FX transaction." As stated above, this provision echoed a similar requirement under ERISA which has been in place since at least January 1999.

37.    The FX Procedures further purported to provide "the method for determining the rates at which FX Transactions will be executed under standing instructions" for Plaintiff and the Class. According to the FX Procedures, income item conversions or orders related to purchases

-11-

CLASS COMPLAINT

1  and sales of foreign securities were to be "transmitted by the custody/fiduciary area [of BNY]

2  through an internal system, which will identify the transaction to the BNY FX Transaction Desk

3  ... as an 'ERISA transaction.'"  Further, the "range of rates" at which the FX Transaction Desk

4  would effect such transactions were to be "posted in BNY's website" several times a day.

5      38.    The FX Procedures provided that "income item conversions" would be "bundled

6  by the relevant custody/fiduciary area [of BNY] with other like FX Transactions and executed ...

7  at or within the range of buy/sell rates in effect at 11:00 a.m. New York time and posted on the

8  website." This "bundling of FX Transactions," according to BNY, was "done to achieve ***better***

9  ***rates for the benefits of clients***." (emphasis added).

10     39.    The foregoing statement was false.  As described herein, Plaintiff was charged

11 spreads in excess of 60 bps, on average, for FX trades done on a "standing instructions" basis,

12 compared to a range of 2-3 bps for arm's length FX trades as described above.

13     40.    The FX Procedures provided that "[o]rders relating to purchases and sales" of

14 foreign securities would be executed  "within the range established by such buy/sell rates" in

15 effect at the time of the order or, "[i]f the order is received by the relevant Desk at least one-half

16 hour prior to a fixing," then "at or within the range established by such buy/sell rates next in

17 effect."  The FX Procedures further provided that FX trades "in excess of $300,000" could be

18 executed in the same fashion unless the custodial client or its fiduciary "exercised its option to

19 cancel" that arrangement "within one hour of the respective fixing time."[3]

20     41.    The FX Procedures did ***not*** disclose, however, that Plaintiff and the Class would

21 be charged buy/sell rates for such transactions that were any different from those "offered by

22 BNY to unrelated parties in a comparable arm's length FX transaction." Certainly, Defendants

23 did not disclose that they would be taking profits on each "standing instructions" trade, at the

24 direct expense of Plaintiff and the Class, that were orders of magnitude greater than those

25 obtained in "direct" FX transactions.

---

[3] For simplicity's sake, such FX transactions in excess of USD $300,000.00 that Defendants
executed in this fashion, without a cancellation request by the custodial client or its fiduciary, are
included within the definition of "standing instructions" FX trades in this Complaint.

-12-

CLASS COMPLAINT

42.     In addition to, and outside of, the Custody Agreement and FX Procedures, Defendants publicly represented their FX services as successful, award-winning, skillful, and offering a cost-saving benefit, pursuant to "best execution standards," to clients such as Plaintiff and the Class.  For instance, BNY Mellon Corp.'s website stated the following:

- "The Bank of New York Mellon is a premier foreign exchange provider and one of the largest foreign exchange dealers in the U.S., making markets and carrying positions in over 100 currencies, with a particular expertise in emerging market currencies. We offer a comprehensive array of innovative products, from basic foreign exchange to customized multicurrency hedging and yield-enhancing strategies."

- "Execution: Our global franchise provides you with 24 hour market coverage. Due to our standing as one of the world's leading custodial Banks, we are an active market-maker in the spot, forward and option markets."

- "Standing Instruction [Indirect Foreign Exchange] trading provide[s] a simple, flexible, and complete service solution that automates the capture of all types of custody-related foreign exchange . . . Operationally simple, *free of charge* and integrated with the client's activity on the various securities markets, [Foreign Exchange] standing instruction is designed to help clients minimize risks and costs related to the foreign exchange and concentrate on their core business."

- "Standing Instruction Foreign Exchange Clients benefit from: [foreign exchange] execution according to *best execution standards* . . ."

(Emphases added).

43.     The duty of "best execution" requires that a broker-dealer seek to obtain for its customers the most favorable terms reasonably available under the circumstances.  At a minimum, therefore, "best execution standards" requires that Defendants execute trades on terms that are no less favorable than those offered to unrelated parties in a comparable arm's length transaction.

-13-

44.     While Defendants' custodian services, including their directed and standing instruction FX services, are aimed at and available to any individual, company or fund needing custody services to safeguard their assets, Defendants specifically touted the strength of their relationship with pension funds, such as Plaintiff, as offering a competitive advantage over other custodial banks.  For instance, BNY Mellon Corp.'s website stated the following:

- •        "A Leading Provider For Government Entities: Public pension plans and other government agencies seek to align themselves with a custodian who is a clear leader, one who has the capabilities and experience to help them meet the numerous challenges facing their organizations today including: Increased regulatory oversight, complex global investing environment, pressure to grow assets while managing with existing or decreasing resources, and corporate governance."

45.     These statements, along with those contained in the written FX Procedures, were false or misleading when made, and aided in the accomplishment of Defendants' deceptive, unlawful and unfair FX trade practices.  Defendants' "standing instructions" FX trading was not done "free of charge," nor was it done pursuant to "best execution standards."

46.     Plaintiff and the Class reasonably expected, because Defendants told them as much (and ERISA so required), that they would be offered terms on "standing instructions" trades that were no less favorable than those offered by Defendants to unrelated parties in comparable arm's length FX transactions.  This expectation was heightened by BNY's (and subsequently BNY Mellon's) position as a "global leader" in custodial services and market-maker in foreign currency exchange.  As recounted in several recently unsealed whistleblower complaints against Defendants, however, Defendants did not offer terms on "standing instructions" trades to Plaintiff and the Class that were no less favorable than those offered to unrelated parties in comparable arm's length FX transactions.  Instead, Defendants purposefully manipulated the FX rates charged or credited to Plaintiff and the Class in "standing instructions" trades so as to result in excessive and undisclosed windfall profits to Defendants at the direct expense of Plaintiff and the Class.

D. **How Defendants' FX Scheme Worked**

47.     Recently unsealed complaints[4] filed in Florida and Virginia under these states' respective *qui tam* (or False Claims Act-analogous) statutes reveal a sophisticated scheme by which BNY and its successors and affiliates, including Defendants, have reaped massive undisclosed profits, over the period of many years, at the direct expense of the custodial clients they have purported to serve.  This scheme, according to whistleblowers from inside BNY Mellon, has included deceiving clients into believing that they had received terms on their "standing instructions" trades that there no less favorable than those offered to unrelated parties in a comparable arm's length FX transaction.  Defendants have accomplished this scheme through a series of deceptive acts, as follows:

48.     Upon receipt of a request for a purchase or sale of a foreign security pursuant to "standing instructions," BNY (subsequently BNY Mellon) executes a trade to fill the request at the FX rate available at or close to that time.  Defendants thereafter watch the market fluctuation in FX rates related to the transaction over the course of the day (covering as much as a 24-hour period, beginning a 5:00 p.m., Eastern Time, but certainly no less than the time permitted by the FX Procedures) in order to charge or credit to the client a different, less favorable rate than the one at which Defendants actually settled the FX transaction.  Defendants thus falsely claim to have paid or received a different rate than that which was actually required settle the trade.

49.     If the transaction is a "buy" of a foreign currency, Defendants charge the custodial client a higher FX rate available at another time in the day, which causes the custodial client to pay more for the FX transaction than what Defendants actually paid.  Defendants will keep for themselves the difference between the true cost of the trade and the fictitious or false FX rate Defendants claimed to have paid and charged to the client.

50.     If the transaction is instead a "sale" of a foreign currency, Defendants will falsely credit the custodial client with an FX rate available at another time in the day that is lower than

---

[4] *See Commonwealth of Virginia, ex. rel. FX Analytics v. The Bank of New York Mellon Corp.*, No. CL-2009-15377 (Va. Cir. unsealed Jan. 21, 2011) and *State of Florida, ex. rel. FX Analytics v. The Bank of New York Mellon Corp.*, No. 2009-ca-4140 (Fla. Cir. unsealed Feb. 7, 2011).

-15-

1    what Defendants actually received in the currency exchange, and remit to the custodial client an

2    amount less than what Defendants actually received on the client's behalf.

3        51.    After Defendants make the actual FX transactions necessary to cover their

4    "standing instructions" clients' needs, Defendants' FX traders assign falsified FX rates to the

5    transactions, determined by looking back to the start of the trading time period allotted by the FX

6    Procedures. The Defendants' FX Traders assign fictitious FX rates, a process called, "locking the

7    rates," as follows:

8                    A.    Higher prices to FX buy orders

9                    B.    Lower prices to FX sell orders

10       52.    The Defendants' global FX operations are managed from New York. According

11   to the whistleblowers, although the Merger was effective as of July 1, 2007, Defendants have

12   maintained the FX departments that existed at BNY and Mellon Corp. to serve the clients served

13   by each bank prior to the Merger. Those custodial clients, such as Plaintiff, that previously hired

14   the Bank to be their custodian still have their trades executed by the legacy BNY FX desk in New

15   York; those custody clients that had previously hired Mellon to be their custodian still have their

16   trades executed by the legacy Mellon FX desk.

17       53.    According to the whistleblowers, since the Merger, a daily "Reconciliation" call

18   between Defendants' New York and Pittsburgh FX trading desks is conducted each day as

19   Defendants begin to choose the FX rates to charge its custodial clients for "standing instructions"

20   FX transactions. The Pittsburgh FX desk (*i.e.*, legacy Mellon) will call the New York FX desk

21   (*i.e.*, legacy BNY) so that they can synchronize their high and low ranges for each currency pair.

22   According to the whistleblowers, these telephone calls are made on a private, direct line, and may

23   have been shielded from Defendants' customary policy of recording transactional conversations.

24   This call, done at approximately 2:30 p.m. Eastern (U.S.) time, is made so that any discrepancies

25   between each transaction desk's operations are avoided, thus making discovery of Defendants'

26   scheme less likely.

27       54.    Each "standing instructions" client with a trade in a particular currency pair for

28   that day accordingly receives the same FX rate, as determined by Defendants' cherry-picked

1  range-of-the-day pricing, regardless of when the client's specific trade request was submitted, the

2  size of the trade, the time the actual FX trade occurred, or the actual FX rate at the time of that

3  trade.

4      55.    The only limitation on this false pricing is that Defendants are careful, with some

5  exceptions, to price the trades within the range of the day. This is done to deceive an audit of the

6  "standing instructions" client's FX transactions, as such audits typically only look to see if an FX

7  transaction is priced within the range of the day on which it occurred.

8      56.    The foregoing notwithstanding, according to the whistleblowers, it has been

9  BNY's practice to occasionally take a "standing instructions" FX deal in the morning New York

10  time and price it using the range that has been observed in London time. This practice allows a

11  much longer time frame from which to review and take advantage of the volatility of an FX rate,

12  and, as a consequence, take a bigger false FX spread from the "standing instructions" client.

13      57.    According to the whistleblowers, post-trade cash flow analyses are immediately

14  done by Defendants to tabulate the profits from each completed trade (after the falsified FX rate

15  has been assigned to the custodial client). The profit from each transaction represents the

16  difference between the falsely high (or low) price assigned to the custodial client and the price the

17  currency actually traded for and paid (or received) by Defendants.

18      58.    Profit and loss reporting is done by each FX transaction desk by the maintenance

19  of a running Profit/Loss report that can be generated at any time. The FX traders review this

20  document in order to keep track of their personal Profit/Loss as well as Defendants' Profit/Loss.

21  In addition, monthly reports are also generated. Both the monthly and daily reports also show

22  year-to-date reporting.

23      59.    According to the whistleblowers, profits from "standing instructions" FX trades

24  drive Defendants' decision-making processes. When the Bank competes for a custodial client,

25  Defendants' FX departments are consulted and asked to estimate what Defendants' profits will be

26  when and if they were to execute the prospective client's FX transactions. Defendants look at

27  what amount of international investments the client presently has and how Defendants might

28  price the deals, directly or indirectly.

60.     The FX traders will then give the custody group a conservative estimate of what the FX profit potential will be with the prospective client. The custody group then incorporates this estimate into their pricing structure as they make a flat-fee, all inclusive proposal (including all FX costs and fees) to the prospective custodial client. The FX department shares some of its profits with the custody group because it understands how valuable the stream of "standing instruction" custodial deals, and the profits obtained from unwitting custodial clients, will be to the FX department.

61.     Defendants unlawful scheme of executing FX trades and assigning fictitious FX rates for "standing instructions" pension fund clients was deliberately set up to leverage the day's trading volatility in favor of Defendants and against the financial interest of the custodial clients. At the beginning of the trading day, there is a very narrow trading range for stocks and currencies, as compared with the end of the day. If, at the beginning of the day, a BNY Mellon trader knows that he has to purchase 1,000,000 Euros for a pension fund, the trader also knows that he does not have to book that trade into BNY Mellon's system until many hours later. The trader has been incentivized, *i.e.*, provided a high-paying, stress-free job, by his employer, to wait and assign a fictitious FX rate to the "standing instructions" trade.

62.     Defendants themselves have noted that volatility in foreign currencies has contributed to an increase in their FX revenues. What they have not disclosed is that this is particularly true because they have taken undue advantage of such volatility. By fixing their FX positions throughout the day at prices advantageous to themselves, Defendants cannot lose on a "standing instructions" transaction. At worst, Defendants break even. To date, all that Defendants have considered it necessary to do to shield their unlawful and unfair practices from scrutiny by those clients who utilize "standing instructions" FX services has been to price such FX trades within the range of FX rates for the day on which the transaction was effected.

63.     End-of-month Client Custody Reports are prepared by the Bank on or before mid-month. These reports list the custodial client's FX trades by date, amount, and price, *i.e.,* the fictitious FX rate (as reported to the custody side of the Bank by its FX traders). These reports never contain time-stamps for the FX trades, and there is nothing on the report that would lead a

1  custodial client to suspect that it had been unfairly charged exorbitant mark-ups (or mark-downs)

2  on its "standing instructions" FX trades that were orders of magnitude larger than under the terms

3  offered to unrelated parties in comparable arm's length FX transactions.

4      64.    By not showing the specific time of day at which the actual, as compared to the

5  feigned, FX trade occurred, Defendants do not have to reveal that a trade they knew about at

6  11:00 AM Eastern time, and, therefore, could (and should) have executed near that time, has

7  instead been assigned an FX rate that only occurred in the Interbank market during mid- or late

8  afternoon.

9      65.    The following example, taken from one of the whistleblower complaints,

10  illustrates the alleged illicit profit-taking on Indirect FX trades: On one trading day, at 9:30 AM

11  Eastern time, BNY Mellon received notice that its clients would be selling approximately

12  $12,500,000.00 United States Dollars. BNY Mellon would be selling them Canadian Dollars in

13  return, as they were obligated to pay for security transactions that they had already entered into in

14  Canada.

15      66.    The FX desk accordingly was aware of this net client exposure that would be

16  offset that day by 9:30 AM Eastern time. The USD/CAD exchange rate had opened that morning

17  in New York at 1.0730 (where it would take 1.0730 CAD to equal 1 USD). The currency market

18  fluctuated throughout the day and the USD/CAD traded lower, ultimately making a low exchange

19  rate of 1.0682 CAD to 1 USD. This rate, 1.0682, was the worst possible rate one would have

20  received if selling USD and buying CAD in the New York trading session. From that low point,

21  the market for USD traded higher, ultimately reaching a high of 1.0847 CAD to 1 USD in the

22  afternoon.

