1 PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Charles E. Davidow (admitted *pro hac vice*)
2 2001 K Street, NW
Washington, District of Columbia 20006
3 Telephone: (202) 223-7300
Facsimile: (202) 223-7420
4 Email: cdavidow@paulweiss.com

5
Robyn F. Tarnofsky (admitted *pro hac vice*)
6 James J. Brennan (admitted *pro hac vice*)
Matthew J. Moses (*pro hac vice* application pending)
7 1285 Avenue of the Americas
New York, New York 10019
8 Telephone: (212) 373-3000
Facsimile: (212) 757-3990
9 Email: rtarnofsky@paulweiss.com
Email: jbrennan@paulweiss.com
10 Email: mmoses@paulweiss.com

11 BINGHAM MCCUTCHEN LLP
David M. Balabanian (SBN: 37368)
12 3 Embarcadero Center
San Francisco, California 94111
13 Telephone:  (415) 393-2000
Facsimile:  (415) 393-2286
14 Email: david.balabanian@bingham.com

15 *Attorneys for Defendants*

16                    UNITED STATES DISTRICT COURT

17                   NORTHERN DISTRICT OF CALIFORNIA

18                       SAN FRANCISCO DIVISION

19 INTERNATIONAL UNION OF OPERATING          No. 3:11-CV-03620-WHA
ENGINEERS, STATIONARY ENGINEERS
20 LOCAL 39 PENSION TRUST FUND,              NOTICE OF MOTION AND MOTION
individually and on behalf of all others similarly    TO DISMISS AND MEMORANDUM
21 situated,                                 OF LAW IN SUPPORT OF THE
                                            MOTION TO DISMISS THE CLASS
22                        Plaintiff,         ACTION COMPLAINT OF
                                            DEFENDANTS BANK OF NEW YORK
23           v.                             MELLON CORPORATION; BANK OF
                                            NEW YORK MELLON; BANK OF
24 THE BANK OF NEW YORK MELLON              NEW YORK COMPANY, INC.; BANK
CORPORATION, THE BANK OF NEW YORK          OF NEW YORK; AND BANK OF NEW
25 MELLON, THE BANK OF NEW YORK             YORK MELLON TRUST COMPANY,
COMPANY, INC., THE BANK OF NEW             NATIONAL ASSOCIATION
26 YORK, and THE BANK OF NEW YORK
MELLON TRUST COMPANY, N.A.,                Date:     November 17, 2011
27                                          Time:     8:00 a.m.
                         Defendants.        Judge:    Hon. William H. Alsup
28

A/74540339.1                                          Case No. 3:11-CV-03620-WHA

NOTICE OF MOTION AND MOTION TO DISMISS AND MEMORANDUM OF LAW IN SUPPORT OF
THE MOTION TO DISMISS THE CLASS ACTION COMPLAINT

1

# TABLE OF CONTENTS

2

Page

3 NOTICE OF MOTION AND MOTION TO DISMISS .................................................................. 1

4 MEMORANDUM OF LAW IN SUPPORT OF THE MOTION TO DISMISS ......................... 1

PRELIMINARY STATEMENT.................................................................................................... 1

5 STATEMENT OF FACTS ............................................................................................................ 3

6       A.     The Global Custody Agreement.................................................................... 3

7       B.     BNY Mellon's Foreign Exchange Procedures........................................... 4

      C.     The Allegations in the Complaint ............................................................... 7

8 ARGUMENT ................................................................................................................................. 8

9 I.     PLAINTIFF FAILS TO STATE A CLAIM FOR BREACH OF CONTRACT .............. 8

10       A.     Plaintiff Fails To State a Claim with Respect to Rates  Offered to Other Investors in Comparable Transactions .......................................... 8

11       B.     Plaintiff Fails Adequately To Allege that BNY Mellon  Breached a Contractual Obligation To Provide IUOE with "Better" Rates ........................... 9

12       C.     Plaintiff Fails Adequately To Allege that BNY Mellon Had an Obligation To Provide Time Stamps for the FX Transactions It Entered into with IUOE ...................................................................... 10

13

14       D.     BNY Mellon's Alleged Failure To Provide Best Execution Standards Does Not Breach the Parties' Contract ..................................... 11

15 II.    PLAINTIFF FAILS TO STATE A CLAIM FOR BREACH  OF AN IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING............................................. 12

16

17 III.   PLAINTIFF FAILS TO STATE A CLAIM  UNDER THE CALIFORNIA UCL OR FAL.............................................................................................................................. 13

18       A.     Plaintiff Fails To State a Claim Under the Unfair Competition Law ................. 13

19             1.     Plaintiff Fails Adequately To Plead  that the FX Transactions Were Fraudulent ................................................................................ 14

20             2.     Plaintiff Fails Adequately To Plead that the FX Transactions Were Unfair ........................................................................................... 15

21       B.     Plaintiff Fails To State a Claim Under the False Advertising Law...................... 17

22 IV.   PLAINTIFF FAILS TO STATE A CLAIM UNDER THE NEW YORK UNFAIR BUSINESS PRACTICES STATUTE ................................................................... 17

23 V.    PLAINTIFF LACKS STANDING  TO BRING CLAIMS BASED ON ALLEGED CONDUCT  BEFORE IT USED THE BANK'S STANDING INSTRUCTION SERVICES ................................................................................... 18

24

25 VI.   THE CLAIMS ARE BARRED BY THE APPLICABLE LIMITATIONS PERIODS .................................................................................................................. 19

26 VII.  PLAINTIFF FAILS TO STATE CLAIMS AGAINST BANK OF NEW YORK MELLON CORP. AND BANK OF NEW YORK CO., INC........................................ 20

27 CONCLUSION ............................................................................................................................ 21

28

# TABLE OF AUTHORITIES

Page

**CASES**

*Ahmadzai* v. *Metully*,
No. CIVS-05-1091LKKJFMPS, 2005 WL 2219215 (E.D. Cal. Sept. 12, 2005) ................... 19

*Ammirato* v. *Duraclean Int'l, Inc.*,
687 F. Supp. 2d 210 (E.D.N.Y. 2010) ................................................................................. 17

*Andre Strishak & Assocs., P.C.* v. *Hewlett Packard Co.*,
752 N.Y.S.2d 400 (N.Y. App. Div. 2002) .......................................................................... 18

*Aryeh* v. *Canon Bus. Solutions*,
185 Cal. App. 4th 1159 (2010) ......................................................................................... 20

*Brooklyn Navy Yard Cogeneration Partners, L.P.* v. *Superior Court*,
60 Cal. App. 4th 248 (1997) ............................................................................................. 21

*Californians for Disability Rights* v. *Mervyn's, LLC*,
39 Cal. 4th 223 (Cal. 2006) .............................................................................................. 19

*Calvert* v. *Huckins*,
875 F. Supp. 674 (E.D. Cal. 1995) .................................................................................... 21

*Christakis* v. *Mark Burnett Prods.*,
No. CV 08-6864-GW (JTLx), 2009 WL 1248947 (C.D. Cal. Apr. 27, 2009) ...................... 19

*Comm. on Children's T.V., Inc.* v. *Gen. Foods Corp.*,
35 Cal. 3d 197 (1983) ....................................................................................................... 17

*Cook* v. *Brewer*,
637 F.3d 1002 (9th Cir. 2011) ............................................................................................ 8

*Coto Settlement* v. *Eisenberg*,
593 F.3d 1031 (9th Cir. 2010) ............................................................................................ 5

*Ctr. for Biological Diversity, Inc.* v. *FPL Gp., Inc.*,
166 Cal. App. 4th 1349 (2008) ......................................................................................... 16

*Daugherty* v. *Am. Honda Motor*,
144 Cal. App. 4th 824 (2006) ........................................................................................... 16

*Dean Witter Reynolds, Inc.* v. *Sup. Ct.*,
211 Cal. App. 3d 758 (1989) ............................................................................................. 17

*EPA Real Estate P'ship* v. *Kang*,
12 Cal. App. 4th 171 (1992) ............................................................................................. 11

1

<u>TABLE OF AUTHORITIES</u>
(continued)

2                                                                                                              <u>Page</u>

3   *ExxonMobil Inter-Am., Inc.* v. *Advanced Info. Eng'g Servs., Inc.*,
4       328 F. Supp. 2d 443 (S.D.N.Y. 2004) .................................................................... 18

5   *Feitelberg* v. *Credit Suisse First Boston, LLC*,
        134 Cal. App. 4th 1997 (2005) ............................................................................. 13
6
    *Gristede's Foods, Inc.* v. *Unkechauge Nation*,
7       532 F. Supp. 2d 439 (E.D.N.Y. 2007) .................................................................. 19

8   *Gutierrez* v. *Wells Fargo Bank, N.A.*,
        730 F. Supp. 2d 1080 (N.D. Cal. 2010) ........................................................... 14, 16
9
    *Guz* v. *Bechtel Nat'l, Inc.*,
10      24 Cal. 4th 317 (2000) ......................................................................................... 12

11  *Hofstetter* v. *Chase Home Fin., LLC*,
12      No. C 10-01313 WHA, 2010 WL 3259773 (N.D. Cal. Aug. 16, 2010) ................ 16