23      67.    According to the whistleblowers, the FX desk sold $12,500,000.00 USD to the

24  trader that covered the USD/CAD on the spot desk, who covered the position at an average rate of

25  1.0795. The rate that the custodial clients that were selling the USD received, however, was the

26  very worst of the day: 1.0682. In other words, this "standing instructions" trade was hyper-

27  priced to the custodial clients at 113 basis points. There was no risk on Defendants' side of this

28  trade. The profit obtained by Defendants from buying $12,500,000 USD/CAD at 1.0682 and

-19-

1    selling the USD/CAD at 1.0795 was $134,937.50. Had the deal been negotiated between

2    unrelated parties in a comparable arm's length transaction, the expected spread (or market price)

3    may have been 2 to 3 bps, or nearly fifty times less.

4        68.    An example from Plaintiff's own trading data further illustrates the manner in

5    which custodial FX clients were gouged by Defendants' deceptive and unfair "standing

6    instructions" FX practices. On June 6, 2008, in 20 trades, Defendants purchased approximately

7    4,463,907 Euros for Plaintiff at a rate of 1.5775 US Dollars per Euro, paying $7,042,084 for the

8    transaction.   All of these trades were conducted at the same FX rate. Had the trades been

9    executed and charged using the FX rate prevailing in the Interbank market at 11 a.m. New York

10   time, Plaintiff would have received a lower and more beneficial FX rate of 1.5735 US Dollars per

11   Euro. This would have cost Plaintiff $6,997,174, or $44,909 less than what Plaintiff was actually

12   charged by Defendants – a more than **63 bps** difference. Further, on this particular day, the US

13   Dollar/Euro exchange rate of 1.5775 did not occur in the Interbank market until approximately

14   3:30 p.m. New York time, and was barely under the high (or least favorable) rate of 1.5778 that

15   occurred in the last minutes of the trading day.

16       69.    Plaintiff and the Class never agreed that their master custodial agreements with the

17   Bank entitled Defendants to any fees above those specified therein. Nonetheless, Defendants

18   falsely reported fictitious FX rates on "standing instructions" FX trades to Plaintiff and the Class,

19   and pocketed the difference from the FX rates that were actually paid or received by Defendants.

20       70.    Plaintiff and the Class paid millions of dollars in custodial fees to Defendants

21   during the Class Period. During that time, Defendants deceptively, unlawfully and unfairly

22   generated millions of dollars in additional risk-free revenue. Plaintiff and the Class have

23   struggled to meet funding requirements in the face of major losses in value attributable to the

24   economic downturn of the last three years. Money lost due to Defendants' deceptive, unlawful

25   and unfair practices is money that will not earn compounded investment returns for Plaintiff and

26   the Class over the thirty-plus year time horizon that applies to most pension plans, and each such

27   loss will triple each decade.

28

E.    **An Analysis Of Plaintiff's FX Trades**

71.    Two analyses of a sample of Plaintiff's FX trades illustrates the extent of the unlawful and undisclosed profits acquired by Defendants, as a result of their unlawful practices, at the expense of custodial clients such as Plaintiff.

72.    In the wake of the unsealing of the whistleblower actions described above, Plaintiff analyzed the rates recorded on its FX trades, conducted by Defendants, in five major global currencies (Euros, Japanese Yen, British Pounds, Swiss Francs, and Australian Dollars) for the period from June 2008 through December 2008.  With respect to each trade, Plaintiff compared the FX rate reported by Defendants with (i) the mid-rate of the day for the currency in question and (ii) the actual market FX rates in effect at 11 a.m. Eastern time on the day of the trade.

73.    For the first analysis, Plaintiff adopted the mid-rate of the day as one possible substitute for the actual FX rate that was in effect at the time of each transaction, since the latter information is exclusively available only to Defendants (who, as alleged above, do not provide time-stamps for each FX transaction to custodial clients on their monthly FX reports). For its second analysis, Plaintiff adopted the market rates in effect at 11 a.m. New York time on the day of each trade as a comparison, based on the FX Procedures' representation that income item conversions (one variety of standing instructions FX trades) would be executed at 11 a.m. New York time each day.

74.    Plaintiff discovered that the analyzed FX deals were assigned FX rates by Defendants that were more expensive to Plaintiff than the mid-rate of the day by an average of **65 bps** (as compared to the 2 to 3 bps of "spread" that a client may expect to be charged in arm's length FX trades).  Using the prevailing Interbank rates at 11 a.m. New York time, rather than the mid-rate, as the measuring tool reveals that Plaintiff's FX trades were assigned FX rates by Defendants that were more expensive than the 11 a.m. New York time rates by an average of nearly **60 bps**.

75.    These sizeable "spreads" notwithstanding, none of the FX trades that Plaintiff analyzed was assigned an FX rate by Defendants that fell outside the range of the day for the

1  applicable FX rate on the day the trade was executed. Accordingly, Plaintiff would have had

2  little reason to believe, prior to the unsealing of the whistleblower complaints, that it had been

3  deceptively charged fictitious FX rates on its "standing instructions" FX trades.

4      76.     The difference in "spreads" charged to Plaintiff's "standing instructions" FX

5  trades (from 60 to 65 bps) and those reasonably expected in arm's length or "direct" deals

6  illustrates the extent to which ERISA funds such as Plaintiff and the Class were overcharged for

7  "standing instructions" deals in comparison to those negotiated at arm's length, notwithstanding

8  Defendants' written FX Procedures and ERISA's requirements.

9      77.     The approximate overcharge to Plaintiff for the "standing instructions" deals

10  analyzed for just the 6-month period and five major currencies described above, using either the

11  mid-rate of the day or the 11 a.m. New York Interbank prevailing FX rate as a guide, exceeds

12  $150,000. An analysis of all of Plaintiff's FX trades would cover more than five years of

13  transactions, involving more than five currencies. Accordingly, Plaintiff's estimated losses from

14  unfair and unlawful FX overcharges for the duration of Defendants' custodial engagement are

15  substantial.

16  **V.    CLASS ACTION ALLEGATIONS**

17      78.     This action is brought and may properly be maintained as a class action pursuant

18  to Rules 23(a), 23(b)(2) and/or 23(b)(3) of the Federal Rules of Civil Procedure. This action is

19  brought pursuant to Rule 23(b)(2) for injunctive or declaratory relief and/or Rule 23(b)(3) for

20  money damages.

21      79.     This suit is a class action brought on behalf of, (1) with respect to Claims for

22  Relief One through Four below, a Class consisting of and defined as all California-based

23  employee benefit plans covered by ERISA for which Defendants or any of their predecessors,

24  successors or affiliates provided custodial FX services, including executing FX transactions

25  pursuant to "standing instructions," (the "California Class") from January 12, 1999 to the present

26  (the "Class Period") and, (2) with respect to Claim for Relief Five below, a Class consisting of

27  and defined as all employee benefit plans covered by ERISA, wherever situated, whose FX

28  transactions, including those executed pursuant to "standing instructions," were executed in New

-22-

1  York by the Defendants' New York FX desk (the "New York Class") during the Class Period.

2  References herein to the "Class" encompass both the California Class and the New York Class,

3  except where otherwise stated.

4      80.     Excluded from the Class are Defendants, any entity in which any Defendant has a

5  controlling interest, and the officers, directors, legal representatives, heirs, successors,

6  subsidiaries and/or assigns of any such individual or entity.

7      81.     The members of the Class are so numerous that joinder of all members

8  individually, in one action or otherwise, is impracticable. Plaintiff believes that there are

9  hundreds (if not thousands) of proposed Class members.

10     82.     There are numerous questions of law and fact common to Plaintiff and the Class,

11  including:

12          a.      whether the Bank and other Defendants owed contractual duties to the

13  Bank's California-based ERISA-covered custodial clients;

14          b.      whether these Defendants violated the contractual obligations owed to their

15  California-based ERISA-covered custodial clients by charging FX rates that did not reflect

16  market rates at the time the clients' "standing instructions" FX trades were executed;

17          c.      whether these Defendants violated the contractual obligations owed to their

18  California-based ERISA-covered custodial clients by retaining, without proper disclosure, the

19  margin between the actual (or market) FX rate when executing a "standing instructions" FX

20  transaction for a custodial client and the rate actually charged the client;

21          d.      whether Defendants, or any of them, violated Cal. Bus. & Prof. Code

22  § 17200, *et seq.*, Cal. Bus. & Prof. Code § 17500, *et seq.*, and/or New York's General Business

23  Law § 349 by charging, and retaining the margin from, FX rates that did not reflect market rates

24  at the time the clients' "standing instructions" FX trades were executed, without disclosure of

25  same;

26          e.      whether Plaintiff and the Class suffered monetary damages as a result of

27  the Defendants' deceptive, unlawful and unfair actions and, if so, the proper measure of those

28  damages; and

1               f.      whether the Class is entitled to injunctive relief.

2       83.     Plaintiff's claims are typical of the claims of the members of the Class, and it is a

3 member of the Class described herein.

4       84.     Plaintiff is willing and prepared to serve the proposed Class in a representative

5 capacity with all of the obligations and duties material thereto. Plaintiff will fairly and adequately

6 protect the interests of the Class and has no interests adverse to, or which conflict with, the

7 interests of other members of the Class.

8       85.     Plaintiff's interests are co-extensive with and not antagonistic to those of the

9 absent Class members. Plaintiff will undertake to represent and protect the interests of absent

10 Class members.

11       86.     Plaintiff has engaged the services of the undersigned counsel. Counsel is

12 experienced in complex class action litigation, will adequately prosecute this action, and will

13 assert and protect the rights of, and otherwise represent, Plaintiff and absent Class members.

14       87.     The questions of law and fact common to the Class, as summarized above,

15 predominate over any questions affecting only individual members, in satisfaction of

16 Rule 23(b)(3), and each such common question warrants class certification under Rule 23(c)(4).

17       88.     A class action is superior to other available methods for the adjudication of this

18 controversy. Individualized litigation increases the delay and expense to all parties and the court

19 system given the complex legal and factual issues of the case, and judicial determination of the

20 common legal and factual issues essential to this case would be far more fair, efficient, and

21 economical as a class action maintained in this forum than in piecemeal individual

22 determinations.

23       89.     Plaintiff knows of no difficulty that will be encountered in the management of this

24 litigation that would preclude its maintenance as a class action. Compared to individualized

25 actions, the class action device presents far fewer management difficulties, and provides the

26 benefits of single adjudication, economy of scale, and comprehensive supervision by a single

27 court.

28

CLASS COMPLAINT

90. Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class.

## VI. TOLLING OF STATUTES OF LIMITATION

91. The applicable statutes of limitation for each of the claims for relief asserted herein have been tolled by Defendants' acts of fraud, concealment, and intentional misrepresentation as described herein. Plaintiff reasonably relied on Defendants' misrepresentations concerning their "standing instructions" custodial FX practices, and could not have discovered, exercising reasonable diligence, any of the claims for relief pleaded herein against Defendants prior to the unsealing of the first whistleblower complaint against one or more of Defendants on January 21, 2011. Plaintiff in fact did not discover any of the claims for relief pleaded herein until after such time, and after conducting the empirical analyses of its FX trading data as described above.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violation of Cal. Bus. & Prof. Code § 17200, *et seq.* - Unlawful, Fraudulent, and Unfair Business Acts and Practices
### [Against All Defendants on behalf of the California Class]

92. Plaintiff repeats and incorporates by reference each of the foregoing allegations of this Complaint. This claim for relief for violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*, is asserted against all Defendants on behalf of the California Class.

93. Defendants' conduct alleged herein constitutes unfair and deceptive business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.* Such conduct includes, but is not limited to, (a) misrepresenting to Plaintiffs and the California Class the true costs of "standing instructions" FX trading services; (b) assigning and reporting fictitious FX rates to "standing instructions" FX trades executed for Plaintiff and the California Class; and (c) pocketing the difference between the actual FX rates at which Plaintiff's and the California Class' "standing instructions" FX trades were completed and the fictitious FX rates that were reported to

-25-

CLASS COMPLAINT

1   Plaintiff and the California Class, to the direct financial detriment of Plaintiff and the California

2   Class.

3         94.     Further, the conduct alleged herein also constitutes fraud, intentional

4   misrepresentation, breach of contract, breach of the implied covenant of good faith and fair

5   dealing, and violates Cal. Bus. & Prof. Code § 17500, *et seq.*, as set forth below. .

6         95.     The conduct herein is "unfair" because it offends established public policy and/or

7   is immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to custodial

8   customers.

9         96.     Defendants' unfair, unlawful, and deceptive acts and practices alleged herein were

10   "fraudulent" and have deceived and/or are likely to deceive Plaintiff and other reasonable

11   consumers.

12         97.     Defendants' unfair, unlawful, and deceptive acts and practices alleged herein were

13   specifically designed to induce Plaintiff and the California Class to permit their FX trades to be

14   executed pursuant to "standing instructions."

15         98.     Defendants' misrepresentations and omissions alleged herein were material in that

16   a reasonable person would attach importance to such information and would be induced to act

17   upon such information in making decisions concerning purchases of FX custodial services.

18         99.     Defendants' misrepresentations and omissions alleged herein are objectively

19   material to the reasonable consumer, and therefore reliance upon such misrepresentations may be

20   presumed as a matter of law.

21         100.     Plaintiff and the California Class relied to their detriment on Defendants'

22   misrepresentations and omissions in conducting FX trades pursuant to "standing instructions."

23         101.     Plaintiff and each member of the California Class have lost money and been

24   damaged as a result of Defendants' unfair, unlawful, and deceptive conduct alleged herein. They

25   are accordingly entitled to injunctive relief and restitution, in an amount to be proven at trial.

26

27

28

**SECOND CLAIM FOR RELIEF**
Violation of Cal. Bus. & Prof. Code § 17500, *et seq.* – False Advertising
[Against All Defendants on behalf of the California Class]

102. Plaintiff repeats and incorporates by reference each of the foregoing allegations of this Complaint. This claim for relief for violation of Cal. Bus. & Prof. Code § 17500, *et seq.*, is asserted against all Defendants on behalf of the California Class.

103. Defendants have committed acts of untrue and misleading advertising, as defined by Cal. Bus. & Prof Code § 17500, *et. seq.*, by, *inter alia*: (a) falsely advertising, in their written FX Procedures, on their respective websites, and elsewhere that "[t]he terms of FX Transactions with any [ERISA] Plan shall not be less favorable to the Plan than terms offered by BNY to unrelated parties in a comparable arm's length FX Transaction," and that such Plaintiff and the Class would receive the benefits of "best execution practices" by Defendants when Defendants executed FX trades pursuant to "standing instructions"; (b) concealing material information about the actual costs to Plaintiff and the Class for permitting Defendants to execute FX trades for them pursuant to "standing instructions"; and (c) concealing the manner in which FX rates were derived and charged to custodial customers such as Plaintiff and the Class for FX trades done pursuant to "standing instructions."

104. Defendants' misrepresentations and omissions alleged herein deceive or have the tendency to deceive the general public regarding the benefits of FX custodial services and "standing instructions" FX trades in particular, and did deceive and mislead Plaintiff and the members of the proposed Class.

105. Defendants' misrepresentations and omissions alleged herein were the type of misrepresentations and omission that are material—*i.e.*, a reasonable person would attach importance to them and would be induced to act on the information in paying for custodial FX services and "standing instructions" FX trades in particular. Defendants knew that their omissions and misrepresentations were material when they made them.