13  *In re Enron Corp. Sec. Derivative & "ERISA" Litig.*,
        540 F. Supp. 2d 759 (S.D. Tex. 2007) ...................................................................4
14
    *In re Mexico Money Transfer Litig.*,
15      267 F.3d 743 (7th Cir. 2001) ............................................................................... 16

16  *In re NYSE Specialists Sec. Litig.*,
17      260 F.R.D. 55 (S.D.N.Y. 2009) ..............................................................................4

18  *Interactive Intelligence, Inc.* v. *KeyCorp*,
        546 F.3d 897 (7th Cir. 2008) ............................................................................... 12
19
    *Kearns* v. *Ford Motor Co.*,
20      567 F.3d 1120 (9th Cir. 2009) ............................................................................. 14

21  *Knievel* v. *ESPN*,
22      393 F.3d 1068 (9th Cir. 2005) ...............................................................................5

23  *La Jolla Village H'owners' Ass'n* v. *Sup. Ct.*,
        212 Cal. App. 3d 1131 (1989) ............................................................................. 15
24
    *Lavie* v. *Procter & Gamble Co.*,
25      105 Cal. App. 4th 496 (2003) .............................................................................. 17

26  *Lee* v. *Capital One Bank*,
27      No. Civ. 07-4599 MHP, 2008 WL 648177 (N.D. Cal. Mar. 5, 2008) ................... 16

28

Case No. 3:11-CV-03620-WHA

NOTICE OF MOTION AND MOTION TO DISMISS AND MEMORANDUM OF LAW IN SUPPORT OF
THE MOTION TO DISMISS THE CLASS ACTION COMPLAINT

1

TABLE OF AUTHORITIES
(continued)

2

Page

3

*Lipuma* v. *Am. Express Co.*,
   406 F. Supp. 2d 1298 (S.D. Fla. 2005) ............................................................2, 12

4

5

*Lovesy* v. *Armed Forces Benefit Ass'n*,
   No. C 07-2745 SBA, 2008 WL 696991 (N.D. Cal. Mar. 13, 2008) ......................19

6

*McCall* v. *Chesapeake Energy Corp.*,
   10-CIV-8897(DLC), 2011 WL 4056310 (S.D.N.Y. Sept 13, 2011)......................19

7

8

*McCann* v. *Lucky Money, Inc.*,
   129 Cal. App. 4th 1382 (2005) .............................................................................16

9

10

*McKelvey* v. *Boeing N. American, Inc.*,
   74 Cal. App. 4th 151 (1999) .................................................................................20

11

*Miller* v. *Wash. Mut. Bank FA*,
   776 F. Supp. 2d 1064 (N.D. Cal. 2011) ................................................................20

12

13

*New York Univ.* v. *Cont'l Ins. Co.*,
   87 N.Y.2d 308 (1995) ...........................................................................................18

14

*O.K. Petroleum Distrib. Co.* v. *Starnet Ins. Co.*,
   No. 09 Civ. 5094 (LMM), 2009 WL 2432725 (S.D.N.Y. Aug. 5, 2009) ..............19

15

16

*Oswego Laborers' Local 214 Pension Fund* v. *Marine Midland Bank, N.A.*,
   85 N.Y.2d 20 (1995) .............................................................................................18

17

18

*P.B. Ams., Inc.* v. *Cont'l Cas. Co.*,
   690 F. Supp. 2d 242 (S.D.N.Y. 2004)...................................................................18

19

*Parrino* v. *FHP, Inc.*,
   146 F.3d 699 (9th Cir. 1998)..................................................................................5

20

21

*Parris* v. *Nat'l Football League Players Assn.*,
   534 F. Supp. 2d 1081 (N.D. Cal. 2007) ................................................................15

22

23

*Parsons* v. *Tickner*,
   31 Cal. App. 4th 1513 (1995) ...............................................................................20

24

*Pfizer Inc.* v. *Superior Court*,
   182 Cal. App. 4th 622 (2010) ...............................................................................13

25

26

*Sanchez* v. *Giromex, Inc.*,
   No. D042459, 2004 WL 2750332 (Cal. App. Dec. 2, 2004) ................................15

27

28

iv

NOTICE OF MOTION AND MOTION TO DISMISS AND MEMORANDUM OF LAW IN SUPPORT OF
THE MOTION TO DISMISS THE CLASS ACTION COMPLAINT

1

TABLE OF AUTHORITIES
(continued)

2

Page

3

*Shadoan* v. *World Sav. & Loan Assn.*,

4

    219 Cal. App. 3d 97 (1990).............................................................................................17

5

*Shovak* v. *Long Island Commercial Bank*,

    858 N.Y.S.2d 660 (N.Y. App. Div. 2008) ...........................................................................18

6

*Shvarts* v. *Budget Gp., Inc.*,

7

    81 Cal. App. 4th 1153 (2000) ...................................................................................14, 17

8

*Smith* v. *Int'l Bhd. of Elec. Workers*,

    109 Cal. App. 4th 1637 (2003) .......................................................................................12

9

*Sokoloff* v. *Town Sports Int'l Inc.*,

10

    778 N.Y.S.2d 9 (N.Y. App. Div. 2004) .............................................................................19

11

*South Bay Chevrolet* v. *Gen. Motors Acceptance Corp.*,

12

    72 Cal. App. 4th 861 (1999) ...........................................................................................15

13

*Southland Sod Farms* v. *Stover Seed Co.*,

    108 F.3d 1134 (9th Cir. 1997).........................................................................................15

14

*Storek & Storek, Inc.* v. *Citicorp Real Estate, Inc.*,

15

    100 Cal. App. 4th 44 (2002) ...........................................................................................12

16

*StreamCast Networks, Inc.* v. *Skype Techs., S.A.*,

17

    No. CV 06-391 FMC (Ex), 2006 WL 5441237 (C.D. Cal. Sept. 14, 2006) ...........................19

18

*Sun Microsystems Inc.* v. *Microsoft Corp.*,

    188 F.3d 1115 (9th Cir. 1999).........................................................................................13

19

*Zalkind* v. *Ceradyne, Inc.*,

20

    194 Cal. App. 4th 1010 (2011) .........................................................................................9

21

**STATUTES**

22

C.P.L.R. § 214(2) .............................................................................................................19

23

Cal. Bus. & Prof. Code § 17200 ....................................................................................7, 13

24

Cal. Bus. & Prof. Code § 17208 ........................................................................................19

25

Cal. Bus. & Prof. Code § 17500 ....................................................................................7, 17

26

Cal. Civ. Code. § 1641 .......................................................................................................9

27

Cal. Civ. Proc. Code § 337.................................................................................................19

28

NOTICE OF MOTION AND MOTION TO DISMISS AND MEMORANDUM OF LAW IN SUPPORT OF
THE MOTION TO DISMISS THE CLASS ACTION COMPLAINT

1

TABLE OF AUTHORITIES
(continued)

2

Page

3   Cal. Civ. Proc. Code § 338(a) ........................................................................................... 19

4   Cal. Civ. Proc. Code § 1859 .............................................................................................. 11

5   ERISA § 408(b)(18), 29 U.S.C. § 1108(b)(18) .................................................................. 16

6   N.Y. Gen. Bus. Law § 349 ................................................................................... 7, 17, 18, 19

7   **OTHER AUTHORITIES**

8   14A CAL. JUR. 3D CONTRACTS § 372 ............................................................................. 9, 10

9

10  Fed. R. Civ. P. 8 ................................................................................................................. 14

11  Fed. R. Civ. P. 9(b) ............................................................................................................ 14

12  Fed. R. Civ. P. 12(b)(6) ....................................................................................................... 1

13  Nat'l Ass'n of Sec. Dealers Rule 2320(a) .......................................................................... 12

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF MOTION AND MOTION TO DISMISS AND MEMORANDUM OF LAW IN SUPPORT OF
THE MOTION TO DISMISS THE CLASS ACTION COMPLAINT

1    **NOTICE OF MOTION AND MOTION TO DISMISS**

2    PLEASE TAKE NOTICE that on November 17, 2011 at 8:00 a.m., or as soon thereafter

3    as may be heard, at the U.S. District Court, Northern District of California, located at 455

4    Golden Gate Avenue, San Francisco, California, before the Honorable William Alsup,

5    Defendants will and hereby move for an Order dismissing the Class Action Complaint filed by

6    Plaintiff, pursuant to Federal Rule of Civil Procedure 12(b)(6), and applicable law.  This motion

7    is based on this Notice of Motion and Motion; the accompanying Memorandum of Law; the

8    Declaration of Matthew J. Moses and the exhibits thereto; and all other matters properly before

9    this Court.

10   Defendants bring this motion to dismiss all of Plaintiff's claims with prejudice.

11   **MEMORANDUM OF LAW IN SUPPORT OF THE MOTION TO DISMISS**

12   Defendants (collectively, "BNY Mellon") submit this memorandum of law in support of

13   this motion to dismiss the Class Action Complaint (the "Complaint") pursuant to Rule 12(b)(6)

14   of the Federal Rules of Civil Procedure.