106. Defendants' misrepresentations and omissions alleged herein are objectively material to the reasonable consumer, and therefore reliance upon such misrepresentations may be presumed as a matter of law.

-27-

107. Defendants' false advertising is ongoing. Unless restrained by this Court, Defendants could continue to engage in untrue and misleading advertising, as alleged above, in violation of Cal. Bus. & Prof Code § 17500, *et. seq.*

108. As a result of the foregoing, Plaintiff and each member of the Class have been injured and have lost money or property, and are entitled to restitution and injunctive relief.

### THIRD CLAIM FOR RELIEF
#### Breach of Contract
**[Against Defendants The Bank of New York Mellon Trust Company, National Association and The Bank of New York on behalf of the California Class]**

109. Plaintiff repeats and incorporates by reference each of the foregoing allegations of this Complaint. This claim for relief for breach of contract is asserted against Defendants The Bank of New York Mellon Trust Company, National Association and The Bank of New York on behalf of the California Class.

110. Plaintiff entered into a contract with Defendants on or about February 14, 2006 for Defendants to provide global custodial FX services. This contract incorporated by reference the terms contained in the written FX Procedures. During the Class Period, members of the California Class entered into contracts with Defendants containing the same or substantially similar terms relating to global custodial FX services, particularly with respect to "standing instructions" FX trades.

111. Defendants' contracts with Plaintiff and the California Class allow for the provision of global custodial FX services, including the execution of FX trades pursuant to "standing instructions" where the amounts concerned fall below USD $300,000.00 or its equivalent, or where the ERISA fund client does not exercise its option to cancel the pricing of an FX trade for an amount exceeding USD $300,000.00 along the same lines as "standing instructions" trades.

112. The FX Procedures, which were incorporated by the contracts and were "the exclusive means by which" Defendants could "enter into an FX Transaction with a[n ERISA] plan," promised that "[t]he terms of FX Transactions with any Plan shall not be less favorable to

1   the Plan than terms offered by BNY to unrelated parties in a comparable arm's length FX

2   Transaction."

3       113.    The contacts also required Defendants to exercise "reasonable care" in the

4   performance of their duties.

5       114.    Defendants have breached their contracts with Plaintiff and the California Class by

6   selecting fictitious FX rates to report and charge or credit to Plaintiff and the California Class for

7   "standing instructions" FX trades, against the reasonable expectations of Plaintiff and the

8   California Class, in order to unfairly and unlawfully increase their profits at the expense of

9   Plaintiff and the California Class. In so doing, Defendants, failed to offer terms to Plaintiff and

10  the California Class, on their "standing instructions" FX trades, that were not less favorable to

11  Plaintiff and the California Class than the terms offered by Defendants to unrelated parties in

12  comparable arm's length FX transactions.

13      115.    Meanwhile, Plaintiff and the California Class have performed all, or substantially

14  all, of the obligations imposed on them under their contracts with Defendants.

15      116.    Plaintiff and the members of the California Class have been damaged as a result of

16  Defendants' breaches of contract by paying falsely inflated prices, or being paid falsely deflated

17  prices, for "standing instructions" FX trades. These false charges and falsely deflated prices

18  constitute damages to Plaintiff and the California Class that they otherwise would not have

19  incurred, for which Plaintiff and the California Class seek relief as prayed below.

20                          **FOURTH CLAIM FOR RELIEF**
                    **Breach of Implied Covenant of Good Faith and Fair Dealing**
21          **[Against Defendants The Bank of New York Mellon Trust Company, National**
            **Association and The Bank of New York on behalf of the California Class]**
22

23      117.    Plaintiff repeats and incorporates by reference each of the foregoing allegations of

24  this Complaint. This claim for relief for breach of implied covenant of good faith and fair dealing

25  is asserted against Defendants The Bank of New York Mellon Trust Company, National

26  Association and The Bank of New York on behalf of the California Class.

27      118.    Under California law, where a contract confers on one party a discretionary power

28  affecting the rights of the other, a duty is imposed to exercise such discretion in good faith and in

                                            -29-

1 accordance with fair dealing. Here, Defendants' contracts with Plaintiff and the California Class

2 confer discretionary power to Defendants for executing FX trades pursuant to "standing

3 instructions" where the amounts concerned fall below USD $300,000.00 or its equivalent, or

4 (with respect to amounts above USD $300,000.00) where the ERISA fund client does not

5 exercise its option to cancel the pricing of its FX trade along the same lines as "standing

6 instructions" trades. However, Defendants have exercised this discretion in bad faith, as they

7 have selected fictitious FX rates to report and charge or credit to Plaintiff and the California Class

8 for "standing instructions" FX trades, against the reasonable expectations of Plaintiff and the

9 California Class, in order to unfairly and unlawfully increase their profits at the expense of

10 Plaintiff and the California Class.

11      119.   Meanwhile, Plaintiff and the California Class have performed all, or substantially

12 all, of the obligations imposed on them under their contracts with Defendants.

13 Plaintiff and the members of the California Class have been damaged as a result of Defendants'

14 breaches of the implied covenant of good faith and fair dealing by paying falsely inflated prices,

15 or being paid falsely deflated prices, for "standing instructions" FX trades. These false charges

16 and falsely deflated prices constitute damages to Plaintiff and the California Class that they

17 otherwise would not have incurred, for which Plaintiff and the California Class seek relief as

18 prayed below.

19 **FIFTH CLAIM FOR RELIEF**
**Violation of N.Y. General Business Law § 349, *et seq.***

20 **[Against Defendants The Bank of New York Mellon Corporation, The Bank of New York Mellon, The Bank of New York Company, Inc., and The Bank of New York on behalf of the**

21 **New York Class]**

22      120.   Plaintiff repeats and incorporates by reference each of the foregoing allegations of

23 this Complaint. This claim for relief for violation of N.Y. General Business Law § 349, *et seq.* is

24 asserted against Defendants The Bank of New York Mellon Corporation, The Bank of New York

25 Mellon, The Bank of New York Company, Inc., and The Bank of New York (the "New York

26 Defendants") on behalf of the New York Class.

27      121.   The New York Defendants' actions constitute unfair, unconscionable and/or

28 deceptive trade practices in the course of their business and in the conduct of trade or commerce,

1   in violation of the New York Deceptive Trade Practices Act, N.Y. Gen. Bus. L. § 349, *et seq.* In

2   that regard, the New York Defendants' actions have caused and will continue to cause financial

3   harm to Plaintiff and the New York Class.

4        122.    The New York Defendants' conduct has caused, and continues to cause, harm to

5   the public. The harm to the public includes overcharging, or under-crediting, custody clients,

6   including ERISA funds on their "standing instructions" FX transactions for a period spanning

7   over a decade. The number of affected employee-beneficiaries of ERISA funds, nationwide, is in

8   the millions. The number of affected FX transactions during the Class Period is likely in the

9   hundreds of thousands, if not millions. The amount of the unlawful profits obtained by the New

10  York Defendants as a result of their practices, during the Class Period, is likely in the hundreds of

11  millions of dollars. This is money directly taken from the coffers of ERISA funds, which have

12  struggled (particularly during the last three years) to meet their funding obligations in the midst of

13  a deep recession.

14       123.    The New York Defendants' conduct as alleged herein has damaged and will

15  continue to damage Plaintiff and the New York Class in an amount that is unknown at the present

16  time.

17                                    **PRAYER FOR RELIEF**

18       WHEREFORE, Plaintiff prays for judgment against Defendants, and requests as

19  follows:

20       124.    that the unlawful acts alleged in this Complaint be adjudged and decreed to be

21  unfair and deceptive business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et*

22  *seq.*;

23       125.    that the unlawful acts alleged in this Complaint be adjudged and decreed to be

24  untrue and misleading advertising in violation of Cal. Bus. & Prof. Code § 17500, *et seq.*;

25       126.    that the unlawful acts alleged in this Complaint be adjudged and decreed to be

26  unfair, unconscionable and/or deceptive trade practices in violation of the New York Deceptive

27  Trade Practices Act, N.Y. Gen. Bus. L. § 349, *et seq.;*

28

127.   that the Court certify this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure, and declare that Plaintiff is a proper Class representative;

128.   that the Court grant such preliminary and permanent equitable relief, including imposition of a constructive trust, as is appropriate to preserve the assets wrongfully taken from Plaintiff and the Class;

129.   that the Court award compensatory, consequential, and general damages in an amount to be determined at trial;

130.   that the Court order disgorgement and restitution of all earnings, profits, compensation and benefits received by Defendants as a result of their unlawful acts, omissions, and practices;

131.   that the Court award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees;

132.   that the Court award pre- and post-judgment interest; and

133.   that the Court grant all such other relief as it deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff respectfully demands a jury trial.

1     Dated: July 22, 2011                 Respectfully submitted,

2                                  Richard M. Heimann (State Bar No. 063607)
                                 *rheimann@lchb.com*

3                                  Lexi J. Hazam (State Bar No. 224457)
                                 *lhazam@lchb.com*

4                                  Robert L. Lieff (State Bar No. 037568) (Of Counsel)
                                 rlieff@lchb.com

5                                  LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
                                 Embarcadero Center West

6                                  275 Battery Street, 29th Floor
                                 San Francisco, CA 94111-3339

7                                  Telephone: (415) 956-1000
                                 Facsimile: (415) 956-1008

8

9                                  Michael P. Lehmann (State Bar No. 77152)
                                 *mlehmann@hausfeldllp.com*

10                                 Christopher L. Lebsock (State Bar No. 184546)
                                *clebsock@hausfeldllp.com*

11                                 HAUSFELD LLP
                                44 Montgomery Street, 34th Floor

12                                 San Francisco, CA 94104
                                Telephone: (415) 633-1908

13                                 Facsimile: (415) 358-4980

14

15                          By: _____

                                  Michael P. Lehmann

16                                 Michael D. Hausfeld
                                *mhausfeld@hausfeldllp.com*

17                                 William P. Butterfield
                                *wbutterfield@hausfeldllp.com*

18                                 Ralph J. Bunche
                                *rbunche@hausfeldllp.com*

19                                 HAUSFELD LLP
                                1700 K Street, NW Suite 650

20                                 Washington, D.C. 20006
                                Telephone: (202) 540-7200

21                                 Facsimile: (202) 540-7201

22                                 Steven E. Fineman (State Bar No. 140335)
                                *sfineman@lchb.com*

23                                 Daniel P. Chiplock
                                *dchiplock@lchb.com*

24                                 Michael J. Miarmi
                                *mmiarmi@lchb.com*

25                                 LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
                                250 Hudson Street, 8th Floor

26                                 New York, NY 10013-1413
                                Telephone: (212) 355-9500

27                                 Facsimile: (212) 355-9592

28

CLASS COMPLAINT

Michael P. Thornton
*mthornton@tenlaw.com*
Michael A. Lesser
*mlesser@tenlaw.com*
THORNTON & NAUMES LLP
100 Summer Street, 30th Floor
Boston, MA 02110
Telephone: (617) 720-1333
Facsimile: (617) 720-2445

Gregory S. Hach
*ghach@hrssclaw.com*
Michael A. Rose
*mrose@hrssclaw.com*
Frank R. Schirripa
*fschirripa@hrssclaw.com*
HACH ROSE SCHUMACHER
SCHIRRIPA & CHEVERIE LLP
185 Madison Avenue, 14th Floor
New York, New York 10016
Telephone: (212) 213-8311
Facsimile: (212) 779-0028

Michael Schumacher Jr. (State Bar. No. 262403)
HACH ROSE SCHUMACHER
SCHIRRIPA & CHEVERIE LLP
44 Montgomery Street, 34th Floor
San Francisco, CA 94104
Telephone: (415) 745-0966
Facsimile: (212) 779-0028

*Attorneys for Plaintiff and the proposed Class*

# Exhibit A

GLOBAL CUSTODY AGREEMENT (ERISA)

between

STATIONARY ENGINEERS LOCAL 39 PENSION TRUST FUND

and

THE BANK OF NEW YORK TRUST COMPANY, NATIONAL ASSOCIATION

Dated as of  FEBRUARY  14 , 200 6

ACCOUNT NUMBER(S) _____

COPY NOT ORIGINAL

GLOBAL CUSTODY AGREEMENT dated as of *FEBRUARY 14* 2006 by and between *PAUL LENSI* , AND *JERRY KALMAR* trustees of the Stationary Engineers Local 39 Pension Trust Fund ("Customer") and THE BANK OF NEW YORK TRUST COMPANY, NATIONAL ASSOCIATION, a limited purpose national banking association with trust powers ("BNYTC").

WHEREAS, Customer desires to establish one or more custody accounts with BNYTC to hold assets of the plan(s) (hereinafter referred to as the "Plan") for which it is trustee;

NOW, THEREFORE, in consideration of the premises and of the mutual promises and covenants contained herein, the parties hereto agree as follows:

1.    Definitions.

Whenever used in this Agreement, the following terms shall have the meaning set forth below:

(a) **"Accounts"** shall collectively mean the accounts and sub-accounts established in accordance with paragraph 2(a) hereof and reference to an "Account" shall be construed accordingly.

(b) **"Act"** shall mean the Employee Retirement Income Security Act of 1974, as amended.

(c) **"Authorized Person"** shall mean any person who, from time to time, is designated in writing by Customer (including any Investment Manager or member of an Investment Committee appointed by Customer pursuant to paragraph 10 hereof and whether or not such person is a trustee of the Plan or an officer or employee of Customer) to give Instructions to BNYTC under the terms of this Agreement and any Account established hereunder.

(d) **"BNYTC"** shall mean The Bank of New York Trust Company, National Association and any affiliate thereof (including The Bank of New York and any affiliate, subsidiary or entity controlled by The Bank of New York Trust Company, National Association or The Bank of New York or under the common control of an entity that controls The Bank of New York Trust Company, National Association or The Bank of New York or any branch of any of the foregoing (including branches of The Bank of New York in London and Brussels).

(e) **"Business Day"** shall mean any day on which BNYTC and any Subcustodian or Depository is open for business in its respective markets.

(f) **"Cash"** shall collectively mean the currency of any jurisdiction which BNYTC accepts for deposit in a Cash Account (as defined in paragraph 2(a)hereof).

(g) **"Cash Accounts"** shall have the meaning set forth in paragraph 2(a) hereof.

(h) **"Depositories"** shall collectively refer to Transnational Depositories and Local Depositories.

(i) **"Distribution"** shall mean all interest, dividends and other income distributed or paid with respect to Cash and Securities.

(j) **"FX Transactions"** shall have the meaning set forth in paragraph 3(d) hereof.

(k) **"Instructions"** shall collectively refer to Oral Instructions and Written Instructions. All Instructions shall be in English.

(l) **"Investment Committee"** shall mean a committee appointed by Customer to manage the Property in the Accounts as specified in paragraph 10 hereunder.

(m) **"Investment Manager"** shall mean any person or entity appointed by Customer to manage the Property in the Accounts as specified in paragraph 10 hereof.

(n) "**Local Depositories**" shall mean any central securities depository, clearing agency, book-entry system or other entity that provides handling, clearing or safekeeping services (including The Depository Trust Company ("DTC"), The Participants Trust Company, the Federal Reserve/Treasury Book Entry System, CREST and CMO) and in which BNYTC or any Subcustodian participates as a customer or member.