15   **PRELIMINARY STATEMENT**

16   Plaintiff International Union of Operating Engineers, Stationary Engineers Local 39

17   Pension Trust Fund ("IUOE") brings suit against BNY Mellon, which acted as custodian for

18   certain IUOE assets, alleging that the bank deceived it and breached the parties' contract when

19   the bank priced "standing instruction" foreign exchange ("FX") transactions.  IUOE's claims

20   cannot be reconciled with the express terms of the parties' agreement.

21   The parties' agreement gave IUOE three choices on each occasion it wished to exchange

22   currencies.  Every day, BNY Mellon would post currency exchange rates, which it would honor

23   (or better) for any customer electing to conduct a standing instruction currency exchange.  With

24   knowledge of those posted rates, IUOE could (i) go forward with its exchange through the

25   standing instruction program, which has numerous advantages, not the least of which are

26   convenience, certainty of execution, and reduction of risk; (ii) negotiate with the bank for

27   different terms; or (iii) conduct its transaction with any other provider of FX services.  Until the

28   agreement was revised in 2008, it provided that the rates would be no less favorable than those

NOTICE OF MOTION AND MOTION TO DISMISS AND MEMORANDUM OF LAW IN SUPPORT OF
THE MOTION TO DISMISS THE CLASS ACTION COMPLAINT

1    offered to unrelated parties in a "comparable" transaction, and Plaintiff alleges that all

2    comparable standing instruction transactions received the same exchange rate.  After the revision

3    in 2008, the agreement no longer contained a comparable transaction provision, stating instead

4    that the rates could deviate up to three percent (300 basis points) from the interbank rate.[1]  The

5    agreement also specified the information Plaintiff was to be provided in its account statements,

6    and there is no dispute that the bank provided that information.

7            Plaintiff does not allege that BNY Mellon ever failed to provide a rate equal to or better

8    than its posted rate guarantee, or within three percent of the interbank rate.  Instead, IUOE

9    contends that BNY Mellon was required to give it the rate that IUOE expects it could have

10   negotiated, notwithstanding that IUOE specifically elected not to negotiate the currency

11   exchange, but rather chose the less burdensome option of executing a standing instruction

12   transaction.  But the parties' agreement does not require the bank to provide negotiated rates for

13   standing instruction transactions.

14           Plaintiff advances a three-step argument in support of its position:  (a) customers

15   generally "expect" that *negotiated* transactions will be within two or three basis points of

16   interbank rates (Compl. ¶¶ 27, 67, 74, 76); (b) such negotiated transactions are "comparable" to

17   *standing instruction* transactions (*id.* ¶¶ 67, 68, 76); and therefore (c) BNY Mellon was obligated

18   to give exchange rates on standing instruction transactions within that two-or-three basis point

19   range but did not.  This argument fails for several reasons.  *First*, Plaintiff does not allege that

20   the bank gave any other client better rates than the ones IUOE received.  Instead, it invents a

21   spread it claims is "expected" and compares that hypothetical rate to the one IUOE received.

22   This is speculation, not the comparison for which the contract provides.  *Second*, Plaintiff

23   assumes that negotiated transactions are "comparable" to standing instruction transactions, even

24   though the agreement calls for different pricing mechanisms for these two distinct types of

25   transactions.  *Third,* Plaintiff ignores express contract terms requiring pricing within a 300 basis

26

27   _____
     [1] The interbank rate is the wholesale rate at which the largest financial institutions exchange
     large volumes of currencies – typically, over $1 million.  *See, e.g.*, *Lipuma* v. *Am. Express Co.*,
28   406 F. Supp. 2d 1298, 1300 (S.D. Fla. 2005).

NOTICE OF MOTION AND MOTION TO DISMISS AND MEMORANDUM OF LAW IN SUPPORT OF
THE MOTION TO DISMISS THE CLASS ACTION COMPLAINT

1    point range of interbank rates, not a two-to-three basis point range.

2         The Complaint asserts five causes of action: breach of contract, breach of an implied

3    covenant of good faith and fair dealing, and violation of three statutes – California's unfair

4    business competition and false advertising laws and the New York unfair business practices law.

5    Each of these claims is defective and the Complaint should be dismissed for the reasons set out

6    below.

7                          **STATEMENT OF FACTS**

8         IUOE alleges that BNY Mellon began providing custodial services for IUOE's

9    investment assets in February 2006, and that the bank also provided ancillary FX services.  The

10   earliest reference in the Complaint to Plaintiff's use of FX services is in June 2008.  (Compl.

11   ¶¶ 68, 72.)

12        **A.     The Global Custody Agreement.**

13        A Global Custody Agreement dated as of February 14, 2006 (the "GCA") is the basic

14   agreement between Plaintiff and BNY Mellon governing the custody of IUOE assets.  (Compl.

15   Ex. A.)[2]  It establishes a trust consisting of such money and property as IUOE elects to

16   contribute.  (GCA § 2.)  A BNY Mellon subsidiary is designated as the "Global Custodian" (*id.*

17   § 2) and has responsibility for maintaining accounts for safekeeping IUOE's assets, for investing

18   trust assets as directed by IUOE or its appointed professional investment managers, and for

19   exercising reasonable care in the performance of its duties.  (*Id.* §§ 2, 6.)  The bank's duties are

20   expressly limited to those specified in the GCA (which contains an integration clause) or

21   otherwise specifically agreed to in writing.  (*Id.* §§ 6(f), 15.)  Among the duties of the appointed

22   third-party investment managers is arranging for the exchange of foreign currency on IUOE's

23   behalf (*id.* § 10) – that is, arranging for conversion of U.S. dollars to foreign currencies when the

24   investment managers need those currencies to buy foreign assets, and converting foreign

25

26   [2] Bank of New York Mellon Corporation is, and Bank of New York Company, Inc. was, a
     holding company that is not alleged to have provided services to Plaintiff; thus, these two
27   defendants do not belong in this case.  *See infra* Part VII.  The Bank of New York Trust
     Company, N.A., the Bank of New York and now the Bank of New York Mellon (a subsidiary of
28   Bank of New York Mellon Corp.) provided the custodial and FX services at issue.

1    currencies to U.S. dollars when funds are returned to the United States.

2           The GCA states that BNY Mellon may offer FX services to IUOE with BNY Mellon

3    "acting as principal" and that BNY Mellon "may retain any profits from such FX Transactions."

4    (*Id.* § 3(d).)  Thus, the GCA makes clear that the bank will not act as an agent, arranging or

5    executing the FX transaction on IUOE's behalf with outside parties or on outside markets.

6    Rather, the GCA provides that the bank will buy or sell for its own account the currency that

7    IUOE wishes to exchange.[3]

8           The GCA also permits BNY Mellon to "establish rules or limitations concerning any

9    foreign exchange facility made available to Customer."  (*Id.*)  These rules and limitations are

10   contained in a series of documents called "Foreign Exchange Procedures," which IUOE

11   acknowledges are part of the parties' contract.  (Compl. ¶¶ 22, 35.)

12          **B.     BNY Mellon's Foreign Exchange Procedures.**

13          The Complaint attaches as Exhibit B a document captioned "Foreign Exchange Policies

14   and Procedures for ERISA Plans," dated July 23, 2003 ("2003 FX Procedures"), on which it

15   relies throughout.  These procedures set forth two different options for exchanging currency with

16   BNY Mellon:  (1) a negotiated (or directed) transaction in which an appointed third-party

17   investment manager negotiates the specific terms of a currency exchange and (2) a standing

18   instruction transaction in which the investment manager shifts the risk and cost of arranging the

19   currency exchange to BNY Mellon.

20          The 2003 FX Procedures provide that they may be amended by the bank.  (2003 FX

21   Procedures at 2.)  The Complaint neglects to attach the current amendment, which went into

22   effect in July 2008 ("2008 FX Procedures").  (Moses Decl. Ex. 1.)[4]  While IUOE fails to state a

23   claim under *any* of the iterations of the FX Procedures, the Court may on this motion consider

24   the 2008 FX Procedures – which make Plaintiff's failure to state a claim even clearer than is the

25   _____

26   [3] *See, e.g.*, *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 61 (S.D.N.Y. 2009) (NYSE
     specialists may trade "on a principal basis" by selling stock from their own account); *In re Enron*

27   *Corp. Sec. Derivative & "ERISA" Litig.*, 540 F. Supp. 2d 759, 784 (S.D. Tex. 2007) (dealer acts
     as a principal in selling commercial paper from its own account).

28   [4] The Complaint also neglects to mention interim versions of the FX Procedures.  (Moses Decl.
     Ex. 2.)

1   case under the 2003 FX Procedures.[5]

2          While the precise terms of the FX Procedures varied, each iteration sets out a similar

3   general process with respect to FX transactions:

4   •   Every day at set times, BNY Mellon establishes and posts a guaranteed rate for each of the

5       currencies in which it deals.  (2003 FX Procedures at 4; 2008 FX Procedures at 1.)

6   •   If IUOE wishes to engage in an FX transaction, it can choose among three options:  (1)

7       electing to do its transaction with an FX service provider other than BNY Mellon, (2) directly

8       negotiating the transaction with BNY Mellon (known as a "direct transaction"), or (3) going

9       forward with a "standing instruction" transaction with BNY Mellon.  If it elects a standing

10      instruction transaction, the FX Procedures provide that it receives a rate equal to or better

11      than the posted rate.  (*See* 2003 FX Procedures at 2-4; 2008 FX Procedures at 1-2.)