(o) "**Losses**" shall mean any and all claims, losses, liabilities, damages, costs, expenses and judgments (including reasonable attorneys' fees and expenses) sustained by either party hereto.

(p) "**Oral Instructions**" shall mean verbal instructions or directions received by BNYTC from an Authorized Person or a person reasonably believed by BNYTC to be an Authorized Person.

(q) "**Property**" shall collectively refer to Securities, Cash and Distributions.

(r) "**Securities**" shall mean all common and preferred stock, bonds, debentures and debt and equity securities, notes, instruments and other intangible assets (including instruments representing the right to receive, purchase or subscribe to the foregoing or representing other rights or interests in the foregoing) as may be agreed upon from time to time by BNYTC and Customer and which shall from time to time be delivered to or received by BNYTC and any Subcustodian for deposit in the Securities Accounts (as defined in paragraph 2(a) hereof).

(s) "**Securities Accounts**" shall have the meaning set forth in paragraph 2(a) hereof.

(t) "**Subcustodian**" shall mean a bank or financial institution other than Depositories identified on Schedule A annexed hereto (as such schedule may be amended from time to time).

(u) "**Transnational Depositories**" shall mean Euroclear, Clearstream, Luxembourg, and any other transnational securities depository, clearing agency, book-entry system or other entity that provides handling, clearing or safekeeping services and in which BNYTC or Subcustodian participates as a customer or member.

(v) "**Written Instructions**" shall mean any notices, directions, instructions or other instruments (i) in writing received in accordance with paragraph 9 hereof by BNYTC from an Authorized Person or from a person reasonably believed by BNYTC to be an Authorized Person or (ii) received through the Computer Services (as defined in Section 8 hereof).

2.  Appointment of BNYTC as Global Custodian; Subcustodian Network.

(a) BNYTC is hereby authorized and directed to, and shall, open and maintain one or more accounts and sub-accounts in such name or names as Customer may, from time to time, direct for the custody and safekeeping, in accordance with the terms hereof, of Securities and non-Cash Distributions which shall from time to time be delivered to or received by it or any Subcustodian or Depository in a country approved by Customer for the holding of Securities ("**Securities Accounts**"). BNYTC is further authorized to open and maintain, in its capacity as a banker, one or cash accounts ("**Cash Accounts**") in its books in the name of Customer or its nominee and pay into such Cash Accounts all Distributions, Cash and monies received for the account of Customer or its nominee. BNYTC may deposit any such Cash with itself as banker or with Subcustodians on behalf of Customer.

(b) The Property shall be invested, without distinction between principal and income, as BNYTC shall be directed by Customer, or if an Investment Manager or Investment Committee shall be appointed pursuant to Article X by such Investment Manager or Investment Committee. To the extent permitted by Section 404(b) of the Act and pursuant to the representations and warranties of Customer under Section 20(b), BNYTC is hereby authorized and directed to, and shall, hold Property (i) in the United States and the United Kingdom at BNYTC and Local Depositories in such countries and (ii) outside the United States and the United Kingdom at branches of BNYTC and Transnational Depositories and Subcustodians set forth on Schedule A annexed hereto, which Schedule A may be amended (by deleting, adding or changing Subcustodians and Transnational Depositories or deleting countries) from time to time by BNYTC without Customer approval. As soon as reasonably practicable, BNYTC shall notify (either orally or in writing) Customer of any amendment or change to Schedule A. Property may be held only with Subcustodians which have entered into a written Subcustodian Agreement with BNYTC and

2

subject to the terms and conditions of such Agreements and with Depositories, provided, however, that Subcustodians may, and are hereby, authorized to, hold Property in Depositories in which such Subcustodians participate or are a member.

(c)  BNYTC shall exercise reasonable care in selecting and continuing to use Subcustodians in each country in light of the customary or established rules, practices and procedures then prevailing in each such country.

(d)  Property held in Depositories shall be held in accordance with, and subject to, the agreements, rules, regulations and conditions imposed by such Depositories.

(e)  Unless otherwise agreed in writing by Customer and BNYTC, or otherwise required by applicable law or practice or a particular Subcustodian Agreement or the rules of a particular Depository, Securities held with Subcustodians and Depositories will be recorded, on the books and records of each Subcustodian or Depository, as the case may be, in a commingled account (with securities of other customers of BNYTC or of the Subcustodian in the relevant Depository) and will be treated as fungible with all other securities of the same issue held in such account by BNYTC or the Subcustodian. BNYTC will identify the Securities in its books and records as being beneficially owned by Customer or, if Customer has advised BNYTC that Customer is acting on behalf of others, by such others. No Securities Account on the books of BNYTC or a Subcustodian shall hold securities beneficially owned by BNYTC or such Subcustodian, as the case may be.

(f)  BNYTC will endeavor, to the extent practicable, to hold Securities in the country or other jurisdiction in which the principal trading market for such Securities is located, where such Securities are to be presented for cancellation and/or payment and/or registration, or where such Securities are acquired.

(g)  BNYTC may hold Cash in any currency and may deposit such Cash with, and effect transactions through, Subcustodians and Depositories. In each country in which Cash is held, it will be held in currencies which may be legally held in such country and (except as otherwise be provided in paragraph 3(h) hereof) may be held in non-interest bearing commingled bank accounts in the name of BNYTC and BNYTC will record, on its books and records, Customer's entitlement to such Cash.

(h)  BNYTC assumes no obligation to review investments in the Accounts or to recommend the purchase, retention or sale of any Property unless provided for by a separate written agreement between the parties.

3.  Duties and Responsibilities of BNYTC.

(a)  General Standing Instructions.  Subject to and in accordance with Customer's instructions, BNYTC is hereby authorized and empowered to, and shall, and (with respect to Securities held with Subcustodians and Depositories) authorize, empower and instruct Subcustodians and Depositories to:

(i)  receive and deliver Property, and settle the purchase and sale of Securities transactions, in accordance with the laws, regulations, rules, practices, customs and procedures in the relevant jurisdiction or market in which the transaction occurs;

(ii)  receive all payments of principal and Distributions payable with respect to Property (including presenting certificates, coupons and other appropriate documentation to the issuer of Securities or its paying agent);

(iii)  exchange Securities in temporary or bearer form for Securities in definitive or registered form; effect an exchange of Securities pursuant to non-discretionary exchange offers and where the par value of such Securities is changed; surrender Securities at maturity or earlier when advised of a call for mandatory redemption and otherwise participate in non-discretionary corporate actions in accordance with customary or established rules, practices and procedures in the relevant jurisdiction or market (provided, however, that BNYTC shall not be liable for failure to so exchange or surrender any Security or take other action (A) if notice of such

3

exchange or call for redemption or other action was not actually received by BNYTC from the issuer (with respect to Securities issued in the United States and the United Kingdom) or from one of the nationally or internationally recognized bond or corporate action services to which BNYTC subscribes or from Customer or (B) if, at the time of deposit, any Security so deposited is subject to call, exchange, redemption or similar action, unless specifically instructed to do so by Customer);

          (iv)    hold Property (A) with the issuer in non-certificated form or (B) with the prior written approval of Customer at any other location;

          (v)    register and/or hold Property in the name of any nominee (as a holder of record) of BNYTC or its Subcustodians or any Depository, as may otherwise required by local law, or as may otherwise be agreed to by the parties hereto;

          (vi)    when fractional shares of any Security are received as a Distribution, sell the fractional shares and credit the relevant Cash Account;

          (vii)    upon receipt of notification of a partial redemption, partial payment or other action affecting less than all Securities of a particular class, BNYTC and Subcustodian may select the Securities to be tendered in any non-discriminatory manner that each customarily uses to make such selection;

          (viii)    hold any Security in bearer form;

          (ix)    in connection with the receipt of Securities, accept documents in lieu of such Securities as long as such documents contain the agreement of the issuer thereof to hold such Securities subject to BNYTC's sole order;

          (x)    make, execute, acknowledge and deliver as agent, any and all documents or instruments (including but not limited to all declarations, affidavits and certificates of ownership) that may be necessary or appropriate to carry out the powers granted herein;

          (xi)    employ and consult with, and obtain advice from, suitable agents, including auditors and legal counsel (who may be counsel to Customer or to BNYTC) or other advisers with respect to questions and issues relating to the Accounts, and BNYTC shall incur no liability in acting in accordance with the reasonable advice and opinion of such agents or advisers;

          (xii)    credit or debit the Cash Accounts with all Distributions provided that, unless BNYTC in its discretion advances funds in accordance with paragraph 7(b) hereof, the Cash Accounts will only be debited if there shall be sufficient funds (which satisfy the definition of final payment set forth in paragraph 7(b) hereof) in the relevant Cash Account equal to the value of the sum to be so debited;

          (xiii)    debit the Cash Accounts, even if, at the sole discretion of BNYTC, such debit creates or increases any overdraft or net debit as BNYTC determines is appropriate when instructed by Customer to receive Securities for the Custody Accounts against payment by BNYTC on behalf of Customer as contemplated by paragraph 7(b) hereof;

          (xiv)    deduct or withhold any sum on account of any tax (including money held in a Cash Account) (A) required or which in BNYTC's view is required to be so deducted or withheld or (B) for which BNYTC is or is in its view liable or accountable, by law or practice of any relevant revenue authority of any jurisdiction, and in each case in accordance with BNYTC's or the Subcustodian's usual and customary business practice;

          (xv)    make any payments incidental to or in connection with this paragraph 3(a) hereof; and

          (xvi)    exercise all other rights and powers and to take any action it deems necessary in carrying out the purposes of this Agreement.

(xvii) to the extent permitted under the Act (including exemptions thereto), BNYTC is further authorized and empowered, at the direction of any securities lending agent (including BNYTC) designated by Customer, to lend Property in the Securities Account to brokers, dealers, banks or other financial institutions.

(b) Discretionary Corporate Action.

(i) Whenever Securities (including, but not limited to, warrants, options, conversions, subscriptions, takeovers, other forms of capital reorganizations, redemptions, tenders, options to tender or non-mandatory puts or calls) confer optional rights on Customer or provide for discretionary action or alternative courses of action by Customer, Customer shall be responsible for making any decisions relating thereto and for instructing BNYTC to act. In order for BNYTC to act, it must receive Customer's Written Instructions at BNYTC's offices, addressed as BNYTC may from time to time request, by the deadline specified by BNYTC, in its sole discretion, from time to time. If BNYTC does not receive such Written Instructions prior to its specified deadlines, BNYTC shall not be liable for failure to take any action relating to or to exercise any rights conferred by such Securities.

(ii) BNYTC shall endeavor to notify Customer of such rights or discretionary actions or of the date or dates by when such rights must be exercised or such action must be taken provided that BNYTC has received, with respect to Securities issued in the United States and the United Kingdom, from the issuer, or, with respect to Securities issued in the United States, United Kingdom and in any other country, from one of the nationally or internationally recognized bond or corporate action services to which BNYTC subscribes, timely notice of such rights or discretionary corporate action or of the date or dates such rights must be exercised or such action must be taken. If BNYTC shall not actually receive such notice, BNYTC shall have no liability for failing to so notify Customer.

(c) Voting. With respect to all Securities, however registered, the voting rights are to be exercised by Customer or its designee. With respect to Securities issued in the United States and the United Kingdom, BNYTC's only duty shall be to mail to Customer any documents (including proxy statements, annual reports and signed proxies) relating to the exercise of such voting rights. With respect to Securities issued outside of the United States and the United Kingdom, at the request of Customer, BNYTC will provide Customer with access to a provider of global proxy services (the cost of which will be paid by Customer). Other than providing access to such provider of global proxy services BNYTC shall have no obligations with respect to voting.

(d) Foreign Exchange Transactions. In connection with the Accounts, BNYTC is authorized to enter into spot or forward foreign exchange contracts ("FX Transactions") with Customer and may provide such foreign exchange services to Customer through BNYTC's subsidiaries or affiliates, through Subcustodians or as may otherwise be agreed upon by BNYTC and Customer. Such contracts may be entered into with BNYTC, any Subcustodian or any affiliate or subsidiary thereof acting as principal or otherwise through customary banking channels and they may retain any profits from such FX Transactions. Written Instructions, including standing instructions, may be issued with respect to such contracts, but BNYTC may establish rules or limitations concerning any foreign exchange facility made available to Customer. In all cases in which BNYTC, Subcustodian or their respective subsidiaries or affiliates enter into FX Transaction relating to an Account, the terms and conditions of such foreign exchange contracts shall apply to such transaction. Neither BNYTC nor any Subcustodian shall be liable for any fluctuations or changes in foreign exchange rates, which shall be the sole risk and liability of Customer, nor shall be required to substitute one currency for any other currency in a Cash Account.

(e) Settlement of Transactions.

(i) In order for BNYTC or any Subcustodian to receive and deliver any Security or to settle any Securities transaction in a timely manner, Customer is responsible for providing BNYTC with sufficient advance notice thereof and all relevant information, as specified by BNYTC, necessary to effect the foregoing. Unless otherwise agreed by BNYTC and subject to paragraph 3(a)(xii) hereof, Property shall be credited to the Securities Account, or as the case may be, the Cash Account only when actually received by BNYTC.

(ii) Settlement of and payment for Securities received for, and delivered from, the Securities Accounts may be made in accordance with the customary or established securities trading or securities

processing practices and procedures in the jurisdiction or market in which the transaction occurs, including without limitation, the delivery of Securities to a purchaser, broker, dealer or their respective agents either against a receipt for future payment or without any payment (so-called "free delivery").

        (iii)    For the purpose of settling Securities and foreign exchange transactions, Customer shall provide BNYTC with sufficient immediately available funds by such time and date as is required to settle such Securities and foreign exchange transactions in the country of settlement and in the currency to be used to settle such transaction. Without prejudice to paragraphs 3(a)(xiii) and 3(e)(iv) hereof, in the event Customer does not have sufficient funds in the currency required to settle the transaction, Customer shall deliver to BNYTC immediately available funds in an amount sufficient to purchase the currency necessary to settle such Securities and foreign exchange transactions. BNYTC, however, shall have no obligation to advance funds for the settlement of such transaction.

        (iv)    BNYTC may reverse any entries to the Securities Accounts or Cash Accounts valued back to the effective date of such credit. Customer shall repay to BNYTC the amount advanced by BNYTC as a result of such credit and except to the extent prohibited by the Act, interest thereon calculated from the effective date of such credit.

        (f)  <u>Taxes</u>. (i) Customer is solely responsible and liable for the payment of and obtaining reclaims, refunds and credits, where applicable, of all taxes assessments, duties, and other governmental charges (including any interest or penalties with respect thereto) with respect to the Property or any Account. (ii) With respect to the payment of taxes, in the event BNYTC or any Subcustodian is required under applicable law to pay any tax, duty or other governmental charge or any interest or penalty with respect thereto in connection with its services hereunder, BNYTC is hereby authorized to debit the relevant Cash Account in the amount thereof and to pay such amount to the appropriate taxing authority. (iii) With respect to tax reclaims, refunds and credits, for each country in which Customer holds Securities and a tax reclaim, refund or credit may be available, BNYTC will submit such forms as are necessary to the appropriate tax or other governmental authorities and take such action as is reasonable to obtain such benefits and, where such forms must be completed by Customer, will provide Customer with the appropriate forms and otherwise assist Customer to obtain such tax benefits.