12         In sum, BNY Mellon guarantees that it will price standing instruction transactions at rates

13  equal to or better than those it publishes, regardless of how the market moves.  IUOE can

14  consider that price in light of other factors, such as the nature and size of the transaction and

15  prices then available from competing FX providers.  Understanding that it can count on receiving

16  the rate posted by the bank but not necessarily a better one, IUOE decides whether to transact

17  with the bank or with another counterparty.

18         *2003 FX Procedures.*  Focusing on the 2003 FX Procedures on which IUOE relies,

19  standing instruction transactions are limited to those involving $300,000 or less.[6]  All larger

20  transactions must be authorized individually and proceed as direct transactions.  (2003 FX

21  ───────────────

22  [5] On a motion to dismiss a court may consider documents not attached to the complaint if "the complaint necessarily relies upon [the] document[s]."  *Coto Settlement* v. *Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010).  The Ninth Circuit has extended this doctrine to include cases where the claim "depends on the contents of a document" notwithstanding that the complaint does not mention the document.  *Knievel* v. *ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).  Here, the 2008 FX Procedures are part of the parties' contract (Compl. ¶ 110):  the 2003 FX Procedures provide that Plaintiff agrees to be bound by any subsequently issued versions of the FX Procedures. (2003 FX Procedures at 2.)  Considering the 2008 FX Procedures is particularly appropriate because it advances the goal of preventing Plaintiff from defeating this motion by "omitting references to documents upon which [its] claims are based."  *Parrino* v. *FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998) (superseded by statute on other grounds).

[6] *See* Compl. ¶ 28 ("'Standing Instructions' are typically used for income item conversions, such as dividend or interest payments on a foreign investment, or 'de minimis' FX transactions of less than a certain dollar amount.").

1   Procedures at 1-2.)  BNY Mellon posts buy and sell rates at specified times each day.  (*Id.* at 4.)

2   Income item conversions (such as interest payments or dividends) are executed at rates equal to

3   or better than those currently posted.  (*Id.*)  FX transactions relating to purchases or sales are

4   executed at prices equal to or better than the next posted rate, but IUOE, knowing that rate, can

5   cancel the currency exchanges within an hour after the rate is posted.  (*Id.*)  The rates are tested

6   daily to ensure they are no more than three percent outside an exchange rate benchmark (the

7   "WM Fixing Rate") for the time of the posting, and the bank investigates any rates falling

8   outside that range.  (*Id.* at 5.)  The 2003 FX Procedures also provide that the "terms of FX

9   Transactions with any Plan shall not be less favorable to the Plan than terms offered by BNY to

10  unrelated parties in a comparable arm's length FX Transaction."  (*Id.* at 2.)

11         The 2003 FX Procedures specify the information that BNY Mellon is to provide with

12  respect to FX transactions:  account name, transaction date, settlement date, exchange rate, and

13  amount and identity of currencies involved.  (*Id.* at 3, 5.)  IUOE objects that BNY Mellon should

14  have disclosed the time at which standing instruction FX trades were executed on outside

15  markets (Compl. ¶¶ 31, 63-64), but the 2003 FX Procedures do not call for this disclosure and, in

16  any event, it makes little sense because BNY Mellon need not execute the trade on any outside

17  market; it can act as a principal under the GCA and trade from its own inventory of currency.

18         *2008 FX Procedures.*  Under the 2008 FX Procedures, which came into effect shortly

19  after IUOE suggests it first began using BNY Mellon's FX services and which currently govern

20  currency exchanges, BNY Mellon posts its guaranteed rates for each currency by 9 a.m.  (2008

21  FX Procedures at 1.)  IUOE has until 11 a.m. to decide whether it wishes to use BNY Mellon for

22  that day's FX transactions and, if so, whether it wants the transaction executed under the

23  standing instruction program.  No distinction is made based on size of transaction.  If IUOE

24  elects to use the standing instruction services, the FX Procedures provide that it receives an

25  exchange rate at least as favorable as the posted rate and that is within three percent of the

26  interbank rate for the currency pair being exchanged.  (*Id.* at 1-2.)

27         The 2008 FX Procedures (reiterating the GCA) note that BNY Mellon acts "on a

28  principal basis."  (*Id.* at 1.)  The 2008 FX Procedures do not include the language from the 2003

1   FX Procedures stating that the terms of FX Transactions shall not be less favorable than the

2   terms offered to unrelated parties in comparable arm's length FX transactions.

3                              *              *              *

4          The critical point, for purposes of this motion, is that all versions of the FX Procedures

5   established a specific pricing mechanism:  BNY Mellon would post foreign exchange rates every

6   morning, and IUOE could compare them with rates available elsewhere and make a decision

7   whether to accept those rates or not.  There is no allegation that BNY Mellon ever executed an

8   FX transaction at a rate inferior to that posted, or more than three percent outside the relevant

9   exchange rate benchmark.  (Compl. ¶¶ 32, 39, 67-68, 74, 76.)  There is no allegation that other

10  clients engaging in comparable standing instruction transactions in the same currency on the

11  same day received different rates from IUOE; rather, the Complaint states that all such

12  transactions were executed at the same rates.  (*Id.* ¶ 54.)  And there is no allegation that BNY

13  Mellon failed to provide IUOE with any data required by the FX Procedures.

14          **C.      The Allegations in the Complaint.**

15         The crux of the Complaint – which alleges violation of Sections 17200 and 17500 of the

16  California Business and Professional Code, breach of contract, breach of an implied covenant of

17  good faith and fair dealing, and violation of Section 349 of the New York General Business Law,

18  and which seeks damages, restitution, and injunctive relief – is that BNY Mellon overcharged

19  IUOE on standing instruction FX transactions by offering rates averaging some 60 basis points

20  outside interbank rates.  IUOE claims that BNY Mellon was required to offer rates within two or

21  three basis points of the interbank rates.  (Compl. ¶¶ 27, 39, 67, 74, 76.)  The Complaint focuses

22  on a provision in the 2003 FX Procedures (not present in the 2008 FX Procedures) that "the

23  terms of FX Transactions with any Plan shall not be less favorable to the Plan than the terms

24  offered by BNY to unrelated parties in a comparable arm's length FX Transaction."  (*Id.* ¶¶ 22-

25  23, 25, 36, 41, 46, 47, 103, 112, 114.)  IUOE alleges that because BNY Mellon's decision as to

26  *how much better the actual rates would be than the posted ones* was made only after a review of

27  the day's interbank rates, the actual rates were "fictitious."  (*Id.* ¶ 51.)  But IUOE identifies no

28

1    contract term requiring the bank to exchange currency at rates *any* better than the posted ones,

2    nor any limitation on the factors the bank could consider in determining the actual rate.

3                                          <u>**ARGUMENT**</u>

4    **I.      PLAINTIFF FAILS TO STATE A CLAIM FOR BREACH OF CONTRACT.**

5            Plaintiff's breach of contract claim should be dismissed with prejudice because the

6    Complaint fails to allege a breach of the actual terms of the parties' agreement.

7            **A.      Plaintiff Fails To State a Claim with Respect to Rates
                        Offered to Other Investors in Comparable Transactions.**
8

9            The Complaint alleges that BNY Mellon breached the parties' contract by failing to

10   provide IUOE with FX rates in standing instruction transactions that were, as the pre-2008 FX

11   Procedures provided, as favorable as the terms offered by Defendants to unrelated parties in

12   comparable arm's length transactions.  This theory fails for several reasons:

13           *First*, to support such a claim Plaintiff would need to allege facts showing that BNY

14   Mellon offered some other client a rate better than it offered Plaintiff on a comparable

15   transaction.  Plaintiff does not even attempt to do so.  IUOE asserts it is "typical," "expected," or

16   "traditional" for FX providers to charge a spread of two-to-three basis points off interbank rates

17   (Compl. ¶¶ 27, 39, 67, 74, 76), and therefore concludes that BNY Mellon violated the 2003 FX

18   Procedures on any occasion when it charged a larger spread than that.  (*Id.* at ¶ 76.)  But this is

19   not the contractual test – the test is whether BNY Mellon *actually offered* a better rate to another

20   customer in a specific, comparable transaction.  Plaintiff makes no such factual allegation, and a

21   complaint based on speculation cannot survive a motion to dismiss.  *Cook* v. *Brewer*, 637 F.3d

22   1002, 1006 (9th Cir. 2011).

23           *Second*, even if Plaintiff had identified an occasion on which BNY Mellon offered

24   another client a better rate, Plaintiff's breach of contract claim would still fail because IUOE

25   ignores the requirement that the transaction be "comparable."  The "comparable" transactions are

26   other standing instruction currency exchanges on the same day in the same currency, and with

27   regard to such transactions, Plaintiff alleges that BNY Mellon used the *same* exchange rates.