        (g)  <u>Valuation/Pricing Services</u>. To the extent that BNYTC provides values of, and pricing information with respect to, Securities, BNYTC is authorized to use generally recognized pricing services (including brokers, dealers and market makers). BNYTC shall not be liable or responsible for or be under any duty to inquire into, nor be deemed to make any assurances or warranties with respect to, the accuracy or completeness of such values or information, even if BNYTC, in performing services for itself and others, including services similar to those performed for Customer, receives different valuations of the same or similar Securities of the same issuer. In the event that such pricing services are unable to provide a value of or pricing information with respect to Securities and BNYTC provides values and pricing information, BNYTC shall so advise Customer, but shall have no other obligation or liability with respect to such valuation or pricing information.

        (h)  <u>Cash Management</u>. BNYTC shall invest Cash balances held in the United States, in the United Kingdom and in those countries in which BNYTC provides such investment service. BNYTC shall advise Customer of the countries in which such investment service is available and the manner of investment. BNYTC is authorized to invest such Cash balances in investment companies, mutual funds and other pooled investment vehicles for which BNYTC or any of its affiliates or subsidiaries act as investment adviser or provide other services and for which BNYTC or its affiliates or subsidiaries receive compensation (including, by way of example and not by way of limitation, investment advisory fees and so-called "12b-1" fees and servicing fees). BNYTC and its affiliates are authorized to retain, for their own account, any fees, compensation or similar payments so received. Further, Cash balances may be invested in any collective investment trust for short-term investments created and administered by The Bank of New York or The Bank of New York Trust Company, National Association for the collective investment of the property of employee benefit trusts of which The Bank of New York Trust Company, National Association or The Bank of New York is trustee or agent, provided that such fund is qualified under the provisions of Section 401(a) of the Internal Revenue Code (the "Code") and exempt under the provisions of Section 501(a) of the Code. To that end, BNYTC is hereby authorized to permit the commingling of any or all Cash balances with the assets of other trusts eligible to participate in such collective investment trusts. To the extent that Cash balances are invested in any such collective investment trust, the declaration of trust pertaining to such

collective investment trust, as amended from time to time and the trust thereby created, shall be a part of this Agreement and of the investing retirement plan. BNYTC shall not be liable for interest on any Cash balances it may be authorized to invest in its discretion and may hold uninvested as it deems to be in the best interest of Customer. BNYTC shall not be liable for interest on any cash balance it holds uninvested pending receipt of directions from Customer, the Investment Manager or the Investment Committee to invest the same. BNYTC shall be entitled to investment management fees in respect of Cash balances which are invested hereunder pursuant to this Section at the discretion of BNYTC.

(i) "Not in Bank" Property. As an accommodation to Customer, BNYTC may provide consolidated recordkeeping services pursuant to which BNYTC reflects, on Statements of Assets and Statements of Account, Securities positions for which BNYTC has no safekeeping or other responsibility under this Agreement ("Non-Custody Securities").¹ Non-Custody Securities shall be designated on BNYTC's books as "shares not held by BNYTC" or by other similar characterization. Customer acknowledges and agrees that BNYTC shall rely, without independent verification, on information provided by Customer or its agents regarding Non-Custody Securities (including but not limited to Securities Account positions and market valuations) and shall have no responsibility whatsoever with respect to Non-Custody Securities or the accuracy of any information received by BNYTC and maintained on BNYTC's books or set forth in a statement of account described in Section 8 concerning Non-Custody Securities.

(j) Funds Transfer Services.

(i) With respect to instructions for a funds transfer, when instructed to credit or pay a party by both name and a unique numeric or alpha-numeric identifier (e.g., ABA number or account number), BNYTC, and any other bank participating in the funds transfer, may rely solely on the unique identifier, even if it identifies a party different from the party named. Such reliance on a unique identifier shall apply to beneficiaries named in such instructions as well as any financial institution which is designated in such instructions to act as an intermediary in a funds transfer.

(ii) It is understood and agreed that unless otherwise specifically provided herein, and to the extent permitted by applicable law, the parties hereto shall be bound by the rules of any funds transfer system utilized to effect a funds transfer hereunder.

4.   General Authorizations.

(a) BNYTC or any of its affiliates may act as agent for, provide banking, investment advisory, investment management and other services to, and generally engage in any kind of business with, others (including without limiting the generality of the foregoing issuers of Securities, of money market instruments or of other Property purchased for and on behalf of Customer) to the same extent as if BNYTC was not a custodian hereunder. Nothing in this Agreement shall in any way be deemed to restrict the right of BNYTC to perform such services for any other person or entity, and the performance of such services for others will not be deemed to violate or give rise to any duty or obligation to Customer not specifically undertaken by BNYTC hereunder. BNYTC and any BNYTC affiliate may receive a fee or other compensation with respect to any service, business or activity referred to in this sub-paragraph, and are authorized to retain for their own any such fees or compensation so received. This Section 4(a) shall not be deemed to authorize any transaction prohibited by the Act.

(b) With respect to Securities issued in the United States, BNYTC [ ] may [ ] may not release the identity of Customer to an issuer which requests such information pursuant to the Shareholder Communications Act of 1985 for the specific purpose of direct communications between such issuer and Customer. IF NO BOX IS CHECKED, BNYTC SHALL RELEASE SUCH INFORMATION UNTIL IT RECEIVES A CONTRARY INSTRUCTION FROM CUSTOMER. With respect to Securities issued outside of the United States, information shall be released to issuers only if required by law or regulation of the particular country in which Property is located.

(c) BNYTC is authorized to disclose information concerning the Accounts and Property to its subsidiaries and affiliates and to Subcustodians and other providers of services as may be necessary in connection with the administration of the Property or performance of this Agreement (including, by way of example and not by

7

way of limitation, attorneys and accountants for BNYTC) and may disclose to third parties that it is providing to Customer the services contemplated by this Agreement. For the avoidance of doubt, BNYTC shall not be held responsible for information held by such persons or of which BNYTC is not aware by virtue of restricted access or "Chinese Wall" arrangements. If BNYTC becomes aware of confidential information which it believes prevents it from effecting a particular transaction under this Agreement, then BNYTC may refrain from effecting that transaction.

5.      Compensation; Fees and Expenses.

        (a) In consideration of the services to be rendered pursuant to this Agreement, Customer shall pay BNYTC in accordance with the Fee Schedule annexed hereto as **Schedule B**, which Fee Schedule may be amended by BNYTC from time to time upon thirty (30) days' prior written notice to Customer.

        (b) In addition, Customer shall be responsible for and shall reimburse BNYTC for all costs and expenses incurred by BNYTC in connection with this Agreement, including (without limiting the generality of the foregoing) all brokerage fees and costs and transfer taxes incurred in connection with the purchase, sale or disposition of Property, and all income taxes or other taxes of any kind whatsoever which may be levied or assessed under existing or future laws upon or in respect to the Property, and all other similar expenses related to the administration of the Accounts incurred by BNYTC in the performance of its duties hereunder.

        (c) Fees and reimbursement for costs and expenses shall be paid quarterly after the last business day of each calendar quarter, with the first payment for the calendar quarter ending _June 30, 2006_. BNYTC is hereby authorized to debit the Cash Accounts for such fees, costs and expenses.

        (d) In the event services are rendered for less than a calendar quarter or this Agreement is terminated prior to the end of a calendar quarter, Customer shall pay BNYTC's fee prorated for the portion of the calendar quarter such services are rendered or the Agreement is in effect, plus any costs and expenses incurred by BNYTC for Customer's Accounts for the period before or after the date of termination.

6.      Limitation of Liability; Indemnification.

        (a) BNYTC shall perform its duties under this Agreement with reasonable care, and with respect to actions taken pursuant to Section 3(h), in accordance with the fiduciary standards of Part 4 of Title I of the Act. BNYTC shall not be liable for any Losses or action taken or omitted or for any loss or injury resulting directly from its or its nominees' actions or its or its nominees' performance or lack of performance of their respective duties hereunder in the absence of fraud, negligence or willful misconduct on their respective parts. With respect to Losses incurred by Customer as a result of the acts or the failure to act by any Subcustodian, BNYTC shall take appropriate action to recover such Losses from such Subcustodian; and BNYTC's sole responsibility and liability to Customer shall be limited to amounts so received from such Subcustodian (exclusive of costs and expenses incurred by BNYTC). In no event shall BNYTC or any Subcustodian be liable (i) for acting in accordance with Instructions from Customer, any Investment Manager, the Investment Committee or any agent of Customer, (ii) except to the extent required by the Act, for special, consequential, punitive or indirect damages or for any loss of business or profits or loss of opportunity, (iii) for the acts or omissions of its nominees, correspondents, agents (other than as specified herein) or any Depository, (iv) for the acts or omissions of brokers or dealers, (v) for holding Property in any particular country, including, but not limited to, Losses resulting from nationalization, expropriation or other governmental actions; regulation of the banking or securities industry; exchange or currency controls or restrictions, devaluations or fluctuations; availability of Cash or Securities or market conditions which prevent the transfer of Property or the execution of Securities transactions or affect the value of Property, or (vi) for any Losses due to forces beyond the control of BNYTC or any Subcustodian, including without limitation strikes, work stoppages, acts of war or terrorism, insurrection, revolution, nuclear or natural catastrophes or acts of God, the insolvency of any Subcustodian or Depository, and interruptions, loss or malfunctions of utilities, communications or computer (software and/or hardware) services. Supervision of Investment Managers and the Investment Committee shall be the exclusive responsibility of Customer. BNYTC shall be under no duty or obligation to review any investment or reinvestment made or received at the direction of Customer, an Investment Manager or the Investment Committee nor to make any recommendation as to the disposition or continued retention thereof. Without limiting the generality of the foregoing, in the case of any transaction which is directed by Customer, the Investment Manager or

the Investment Committee, Customer, the Investment Manager or the Investment Committee shall have entire responsibility for assuring that the transaction does not violate the prohibitions of any applicable state or federal law, including Section 406 and 407 of the Act. For the avoidance of doubt, BNYTC shall have no liability for any Losses or for the payment or repayment of any Cash or sums arising from the application of any law or regulation now or hereafter in effect, or from the occurrence of any event, in the country in which such Cash is held which may affect, limit, prohibit or prevent the transferability, convertibility, availability, payment or repayment of any Cash or sums until such time as such law, regulation or event shall no longer affect, limit, prohibit or prevent such transferability, convertibility, availability, payment or repayment and in no event shall BNYTC be obligated to substitute another currency for a currency whose transferability, convertibility or availability has been affected, limited, prohibited or prevented by such law, regulation or event.

(b) The Trustees agree that the Account will be liable for and will indemnify and keep fully indemnified (on an after-tax basis), BNYTC and its nominees and hold them harmless from and against, any and all Losses howsoever arising from or in connection with this Agreement or the performance of their duties hereunder (including disputes between the parties or enforcement of this Agreement), provided, however, that nothing contained herein shall require that BNYTC or its nominees be indemnified for their respective fraud, negligence or willful misconduct or, solely with respect to actions taken by BNYTC pursuant to Section 3(n), if due to BNYTC's failure to act in accordance with the requirements of Part 4 of Title 1 of the Act. Nothing contained herein shall limit or in any way impair the right of BNYTC to indemnification under any other provision of this Agreement.

(c) Where an event has occurred (including an omission) for which BNYTC is liable under this Agreement, BNYTC may take such steps as it considers appropriate to correct the situation and, provided that Customer is put in the same position as it would have been in if the event had not occurred, the consequences of taking such steps (whether favorable or unfavorable) shall be solely for the account of BNYTC, which shall not be liable to account to the Customer for any benefit received by it as a result of taking such action.

(d) Neither BNYTC nor any Subcustodian shall have any liability for Losses incurred by Customer or any other person as a result of the receipt or acceptance of fraudulent, forged or invalid Securities (or Securities which are otherwise not freely transferable or deliverable without encumbrance in any relevant market).

(e) BNYTC shall have no responsibility for the accuracy of any information provided to Customer that has been obtained from, or provided to BNYTC by, any other entity.

(f) BNYTC's duties and responsibilities are solely those set forth herein and it shall not be obligated to perform any services or take any action not provided for herein unless specifically agreed to by it in writing.

7.    Advances; Overdrafts and Indebtedness.

(a) Customer understands that when BNYTC is instructed to deliver Securities against payment or in exchange for Cash (for example in connection with the settlement of a Securities transaction or a redemption, exchange, tender offer or similar corporate action), such payment or exchange of Cash may not occur simultaneously with the delivery of Securities and that BNYTC may deliver such Securities prior to actually receiving final payment. Consequently, as a matter of bookkeeping convenience, BNYTC may credit Customer's Cash Account with the anticipated receipt of payment prior to actual receipt of final payment. The risk of non-receipt of payment shall be Customer's and BNYTC shall have no liability therefor.

(b) All credits to a Cash Account in anticipation of receipt of final payment of proceeds of sales and redemptions of, and similar corporate actions with respect to, Securities and Distributions shall be conditional upon receipt by BNYTC of final payment and may be reversed to the extent final payment is not received. In the event that BNYTC in its discretion advances funds to Customer to facilitate the settlement of any transaction, or elects to permit Customer to use funds credited to a Cash Account in anticipation of final payment, or if Customer otherwise becomes indebted to BNYTC (including indebtedness as a result of overdrafts in the Cash Accounts), Customer shall, immediately upon demand, reimburse BNYTC for such amounts (in the same currency if legally available) plus, except to the extent prohibited by the Act, any interest thereon. For purposes of this Agreement, payment will not be "final" until BNYTC or a Subcustodian has received immediately available funds which, under

9

applicable local laws, regulations, rules, customs or practices, are not reversible and not subject to any encumbrance. Any interest charged by BNYTC in relation to any such debits or overdrafts shall be charged at a rate separately agreed between BNYTC and the Customer.

(c) Except to the extent prohibited by the Act, in addition to any rights which BNYTC may have under applicable law or pursuant to other agreements, BNYTC shall have the right to, and may, without notice to Customer, combine, consolidate or merge all or any of Customer's Cash Accounts with, and liabilities to, BNYTC and may set-off from or transfer any Cash (in any currency) held for Customer or standing to the credit of any such Accounts in or towards the satisfaction of any liability of Customer to BNYTC whether arising from or as a result of an FX Transaction, a Securities transaction or this Agreement, and may do so notwithstanding that Cash held for Customer or the balances of such Accounts may be held or deposited at different branches of BNYTC or at any Subcustodian and may not be expressed in the same currency as the currency of Customer's liability to BNYTC, and BNYTC is hereby authorized to effect any necessary conversions at the BNYTC's own rate of exchange then prevailing.

(d) In addition to any rights which BNYTC may have under applicable law or pursuant to other agreements, BNYTC shall, to the extent permitted under the Act, have the right to, and may, without notice to Customer, combine, consolidate or merge all or any of Customer's Cash Accounts with, and liabilities to, BNYTC and may set-off from or transfer any Cash (in any currency) held for Customer or standing to the credit of any such Accounts in or towards the satisfaction of any liability of Customer to BNYTC whether arising from or as a result of an FX Transaction, a Securities transaction, this Agreement or otherwise, and may do so notwithstanding that Cash held for Customer or the balances of such Accounts may be held or deposited at different branches of BNYTC or at any Subcustodian and may not be expressed in the same currency as the currency of Customer's liability to BNYTC; and BNYTC is hereby authorized to effect any necessary conversions at the BNYTC's own rate of exchange then prevailing.