28   (Compl. ¶ 54.)  Thus, Plaintiff treats directly negotiated (and often much larger) transactions as

1  "comparable" to standing instruction transactions, notwithstanding that the parties' agreement

2  treats the two types of transactions as different and that, given the choice between them, Plaintiff

3  elected to use standing instructions.  The Complaint offers no basis for assuming, contrary to the

4  architecture of the agreement, that directly-negotiated FX transactions are comparable to

5  standing instruction transactions (and the assumption disregards a basic rule of commerce that

6  larger transactions are generally priced differently than smaller ones).  Much of the structure of

7  the FX Procedures with respect to standing instruction transactions – for example, the minimum

8  rate guarantees – would be surplusage if BNY Mellon had to price standing instruction

9  transactions on a "most favored nation" basis with the best rate in any directly-negotiated

10  transaction, let alone within two-to-three basis points of the interbank rates, as Plaintiff

11  "expected."  *See, e.g.*, Cal. Civ. Code. § 1641 ("whole of a contract is to be taken together, so as

12  to give effect to every part"); *Zalkind* v. *Ceradyne, Inc.*, 194 Cal. App. 4th 1010, 1027 (2011).

13      *Third*, Plaintiff's assertion that BNY Mellon breached the parties' contract by not

14  exchanging currency at what Plaintiff calls a "market rate" (Compl. ¶¶ 27, 32) fails, because it

15  disregards the express contract terms and invents new ones.  *See* 14A CAL. JUR. 3D CONTRACTS

16  § 372 (no breach of contract for failure to perform tasks that defendant "is not obligated to

17  perform either by law or by the terms of the contract").  The FX Procedures provide that BNY

18  Mellon would execute FX transactions at rates at least as favorable as its posted rates and within

19  three percent of an exchange rate benchmark.  (2008 FX Procedures at 1-2; 2003 FX Procedures

20  at 4-5.)  Plaintiff does not allege that the bank ever failed to do so.

21      **B.    Plaintiff Fails Adequately To Allege that BNY Mellon**
            **Breached a Contractual Obligation To Provide IUOE with "Better" Rates.**

22

23      Plaintiff's reference to a statement in the 2003 FX Procedures (but not in any later

24  versions) that all FX transactions on a given day would be "bundled" together to "achieve better

25  rates for the benefit of clients" (Compl. ¶ 24) cannot salvage the breach of contract claim.  This

26  descriptive statement does not purport to impose any obligations on BNY Mellon.  In addition,

27  the document does not identify the rates to which the bundled rates are supposed to be superior.

28  The most logical comparison would be to the rates Plaintiff would have been able to secure if it

1  had independently negotiated the currency exchanges with other FX providers.  But Plaintiff

2  does not allege any concrete facts showing that BNY Mellon did not in fact provide better

3  exchange rates than IUOE would have been able to secure on its own.  Indeed, assuming IUOE's

4  investment managers were carrying out their fiduciary duties, they were comparing rates offered

5  by BNY Mellon with those available elsewhere and opting to execute standing instruction FX

6  transactions only when the standing instruction rate was superior to other available options.

7

8
      **C.**     **Plaintiff Fails Adequately To Allege that BNY Mellon Had an Obligation To Provide Time Stamps for the FX Transactions It Entered into with IUOE.**

9      Plaintiff alleges that BNY Mellon was able to get away with providing purportedly unfair

10  foreign exchange rates by failing to provide stamps showing the exact time of each transaction

11  on the account statements that were sent to Plaintiff and/or its investment managers.  (Compl.

12  ¶¶ 63-64.)  However, the FX Procedures specifically itemize the information that BNY Mellon

13  will provide to IUOE in connection with completed transactions.  (2003 FX Procedures at 3, 5.)

14  They contain no requirement that BNY Mellon provide a time stamp or the time of the trade; nor

15  does the GCA.  In the absence of such a requirement, Plaintiff has no basis to argue that the

16  failure to provide time stamps breached the parties' contract or contributed to any alleged breach.

17  *See* 14A Cal. Jur. 3d Contracts § 372, *supra*.

18      Moreover, the contention that BNY Mellon has breached a contractual, implied, or

19  statutory obligation by failing to provide time stamped execution prices makes little sense in the

20  context of the agreement between the parties, which provides that the bank would act as a

21  principal when engaging in standing instruction foreign currency exchanges, purchasing

22  currency from or selling it to BNY Mellon's own account on agreed-upon terms.  IUOE, or its

23  investment manager, could have compared the price it received with the market prices on any

24  given day and determined whether it wanted to continue making use of BNY Mellon's standing

25  instruction services.  Indeed, it is notable that the analysis performed by Plaintiff that purports to

26  show that BNY Mellon's FX rates were unfair (Compl. ¶¶ 71-77) was done without the benefit

27  of time stamps or any other information that was not either provided by the bank on a regular

28  basis or publicly available.

NOTICE OF MOTION AND MOTION TO DISMISS AND MEMORANDUM OF LAW IN SUPPORT OF
THE MOTION TO DISMISS THE CLASS ACTION COMPLAINT

1  **D.    BNY Mellon's Alleged Failure To Provide Best**
          **Execution Standards Does Not Breach the Parties' Contract.**
2

3      Plaintiff also claims BNY Mellon breached the parties' contract by failing to execute

4  standing instruction trades free of charge and failing to apply best execution standards

5  (Compl. ¶ 42) – terms Plaintiff finds on a promotional page on the bank's website.

6      With respect to best execution standards, IUOE interprets the term to mean that

7  customers are and always were entitled to a best-price guarantee, which IUOE equates with a

8  right to exchange currency at rates at least as favorable as those used in direct FX transactions.

9  Notably, IUOE does not claim that it relied on or even saw this language before taking advantage

10 of BNY Mellon's standing instruction FX services.  This claim fails for several reasons:

11     *First*, the "best execution" language upon which IUOE relies to rewrite BNY Mellon's

12 pricing obligations is not part of the parties' contract.  Neither the GCA nor the FX Procedures

13 ever uses the term "best execution."  The promotional webpage on which the term appears is not

14 incorporated by reference into the GCA, which contains an integration clause.  (GCA § 15.)

15 Accordingly, the term does not impose any obligations on the bank.  *See, e.g.*, *EPA Real Estate*

16 *P'ship* v. *Kang*, 12 Cal. App. 4th 171, 176-77 (1992).

17     *Second*, even if the best execution language were part of the parties' agreement,

18 established rules of contract interpretation provide that the express terms of the contract relating

19 to pricing would prevail.  Contrary to IUOE's argument that BNY Mellon was required by the

20 "best execution" language to give IUOE the benefit of hypothetical directed rates, the express

21 terms of the GCA and the FX Procedures contain no such undertaking.  Indeed, as noted above,

22 the FX Procedures expressly contemplate rates up to three percent outside exchange rate

23 benchmarks.  (2008 FX Procedures at 4-5; 2003 FX Procedures at 1-2.)  Where, as here, a

24 plaintiff attempts to read general language to conflict with express contract terms, California law

25 precludes the claim.  *See* Cal. Civ. Proc. Code § 1859 (when general and particular provisions

26 are inconsistent, "the latter is paramount").

27     *Third*, the "best execution" language imposes no obligation on the bank with respect to

28 pricing.  IUOE's interpretation of the phrase presumably seeks to import into a world of FX

NOTICE OF MOTION AND MOTION TO DISMISS AND MEMORANDUM OF LAW IN SUPPORT OF
THE MOTION TO DISMISS THE CLASS ACTION COMPLAINT

1    trading an obligation imposed on broker-dealers with respect to securities trading.[7]  But there is

2    no comparable rule governing pricing in the area of FX trading, and IUOE does not allege

3    otherwise.  *See, e.g.*, *Interactive Intelligence, Inc.* v. *KeyCorp*, 546 F.3d 897, 899-901 (7th Cir.

4    2008) (rejecting claim based on failure to execute FX trades without spread); *Lipuma*, 406 F.

5    Supp. 2d at 1320-21 (noting weakness of claim based on mark-ups of FX trades).

6        Plaintiff's argument based on the "free of charge" language that appeared on prior

7    versions of the bank's website – but does not appear on the current website – is also deficient.

8    The term is not part of the parties' contract (which expressly permits BNY Mellon to "retain any

9    profits from . . . FX Transactions"), and the integration clause precludes Plaintiff from relying on

10   any external statements.  (GCA § 15.)  Further, Plaintiff's interpretation – that executing

11   standing instruction FX transactions free of charge means using an exchange rate within two-to-

12   three basis points of the interbank rate – fails since there is no logical rationale for equating free

13   with two or three basis points outside the interbank rate.[8]

14   **II.    PLAINTIFF FAILS TO STATE A CLAIM FOR BREACH
15          OF AN IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.**

16       Plaintiff's claim for breach of an implied covenant of good faith and fair dealing seeks to

17   rewrite the parties' contract.  But under California law a claim for breach of an implied covenant

18   must be dismissed if it would impose obligations "beyond those incorporated into the specific

19   terms" of the contract, *Guz* v. *Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 327, 349-50 (2000), or would

20   contradict the contract terms.  *Storek & Storek, Inc.* v. *Citicorp Real Estate, Inc.*, 100 Cal. App.