8. Reports; Statements of Account; Computer Services; Analytic Tools.

(e) **Written Reports.** BNYTC shall keep accurate and detailed accounts of all investments, receipts, disbursements and other transactions hereunder, accounting separately for each Account, and all of BNYTC's accounts, books and records relating thereto shall be open to inspection and audit at all reasonable times by any person designated by Customer. Within 90 days after the close of each fiscal year of the Plan (or such other date as may be agreed upon in writing between Customer and BNYTC), and within 120 days after the effective date of the termination of this Agreement as provided in Section 12 hereof, BNYTC shall file with Customer a written account, setting forth all investments, receipts, disbursements and other transactions effected by it during the year (in the case of a termination, the portion of a year) ending on such date. Such account may incorporate by reference any statements that BNYTC has furnished to Customer prior to the filing of such account. To the extent that BNYTC shall be required to provide values of, or pricing information with respect to, securities or other instruments, BNYTC is authorized to utilize generally recognized pricing services (including brokers, dealers, and market makers). BNYTC shall not be liable or responsible for the accuracy or completeness of such values or information. In the event such services are unable to provide a value of or pricing information with respect to securities and other instruments and BNYTC provides values and pricing information, BNYTC shall so advise Customer, but shall have no other obligation or liability with respect to such valuation or pricing information. BNYTC may rely for all purposes of this Agreement upon any certified appraisal or other form of valuation submitted to it by the Trustees, any Investment Manager or the Investment Committee.

(f) **Other Accountings.** BNYTC shall also submit such other reports to Customer as may be agreed upon from time to time between the Custodian and Customer. Customer agrees to examine each such report promptly and to file any exceptions thereto within 90 days of the date thereof.

(g) **Settlement of Accounts.** Upon the expiration of 90 days after receipt by Customer of any account or report submitted by BNYTC, Customer shall be deemed to have approved the same, BNYTC shall be forever released and discharged from all liability and accountability to Customer with respect to its acts, omissions, transactions, duties, obligations or responsibilities as shown in or reflected by such account or report, except those

as to which Customer shall have filed written objections with BNYTC within such 90-day period. Nothing herein contained shall impair the right of BNYTC to a judicial settlement of any account of proceedings rendered by it. Computer Services. BNYTC may provide Customer and its Investment Manager, if any are appointed, with certain computer services as may be mutually agreed upon by BNYTC and Customer from time to time ("Computer Services"). Customer's and its Investment Manager's use of such Computer Services shall be governed by Appendix I annexed hereto. BNYTC may terminate Computer Services provided pursuant to this Agreement at any time in its sole discretion or upon direction from Customer.

(h) Analytic Tools. From time to time BNYTC may make available to Customer certain Investment and Analytic Tools ("Tools") which may be used by Customer to evaluate Securities in Customer's Account, Customer's Investment Managers, compliance with Customer's investment guidelines and investment criteria; and BNYTC may assist Customer in modifying such Tools to meet specific needs of Customer. Such Tools are provided "AS IS" and BNYTC DISCLAIMS ANY AND ALL WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO THE TOOLS, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY, TITLE, NON-INFRINGEMENT AND FITNESS FOR A PARTICULAR PURPOSE. BNYTC ASSUMES NO LIABILITY FOR ANY LOSS, DAMAGE, COST, EXPENSE OR LIABILITY INCURRED BY CUSTOMER OR ANY OTHER PERSON AS A RESULT OF CUSTOMER'S USE OF OR RELIANCE UPON ANY TOOLS OR ANY ASSISTANCE PROVIDED BY BNYTC IN MODIFYING ANY TOOLS.

9. Notices; Instructions and Other Communications. (a) Unless otherwise specified herein, all account statements pursuant to Section 8 and confirmations shall be in writing and all notices, Instructions or other communications shall be in English and may be given either orally or in writing (including by tested telex, telecopy, facsimile or other electronic transmission, which may include transmission through Computer Services and Trade Reports issued by the Institutional Delivery System of Depository Trust Company). All Statements of Assets, Statements of Account, Confirmations, notices, Instructions and other communications shall be delivered to the address (post office, telephone, telex or other electronic address) set forth on Schedule C annexed hereto, which address may be changed upon thirty (30) days prior written notice to the other party. Customer shall furnish, and shall cause each Investment Manager or the Investment Committee to furnish, to BNYTC a certificate (in the form annexed hereto) containing the names and specimen signatures of each Authorized Person. BNYTC is authorized to comply with and rely upon any such notices, Instructions or other communications believed by it to have been sent or given by an Authorized Person. Customer and any Investment Manager or the Investment Committee may amend such certificate or add any person to or delete any person from such certificate by delivering a replacement certificate to BNYTC. However, until BNYTC actually receives such replacement certificate, BNYTC shall be authorized to rely upon, and shall incur no liability for relying upon, the original certificate.

(b) Customer shall use all reasonable endeavors to ensure that Instructions transmitted to BNYTC pursuant to this Agreement are correct and complete. Any Instructions (written or oral or transmitted by tested telex, telecopy, facsimile or any other electronic means acceptable to BNYTC), shall be conclusively deemed to be valid Instructions from Customer to BNYTC for the purposes of this Agreement. BNYTC may in its discretion decline to act upon any Instructions which are insufficient or incomplete or are not received by BNYTC in sufficient time for BNYTC to act upon or in accordance with such Instructions. If Customer elects to give BNYTC Oral Instructions and BNYTC in its discretion elects to act upon such Oral Instructions, BNYTC's understanding of such Oral Instruction shall be deemed controlling. BNYTC shall not be liable for any Losses arising directly or indirectly from BNYTC's reliance upon and compliance with such Oral Instruction notwithstanding such Oral Instruction conflicts or is inconsistent with a subsequent Written Instruction.

(c) Whenever BNYTC is required to take any action hereunder based upon the receipt of notice or information from an issuer of a Security or other entity which is not a party to this Agreement, BNYTC's obligation to so act is conditional upon the receipt of such notice or information by the department of BNYTC responsible for processing such notice or information or for providing notice to Customer.

10. Appointment of Investment Manager or Investment Committee. Customer may, from time to time, appoint one or more Investment Managers or an Investment Committee to manage the Property in an Account and give Instructions in respect of such Property, to vote securities in a Securities Account, to purchase, sell or otherwise acquire or dispose of Property in an Account, and to engage in FX Transactions on behalf of Customer.

11

Upon receipt of notice of the appointment of any Investment Manager or Investment Committee, which notice shall be annexed hereto as Schedule D (as such Schedule may be amended from time to time by Customer), and except as otherwise provided herein, BNYTC is to rely upon and comply with (and shall have no liability for relying upon and complying with) Instructions from the Investment Manager or the Investment Committee (including Instructions with respect to the voting of Securities in a Securities Account, the purchase, sale or other acquisition or disposition of Property in an Account and the furnishing of information and records relating to an Account to the Investment Manager and Instructions communicated by any means or methods authorized herein for communicating with Customer) to the same extent as if such Instructions were given by Customer and BNYTC shall have no duty or obligation to determine the propriety or appropriateness of such Instructions. Any such appointment shall remain in full force and effect unless and until BNYTC actually receives written notice from Customer to the contrary and BNYTC shall incur no liability for relying upon the existing authorizations.

11.   Accounts; Payments. (a)  BNYTC may maintain one or more accounts for the purpose of making payments and disbursements and such other purposes, if any, as may be reasonably required for the convenient administration of the Plan or the trust(s) thereunder. BNYTC shall not be required to maintain any separate records of accounts with respect to the participants in the Plan (or their beneficiaries), and any such records or accounts required to be maintained pursuant to the terms of the Plan shall be maintained by Customer. BNYTC may transfer the amount of such payments and disbursements to one or more accounts (collectively, the "Disbursement Account") maintained at The Bank of New York Trust Company, National Association or The Bank of New York. Disbursements and payments from the Disbursement Account may be made by wire transfer or checks of BNYTC in accordance with Section 11(b) hereof.

(b)    BNYTC, from time to time, upon receipt of a written direction from Customer, shall make payments and disbursements from the Accounts to such persons and in such amounts as Customer shall direct. Such directions need not specify the purpose of the payments or disbursements so directed, and BNYTC shall not be responsible in any way, including any duty of inquiry, respecting the purpose or propriety of such payments or disbursements or for the administration of the Plan or the trust thereunder. Any such written direction shall constitute a certification that the payment or distribution so directed is one which Customer are authorized to direct. If a dispute arises as to who is entitled to or should receive any benefit or payment or disbursement, BNYTC may withhold such payment until the dispute has been resolved.

(i)    It is understood and agreed that, in connection with each payment and disbursement, the amount of such payment and disbursement (the "Disbursement Amount") shall be transferred from the Accounts into the Disbursement Account. It is also understood and agreed that, so long as the Disbursement Amount remains in the Disbursement Account, any amounts earned by BNYTC on such Disbursement Amount shall inure solely and exclusively to the benefit of BNYTC and shall constitute compensation to BNYTC in addition to that specified in Schedule B annexed hereto.

(ii)    In the event that any payment or disbursement directed by Customer shall be distributed or mailed by BNYTC and (i) such payment or disbursement shall be returned to BNYTC because the payee or the payee's account cannot be located at such address, or (ii) any check so mailed shall not be presented for payment within six months of the date thereof, BNYTC shall notify Customer of such return or failure to present. The Disbursement Amount of such payment or disbursement shall remain in the Disbursement Account as specified in and in accordance with Section 11(b) hereof unless and until a written direction is received by the BNYTC from Customer with respect to such Disbursement Amount. BNYTC shall maintain records of all payments and disbursements that are returned or not presented for payment, which records shall specify the name, address and tax identification number of each such payee, the Disbursement Amount, and the date when such Disbursement Amount was first transferred to the Disbursement Account and shall periodically report such information to Customer. BNYTC shall not be obligated to search for or ascertain the whereabouts of any payee entitled to payments hereunder (or his/her duly appointed representative).

12.    Termination; Variation and Confidentiality.

(a)  This Agreement shall be continuing and shall remain in full force and effect until terminated by BNYTC or Customer at any time and for any reason or for no reason upon delivery of thirty (30) days' prior written notice to the other party or automatically upon the dissolution of Customer if Customer is a body corporate

or partnership or upon Customer being subject to insolvency, or analogous, proceedings in any jurisdiction. The provisions of paragraphs 5, 6, 7, 8(c), 16, 17,20 and the indemnity and limitation of liability provisions set forth herein shall survive such termination.

(b) Upon termination of this Agreement and payment of all amounts due and owing to BNYTC, BNYTC shall deliver the Property and all records relating to the Property pursuant to Customer's Written Instructions. Customer shall be responsible and liable for any shipping and insurance costs associated with such delivery.

(c) It may be desirable or necessary for BNYTC to amend this Agreement from time to time in order to comply with or complement the rules and requirements of governmental agencies or regulatory authorities. Therefore, this Agreement shall be amended from time to time by BNYTC in accordance with terms which BNYTC provides to Customer in order that this Agreement, BNYTC, Customer and any other relevant person shall comply with or complement (as the case may be) any such rules or requirements.

(d) Subject to paragraph 4(d) hereof, BNYTC will at all times respect the confidentiality of this Agreement and any arrangements or agreements made or entered into in connection with this Agreement and will not disclose to any other person any information acquired as a result of or pursuant to this Agreement unless required to do so by law, a regulatory authority, revenue authority, governmental body or an order of a court or regulatory authority or as authorized by Customer.

13.     Assignment.. Neither party may assign, transfer or change all or any of its rights or benefits hereunder without the written consent of the other party, provided, however, that BNYTC may upon prior written notice to Customer assign this Agreement to any affiliate, subsidiary or entity controlled by BNYTC or by an entity that controls BNYTC or to any entity with which BNYTC is merged or to whom BNYTC transfers all or substantially all of its custody business.

14.     Headings.  The section and paragraph headings contained herein are for convenience and reference only and are not intended to define or limit the scope of any provision of this Agreement.

15.     Entire Agreement; Amendment.  This Agreement shall constitute the entire agreement of the parties with respect to the subject matter and supersedes all prior oral or written agreements in regard thereto. Except as otherwise provided in Sections 2(b), 5(a), 9 and 12 hereof, this Agreement may be amended only by an instrument in writing duly executed by both parties hereto. The provisions of Appendix 1 hereto shall be deemed to be a part of this Agreement

16.     Governing Law; Jurisdiction; Certain Waivers.

(a)  This Agreement shall be interpreted and construed in accordance with the internal substantive laws (and not the choice of law rules) of the State of California. All actions and proceedings brought by BNYTC relating to or arising from, directly or indirectly, this Agreement may be litigated in courts located within the State of California. Customer hereby submits to the personal jurisdiction of such courts; hereby waives personal service of process upon it and consents that any such service of process may be made by certified or registered mail, return receipt requested, directed to Customer at its address last specified for notices hereunder, and service so made shall be deemed completed five (5) days after the same shall have been so mailed; and hereby waives the right to a trial by jury in any action or proceeding with BNYTC.  Except as otherwise required under ERISA,  all actions and proceedings brought by Customer against BNYTC relating to or arising from, directly or indirectly, this Agreement shall be litigated only in courts located within the State of California.  In this regard, the parties agree that the courts of the State of California are the most convenient forum to resolve such actions and, accordingly, will not argue to the contrary in such actions or proceedings.

(b)  The invalidity, illegality or unenforceability of any provision of this Agreement shall in no way affect the validity, legality or enforceability of any other provision; and if any provision is held to be unenforceable as a matter of law, the other provisions shall not be affected thereby and shall remain in full force and effect.

13

(c) *For Governmental Entities Only*: To the extent that, in any jurisdiction, Customer has or hereafter may acquire, or is or hereafter may be entitled to claim, for itself or its assets, immunity (sovereign or otherwise) from suit, execution, attachment (before or after judgment) or any other legal process, Customer irrevocably agrees not to claim, and hereby waives, such immunity.

17.  Conditions Precedent. This Agreement is conditional upon Customer providing to BNYTC or BNYTC obtaining, as the case may be, the documents set out in the Schedule headed "Condition Precedent Documents Schedule" annexed to this Agreement. In the event that the condition set out in the immediately preceding sentence is not fulfilled, BNYTC may elect to terminate this Agreement whereupon this Agreement shall have no further effect and all the liabilities and obligations of BNYTC and Customer shall cease.

18.  Rights and Remedies. Each and every right granted to either party hereunder or any document delivered hereunder or in connection herewith, or allowed by law or equity, shall be cumulative, and the exercise or waiver of any such right or remedy shall not preclude or inhibit the exercise of any additional rights or remedies. The waiver of or failure or delay by any party in exercising, or any single or partial exercise by either party of, any right or remedy hereunder shall not preclude or inhibit the subsequent exercise of such right or remedy.

19.  Partial Invalidity. The invalidity, illegality or unenforceability of any provision of this Agreement shall in no way affect the validity, legality or enforceability of any other provision, and if any provision is held to be unenforceable as a matter of law, the other provisions shall not be affected thereby and shall remain in full force and effect.

20.  Representations and Warranties.

(a) The representations and warranties set out in this paragraph 20 shall survive the acceptance of the terms of this Agreement by Customer.

(b) Customer hereby represents and warrants, each of which shall be continuing and deemed repeated on each day on which BNYTC holds any Property hereunder:

(i)  It is a fiduciary within the meaning of Section 3(21) of the Act of the Plan and is vested with authority to control and manage the operation of the Plan and to execute this Agreement as trustee of the Plan.