21   4th 44, 55 (2002).[9]

22

_____

23   [7] *See, e.g.*, Nat'l Ass'n of Sec. Dealers ("NASD") Rule 2320(a) (broker-dealer obligated to "use
     reasonable diligence to ascertain the best market for the subject security and buy or sell in such
24   market so that the resultant price to the customer is as favorable as possible under prevailing
     market conditions").
25   [8] The "free of charge" language relates to the parties' agreement that the bank may charge IUOE
     a per-transaction administrative fee for currency exchange executed with third parties, but that
26   there would be no such fee for standing instruction FX transactions.
     [9] Additionally, Plaintiff may not bring a claim for breach of an implied covenant of good faith
27   because it is also bringing suit for breach of contract:  "breach of the covenant of good faith . . .
     does not give rise to a cause of action separate from a cause of action for breach of the contract."
28   *Smith* v. *Int'l Bhd. of Elec. Workers*, 109 Cal. App. 4th 1637, 1644 n.3 (2003).

1    Here, Plaintiff alleges that BNY Mellon breached an implied covenant of good faith by

2    providing supposedly sub-optimal rates in standing instruction FX transactions.  But the express

3    contract between the parties explicitly addresses pricing of FX transactions, requiring that BNY

4    Mellon post daily rates that Plaintiff and its investment managers can accept or reject.  Plaintiff

5    now seeks to use an implied covenant to create a different pricing mechanism, under which BNY

6    Mellon was required to give IUOE the benefit of hypothetical rates that IUOE would have

7    "expected."  This claim would impermissibly impose duties on the bank in addition to and

8    inconsistent with the specific terms of the parties' contract.

9    **III.    PLAINTIFF FAILS TO STATE A CLAIM**
     **        UNDER THE CALIFORNIA UCL OR FAL.**

10

11    Plaintiff fails adequately to allege facts that support the two California statutory claims

12   and so these claims should be dismissed with prejudice.[10]

13    **A.    Plaintiff Fails To State a Claim Under the Unfair Competition Law.**

14    The Complaint fails to state a claim under the California Unfair Competition Law

15   ("UCL"), which prohibits fraudulent or unfair business practices, Cal. Bus. & Prof. Code

16   §§ 17200, *et seq.*, because Plaintiff fails to plead that the bank's practices were either fraudulent

17   or unfair, as required by the UCL.[11]  This claim is also largely time-barred.  *See infra* Part VI.

18   [10] The Court should also dismiss Plaintiff's request for injunctive relief pursuant to the UCL and
     the FAL.  Settled California law provides that injunctions may not issue "in the absence of any
19   evidence that the [allegedly wrongful] acts are likely to be repeated in the future."  *Feitelberg* v.
     *Credit Suisse First Boston, LLC*, 134 Cal. App. 4th 1997, 1012, 1022 (2005).  This principle
20   applies in full force to claims for injunctive relief under the UCL and the FAL.  *See, e.g.*, *Sun
     Microsystems Inc.* v. *Microsoft Corp.*, 188 F.3d 1115, 1123 (9th Cir. 1999) (UCL); *Pfizer Inc.* v.
21   *Superior Court*, 182 Cal. App. 4th 622, 631 & n.5 (2010) (UCL and FAL).  IUOE's argument
     that the "best execution" language on BNY Mellon's website led it to believe that the bank was
22   providing a best price guarantee for the rates used in standing instruction currency exchanges
     (Compl. ¶¶ 42, 45, 103) cannot withstand scrutiny in light of other language from the same
23   webpage that defines best execution in a manner that has nothing to do with pricing, but instead
     concerns facilitating customer trades.  *See* BNY Mellon, *Standing Instructions*,
24   https://gm.bankofny.com/FX/TradeExecution/StandingInstruction.aspx (last visited Oct. 6,
     2011).  The other allegedly misleading statements identified by Plaintiff do not appear in the
25   current FX Procedures or BNY Mellon's current website.  As a result, there is no "offending
     conduct" to enjoin; the allegedly wrongful practices "ended before the action was filed"; and no
26   allegation has been or can be made that the complained-of conduct is likely to recur.
     [11] An alleged illegal act may also serve as the predicate for a UCL claim, but Plaintiff does not
27   assert that BNY Mellon violated any law.  The only statute Plaintiff references in its Complaint
     is ERISA (Compl. ¶ 23), but IUOE does not contend that the bank violated ERISA (and the
28   allegations in the Complaint do not state such a claim).

1

> 1. **Plaintiff Fails Adequately To Plead**
> **that the FX Transactions Were Fraudulent.**

2

3    Plaintiff's allegations do not meet the requirements under the UCL for pleading that a

4 business practice is "fraudulent," which obligate a plaintiff to assert that "members of the public

5 are likely to be deceived." *Gutierrez* v. *Wells Fargo Bank, N.A.*, 730 F. Supp. 2d 1080, 1126

6 (N.D. Cal. 2010) (Alsup, J.) (internal citations and quotation marks omitted).[12]

7    Plaintiff points to three reasons why BNY Mellon's pricing for standing instruction

8 foreign exchange transactions supposedly was fraudulent: (i) the failure to execute standing

9 instruction currency exchanges at the rates it would "expect" for negotiated transactions (Compl.

10 ¶ 27, 67, 74, 76); (ii) the failure to provide rates consistent with a statement in promotional

11 materials that the bank would use best execution standards for its currency exchanges (*id.* ¶¶ 42-

12 44); and (iii) the failure to disclose the amount the bank earned on standing instruction FX

13 transactions (*id.* ¶ 41). None of these allegations can support a claim for violation of the UCL

14 because none suggests that members of the public were likely to have been deceived:

15 • The bank's commitment in the 2003 FX Procedures to provide foreign currency exchange

16    rates in standing instruction transactions that were as favorable as those provided in

17    comparable transactions (Compl. ¶¶ 22, 36) was not misleading because Plaintiff never

18    alleges that BNY Mellon provided better rates to any other client in a transaction comparable

19    to one of Plaintiff's. *See supra* Part I.A. IUOE thus fails to satisfy the pleading requirements

20    of Fed. R. Civ. P. 8, let alone the heightened standards of Rule 9(b), which govern the fraud-

21    based UCL claim. *See, e.g.*, *Kearns* v. *Ford Motor Co.*, 567 F.3d 1120, 1124-25 (9th Cir.

22    2009).

23 • In light of BNY Mellon's numerous disclosures of its practices in connection with pricing

24    standing instruction FX transactions, not to mention the basic distinction in the FX

25    Procedures between standing instruction and direct currency exchanges, no reasonable

26    consumer (let alone a financially sophisticated entity such as Plaintiff) could have thought

27

---

28 [12] *See also Shvarts* v. *Budget Gp., Inc.*, 81 Cal. App. 4th 1153, 1159-60 (2000) (affirming dismissal on demurrer because customers were not likely to be deceived).

NOTICE OF MOTION AND MOTION TO DISMISS AND MEMORANDUM OF LAW IN SUPPORT OF
THE MOTION TO DISMISS THE CLASS ACTION COMPLAINT

1   the bank had agreed to provide negotiated rates, much less hypothetical "expected"

2   negotiated rates, for standing instruction exchanges.  *South Bay Chevrolet* v. *Gen. Motors*

3   *Acceptance Corp.*, 72 Cal. App. 4th 861, 878-881 (1999) (plaintiff with information needed

4   to determine interest calculation method failed to prove UCL claim based on alleged

5   unauthorized and undisclosed use of purportedly unfair calculation method).

6   • Plaintiff's allegation that the phrase "best execution standards" on the bank's promotional

7   webpage was misleading cannot support Plaintiff's claim under the fraud prong of the UCL,

8   because Plaintiff does not allege that it relied upon the term before making use of the bank's

9   standing instruction services.  *See, e.g.*, *Parris* v. *Nat'l Football League Players Assn.*, 534 F.

10   Supp. 2d 1081, 1093-94 (N.D. Cal. 2007) (Alsup, J.) (failure to meet heightened pleading

11   standard for claim under the fraud prong of UCL because plaintiffs never alleged seeing or

12   relying on defendants' statements).[13]

13   • With respect to the allegation that BNY Mellon violated the UCL by failing to disclose its

14   earnings on foreign currency exchanges, there is ordinarily no claim for fraud based on non-

15   disclosure in the absence of a contractual or other legal obligation to disclose, *La Jolla*

16   *Village H'owners' Ass'n* v. *Sup. Ct.*, 212 Cal. App. 3d 1131, 1151 (1989), and Plaintiff does

17   not allege any basis for requiring the bank to reveal its foreign currency spread.  One

18   California court has already held that failure to disclose earnings on foreign currency

19   exchanges is not deceptive when the defendant gave the plaintiff the benefit of its published

20   exchange rates.  *Sanchez* v. *Giromex, Inc.*, No. D042459, 2004 WL 2750332 at *10, *13

21   (Cal. App. Dec. 2, 2004) (unpublished).  Such is also the case here.

22       2.   Plaintiff Fails Adequately To Plead that the FX Transactions Were Unfair.

23       Plaintiff's claim under the "unfair" prong of the UCL is likewise deficient.  "An act or

24   practice is unfair if the consumer injury is substantial, is not outweighed by any countervailing

25   benefit to consumers or to competition, and is not an injury the consumers themselves could

26   _____

27   [13] The claim under the fraud prong of the UCL based on language in promotional materials, including the bank's description of itself as "a premier foreign exchange provider" (Compl. ¶¶ 5, 42-45), fails for the further reason that this language is non-actionable puffery.  *See, e.g.*,

28   *Southland Sod Farms* v. *Stover Seed Co.*, 108 F.3d 1134, 1145 (9th Cir. 1997).