(ii)  This Agreement has been duly authorized, executed and delivered on its behalf and constitutes the legal, valid and binding obligation of Customer and of the Plan. The execution, delivery and performance of this Agreement by Customer do not and will not violate any applicable law or regulation and do not require the consent of any governmental or other regulatory body except for such consents and approvals as have been obtained and are in full force and effect.

(iii)  The Securities (whether beneficially owned by Customer or by others on whose behalf Customer is acting) are free and clear of all liens, claims, security interests and encumbrances (except for those granted herein). If Customer is acting on behalf of others, Customer is fully authorized and empowered by such others and such others have the capacity to engage in the transactions contemplated by this Agreement (including for the avoidance of doubt FX Transactions) and to grant the lien and Security interest and rights of set-off as set forth herein.

(iv)  In relation to data disclosed to BNYTC in connection with this Agreement, or any previous custody arrangements, both BNYTC and any other person designated by Customer to send Instructions to BNYTC on Customer's behalf, has complied with, and shall continue to comply with the provisions of all relevant data protection laws and regulations and shall not do anything, or permit anything to be done which might lead to a breach of such laws or regulations by BNYTC.

(v)  If Customer is acting on behalf of others,

14

(A)     Customer has established and presently maintains policies and procedures (a copy of which will be provided to BNYTC) which require Customer to obtain and verify information about the identity of each such other persons and which are reasonably designed to ensure that Customer is not being used by any such other person as a conduit for money laundering or other illegal or illicit purposes;

(B)     Customer has verified the identity of each person on whose behalf Customer is acting and, to the best of Customer's knowledge, no transaction undertaken with respect to the Account is prohibited by applicable law, regulation or rule and no Property held in the Account is derived from any activity prohibited by applicable law, regulation or rule.

(vi)     All Property of the Plan to be held hereunder outside the jurisdiction of the district courts of the United States is Property described in 29 C.F.R. of 2550.404b-1(a)(1).

(vii)     An entity specified in 29 C.F.R. §2550.404b-1(a)(2)(i) has "management and control" of Property deposited or from time to time held hereunder within the meaning of 29 C.F.R. §2550.404b-1(c)(1).

(viii)     Each spot or forward foreign exchange contract between Customer and BNYTC shall be permitted by and in accordance with the Act and regulations and exemptions thereunder.

(c) BNYTC hereby represents and warrants:

(i)     The Bank of New York Trust Company, National Association is a limited purpose national banking association with trust powers

(ii)     This Agreement has been duly authorized, executed and delivered on its behalf and constitutes the legal, valid and binding obligation of BNYTC. The execution, delivery and performance of this Agreement by BNYTC do not and will not violate any applicable law or regulation and do not require the consent of any governmental or other regulatory body except for such consents and approvals as have been obtained and are in full force and effect.

21.     Authorization of The Bank of New York. Customer hereby specifically authorizes that any of BNYTC's powers, duties, obligations and responsibilities under this Agreement may be performed or assumed, to the extent determined by BNYTC in its sole and absolute discretion and without any further notice to the Customer, by BNYTC's New York affiliate, The Bank of New York ("BNY (New York)") or any successor thereto. Customer agrees to be bound by all actions taken by BNY (New York) pursuant to the preceding sentence to the same extent as if they were taken by BNYTC. Customer further agrees that BNY (New York) shall be entitled to all of the protections accorded to BNYTC under this Agreement (including without limitation the protections and indemnities set forth under Section 6 and the rights set forth under Section 7(d) hereof) and that the performance of any action by BNY (New York) shall not enlarge the responsibilities of BNY (New York) under this Agreement beyond the responsibilities of BNYTC. If so advised by BNYTC, Customer shall provide directions or information to BNY (New York) rather than to BNYTC.

22.     Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but such counterparts shall, together, constitute only one instrument.

15

IN WITNESS WHEREOF, this Agreement has been executed and attested, as of the day and year first above written, by the duly authorized officers of Customer and BNYTC.

STATIONARY ENGINEERS
LOCAL 39 PENSION TRUST FUND
_____
(Name of Customer)

THE BANK OF NEW YORK TRUST
COMPANY, NATIONAL ASSOCIATION

By: *Paul Bensi*
Name:
Title: *President*

By: *Paul Bensi*

SECRETARY

By: _____
Name: JANET E POTTER
Title: MANAGING DIRECTOR

Tax Identification Number: 94-6118939

mam\models2k\bnytc na\glberisabnytc.doc\110104

STATE OF _California_
COUNTY OF _San Francisco_ } ss.:

On the 4th day of _February_ 2006 before me personally came _Paul Bensi_, to me known, who, being by me duly sworn, did depose and say that he/she resides at _____, that he/she is a trustee of the _____, the trust described in and on whose behalf he/she executed the foregoing instrument; and that he/she signed his/her name thereto by authority of the instrument creating such trust.

_____
Notary Public

PATRICIA J. RICHMAN
COMM. #1578141
Notary Public - California
San Francisco County
My Comm. Expires May 12, 2009

STATE OF _California_
COUNTY OF _Alameda_ } ss.:

On the 16th day of _February_ 10 , before me personally came _Jerry Salmon_ she known, who, being by me duly sworn, did depose and say that he/she resides _Berkeley, California_, that he/she is a trustee of the _Stationary Engineers Loc 39 Credit_ described in and on whose behalf he/she executed the foregoing instrument; and that he/she signed his/her name thereto by authority of the instrument creating such trust.

_____
Notary Public

JANET E. PARKER
COMM. # 1508996
NOTARY PUBLIC - CALIFORNIA
ALAMEDA COUNTY
My Comm. Expires September 18, 2008

COPY / NOT ORIGINAL

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of  **SAN FRANCISCO**  } ss.

On **FEBRUARY 17, 2006** before me, **\*\*\*JOSEPHINE S. LIBUNAO\*\*\*\***
<br>Date                                                                                                  Name and Title of Officer (e.g., "Jane Doe, Notary Public")

personally appeared  **\*\*\*\*JANET POTTER\*\*\*\*\***
<br>Name(s) of Signer(s)

☒ personally known to me
<br>☐ proved to me on the basis of satisfactory evidence

to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

JOSEPHINE S. LIBUNAO
<br>Commission # 1568376
<br>Notary Public - California
<br>San Francisco County
<br>My Comm. Expires Apr 11, 2009

WITNESS my hand and official seal.

Signature of Notary Public

---------------- OPTIONAL ----------------

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

### Description of Attached Document

Title or Type of Document: **GLOBAL CUSTODY AGREEMENT**

Document Date: **FEBRUARY 14, 2006**                    Number of Pages: _____

Signer(s) Other Than Named Above: _____

### Capacity(ies) Claimed by Signer

Signer's Name: _____

☐ Individual
<br>☐ Corporate Officer — Title(s): _____
<br>☐ Partner — ☐ Limited ☐ General
<br>☐ Attorney-in-Fact
<br>☐ Trustee
<br>☐ Guardian or Conservator
<br>☐ Other: _____

Signer Is Representing: _____

RIGHT THUMBPRINT
<br>OF SIGNER
<br>Top of thumb here

© 1999 National Notary Association · 9350 De Soto Ave., P.O. Box 2402 · Chatsworth, CA 91313-2402 · www.NationalNotary.org     Prod. No. 5907     Reorder: Call Toll-Free 1-800-876-6827

## APPENDIX I

### THE BANK OF NEW YORK TRUST
### COMPANY, NATIONAL ASSOCIATION
### ON-LINE COMMUNICATIONS SYSTEM (THE "SYSTEM")

#### TERMS AND CONDITIONS

1.     License; Use:

(a)     This Appendix I shall govern Customer's use of the System and any computer software provided by BNYTC to Customer in connection herewith (collectively, the "Software"). In the event of any conflict between the terms of this Appendix I and the main body of this Agreement with respect to Customer's use of the System, the terms of this Appendix I shall control. Terms not defined in this Appendix shall have the meaning set forth in the main body of this Agreement.

(b)     Upon delivery by BNYTC of Software and/or System access codes, BNYTC grants to Customer a personal, nontransferable and nonexclusive license to use the Software and the System solely for the purpose of transmitting written instructions, receiving reports, making inquiries or otherwise communicating with BNYTC in connection with the Account. Customer shall use the Software and the System solely for its own respective internal and proper business purposes and not in the operation of a service bureau. Except as set forth herein, no license or right of any kind is granted to Customer or its Investment Manager with respect to the Software or the System. Customer acknowledges that BNYTC and its suppliers retain and have title and exclusive proprietary rights to the Software and the System, including any trade secrets or other ideas, concepts, know-how, methodologies, or information incorporated therein and the exclusive rights to any copyrights, trademarks and patents (including registrations and applications for registration of either), or other statutory or legal protections available in respect thereof. Customer further acknowledges that all or a part of the Software or the System may be copyrighted or trademarked (or a registration or claim made therefor) by BNYTC or its suppliers. Customer shall not take any action with respect to the Software or the System inconsistent with the foregoing acknowledgements. Customer shall not attempt to decompile, reverse engineer or modify the Software. Except as otherwise expressly permitted in this Appendix, Customer may not copy, sell, lease or provide, directly or indirectly, any of the Software or any portion thereof to any other person or entity without BNYTC's prior written consent. Customer may not remove any statutory copyright notice or other notice included in the Software or on any media containing the Software. Customer shall reproduce any such notice on any reproduction of the Software and shall add any statutory copyright notice or other notice to the Software or media upon BNYTC's request.

(c)     Customer may, subject to the terms of this Agreement and the main body of this Agreement and upon advance written notice to BNYTC, provide a copy of the Software (or arrange for BNYTC to provide a copy of the Software) and access to the System to Customer's Investment Managers that require access to the System and the Software to act on Customer's behalf, provided that Customer shall ensure that such Investment Managers agree in writing to be bound by the terms of this Appendix. Customer shall include on any such copy of the Software all of BNYTC's proprietary notices. Upon cessation of any Investment Manger's services, Customer shall terminate such Investment Manager's access to the System and shall retrieve from said Investment Manager any copies of the Software and destroy them (and provide to BNYTC evidence of such destruction) and shall retrieve and return to BNYTC any physical security devices provided to the Investment Manager. Customer shall be fully responsible for any Investment Manager's use of or access to the System or the Software.

(d)     If Customer subscribes to any database service provided by BNYTC in connection with its use of the System, delivery of such database to Customer shall constitute the granting by BNYTC to Customer of a non-exclusive, non-transferable license to use such database for so long as this Appendix I is in effect. It is understood and agreed that any database supplied by BNYTC is derived from sources which BNYTC believes to be reliable but BNYTC does not, and could not for the fees charged, guarantee or warrant that the data is correct, complete or current. All such databases are provided as an accommodation by BNYTC to its customers and are compiled

1

without any independent investigation by BNYTC. However, BNYTC will endeavor to update and revise each database on a periodic basis as BNYTC, in its discretion, deems necessary and appropriate. Customer also agrees that Customer will promptly install all updates and revisions to each database which BNYTC provides and that BNYTC cannot bear any responsibility whatsoever for Customer's failure to do so. BNYTC IS NOT RESPONSIBLE FOR ANY RESULTS OBTAINED BY CUSTOMER FROM USE OF DATABASE SERVICES PROVIDED BNYTC.

2. **Equipment.** Customer shall obtain and maintain at its own cost and expense all equipment and services, including but not limited to communications services, necessary for it to utilize the Software and obtain access to the System, and BNYTC shall not be responsible for the reliability or availability of any such equipment or services.

3. **Proprietary Information.** The Software, any data base' and any proprietary data, processes, information and documentation made available to Customer (other than which are or become part of the public domain or are legally required to be made available to the public) (collectively, the "Information"), are the exclusive and confidential property of BNYTC or its suppliers. However, for the avoidance of doubt, reports generated by Customer containing information relating to the Account are not deemed to be within the meaning of the term "Information." Customer shall keep the Information confidential by using the same care and discretion that Customer uses with respect to its own confidential property and trade secrets, but not less than reasonable care. Upon termination of the Agreement or the licenses granted herein for any reason, Customer shall return to BNYTC any and all copies of the Information which are in its possession or under its control. The provisions of this Section 3 shall not affect the copyright status of any of the Information which may be copyrighted and shall apply to all information whether or not copyrighted.

4. **Modifications.** BNYTC reserves the right to modify the Software and the System from time to time and Customer shall install new releases of the Software as BNYTC may direct. Customer shall not modify or attempt to modify the Software without BNYTC's prior written consent. Any modifications to the Software, whether by Customer or BNYTC and whether with or without BNYTC's consent, shall become the property of BNYTC.

5. **NO REPRESENTATIONS OR WARRANTIES.** BNYTC AND ITS MANUFACTURERS AND SUPPLIERS MAKE NO WARRANTIES OR REPRESENTATIONS WITH RESPECT TO THE SOFTWARE, THE SYSTEM, ANY SERVICES OR ANY DATABASE, EXPRESS OR IMPLIED, IN FACT OR IN LAW, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. CUSTOMER ACKNOWLEDGES THAT THE SOFTWARE, THE SYSTEM, ANY SERVICES AND ANY DATABASE ARE PROVIDED "AS IS." TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN NO EVENT SHALL BNYTC OR ANY SUPPLIER BE LIABLE FOR ANY DAMAGES, WHETHER DIRECT, INDIRECT SPECIAL, OR CONSEQUENTIAL, WHICH CUSTOMER MAY INCUR IN CONNECTION WITH THE SOFTWARE, THE SERVICES OR ANY DATABASE, EVEN IF BNYTC OR SUCH SUPPLIER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN NO EVENT SHALL BNYTC OR ANY SUPPLIER BE LIABLE FOR ACTS OF GOD, MACHINE OR COMPUTER BREAKDOWN OR MALFUNCTION, INTERRUPTION OR MALFUNCTION OF COMMUNICATION FACILITIES, LABOR DIFFICULTIES OR ANY OTHER SIMILAR OR DISSIMILAR CAUSE BEYOND THEIR REASONABLE CONTROL.

6. **Security; Reliance; Unauthorized Use.**

(a) BNYTC will establish security procedures to be followed in connection with the System. Customer understands and agrees that the security procedures are intended to determine whether instructions received by BNYTC through the System are authorized but are not (unless otherwise specified in writing) intended to detect any errors contained in such instructions. Customer will cause all persons utilizing the Software and the System to treat all applicable user and authorization codes, passwords and authentication keys with the highest degree of care and confidentiality. BNYTC is hereby irrevocably authorized to comply with and rely upon instructions, whether or not authorized, received by it through the System in accordance with the security procedures. Customer acknowledges that it is its sole responsibility to assure that only Authorized Persons use the System and that to the fullest extent

2

permitted by applicable law BNYTC shall not be responsible or liable for any unauthorized use thereof or for any losses sustained by Customer arising from or in connection with the use of the System or BNYTC's reliance upon and compliance with instructions received through the System.

(b)     The Software and the System may contain features designed to encrypt portions of certain communications between Customer and BNYTC. BNYTC may also make hardware encryption devices available to Customer for an additional charge. Certain browser-based versions of the System may utilize encryption capabilities offered by the Customer's web browser software, and Customer is solely and fully responsible for ensuring that such capabilities are adequate for Customer. Encryption may not be available for every type of communication or for all data. Customer agrees that BNYTC may deactivate any encrypting features at any time, without notice or liability to Customer, for the purpose of maintaining, repairing or troubleshooting the Software, the System or any BNYTC equipment.