1   reasonably have avoided." *Daugherty* v. *Am. Honda Motor*, 144 Cal. App. 4th 824, 839 (2006).

2   Plaintiff fails to plead any of these elements, but the Complaint's most glaring deficits are the

3   failure to allege injury and the failure to allege that any injury was unavoidable.[14]

4         Plaintiff does not adequately allege injury because it does not plead facts showing that it

5   failed to receive the benefit of its bargain.  *Lee* v. *Capital One Bank*, No. Civ. 07-4599 MHP,

6   2008 WL 648177 at *4 (N.D. Cal. Mar. 5, 2008).  Plaintiff contends it was harmed because BNY

7   Mellon did not charge hypothetical negotiated rates in standing instruction currency exchanges

8   as expected (Compl. ¶¶ 46, 67, 76), but the bank never agreed to charge negotiated (much less

9   "expected") rates for standing instruction transactions.  *See supra* Part I.A.

10        Plaintiff also says it was harmed because the bank did not disclose its profits on standing

11  instruction FX transactions.  (Compl. ¶¶ 25-26, 32, 41, 46-47.)  But the bank was under no

12  obligation to do so.  Non-disclosure of a party's FX spread does not run afoul of the unfair prong

13  of the UCL in the absence of an independent duty to make such disclosure.  *McCann* v. *Lucky*

14  *Money, Inc.*, 129 Cal. App. 4th 1382, 1395-96 (2005).  And Plaintiff identifies no such

15  independent duty.  *In re Mexico Money Transfer Litig.*, 267 F.3d 743 (7th Cir. 2001)

16  (Easterbrook, J.) is instructive on this point.  As that case explains, "[m]oney is just a commodity

17  in an international market," and thus an FX transaction is no different than a purchase at a

18  department store, where there is no duty to disclose the commodity's wholesale price.  *Id.* at 749.

19  _____

20  [14] This claim also fails under the alternative standard for pleading unfairness, which requires a
    plaintiff to "(1) identify an unfair policy or practice *tethered to a legislatively declared policy* or
21  (2) show an actual or threatened impact on competition." *Gutierrez*, 730 F. Supp. 2d at 1120;
    *Hofstetter* v. *Chase Home Fin., LLC*, No. C 10-01313 WHA, 2010 WL 3259773 at *14 (N.D.
    Cal. Aug. 16, 2010) (Alsup, J.) (tethering test applies to consumer UCL cases).  The absence of
22  competitive harm is discussed in text below.  Plaintiff also does not identify a declared
    legislative policy that the standing instruction FX transactions offend.  While the Complaint
23  refers to a provision in ERISA containing language similar to the "not less favorable" provision
    in the 2003 FX Procedures (Compl. ¶¶ 23, 25), it alleges no facts showing that the bank violated
24  that contract term or the statute, which allows plans to engage in transactions with a "party in
    interest" if, as is relevant here, the transaction is a foreign currency exchange with a rate:  (i) not
25  less favorable than that generally available in arm's length transactions, *or* than the rate the bank
    is offering in comparable arm's length transactions; and (ii) that does not deviate by more than
26  three percent from the interbank rate.  ERISA § 408(b)(18), 29 U.S.C. § 1108(b)(18).  If Plaintiff
    is contending that the bank violated a provision of ERISA – which is administered by the
27  Department of Labor – to support the California statutory claims, judicial abstention would be
    required so that the Court does not interfere with agency functions.  *See,* e.g., *Ctr. for Biological
28  Diversity, Inc.* v. *FPL Gp., Inc.*, 166 Cal. App. 4th 1349, 1371-72 (2008).

NOTICE OF MOTION AND MOTION TO DISMISS AND MEMORANDUM OF LAW IN SUPPORT OF
THE MOTION TO DISMISS THE CLASS ACTION COMPLAINT

1    Additionally, a practice cannot threaten competition if the plaintiff has a reasonably

2  available alternative source of supply for the allegedly unfair service.  *See, e.g.*, *Shvarts*, 81 Cal.

3  App. 4th at 1159.[15]  Here, Plaintiff was free to opt out of using standing instruction transactions,

4  either by negotiating with the bank or by exchanging currency with another counterparty.  The

5  parties' contract explicitly reminds IUOE of these alternatives.  (2003 FX Procedures at 2; 2008

6  FX Procedures at 2.)

7    **B.    Plaintiff Fails To State a Claim Under the False Advertising Law.**

8    Like Plaintiff's claim for violation of the UCL, Plaintiff's claim for violation of the

9  California False Advertising Law ("FAL") – which prohibits dissemination of promotional

10  materials that the advertiser knew or should have known were untrue or misleading, Cal. Bus. &

11  Prof. Code §§ 17500, *et seq.* – should be dismissed with prejudice.  *First*, California courts have

12  adopted the standard used for the "fraud" prong of the UCL to determine whether advertising

13  was untrue or misleading, and so this claim is subject to the same defenses as Plaintiff's claim

14  for violation of the UCL.  *See, e.g.*, *Comm. on Children's T.V., Inc.* v. *Gen. Foods Corp.*, 35 Cal.

15  3d 197, 211 (1983) (superseded by statute).[16]  *Second*, Plaintiff does not allege that BNYM knew

16  the alleged misrepresentations were untrue or misleading, as is required by the FAL.  *See* Cal.

17  Bus. & Prof. Code § 17500.  *Third*, the FAL claim is largely barred by the statute of limitations.

18  *See infra* Part VI.

19  **IV.   PLAINTIFF FAILS TO STATE A CLAIM UNDER THE NEW YORK UNFAIR
         BUSINESS PRACTICES STATUTE.**
20

21    To state a claim under the New York unfair business practices statute, General Business

22  Law § 349, Plaintiff must allege that: (1) the act or practice in question was "consumer

23  oriented"; (2) it was materially misleading; and (3) Plaintiff suffered injury.  *See, e.g.*, *Ammirato*

24

25  [15] *See also Dean Witter Reynolds, Inc.* v. *Sup. Ct.*, 211 Cal. App. 3d 758, 770-72, 774-75  (1989)
    (availability of alternative sources precluded finding that fee was unconscionable); *Shadoan* v.
26  *World Sav. & Loan Assn.*, 219 Cal. App. 3d 97, 102-06 (1990).
    [16] If the challenged advertising is aimed at a particular group, the question whether it is
27  misleading is viewed from the group's perspective.  *Lavie* v. *Procter & Gamble Co.*, 105 Cal.
    App. 4th 496, 512 (2003).  The bank marketed standing instruction services to sophisticated
28  parties that are even less likely to have been misled than the general public.

1   v. *Duraclean Int'l, Inc.*, 687 F. Supp. 2d 210, 221 (E.D.N.Y. 2010).  Plaintiff here fails to allege

2   facts that meet either the first or the second prong of the test.  Moreover, this claim is largely

3   barred by the three-year statute of limitations.  *See infra* Part VI.

4        BNY Mellon's standing instruction FX services are not "consumer oriented" within the

5   meaning of the New York statute.  *First*, the standing instruction transactions involve

6   sophisticated parties.  *See, e.g.*, *ExxonMobil Inter-Am., Inc.* v. *Advanced Info. Eng'g Servs., Inc.*,

7   328 F. Supp. 2d 443, 449-50 (S.D.N.Y. 2004) (GBL § 349 is "severely limit[ed]" in its

8   application when plaintiff is a business).[17]  *Second*, the standing instruction transactions do not

9   involve consumer services.  *See, e.g.*, *P.B. Ams., Inc.* v. *Cont'l Cas. Co.*, 690 F. Supp. 2d 242,

10   252 (S.D.N.Y. 2004) (defining "consumers" as those "who purchase . . . services for personal,

11   family, or household use").  *Third*, the standing instruction FX transactions were carried out

12   pursuant to the GCA, which is on its face an individually negotiated contract.  *See, e.g.*,

13   *ExxonMobil*, 328 F. Supp. 2d at 449-50 (no liability under GBL § 349 since contract was tailored

14   to plaintiff's needs).

15        Nor were BNY Mellon's standing instruction FX services materially misleading – that is,

16   "likely to mislead a reasonable consumer acting reasonably under the circumstances."  *Andre*

17   *Strishak & Assocs., P.C.* v. *Hewlett Packard Co.*, 752 N.Y.S.2d 400, 403 (N.Y. App. Div. 2002).

18   This standard is similar to the one governing claims under the fraud prong of the UCL, and

19   Plaintiff's claim under the New York statute fails for the same reasons that the UCL claim fails.

20   *See supra* Part III; *Shovak* v. *Long Island Commercial Bank*, 858 N.Y.S.2d 660, 662-63 (N.Y.