7.     System Acknowledgments.  BNYTC shall acknowledge through the System its receipt of each transmission communicated through the System and, in the absence of such acknowledgment, BNYTC shall not be liable for any failure to act in accordance with such transmission and Customer may not claim that such transmission was received by BNYTC.

8.     EXPORT RESTRICTIONS.  EXPORT OF THE SOFTWARE IS PROHIBITED BY UNITED STATES LAW.  CUSTOMER MAY NOT UNDER ANY CIRCUMSTANCES RESELL, DIVERT, TRANSFER, TRANSSHIP OR OTHERWISE DISPOSE OF THE SOFTWARE (IN ANY FORM) IN OR TO ANY OTHER COUNTRY.  IF BNYTC DELIVERED THE SOFTWARE TO CUSTOMER OUTSIDE OF THE UNITED STATES, THE SOFTWARE WAS EXPORTED FROM THE UNITED STATES IN ACCORDANCE WITH THE EXPORT ADMINISTRATION REGULATIONS.  DIVERSION CONTRARY TO U.S. LAW IS PROHIBITED. Customer hereby authorizes BNYTC to report its name and address to government agencies to which BNYTC is required to provide such information by law.

9.     On-Line Inquiry and Modification of Records.  In connection with Customer's use of the System, BNYTC may, at Customer's request, permit Customer to enter data directly into a BNYTC database for the purpose of modifying certain information maintained by BNYTC's systems, including, but not limited to, change of address information. To the extent that Customer is granted such access, Customer agrees to indemnify and hold BNYTC harmless from all loss, liability, cost, damage and expense (including attorney's fees and expenses) to which BNYTC may be subjected or which may be incurred in connection with any claim which may arise out of or as a result of changes to BNYTC database records initiated by Customer.



3

<u>SCHEDULE B</u>

THE BANK OF NEW YORK TRUST COMPANY, NATIONAL ASSOCIATION

GLOBAL CUSTODY AGREEMENT

WITH

STATIONARY ENGINEERS LOCAL 39 PENSION TRUST FUND

FEE SCHEDULE

\* \* \* \*

FEBRUARY 14, 2006

\* \* \* \*

COPY — NOT ORIGINAL

*Schedule B*


*The* **BANK**
*of* **NEW YORK**

# THE BANK OF NEW YORK TRUST COMPANY, N.A.
## US CUSTODY SERVICES FEE SCHEDULE
### For
## STATIONARY ENGINEERS LOCAL 39
## PENSION TRUST FUND

Dated: 2/14/06

**SECURITIES SETTLED AND SAFEKEPT WITHIN THE UNITED STATES**

The Bank of New York Trust Company N.A. fee for custody services for each account is as follows:

- **. Administration/Safekeeping Fee:**

All inclusive 1.50 basis points per annum calculated on the month-end/ period-end market value of the portfolio for Book Entry Securities (DTC/FED*).

*\*For DTC non-transferable assets: securities that have been non-transferable for more than 6 years. BNY's policy is to remove these securities from BNY client's account. Clients who decide to keep in their account a security identified as non-transferable for more than 6 years will be charged a fee of $5.00 per security.*

**Investment Accounting Fees**

- **Investment Accounting**

The provisions of accounting services are inclusive.

**Communication Fees**

- **INFORM**

The provision of access to The Bank of New York's proprietary application - INFORM – including installation and training for standard custody instructions and reporting is included.

✓ Art → 415-263-2422

1

**STATIONARY ENGINEERS LOCAL 39**



Out of Pocket Expenses - Charges incurred by The Bank of New York Trust Company N.A. for local taxes, stamp duties or other local duties and assessments, stock exchange fees, postage and insurance for shipping, facsimile reporting, extraordinary telecommunications fees or other expenses which are unique to a country in which the client or its clients is investing will be passed along as incurred.

**Terms and Conditions of this Proposal**
- The Bank of New York Trust Company, N.A. reserves the right to amend the fees from those quoted should the actual business awarded differ significantly to the information on which this proposal was based.
- All of the information contained within this schedule is confidential and should not be made available to third parties prior to reference to The Bank of New York Trust Company, N.A.
- Once signed the proposal shall remain valid for a period of not less than 3 (three) years.

Agreed and accepted by:

**Stationary Engineers Local 39 Pension Trust Fund**

By: (signature) _Paul Bensi_         By: (signature) _____

Name: _Paul Bensi_                    Name: _Jerry Kalman_
(Please print)                        (Please print)

Title: _Chairman_                     Title: _Secretary_

Date: _2-14-06_                       Date: _2-16-06_


**The Bank of New York Trust Company, N.A.**

By: (signature) _____

Name: _JANET E POTTER_
(Please print)

Title: _MANAGING DIRECTOR_

Date: _2-17-06_


2

**STATIONARY ENGINEERS LOCAL 39**

SCHEDULE C

THE BANK OF NEW YORK TRUST COMPANY, NATIONAL ASSOCIATION

GLOBAL CUSTODY AGREEMENT

WITH

STATIONARY ENGINEERS LOCAL 39 PENSION TRUST FUND

NOTICES

*   *   *   *

FEBRUARY 14, 2006

*   *   *   *

TO:  THE BANK OF NEW YORK TRUST COMPANY, NATIONAL ASSOCIATION

Post Office Address:    550 Kearny Street, Suite 600
                        San Francisco, CA 94108-2527
                        Attn: Arthur A. Londos, Vice President & Relationship Manager

Telephone:              (415) 263-2422
Telecopy:               (415) 263-2071

TO:  STATIONARY ENGINEERS LOCAL 39 PENSION TRUST FUND

Post Office Address:    c/o ATPA
                        1640 South Loop Road
                        Alameda, CA 94502
                        Attn: Michael Schumacher, Plan Manager

Telephone:              (510) 337-3330
Telecopy:               (510) 337-3060

# Exhibit B

# THE BANK OF NEW YORK

## FOREIGN EXCHANGE POLICIES AND PROCEDURES
## FOR ERISA PLANS

These Policies and Procedures apply to foreign exchange ("FX") transactions between The Bank of New York or any of its affiliates ("BNY") and any employee benefit plan (a "Plan") covered by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), where BNY acts as a trustee, custodian, or fiduciary for the Plan, or other party-in-interest under ERISA ("FX Transactions").

These Policies and Procedures are issued pursuant to U.S. Department of Labor Prohibited Transaction Class Exemptions 94-20 and 98-54, which established requirements for certain directed FX Transactions and FX Transactions pursuant to standing instructions.

Subject to the Legal Department's approval of the use of any other exemption from ERISA's prohibited transaction rules, these Policies and Procedures are the exclusive means by which BNY may enter into an FX Transaction with a Plan.

These Policies and Procedures apply to:

1. Directed Transactions. An FX Transaction will be considered a directed transaction where an independent Plan fiduciary that has not been appointed by BNY directs BNY to effect an FX Transaction relating to the exchange of a specific amount of currency of one nation for the currency of another nation at a specific exchange rate in connection with a transaction involving the assets of a Plan. For avoidance of doubt, directed transactions will, in addition to transactions executed through such traditional means as the telephone, include (i) any such FX Transaction initiated and executed by a Plan fiduciary through an electronic service provided by BNY if it otherwise meets the criteria for directed FX Transactions; and (ii) any such FX Transaction initiated and executed by a Plan fiduciary in excess of $300,000 which might otherwise be construed as a Standing Instruction transaction provided that BNY has displayed a rate on its website concurrent with each fixing time at which a Standing Instruction transaction may be executed, and the Plan fiduciary has not exercised its option to cancel such FX transaction within one hour of the respective fixing time as allowed by these Policies and Procedures. These Policies and Procedures will be delivered to the Plan fiduciary for the purpose of advising the Plan that such trades shall be deemed directed transactions, and obtaining approval of the Policy and Procedures with respect to the mechanism by which the Plan fiduciary can assess a pending transaction and renegotiate its terms if desired.

2. Standing Instructions for Income Item Conversions Equal to or Less than $300,000. An FX Transaction may be effected pursuant to standing instructions of an independent Plan fiduciary for purposes of income item conversions in an amount of no more than US $300,000 or the equivalent thereof. An income item conversion means the conversion into US dollars or other currency of any amount of interest, dividends or other distributions or payments with respect to a security, tax reclaims, proceeds from dispositions of rights,

fractional shares or other similar items denominated in the currency of another nation that are received by BNY on behalf of the Plan from the Plan's foreign investment portfolio. All FX transactions executed by a Plan fiduciary in excess of $300,000 should be handled as directed transactions.

3. Standing Instructions for "de minimis" Purchase or Sale FX Transactions. An FX Transaction may be effected pursuant to standing instructions of an independent Plan fiduciary for the purchase or sale of foreign securities in an amount of no more than US $300,000 or the equivalent thereof in connection with the purchase or sale of foreign securities by a Plan.

The procedures applicable to FX Transactions with a Plan are as follows:

**General Provisions**

1. Directed FX Transactions must be authorized by an independent Plan fiduciary not appointed by BNY on a transaction by transaction basis.

2. BNY may not engage in FX Transactions in any instance when BNY has discretionary investment authority or control with respect to the investment of Plan assets, or when it renders investment advice with respect to Plan assets.

3. A list of all Plans for which BNY may provide FX services shall be available to all FX traders.

4. The terms of FX Transactions with any Plan shall not be less favorable to the Plan than terms offered by BNY to unrelated parties in a comparable arm's length FX Transaction.

5. BNY shall provide a copy of these Policies and Procedures to all Plan investment fiduciaries that require FX services. In order to provide FX trading under standing instructions, as provided below, the investment fiduciary must specifically approve these Policies in writing. Once given, such approval shall continue in force until these Policies are materially amended as to FX rates or availability or the investment fiduciary revokes the approval in writing. Amendments to these Policies and Procedures may be made at any time by BNY and will be provided in writing to those fiduciaries that have previously approved the Policies and Procedures in writing.

6. Investment fiduciaries are hereby advised, by receipt of these Policies and Procedures, that Plans may obtain foreign exchange services from sources other than BNY.

7. Records sufficient to track compliance with these Policies will be maintained within the jurisdiction of the United States government for a period of at least six years from the date of the transactions and will be available for examination, on reasonable notice, to:

   a. Plan fiduciaries with authority over the assets involved in the FX Transaction, or any authorized employee or representative of the Plan;

2

    b. Authorized representatives of employers contributing to the Plan involved in the FX Transaction; and

    c. Authorized representatives of the Department of Labor or the Internal Revenue Service. Records to be kept shall include information provided in confirmations.

(Standing instructions will be maintained for so long as the account is active.)

## Directed Transactions

The independent Plan fiduciary usually issues directions by calling the FX Transaction Desk directly. It may also issue directions to BNY for FX Transactions with BNY through the relevant custody/fiduciary area, however. If a transaction is effected through that area, all essential terms must be communicated by the area to the BNY FX Transaction Desk. The Plan fiduciary will have access to the range of rates that would be applicable to the anticipated transaction and have the opportunity to renegotiate it within a reasonable period of time, as determined by the Transaction Desk. FX Transactions conducted through the relevant custody/fiduciary area will be subject to operational time restraints as communicated by the BNY FX Transaction Desk.

### Directed Transaction Confirmations

BNY shall issue a written confirmation for every directed FX Transaction with a Plan to the independent Plan fiduciary that directed the transaction within five business days of contract execution. Each such confirmation shall contain the following information:

    a. account name;
    b. transaction date;
    c. settlement date;
    d. exchange rate(s);
    e. currencies exchanged, including:

        (i) identity of currency sold
        (ii) amount sold (or, in the case of income conversions, amount of currency received);
        (iii) identity of currency purchased
        (iv) amount of currency purchased

## Standing Instructions

When required by an independent Plan fiduciary, BNY provides FX services pursuant to standing instructions to benefit Plans and Plan participants through income item conversions and de minimis purchases and sales. A "de minimis" purchase or sale means currency purchased or sold valued (as of the execution date) at US $300,000 or less. Income item conversions are also subject to this limitation as to amount.

Additional requirements for standing instructions are as follows:

1. All standing instructions to transact income item conversions or "de minimis" purchases or sales must be in writing from an independent Plan fiduciary and must identify the currencies from which FX Transactions may be executed (which shall include only currencies for assets which BNY acts as custodian, including through a subcustodian). Such written instructions shall continue in force until terminated by either BNY or the fiduciary without penalty upon up to 10 days prior notice.

2. The method for determining the rates at which FX Transactions will be executed under standing instructions will be provided to Plan fiduciaries as follows:

   a. Orders will be transmitted by the custody/fiduciary area through an internal system, which will identify the transaction to the BNY FX Transaction Desk (the "Brussels Desk in the case of income items, the Brussels Desk or the "NY Desk" for purchases or sales) as an "ERISA transaction" (or to this effect). The range of rates at which the Brussels Desk will transact income item conversions (which transactions will usually occur on the business day prior to the settlement date for the income items) and either Desk will transact purchase/sale transactions (which transactions will usually occur on the business day received by the Desk) will be posted in BNY's website, and independent Plan fiduciaries are hereby given notice to such effect. Rates will be posted at 9:00 a.m., 11:00 a.m. and 3:00 p.m. New York time. A buy and sell rate establishing the range will be posted for each unrestricted currency.

   b. All income item conversions will be bundled by the relevant custody/fiduciary area with other like FX Transactions and executed by the Brussels Desk at 5:00 p.m. Brussels time (11:00 a.m. New York time) at or within the range of buy/sell rates in effect at 11:00 a.m. New York time and posted on the website. The bundling of FX Transactions is done to achieve better rates for the benefit of clients. (For short periods during the year, there may be changes to the timing above as the result of daylight savings time changeover mismatches.)

   c. Orders relating to purchases and sales will be executed by the Brussels Desk or the NY Desk, as selected by the relevant custody/fiduciary area. If the order is received by the relevant Desk at least one-half hour prior to a fixing, it will be executed at or within the range established by such buy/sell rates next in effect. Independent Plan fiduciaries will be allowed to cancel such executions if the relevant Desk receives the cancellation order no later than one hour after the fixing (and there remains enough time to execute the cancellation prior to expiration of the one hour grace period). (This right to cancel is not available for income items because of the manner in which they are executed.)

   d. Rates will not be published for restricted currencies, which do not freely trade. Instead, such currencies will simply be listed in the website, and transactions in such currencies will be executed according to market practice.

3. In all cases actual rates for FX Transactions will be tested by the daily run flagging Transactions with rates more than 3% over or under the WM Fixing Rate for each applicable fixing time (9:00am, 11:00am and 3:00pm). Transactions so flagged will be investigated and any action deemed necessary will be taken to assure compliance with these Policies and Procedures.

4. In all cases, BNY reserves the right to advise independent Plan fiduciaries in a timely manner during, or in advance of, a business day that it will not provide FX for a particular currency or in a particular market under standing instructions. In such cases, FX may be provided pursuant to direction or by third parties selected by the fiduciary.

5. In the case of income item conversions, the execution date depends on the posting date of the relevant income. In "as collected" markets, the execution date is the date the funds are received. The FX Transaction is usually executed on that day (at the rate at 11:00 a.m. New York time), but in the case of restricted currencies, execution may take place the following day. Purchase/sale transactions will be executed on the day of receipt if received early enough in the day (local time) by the relevant Desk.

6. With respect to FX Transactions provided under standing instructions, a confirmation, ticket, or advice of receipt (written or in electronic form) will be issued to the independent Plan fiduciary within five business days of the date the FX Transaction was executed, and will contain the same information as that for directed transactions.