21   App. Div. 2008) (plaintiff not misled since maximum currency exchange spread was disclosed).

22   **V.   PLAINTIFF LACKS STANDING**
       **TO BRING CLAIMS BASED ON ALLEGED CONDUCT**
23     **BEFORE IT USED THE BANK'S STANDING INSTRUCTION SERVICES.**

24        Plaintiff lacks standing to bring claims based on the FX transactions that occurred before

25

---

26   [17] Plaintiff may point to *Oswego Laborers' Local 214 Pension Fund* v. *Marine Midland Bank,*
     *N.A.*, 85 N.Y.2d 20 (1995), to argue that a pension fund can recover under GBL § 349.  *Id.* at 25.
27   But the *Oswego* plaintiff's claim alleged it was treated like any other customer, suggesting that
     defendant's practices threatened harm to ordinary consumers.  *See also New York Univ.* v. *Cont'l*
28   *Ins. Co.*, 87 N.Y.2d 308, 321 (1995).  IUOE makes no such allegation.

1    its first alleged use of standing instruction FX services because it cannot allege that it suffered

2    harm with respect to those transactions.  *See McCall* v. *Chesapeake Energy Corp.*, 10-CIV-

3    8897(DLC), 2011 WL 4056310, at *3 (S.D.N.Y. Sept 13, 2011) (no standing to claim breach of

4    contract because plaintiff was not party to contract).[18]  Thus, IUOE cannot sue on transactions

5    that occurred before June 2008 – the earliest date that IUOE has identified for any of its standing

6    instruction FX trades.  The 2008 FX Procedures came into effect on or around July 1, 2008; they

7    do not contain the language about "comparable" transactions or "better" rates.  (Moses Decl. Ex.

8    1.)  Thus, for all but one month of the period when IUOE used standing instruction services, the

9    FX Procedures said nothing about the bank's providing rates as favorable as those available in

10   "comparable" transactions or bundling transactions to get "better" rates.  IUOE is left to base its

11   claim on two inadequate predicates:  the "best execution" language on the bank's webpage and a

12   purported obligation to disclose its spread on FX trades.

13   **VI.    THE CLAIMS ARE BARRED BY THE APPLICABLE LIMITATIONS PERIODS.**

14        Plaintiff appears to be asserting its claims going back to January 12, 1999.  (Compl.

15   ¶ 79.)  To the extent Plaintiff seeks to advance claims that are barred by their respective statutes

16   of limitation – for breach of contract and an implied covenant of good faith and fair dealing, four

17   years (Cal. Civ. Proc. Code § 337); for the UCL claim, four years (Cal. Bus. & Prof. Code

18   § 17208); and for the FAL (Cal. Civ. Proc. Code § 338(a)) and the New York statutory claim,

19   three years (C.P.L.R. § 214(2)) – the claims should be dismissed.[19]

20

---

21   [18] *See also Lovesy* v. *Armed Forces Benefit Ass'n*, No. C 07-2745 SBA, 2008 WL 696991, at *10
     (N.D. Cal. Mar. 13, 2008) (no standing to claim breach of contract absent harm); *O.K. Petroleum*
22   *Distrib. Co.* v. *Starnet Ins. Co.*, No. 09 Civ. 5094 (LMM), 2009 WL 2432725, at *2 (S.D.N.Y.
     Aug. 5, 2009) (no standing to claim breach of implied covenant of good faith absent harm);
23   *Californians for Disability Rights* v. *Mervyn's, LLC*, 39 Cal. 4th 223, 228-29 & n.2 (Cal. 2006)
     (no standing to claim violation of UCL and FAL absent harm); *Sokoloff* v. *Town Sports Int'l Inc.*,
24   778 N.Y.S.2d 9, 10 (N.Y. App. Div. 2004) (no standing to claim violation of GBL § 349 absent
     harm).
25   [19] *Ahmadzai* v. *Metully*, No. CIVS-05-1091LKKJFMPS, 2005 WL 2219215, at *3 (E.D. Cal.
     Sept. 12, 2005), *adopted in full*, No. S-05-1091 LKK JFM PS, 2006 WL 20793, at *1 (E.D. Cal.
26   Jan. 3, 2006) (breach of contract); *Christakis* v. *Mark Burnett Prods.*, No. CV 08-6864-GW
     (JTLx), 2009 WL 1248947, at *4 (C.D. Cal. Apr. 27, 2009) (breach of covenant of good faith);
27   *StreamCast Networks, Inc.* v. *Skype Techs., S.A.*, No. CV 06-391 FMC (Ex), 2006 WL 5441237,
     at *9 & n.8 (C.D. Cal. Sept. 14, 2006) (UCL and FAL); *Gristede's Foods, Inc.* v. *Unkechauge*
28   *Nation*, 532 F. Supp. 2d 439, 453 (E.D.N.Y. 2007) (GBL § 349).

1    Plaintiff's contention that it could not have discovered its claims by the exercise of

2   reasonable diligence – thereby implicitly invoking the discovery rule (Compl. ¶ 91) – cannot

3   salvage its untimely claims.  Under the discovery rule, the statute of limitations begins to run

4   "when the plaintiff has notice or information of circumstances to put a reasonable person on

5   inquiry."  *Parsons* v. *Tickner*, 31 Cal. App. 4th 1513, 1525 (1995).  For the rule to apply,

6   Plaintiff must make concrete allegations showing that it could not have discovered its claims by

7   the exercise of reasonable diligence.  *See, e.g.*, *McKelvey* v. *Boeing N. American, Inc.*, 74 Cal.

8   App. 4th 151, 160 (1999) (superseded by statute on other grounds).[20]  Plaintiff makes no such

9   allegations, relying instead on a conclusory assertion that it could not have discovered its claims

10  before two whistleblower complaints against the bank were unsealed earlier this year.  (Compl.

11  ¶¶ 6, 91.)  But the Complaint and other materials properly before the Court disprove this

12  assertion.  At all relevant times, IUOE had the data to perform the analysis cited in the

13  Complaint to support the position that the bank used unfair FX rates.  (Compl. ¶¶ 71-77.)

14  **VII.    PLAINTIFF FAILS TO STATE CLAIMS AGAINST BANK OF NEW YORK
            MELLON CORP. AND BANK OF NEW YORK CO., INC.**

15

16   Plaintiff's claims against Defendants Bank of New York Co., Inc. ("BNY Inc.")

17  (formerly the corporate parent of Defendant Bank of New York Co.), and Bank of New York

18  Mellon Corp. ("BNY Mellon Corp.") (currently the parent of Defendants Bank of New York

19  Mellon and Bank of New York Mellon Trust Co., N.A.) – for alleged violation of California's

20  UCL and FAL and New York's unfair business practices law – fail because Plaintiff never

21  asserts that the holding companies provided services to IUOE.  Plaintiff merely identifies the

22  holding companies as parties (Compl. ¶¶ 11, 13); sets out their relationship to their subsidiaries

23  (*id*. ¶¶ 12, 14); and asserts that BNY Mellon Corp.'s website made misleading statements about

24

25  [20] Some courts have held that the discovery rule does not apply to UCL claims.  *See e.g.*, *Aryeh*
    v. *Canon Bus. Solutions*, 185 Cal. App. 4th 1159, 1166 (2010), *review granted* 240 P.3d 823
26  (Cal. 2010).  Others reach the opposite result.  *See, e.g., Miller* v. *Wash. Mut. Bank FA*, 776 F.
    Supp. 2d 1064, 1070 (N.D. Cal. 2011) (Alsup, J.) (applying discovery rule where unsophisticated
27  party alleged being misled).  The California Supreme Court granted review of *Aryeh* to resolve
    this issue.  Unlike in *Miller*, the plaintiff here is sophisticated, so the Court should not apply the
28  discovery rule to the UCL claim.

1   Bank of New York Mellon's FX services (*id*. ¶¶ 42, 44).  These allegations based on the holding

2   companies' actions do not satisfy the elements of the claims against them.  *See supra* Parts I-V.

3         Nor does Plaintiff plead facts showing that the holding companies should be liable for

4   alleged acts of their subsidiaries under a veil-piercing theory.  Because disregarding corporate

5   formalities is an "extreme" remedy, there is a general presumption against piercing the corporate

6   veil.  *Calvert* v. *Huckins*, 875 F. Supp. 674, 678 (E.D. Cal. 1995).  California courts will do so

7   only if (1) the corporations do not have "separate personalities"; and (2) respecting corporate

8   separateness would be unfair.  *Brooklyn Navy Yard Cogeneration Partners, L.P.* v. *Superior*

9   *Court*, 60 Cal. App. 4th 248, 257-58 (1997).  Plaintiff's allegation of "substantial overlap

10   between BNY Mellon Corp. and [Bank of New York Mellon]" (Compl. ¶ 12) fails to meet this

11   standard; and the Complaint is bare of allegations that support piercing BNY Inc.'s veil.

12   <u>**CONCLUSION**</u>

13         For the foregoing reasons, the Complaint should be dismissed in its entirety with

14   prejudice.  BNY Mellon respectfully requests oral argument of this motion.

15

16   DATED:  October 7, 2011          Respectfully submitted,

17                       Bingham McCutchen LLP

18

19

20                  By:_____ /s/ David M. Balabanian _____
                    David M. Balabanian

21                       Attorneys for All Defendants

22

23

24

25

26

27

28

A/74540339.1          21          Case No. 3:11-CV-03620-WHA

NOTICE OF MOTION AND MOTION TO DISMISS AND MEMORANDUM OF LAW IN SUPPORT OF
THE MOTION TO DISMISS THE CLASS ACTION COMPLAINT