1   Richard M. Heimann (State Bar No. 063607)        Michael P. Lehmann (State Bar No. 77152)
    Lexi J. Hazam (State Bar No. 224457)              Christopher L. Lebsock (State Bar No.
2   Robert L. Lieff (State Bar No. 037568) (Of       184546)
    Counsel)                                         HAUSFELD LLP
3   LIEFF, CABRASER, HEIMANN &                       44 Montgomery Street, 34th Floor
    BERNSTEIN, LLP                                   San Francisco, CA 94104
4   Embarcadero Center West                          Telephone:  (415) 633-1908
    275 Battery Street, 29th Floor                   Facsimile:  (415) 358-4980
5   San Francisco, CA  94111-3339
    Telephone:  (415) 956-1000
6   Facsimile:   (415) 956-1008

7   *Attorneys for Plaintiff and the Proposed Class*

8
    [Additional counsel listed on signature page]
9

10                      UNITED STATES DISTRICT COURT

11                      NORTHERN DISTRICT OF CALIFORNIA

12  INTERNATIONAL UNION OF                  Civil Action No.  3:11-cv-03620-WHA
    OPERATING ENGINEERS,
13  STATIONARY ENGINEERS LOCAL 39
    PENSION TRUST FUND,                     **MEMORANDUM OF POINTS AND**
14  individually and on behalf of all others **AUTHORITIES IN OPPOSITION TO**
    similarly situated,                     **MOTION TO DISMISS THE CLASS ACTION**
15                                          **COMPLAINT**
                    Plaintiff,
16
17              v.

18  THE BANK OF NEW YORK MELLON
    CORPORATION, THE BANK OF NEW            Date:      December 15, 2011
19  YORK MELLON, THE BANK OF NEW            Time:      8:00 a.m.
    YORK COMPANY, INC., THE BANK            Judge:     Hon. William H. Alsup
20  OF NEW YORK, and THE BANK OF
    NEW YORK MELLON TRUST
21  COMPANY, NATIONAL
    ASSOCIATION,
22
                    Defendants.
23

24

25

26

27

28

1

## TABLE OF CONTENTS

2

Page

PRELIMINARY STATEMENT ...................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 1

ARGUMENT .................................................................................................................... 3

    I.     Plaintiff States A Claim Under California's Unfair Competition Law Based
        On Defendants' Use And Reporting Of Fictitious FX Rates ................................ 3

        A.    Plaintiff Sufficiently Alleges That Defendants' Conduct Was
            "Fraudulent" Under The UCL ........................................................................ 5

        B.    Plaintiff Sufficiently Alleges Defendants' Conduct Was
            "Unlawful." .................................................................................................... 8

        C.    Plaintiff Also Satisfies The UCL's "Unfairness" Standard. ...................... 9

    II.    Plaintiff States A Claim Under The False Advertising Law ............................... 12

    III.   Plaintiff Adequately Alleges That Defendants Breached The Terms Of The
        Custody Agreement ............................................................................................. 14

    IV.   Plaintiff States A Claim For Breach Of The Implied Covenant Of Good
        Faith And Fair Dealing. ...................................................................................... 17

    V.    Plaintiff States A Claim Under N.Y. General Business Law Section 349 ........... 19

    VI.   Plaintiff Has Standing To Bring Claims Individually And On Behalf Of
        The Class. ............................................................................................................ 20

    VII.  Plaintiff's Allegations Sufficiently Demonstrate The Timeliness Of Its
        Claims. ................................................................................................................ 21

    VIII. Plaintiff States Claims Against BNYMC And Bank Of New York Co., Inc. ...... 24

CONCLUSION ............................................................................................................... 25

# TABLE OF AUTHORITIES

**Page**

## CASES

*Ashcroft v. Iqbal,*
129 S. Ct. 1937 (2009) ........................................................................................ 4

*Athena Feminine Techs. Inc. v. Wilkes,*
No. C 10-04868 SBA, 2011 WL 4079927 (N.D. Cal. Sept. 13, 2011)............................ 4, 14

*Autodesk, Inc. v. Dassault Systemes Solidworks Corp.,*
No. C 08-04397 WHA, 2008 U.S. Dist. LEXIS 109800 (N.D. Cal. Dec. 18,
2008) ........................................................................................................ 15

*Boschma v. Home Loan Ctr., Inc.,*
198 Cal. App. 4th 230 (2011) ...................................................................... 3, 4, 10

*Brooklyn Navy Yard Cogeneration Partners v. Superior Court,*
60 Cal. App. 4th 248 (1997) ............................................................................ 25

*Calvert v. Huckins,*
875 F. Supp. 674 (E.D. Cal. 1995)....................................................................... 25

*Comm. on Children's Television, Inc. v. Gen. Foods Corp.,*
35 Cal. 3d 197 (1983) ............................................................................... 12, 13

*Cooper v. Pickett,*
137 F.3d 616 (9th Cir. 1997).............................................................................. 5

*Council v. Better Homes Depot, Inc.,*
No. 04 CV 5620 (NGG) (KAM), 2006 U.S. Dist. LEXIS 57851 (E.D.N.Y.
Aug. 16, 2006) .............................................................................................. 23

*Ctr. for Biological Diversity v. FPL Grp., Inc.,*
166 Cal. App. 4th 1349 (2008) .......................................................................... 10

*Davis v. Chase Bank U.S.A., N.A.,*
650 F. Supp. 2d 1073 (C.D. Cal. 2009) ................................................................ 16

*Dean Witter Reynolds, Inc. v. Superior Court of Alameda County,*
211 Cal. App. 3d 758 (1989)............................................................................. 11

*El Pollo Loco, Inc. v. Hashim,*
316 F.3d 1032 (9th Cir. 2003)........................................................................... 21

*Ellis v. Costco Wholesale Corp.,*
No. 07–15838, 2011 WL 4336668 (9th Cir. Sept. 16, 2011) ...................................... 20

*EPA Real Estate Partnership v. Kang,*
12 Cal. App. 4th  171 (1992) ............................................................................ 16

*Exxonmobil Inter-Am., Inc. v. Advanced Info. Eng'g Services, Inc.,*
328 F. Supp. 2d 443 (S.D.N.Y. 2004).................................................................. 20

*Farmers Ins. Exchange v. Super. Ct. of L.A. Cnty.,*
2 Cal. 4th 377 (1992) ..................................................................................... 9

*Fortaleza v. PNC Fin. Servs. Grp., Inc.,*
642 F. Supp. 2d 1012 (N.D. Cal. 2009) ................................................................ 17

*Gibson v. United States,*
781 F.2d 1334 (9th Cir. 1986)........................................................................... 15

1

2

**TABLE OF AUTHORITIES**
(continued)

Page

3

*Gutierrez v. Wells Fargo Bank, N.A.*,
    730 F. Supp. 2d 1080 (N.D. Cal. 2010) ............................................................. 5, 10

4

*Guz v. Gechtel National, Inc.*,
    24 Cal. 4th 317 (2000) ................................................................................. 18

5

*Hameed v. IHOP Franchising, LLC*,
    No. 2:10-cv-02276, 2011 WL 590905 (E.D. Cal. Feb. 10, 2011) ......................................... 22

6

*Harshbarger v. Philip Morris, Inc.*,
    No. 02-05267, 2003 WL 23342396 (N.D. Cal. Apr. 1, 2003) .............................................. 22

7

*Harvey G. Ottovich Revocable Living Trust Dated May 12, 2006 v. Wash. Mut., Inc.*,
    No. C 10-02842 WHA, 2010 U.S. Dist. LEXIS 99161 (N.D. Cal. Sept. 22, 2010) ......................................................................... 11, 14, 18

8

9

10

*Hernandez v. Attisha*,
    Case No. 09-CV-2257, 2010 U.S. Dist. LEXIS 20235 (S.D. Cal. Mar. 4, 2010) ................... 24

11

*Hill v. State St. Corp.*,
    No. 09cv12146-NG, 2011 WL 3420439 (D. Mass. Aug. 3, 2011) ..................................... 6, 7

12

*In re Connetics Corp. Secs. Litig.*,
    542 F. Supp. 2d 996 (N.D. Cal. 2008) .................................................................. 21

13

*In re Mexico Money Transfer Litigation*,
    267 F.3d 743 (7th Cir. 2001) ....................................................................... 11, 17

14

*In re Toyota Motor Corp. Hybrid Brake Mktg., Sales, Practices & Prods. Liab. Litig.*,
    No. SAML 10-02172-CJC(RNBx), 2011 U.S. Dist. LEXIS 110206 (C.D. Cal. Sept. 12, 2011) ................................................................................... 9

15

16

17

*Interactive Intelligence, Inc. v. KeyCorp*,
    546 F.3d 897 (7th Cir. 2008) ........................................................................... 17

18

*Interested Underwriters at Lloyd's of London Subscribing to Policy No. 991361018 v. Church Loans & Investments Trust*,
    432 F. Supp. 2d 330 (S.D.N.Y. 2006) .............................................................. 20

19

20

*Jones v. Harris Assocs. L.P.*,
    130 S. Ct. 1418 (2010) .................................................................................... 7

21

*Kasky v. Nike, Inc.*,
    27 Cal. 4th 939 (2002) ................................................................................. 12

22

*La Jolla Village Homeowners' Association, Inc. v. Superior Court of San Diego County*,
    212 Cal. App. 3d 1131 (1989) ............................................................................ 8

23

24

*Lavie v. Procter & Gamble Co.*,
    105 Cal. App. 4th 496 (2003) ..................................................................... 12, 13

25

*Lee v. Capital One Bank*,
    No. C 07-4599 MHP, 2008 WL 648177 (N.D. Cal. Mar. 5, 2008) ..................................... 11

26

*Leoni v. St. Bar*,
    39 Cal. 3d 609 (1985) ................................................................................. 12

27

28

**TABLE OF AUTHORITIES**
(continued)

Page

*Lipuma v. American Express Co.*,
  406 F. Supp. 2d 1298 (S.D. Fla. 2005) .................................................................... 17

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
  416 F.3d 940 (9th Cir. 2005) .................................................................................. 6

*M&T Mortg. Corp. v. White*,
  736 F. Supp. 2d 538 (E.D.N.Y. 2010) ........................................................... 22, 23

*McCann v. Lucky Money, Inc.*,
  129 Cal. App. 4th 1382 (2005) .............................................................................. 11

*McKell v. Wash. Mut., Inc.*,
  142 Cal. App. 4th 1457 (2006) ................................................................................ 9

*Miller v. Wash. Mut. Bank FA*,
  776 F. Supp. 2d 1064 (N.D. Cal. 2011) ................................................................ 22

*Morgan v. AT&T Wireless Servs., Inc.*,
  177 Cal. App. 4th 1235 (2009) ................................................................................ 5

*MSGI Sec. Solutions, Inc. v. Hyundai Syscomm Corp.*,
  No. C 09-03330 RS, 2010 U.S. Dist. LEXIS 68466 (N.D. Cal. July 9, 2010) ....................... 25

*Nava v. VirtualBank*,
  No. 2:08-CV-00069, 2008 U.S. Dist. LEXIS 72819 (E.D. Cal. July 16, 2008) ................... 18

*Ng v. HSBC Mortg. Corp.*,
  No. 07 Civ. 5434, 2010 WL 889256 (E.D.N.Y. Mar. 10, 2010) ........................................ 20

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*,
  85 N.Y.2d 20 (1995) ................................................................................................ 19

*Parino v. BidRack, Inc.*,
  No. CV 11-3149 WHA, 2011 WL 4479462 (N.D. Cal. Sept. 26, 2011) ............................ 4, 9

*Parrish v. National Football League Players Association*,
  534 F. Supp. 2d 1081 (N.D. Cal. 2007) .................................................................... 8

*Quelimane Co. v. Stewart Title Guar. Co.*,
  19 Cal. 4th 26 (1998) .............................................................................................. 12

*Sanchez v. Giromex, Inc.*,
  No. D042459, 2004 WL 2750332 (Cal. Ct. App. Dec. 2, 2004) ............................................ 8

*Sevey v. Soliz*,
  No. C 10-3677 LHK (PR), 2011 U.S. Dist. LEXIS 71620 (N.D. Cal. July 2, 2011) ................. 15

*Shadoan v. World Savings & Loan Association*,
  219 Cal. App. 3d 97 (1990)...................................................................................... 11

*Shvarts v. Budget Group, Inc.*,
  81 Cal. App. 4th 1153 (2000) .................................................................................. 11

*South Bay Chevrolet v. General Motors Acceptance Corp.*,
  72 Cal. App. 4th 861 (1999) ..................................................................................... 8

*Storage Servs. v. Oosterbaan*,
  214 Cal. App. 3d 498 (1989)..................................................................................... 24

1

2

**TABLE OF AUTHORITIES**
**(continued)**

Page

3

*Storek & Storek, Inc. v. Citicorp Real Estate, Inc.*,
100 Cal. App. 4th 44 (2002) ................................................................................. 19

4

*Taheny v. Wells Fargo Bank, N.A.*,
No. S-10-2123-LKK, 2010 U.S. Dist. LEXIS 138048 (E.D. Cal. Dec. 22,

5

2010) ...................................................................................................................... 18

6

*Textainer Equip. Mgmt. (U.S.) Ltd. v. TRS Inc.*,
No. C 07-01519 WHA, 2007 U.S. Dist. LEXIS 47527 (N.D. Cal. June 20,

7

2007) ...................................................................................................................... 17

8

*Van Meter v. Bent Constr. Co.*,
46 Cal. 2d 588 (1956) ............................................................................................ 24

9

*Vega v. Jones, Day, Reavis & Pogue*,
121 Cal. App. 4th 282 (2004) ................................................................................. 8

10

*Vess v. Ciba-Geigy Corp. USA*,
317 F.3d 1097 (9th Cir. 2003) ................................................................................ 4

11

*Watts v. Jackson Hewitt Tax Serv.*,
579 F. Supp. 2d 334 (E.D.N.Y. 2008) .................................................................. 21

12

*Wolf v. Wells Fargo Bank, N.A.*,
No. C11-01337 WHA, 2011 WL 4831208 (N.D. Cal. Oct. 12, 2011) .............. 4, 10

13

*Yakas v. Chase Manhattan Bank, U.S.A., N.A.*,
No. C 09-02964 WHA, 2010 U.S. Dist. LEXIS 5359 (N.D. Cal. Jan. 25, 2010)............. 14, 17

14

*Yao v. Crisnic Fund, S.A.*,
No. SACV 10-1299 AG (JCGx), 2011 WL 3818406 (C.D. Cal. Au . 29, 2011) .................... 6

15

16

**STATUTES**

17

Cal. Bus. & Prof. Code §§ 17200, *et seq.* ........................................................... 3, 5, 10

18

Cal. Bus. & Prof. Code §§ 17500, *et seq.* ............................................................. 9, 12

19

ERISA § 408(b)(18) ..................................................................................................... 2, 10

New York General Business Law §§ 349, *et seq.* ...................................... 19, 20, 22, 23

20

**RULES**

21

Cal. R. Ct. 8.1115 ............................................................................................................ 8

22

Fed. R. Civ. P. 8 .................................................................................................... 4, 14, 16

Fed. R. Civ. P. 8(a) ......................................................................................................... 4

23

Fed. R. Civ. P. 9(b) ................................................................................................. 4, 5, 6

24

Fed. R. Civ. P. 12(b)(6) ................................................................................................... 6

25

N.D. Cal. Civil L.R. 3-4(e) ............................................................................................. 8

26

27

28

1

## **PRELIMINARY STATEMENT**

2      Plaintiff International Union of Operating Engineers, Stationary Engineers Local 39

3  Pension Trust Fund ("Plaintiff") entrusted Defendants[1] as "custodians" to conduct foreign

4  exchange ("FX") trades on its behalf in accordance with Defendants' written representations and

5  the legislatively declared policies underlying the Employee Retirement Income Security Act of

6  1974 ("ERISA").  Defendants breached that trust by misrepresenting the rates they charged or

7  credited to their clients, allowing Defendants to unlawfully reap hundreds of millions of dollars at

8  the direct expense of Plaintiff and other Class members, from whom Defendants actively

9  concealed their malfeasance.  In short, Defendants conducted FX trades for ERISA plans using

10  one rate, then reported and charged the plans a different rate, pocketing the difference.

11      In the face of Plaintiff's compelling allegations—based in part on whistleblowers'

12  statements and echoed in lawsuits by the United States Department of Justice and the states of

13  New York, Massachusetts, Virginia and Florida, along with a number of California counties, as

14  well as an investigation by the United States Securities and Exchange Commission—Defendants

15  ask the Court to favor their assertions over Plaintiff's allegations and to resolve questions of fact

16  in their favor, contrary to well-established Rule 12(b)(6) standards.  The Court therefore should

17  deny Defendants' motion in its entirety.

18

## **STATEMENT OF FACTS**

19      Since at least February 14, 2006, under an executed Custody Agreement, Defendants have

20  provided custodial services to Plaintiff, including executing FX transactions on Plaintiff's behalf

21  under "standing instructions."  ¶¶ 1, 27.[2]  Under standing instructions, a custodial FX services

22  provider acquires foreign or domestic currency to effectuate a client's purchase or sale of a

23  foreign security, or the repatriation of a foreign dividend, on an as-needed basis without the direct

24  involvement of either the custodial client's investment staff or outside investment managers.

25

26

_____

27  [1] "Defendants" refers to The Bank of New York Mellon Corporation ("BNYMC"), The Bank of New York Mellon, The Bank of New York Company, Inc., The Bank of New York ("BNY"), and The

28  Bank of New York Mellon Trust Company, National Association.
[2] Citations to "¶ __" are to paragraphs of Plaintiff's Class Action Complaint (the "Complaint").

MPA IN OPPOSITION TO MOTION TO DISMISS THE
CLASS ACTION COMPLAINT
CASE NO. C 11-03620 WHA

¶ 28.  Custodial clients pay a flat fee for custodial FX services that include standing instruction transactions.  ¶ 29.

In "direct" or "negotiated" sales or purchases of foreign or domestic currency, by contrast, the custodial client or its outside investment manager directly negotiates, at arm's length, the sale or purchase of foreign currency with the custodial FX services provider.  ¶ 27.  Direct FX transactions traditionally yield modest profits to a purchaser or seller of currency, perhaps up to two to three basis points ("bps") of "spread" per unit as compared with the Interbank exchange rate applicable to the currency at the time.  *Id.*

BNY's written Foreign Exchange Policies & Procedures for ERISA Plans ("FX Procedures"), which were incorporated by the Custody Agreement, ostensibly set forth the method for determining the rates at which FX transactions would be executed under standing instructions, which included the publication of "ranges" for specified currencies several times a day, as well as the assertion that "action . . . will be taken" to investigate and flag any assigned rates for FX Transactions that deviated by more than three percent from the Interbank rate.  ¶ 22; Compl. Ex. B.  At the same time, Defendants promised that "[t]he terms of FX Transactions," including those executed pursuant to "standing instructions," with any ERISA plan "*shall not be less favorable* to the Plan than terms offered by BNY to unrelated parties in a *comparable arm's length* FX Transaction."  ¶ 22.[3]  This contractual term echoed Section 408(b)(18) of ERISA (still in effect), which permits FX transactions to be performed for an ERISA-covered plan by a custodial bank if "[a]t the time the [FX] transaction is entered into, the terms of the transaction are not less favorable to the plan than . . . the terms afforded by the bank in comparable arm's length foreign exchange transactions involving unrelated parties."  ¶ 23.

The FX Procedures further provided that, under standing instructions, "all income item conversions" (*e.g.,* dividend repatriations) involving foreign currency for ERISA fund clients would be "bundled" and "executed" each day at 11:00 a.m. New York time "*at or within the range* of buy/sell rates in effect at 11:00 a.m. New York time," and that this was done "to achieve *better rates for the benefit of clients*."  ¶ 24.  In addition to these contractual obligations,

---

[3] Unless otherwise indicated, all emphases are added.

- 2 -

1   Defendants publicly marketed their standing instructions FX services as being "free of charge"

2   (apart from whatever the custodial client paid in annual custodial fees) and subject to "best

3   execution standards," which requires that a broker-dealer seek to obtain for its customers the most

4   favorable terms reasonably available under the circumstances.  ¶¶ 29, 42-43.

5          Contrary to the express terms of the Custody Agreement, other written representations,

6   and the legislative policies underlying ERISA, Defendants did not execute standing instruction

7   FX transactions on behalf of Plaintiff and other Class members using terms as favorable to those

8   clients as the terms afforded or generally available to unrelated parties in comparable "arm's

9   length" (*i.e.*, direct or negotiated) transactions.  ¶ 25.  Nor did Defendants "achieve better rates for

10  the benefit of clients" through their FX practices as related to income item conversions.  *Id.*

11  Rather than arm's length market rates, Defendants charged its standing instructions clients

12  fictitious FX rates that were higher (for purchases) or lower (for sales) than those Defendants

13  owed or received for the currencies in question, and pocketed the difference, resulting in profits

14  that were orders of magnitude greater than those Defendants earned on direct transactions.  ¶¶ 32,

15  41, 46-70.  Indeed, Plaintiff's  analysis of a six-month sample of FX trades Defendants conducted

16  on its behalf revealed that Defendants charged Plaintiff FX rates as much as 65 bps worse, on

17  average, than those it could have expected from arm's-length transactions.  ¶¶ 71-77.

18  Defendants' profits from this scheme have been massive—in 2008, during a financial crisis which

19  saw wild fluctuations in currency values, BNYMC reported a record $1.5 *billion* in FX and other

20  trading activity revenue (an increase of $676 million (86%) over the previous year).  ¶ 26.

21                                  **ARGUMENT**

22  **I.    Plaintiff States A Claim Under California's Unfair Competition Law Based On
        Defendants' Use And Reporting Of Fictitious FX Rates.**

23         Plaintiff's First Claim for Relief arises under Cal. Bus. & Prof. Code §§ 17200, *et seq.*

24  (the "Unfair Competition Law" or "UCL"), which "broadly prohibits any unlawful, unfair or

25  fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

26  *Boschma v. Home Loan Ctr., Inc.*, 198 Cal. App. 4th 230, 251-52 (2011).[4]  The UCL "is written

27

28

[4] Unless otherwise stated, all internal citations and quotation marks have been omitted from citations.

1   in the disjunctive," establishing "three varieties of unfair competition—acts or practices which are

2   unlawful, or unfair, or fraudulent." *Id.*  Fraud is thus "not an essential element" of a UCL claim.

3   *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1104-05 (9th Cir. 2003).

4        Allegations of "unlawful" or "unfair" conduct must only satisfy Rule 8's notice pleading

5   standard.  *Id.* ("[I]n a case where fraud is not an essential element of the claim, only allegations

6   ('averments') of fraudulent conduct must satisfy the heightened pleading requirements of

7   Rule 9(b).  Allegations of non-fraudulent conduct need satisfy only the ordinary notice pleading

8   standards of Rule 8(a).").[5]  To survive a motion to dismiss under Rule 8, "a complaint must

9   contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its

10  face."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  The plausibility standard does not impose

11  "a probability requirement"; rather, "it asks for more than a sheer possibility that a defendant has

12  acted unlawfully."  *Id.*; *see also Wolf v. Wells Fargo Bank, N.A.*, No. C11-01337 WHA, 2011 WL

13  4831208, at *3, *7 (N.D. Cal. Oct. 12, 2011) (Alsup, J.) (upholding UCL claims of unfair conduct

14  as "facially plausible" where they afforded at least "a reasonable inference that defendants are

15  liable for the misconduct alleged").

16        Rule 9(b)'s particularity requirement, meanwhile, applies only to allegations in support of

17  the "fraud" prong of the UCL.  *Vess*, 317 F.3d at 1104-05; *Athena Feminine Techs. Inc.*, 2011

18  WL 4079927, at *8-9.[6]  Importantly, "a claim based upon the fraudulent business practice prong

19  of the UCL is distinct from common law fraud."  *Boschma*, 198 Cal. App. 4th at 251-52.  Under

20  the common law, a "fraudulent deception must be actually false, known to be false by the

21  perpetrator and reasonably relied upon by a victim who incurs damages."  *Id.*  But "*[n]one of

22  these elements are required to state a claim for relief under the UCL.*"  *Id.*  To constitute a

23  fraudulent business practice under the UCL, conduct must only be "likely to deceive members of

24  the public."  *Id.* at 251 (citing *Morgan v. AT&T Wireless Servs., Inc.*, 177 Cal. App. 4th 1235,

25  ___
[5] *See also Athena Feminine Techs. Inc. v. Wilkes*, No. C 10-04868 SBA, 2011 WL 4079927, at *8-9
26  (N.D. Cal. Sept. 13, 2011) ("Different legal standards and pleading requirements apply to each prong
    [of the UCL].  For example, a claim brought under the fraudulent prong of the UCL must be pled with
27  particularity under Rule 9(b), while the other prongs do not.").
    [6] Even if Plaintiff's allegations as to the "unlawful" or "unfair" prongs of the UCL "sound in fraud,"
28  Plaintiff has pled those claims with the requisite particularity.  *See Parino v. BidRack, Inc.*, No. CV
    11-3149 WHA, 2011 WL 4479462, at *7-8 (N.D. Cal. Sept. 26, 2011) (Alsup, J.).

1255 (2009)).  Accordingly, "[a] claim that a business practice is (or was) 'fraudulent' under Section 17200 can be based upon representations that deceive because they are untrue as well as representations that may be accurate on some level but nonetheless tend to mislead or deceive." *Gutierrez v. Wells Fargo Bank, N.A.*, 730 F. Supp. 2d 1080, 1127 (N.D. Cal. 2010) (Alsup, J.).

Plaintiff has sufficiently alleged that Defendants' conduct was unlawful, unfair *and* fraudulent, thus satisfying all three distinct prongs of the UCL (where just one would suffice).  In response to Plaintiff's well-pled allegations and the reasonable inferences this Court may derive from them, Defendants (1) mischaracterize and distort Plaintiff's allegations; (2) inappropriately invite the Court to resolve matters of disputed fact at the pleading stage; and (3) rely on inapposite legal authority.  Defendants' arguments lack merit, and should be rejected.

### A.   Plaintiff Sufficiently Alleges That Defendants' Conduct Was "Fraudulent" Under The UCL.

Plaintiff sufficiently alleges actionable conduct under the "fraud" prong of the UCL in a manner that more than satisfies Rule 9(b)'s heightened pleading requirements.[7]  Specifically, Plaintiff alleges "the *who* [BNY Mellon and its affiliates], *what* [misstating or failing to disclose to Plaintiff and others the actual rates at which Defendants purchased or sold foreign currency], *when* [from January 12, 1999 to the present], *where* [in written statements issued to Plaintiff and other clients], and *how* [by fictitiously reporting different FX rates than those at which Defendants actually purchased or sold the currency] that would suggest fraud, rather than a business mistake viewed with the benefit of hindsight."  *See Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997); ¶¶ 17-77.

Accordingly, the Complaint cogently alleges a scheme by which Defendants bilked Plaintiff and other similarly situated clients out of millions of dollars in revenues.  Defendants' characterization of Plaintiff's allegations as mere "speculation" thus strains credulity.  Defs. Br. 2.[8]  Indeed, in recently upholding securities fraud claims against another custodial bank, State

---

[7] *See* Fed. R. Civ. P. 9(b) (providing "a party must state with particularity the circumstances constituting fraud or mistake," but "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally").

[8] "Defs. Br." refers to Defendants' Notice of Motion and Motion to Dismiss and Memorandum of Law in Support of the Motion to Dismiss the Class Action Complaint, filed November 17, 2011.

1   Street, and certain high-ranking employees based on their failure to disclose that State Street's

2   revenue increases between 2005 and 2008 "were due in large part to Defendants' long-running

3   fraudulent scheme to overcharge State Street's largest institutional customers for foreign

4   exchange trades," Judge Gertner of the District of Massachusetts explained she could not "ignore

5   that Plaintiffs' complaint is buttressed by, among other things, allegations made by six

6   confidential sources and the booty from an 18-month investigation by the California AG." *Hill v.*

7   *State St. Corp.*, No. 09cv12146-NG, 2011 WL 3420439, at *10 (D. Mass. Aug. 3, 2011).  To

8   require more from plaintiffs, Judge Gertner explained, "would be to improperly declare that a

9   plaintiff must produce a smoking gun . . ., a burden too heavy to bear at the pleading stage." *Id.*[9]

10         Defendants, on the other hand, distort Plaintiff's allegations and the terms of their

11   contract, and impermissibly introduce questions of fact.  *First*, Defendants fault Plaintiff for not

12   alleging BNY Mellon "gave any other client better rates than the ones [Plaintiff] received."  Defs.

13   Br. 2, 14.  But that is a false comparison.  The gravamen of Plaintiff's UCL claim is that

14   Defendants traded at one rate but reported a different rate—higher with respect to purchases and

15   lower with respect to sales—to their custodial clients.  ¶¶ 47-77.  Additionally, in challenging

16   Plaintiff's allegation that the rates in negotiated transactions generally fall within two or three

17   basis points of the Interbank rate—which Plaintiff cites to illustrate the significant difference

18   between the profits Defendants made on those trades and profits they reaped from standing

19   instruction trades for Plaintiff and other Class members—Defendants raise a factual matter

20   inappropriate for resolution at the pleading stage.  *See Livid Holdings Ltd. v. Salomon Smith*

21   *Barney, Inc.*, 416 F.3d 940, 949-50 (9th Cir. 2005) (factual determination as to element of the

22   subject claim was "inappropriate" at the Rule 12(b)(6) stage).

23         *Second*, Defendants argue that Plaintiff wrongly "assumes" that Defendants'

24   representation that the terms of all FX transactions "'shall not be less favorable to the Plan than

25   terms offered by BNY to unrelated parties in a comparable arm's length FX transaction'" (¶ 36)

26   _____

27   [9] Judge Gertner's reasoning is additionally noteworthy because securities fraud claims must satisfy
the stringent pleading requirements of the Private Securities Litigation Reform Act of 1995 to
withstand dismissal.  *See Yao v. Crisnic Fund, S.A.*, No. SACV 10-1299 AG (JCGx), 2011 WL

28   3818406, at *14 (C.D. Cal. Au . 29, 2011) (noting the "raising [of] the pleading standard in private
securities fraud litigation cases beyond Rule 9(b) requirements").

1    refers to negotiated trades as the "comparable" transactions.  Plaintiff, however, relies on the very

2    words of the parties' agreement.  It is eminently plausible that "arm's length" indicates the

3    equivalent of a negotiated transaction—or at a minimum provides reasonable assurance to a client

4    that it will not be deceptively overcharged in a manner completely disproportionate to the

5    services being rendered.   ¶¶ 32, 41.[10]

6         Even more to the point, that Defendants disagree with Plaintiff's interpretation of "arm's

7    length" and "comparable" as used in the FX Procedures raises a factual dispute not ripe for

8    adjudication at the pleading stage.  Judge Gertner's reasoning in *State Street* is once again

9    persuasive.  As the parties in that case disagreed over the meaning of a custodial contract

10   provision stating "[a]ll trades are priced *based on the interbank rate at the time the trade is*

11   *executed*," Judge Gertner determined "[t]he resolution to this contract dispute turns, at least in

12   part, on the meaning of 'based on.'"  *State St.*, 2011 WL 3420439, at *11 (emphasis in original).

13   Observing that the parties "offered no evidence for evaluating the meaning of the disputed term"

14   and noting that on a motion to dismiss, the court "must take all well-plead allegations as true,"

15   Judge Gertner concluded, "I am obliged to accept that, as plaintiffs allege, State Street was

16   obligated to provide its clients the same exchange rate that State Street actually used to make the

17   trade."  *Id.* at *11.  A similar rationale should apply here.

18        Moreover, the alleged factual basis on which Defendants rely for their assertions is

19   questionable.  Defendants assert that the "numerous disclosures" of their "practices in connection

20   with pricing standing instruction transactions," in addition to the distinction between standing

21   instruction and negotiated exchanges, render any expectation that the FX rates for Plaintiff's and

22   other Class members' transactions would not exceed two or three basis points higher than the

23   interbank rate unreasonable as a matter of law.  Defs. Br. 14-15.  In that vein, Defendants refer to

24   supposedly "express contract terms" requiring pricing within a 300-basis point range.[11]  But the

25

26   [10] *See, e.g., Jones v. Harris Assocs. L.P.*, 130 S. Ct. 1418, 1426 (2010) (concerning fees "so
     disproportionately large" that they bear "no reasonable relationship to the services rendered and could
27   not have been the product of arm's length bargaining").

28   [11] Only one provision of the FX Procedures mentions 300 basis points:  "In all cases actual rates for
     FX Transactions will be tested by the daily run flagging Transactions with rates more than 3% [300
     basis points] over or under the WM Fixing Rate for each applicable fixing time . . . .  Transactions so

provision on which they apparently rely does not establish (let alone "expressly") a 300-basis

point range for FX transactions.  Moreover, even assuming *arguendo* the FX Procedures did

permit Defendants to charge Plaintiff and other Class members rates that were as much as 300

basis points above (for a purchase) or below (for a sale) the Interbank rate, that would not relieve

Defendants of their duty, among other things, not to deceptively charge their ERISA fund clients

excessive spreads *based on fictional FX rates*.[12]

     *Finally*, Defendants' contention that they had no duty to disclose their "earnings on

foreign currency exchanges" mischaracterizes the nature of Plaintiff's claims—the amount

Defendants "earned" in performing FX transactions on Plaintiff's and other Class members'

behalf would be irrelevant here but for Defendants' alleged *misconduct* in accruing those

"earnings."  Moreover, having chosen to make statements concerning FX transactions,

Defendants were obligated to speak truthfully.  *See Vega v. Jones, Day, Reavis & Pogue*, 121 Cal.

App. 4th 282, 294 (2004) ("[A]ctive concealment may exist where a party [w]hile under no duty

to speak, nevertheless does so, but does not speak honestly or makes misleading statements or

suppresses facts which materially qualify those stated. . . Providing a disclosure schedule which

deliberately omitted material facts seems clearly to fit this category.").[13]

### B.   Plaintiff Sufficiently Alleges Defendants' Conduct Was "Unlawful."

     In addition to satisfying the UCL's "fraud" prong, Plaintiff alleges Defendants' conduct

---

flagged will be investigated and any action deemed necessary will be taken to assure compliance with these Policies and Procedures."  Compl. Ex. B at 5.

[12] Defendants also rely on inapposite caselaw.  *South Bay Chevrolet v. General Motors Acceptance Corp.*, 72 Cal. App. 4th 861, 878 (1999) concerns *a judgment after trial* (not a motion to dismiss), where "the record contained substantial evidence" indicating that plaintiff "understood, agreed [to] and expected" the conduct complained-of.  *Parrish v. National Football League Players Association*, 534 F. Supp. 2d 1081 (N.D. Cal. 2007) (Alsup, J.) likewise is unavailing, because unlike plaintiffs in that case, Plaintiff here alleges it relied on Defendants' misrepresentations, including the "best execution standards" term of the FX Procedures.  *See* ¶ 100.  And in *La Jolla Village Homeowners' Association, Inc. v. Superior Court of San Diego County*, 212 Cal. App. 3d 1131, 1151-52 (1989), the court addressed liability for common law nondisclosure, which is more narrow than the standard for pleading a UCL "fraudulent business act or practice."

[13] Defendants improperly cite to an unpublished California appellate decision, *Sanchez v. Giromex, Inc.*, No. D042459, 2004 WL 2750332 (Cal. Ct. App. Dec. 2, 2004).  *See* N.D. Cal. Civil L.R. 3-4(e); Cal. R. Ct. 8.1115.  Beyond violating the Local Rules of this Court, Defendants' reliance on *Sanchez* is misplaced.  *See* 2004 WL 2750332, at *9 (addressing trial court's grant of *summary judgment*, Court of Appeal described plaintiff's allegations as contending either that defendants failed to disclose "the FX spread" or "that a currency exchange rate would be used in defendants' money transmission transactions," not, as here, that defendants reported fictitious FX rates).

MPA IN OPPOSITION TO MOTION TO DISMISS THE
CLASS ACTION COMPLAINT
CASE NO. C 11-03620 WHA

1   was "unlawful" under the statute.  The UCL's "unlawful" prong encompasses "anything that can

2   properly be called a business practice and that at the same time is forbidden by law." *Farmers*

3   *Ins. Exchange v. Super. Ct. of L.A. Cnty.*, 2 Cal. 4th 377, 383 (1992).  Accordingly, the UCL

4   "borrows violations of other laws and treats them as independently actionable under the UCL."

5   *In re Toyota Motor Corp. Hybrid Brake Mktg., Sales, Practices & Prods. Liab. Litig.*, No. SAML

6   10-02172-CJC(RNBx), 2011 U.S. Dist. LEXIS 110206, at \*26-27 (C.D. Cal. Sept. 12, 2011).

7   Violation of "any law, civil or criminal, statutory or judicially made, federal, state or local," falls

8   within the UCL's ambit.  *McKell v. Wash. Mut., Inc.*, 142 Cal. App. 4th 1457 (2006).

9        Plaintiff satisfies the UCL's "unlawful" standard by sufficiently pleading claims under

10   Section 17500, Section 349 of New York's General Business Law, and claims for breach of

11   contract and breach of the implied covenant of good faith and fair dealing.  *See* §§ II-VI, *infra*;

12   ¶¶ 102-123; *BidRack*, 2011 WL 4479462, at \*2-3 (any violation of the False Advertising Law

13   "necessarily violates" the UCL).[14]  Defendants' contentions that only a statutory violation may

14   trigger the UCL's "unlawful" prong and that ERISA is the only statute Plaintiff references in its

15   Complaint are incorrect.

16        **C.      Plaintiff Also Satisfies The UCL's "Unfairness" Standard.**

17        In addition to alleging "fraudulent" and "unlawful" conduct under the UCL, the

18   Complaint states a claim under the UCL's "unfair" prong, which "provides an intentionally broad

19   independent basis for relief."  *Toyota*, 2011 U.S. Dist. LEXIS 110206, at \*27.  Where, as here,

20   Plaintiff and other Class members are consumers, California courts have articulated three

21   different tests to assess whether a business act or practice is "unfair" under the UCL:

22          (1) the "unfair" conduct must be 'tethered to specific constitutional, statutory or
            regulatory provisions,' (2) unfair conduct requires the court to weigh the utility of
23          the defendant's conduct against the gravity of the harm to the alleged victim to
            find that the defendant's conduct is immoral, unethical, oppressive, unscrupulous,
24          or substantially injurious to consumers, and (3) unfair conduct requires that the
            consumer injury must be substantial, the injury must not be outweighed by any
25          countervailing benefits to consumers or competition, and it must be an injury that
            consumers themselves could not reasonably have avoided.
26
     *Id.* at \*27-28 (citing *Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 257
27

28   _____

1    (2010)).  Plaintiff's allegations of Defendants' misconduct satisfy all three tests.  *See Wolf*,

2    2011 WL 4831208, at *3, *7 (denying motion to dismiss Section 17200 claim, this Court held

3    that plaintiff sufficiently alleged defendants engaged in an "unfair . . . business act or practice"

4    by, *inter alia*, "disclosing to her an APR rate lower than the actual APR rate").

5           As to the first, Plaintiff alleges that through their scheme of reporting fictitious rates to

6    Plaintiff and other Class members that differed from the rates at which they actually purchased or

7    sold foreign currency on those clients' behalf, Defendants violated their duty to provide terms on

8    FX transactions to ERISA plans that were "not . . . less favorable" than the terms Defendants

9    offered to "unrelated parties" in comparable arm's length transactions.  *See, e.g.*, ¶¶ 22-25.  That

10   requirement reflected ERISA's provision affording a party in interest, such as a custodial bank or

11   its affiliate, a statutory exemption allowing FX transactions if "[a]t the time the [FX] transaction

12   is entered into, the terms of the transaction are not less favorable to the plan than the terms

13   generally available in comparable arm's length foreign exchange transactions between unrelated

14   parties or the terms afforded by the bank in comparable arm's length foreign exchange

15   transactions involving unrelated parties."  *See* ¶¶ 23, 36; ERISA § 408(b)(18).  Defendants'

16   alleged malfeasance thus was "tethered to a legislatively declared policy."  *Gutierrez v. Wells*

17   *Fargo & Co.*, 622 F. Supp. 2d 946, 953-54 (N.D. Cal. 2009) (Alsup, J.) (determining plaintiffs'

18   allegation "that the bank violated the covenant of good faith and fair dealing in abusing its

19   discretion so as to maximize (or virtually maximize) its penalty charges by using posting

20   transactions from highest to lowest" was "tethered to a legislative comment addressing re-

21   sequencing and requiring that the bank act in good faith").[15]

22          Defendants' misconduct also satisfies the second and third tests, which contemplate a

23   cost-benefit analysis between the conduct at issue and the injury.  The harm Plaintiff and other

24

_____

25   [15] Defendants' judicial abstention argument (*see* Defs. Br. 16 n.14) is off-point because, in assessing
     whether Defendants' misconduct is "tethered" to ERISA, the Court need not adjudicate a claim under
26   that statute, nor does Plaintiff's UCL claim threaten to drag the Court "into an area of complex
     economic [or similar] policy."  *See Ctr. for Biological Diversity v. FPL Grp., Inc.*, 166 Cal. App. 4th
27   1349, 1367-72 (2008); *Boschma*, 198 Cal. App. 4th at 254 (determining that "to the extent an 'unfair'
     claim must be 'tethered' to specific statutory or regulatory provisions," the Truth in Lending Act and
28   an accompanying regulation "provide[d] an adequate tether even though plaintiffs [we]re not directly
     relying on federal law to make their claims").

MPA IN OPPOSITION TO MOTION TO DISMISS THE
                                                                        CLASS ACTION COMPLAINT
                                                                        CASE NO. C 11-03620 WHA

1    Class members have suffered—millions of dollars in revenues, as well as Defendants' breach of

2    trust—is "grave" or "substantial," and Defendants' misrepresentations served no "utility" nor

3    embodied any "countervailing benefits."  To the contrary, those actions sacrificed clients'

4    financial interest for ill-gotten personal gain.[16]  And Defendants' assertions that Plaintiff does not

5    adequately allege injury or a duty to disclose fail for the reasons discussed above with respect to

6    the UCL's "fraud" prong.[17]

7            Finally, Defendants argue that Plaintiff could have avoided injury by "opt[ing] out" of

8    using standing instruction transactions.  Defs. Br. 17.  But because Defendants misrepresented to

9    their custodial clients the FX rates at which they were transacting on the clients' behalf, neither

10   Plaintiff nor other custodial clients would have had any reason to believe—until the

11   whistleblower actions were unsealed—that anything was amiss.  ¶¶ 3-4, 46-70, 91.[18]

12

13   [16] Defendants summarily call for dismissal of Plaintiff's request for injunctive relief claiming the
     alleged offending conduct has ended.  On this motion, however, Defendants' unsupported assertions
14   do not trump Plaintiff's well-pled allegations that the misconduct is ongoing.  *See, e.g.*, ¶¶ 47-70, 79;
     *Harvey G. Ottovich Revocable Living Trust Dated May 12, 2006 v. Wash. Mut., Inc.*, No. C 10-02842
15   WHA, 2010 U.S. Dist. LEXIS 99161, at *13-14 (N.D. Cal. Sept. 22, 2010) (Alsup, J.) (denying
     motion to dismiss claim for injunctive relief, this Court reasoned, "[u]ntil this case is finally
16   determined, it is impossible to say that injunctive relief will not be in order").

     [17] The legal authority Defendants cite on these points does not assist them.  In *In re Mexico Money*
17   *Transfer Litigation*, 267 F.3d 743 (7th Cir. 2001), which addressed objections to a settlement,
     plaintiffs alleged that defendants improperly failed to disclose "the interbank rate at which they buy
18   specie, as opposed to the retail rate at which they sell currency," *id.* at 749—not the deception at issue
     here.  And "the economic substance" of the transactions at issue in *McCann v. Lucky Money, Inc.*,
19   129 Cal. App. 4th 1382 (2005), unlike here, was "that customers buy foreign currency from
     [defendant] at one rate, and [defendant] buys the foreign currency elsewhere for a better rate."
20   Additionally, the court in *Lee v. Capital One Bank*, No. C 07-4599 MHP, 2008 WL 648177 (N.D.
     Cal. Mar. 5, 2008), ruled that plaintiff did not sufficiently allege "injury-in-fact" to establish standing
21   because he did not "allege[] facts indicating that he was personally harmed by defendants' alleged
     statutory violations."  *Id.* at *4.  The Complaint in this case does not suffer from that infirmity.
22   [18] Defendants' citations once again miss the mark.  In *Shvarts v. Budget Group, Inc.*, 81 Cal. App. 4th
     1153 (2000), the California Court of Appeal upheld the dismissal of plaintiffs' unfair business
23   practices claim premised on the amount of a rental car company's refueling charge, because
     California statutory law "authorized avoidable fuel service charges" and "[e]ach of the three [fuel]
24   payment options is clearly printed, in boldface, in the rental agreement provided to [plaintiffs] at the
     time of rental" and "the amount per gallon . . . is clearly printed on the first page."  *Id.* at 1158-59.
25   Additionally, plaintiffs in *Shadoan v. World Savings & Loan Association*, 219 Cal. App. 3d 97, 101
     (1990), claimed the defendant "committed an unfair business practice *by including in its loan*
26   *agreement*" certain allegedly objectionable clauses.  *Id.* at 101.  Furthermore, in *Dean Witter*
     *Reynolds, Inc. v. Superior Court of Alameda County*, 211 Cal. App. 3d 758 (1989), the court ruled
27   that plaintiff could not demonstrate "oppression" necessary to establish procedural unconscionability
     because "[t]he agreed-upon terms of the termination fee were not shown to have been hidden from
28   him to such an extent in the Dean Witter documentation as to establish the [requisite] 'surprise'
     factor."  *Id.* at 768-72.  Plaintiff here, by contrast, alleges in detail that Defendants failed to apprise

1  **II.      Plaintiff States A Claim Under The False Advertising Law.**

2          Defendants argue that Plaintiff fails to adequately plead its Second Claim for Relief, under

3  Cal. Bus. & Prof. Code §§ 17500, *et seq.* (the "False Advertising Law" or "FAL"), for three

4  reasons:  (1) Plaintiff purportedly does not satisfy the "fraud" prong of the UCL, thereby failing

5  to sufficiently plead that Defendants' statements were untrue or misleading; (2) Plaintiff fails to

6  adequately plead Defendants' scienter; and (3) the claim is time-barred.[19]  In so arguing,

7  Defendants both misstate the law and rely on authority that either is inapposite or actually argues

8  *against* dismissal of Plaintiff's claims.

9          The FAL makes it unlawful "to make or disseminate . . . before the public in this state, . . .

10  in any newspaper or other publication . . . or in any other manner or means whatever . . . any

11  statement, concerning . . . real or personal property or . . . services . . . which is untrue or

12  misleading, and which is known, *or which by the exercise of reasonable care should be known*, to

13  be untrue or misleading."  *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 950 (2002) (citing FAL).  In short,

14  the FAL "prohibits advertising property or services with untrue or misleading statements *or* with

15  intent not to sell at the advertised price."  *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th

16  26, 52 (1998).  "Scienter" is accordingly not a necessary element of this claim.

17          The California Supreme Court has recognized that the FAL, like the UCL, prohibits "not

18  only advertising which is false, but also advertising which[,] *although true*, is either actually

19  misleading or which has a *capacity, likelihood or tendency* to deceive or confuse the public."

20  *Kasky*, 27 Cal. 4th at 951 (citing *Comm. on Children's Television, Inc. v. Gen. Foods Corp.*,

21  35 Cal. 3d 197, 210 (1983) ("*CCTV*"); *Leoni v. St. Bar*, 39 Cal. 3d 609, 626 (1985)).  Moreover,

22  "[a]dvertisements as a whole may be completely misleading although every sentence separately

23  considered is literally true," where "things are omitted that should be said" the advertisements

24  "are composed or purposefully printed in such way as to mislead."  *Lavie v. Procter & Gamble*

25  *Co.*, 105 Cal. App. 4th 496, 509 (2003).

26          Plaintiff alleges that Defendants violated the FAL by, *inter alia*, (a) falsely advertising, in

27

28  Plaintiff and other Class members of the difference between the actual and reported rates at which
Defendants purchased and sold foreign currency on their clients' behalf.
[19] Plaintiff's FAL claim is timely for the reasons set forth below at § VII.

MPA IN OPPOSITION TO MOTION TO DISMISS THE
CLASS ACTION COMPLAINT
CASE NO. C 11-03620 WHA

1  their written FX Procedures, on their respective websites and elsewhere that "[t]he terms of FX

2  Transactions with any [ERISA] Plan shall not be less favorable to the Plan than terms offered by

3  BNY to unrelated parties in a comparable arm's length FX Transaction," and that Plaintiff and

4  other Class members would receive the benefits of Defendants' "best execution practices" when

5  Defendants executed FX trades under standing instructions; (b) concealing material information

6  about the actual costs to Plaintiff and other Class members for permitting Defendants to execute

7  "standing instruction" FX trades for them; and (c) concealing the manner in which FX rates were

8  derived and charged to those custodial customers.  ¶¶ 42-45, 103.  Plaintiff further alleges that the

9  massive spreads Defendants charged to Plaintiff belied their claims that their standing instructions

10 practices were designed to achieve "better rates for the benefit of clients" (¶¶ 24-25, 38), and

11 were "free of charge" (¶ 42).  Plaintiff's allegations derive from, among other things, its analysis

12 of FX trades that Defendants conducted on Plaintiff's behalf related to just five currencies over a

13 six-month portion of the Class Period.  ¶¶ 32, 39, 68, 71-77.  Plaintiff thus has more than met its

14 burden of pleading that it and other BNY custodial customers were "likely to be deceived" by

15 Defendants' statements concerning standing instructions FX trades.  ¶ 104.  Any further debate as

16 to whether Defendants' statements were *actually* misleading raises questions of fact not

17 appropriately resolved at this stage.  *See CCTV*, 35 Cal. 3d at 214 (defendant's "contention that

18 the words and images used do not constitute . . . misrepresentations, and [do] not conceal material

19 facts, frames an issue for trial, not demurrer").[20]

20

21

---

22 [20] The authorities on which Defendants rely do not hold otherwise, and in fact argue against granting
Defendants' motion.  The California Supreme Court's decision in *CCTV*, which Defendants cite for
the proposition that Plaintiff's FAL claim is subject to the same "fraud prong" defenses as Plaintiff's

23 UCL claim, actually reaffirms that the UCL and FAL are each distinct from common law fraud, and
that a plaintiff need not go so far as to proffer "evidence" of wrongdoing at the pleading stage.

24 35 Cal. 3d at 211-12 (holding, *inter alia*, that "[a]llegations of actual deception" are unnecessary
under the consumer protection statutes).  And *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496

25 (2003), the only other case Defendants cite, concerned the appeal of a judgment entered after a 13-day
bench trial, in which evidence was presented under the "reasonable consumer" standard.  Even

26 assuming *arguendo* this Court ultimately were to apply a "reasonable pension fund," rather than a
"reasonable consumer," standard—*i.e.*, assess whether Plaintiff and other Class members were "too

27 sophisticated to be deceived"—as Defendants appear to advocate, that inquiry would necessarily turn
on questions of fact.  *See* 105 Cal. App. 4th at 509 ("That exceptionally acute and sophisticated

28 readers might have been able by penetrating analysis to have deciphered the true nature of the
[statements'] terms is not sufficient to bar findings of fraud by a factfinding tribunal.").

**III.    Plaintiff Adequately Alleges That Defendants Breached The Terms Of The Custody Agreement.**

Plaintiff sufficiently pleads a breach of contract claim against Defendants by alleging "(1) existence of the contract; (2) [P]laintiff's performance . . .; (3) [D]efendant[s]' breach; and (4) damages to [P]laintiff as a result of the breach."  *See Athena Feminine Techs.*, 2011 U.S. Dist. LEXIS 103209, at *20.  Specifically, Plaintiff alleges Defendants breached the Custody Agreement by failing to:  (i) offer terms on standing instruction FX trades that were "not . . . less favorable to the Plan than terms offered by BNY to unrelated parties in a comparable arm's length FX Transaction," which the FX Procedures (incorporated by the Custody Agreement) required (¶ 22); (b) "achieve better rates for the benefit of clients," as the FX Procedures represented was the purpose of "bundling" FX transactions (¶ 24); and (c) execute standing instruction FX transactions "free of charge" and "according to best execution standards," as Defendants' own statements regarding FX trades mandated (¶ 42).  *See Harvey G. Ottovich Revocable Living Trust*, 2010 U.S. Dist. LEXIS 99161, at *7-9 (upholding breach of contract claim where plaintiffs, *inter alia*, "alleged numerous instances of defendants' breach"). Defendants' challenge to Plaintiff's breach of contract claim rests on fact-specific interpretations of the Custody Agreement, as well as the FX Procedures and representations on BNYMC's website—but those arguments carry no weight on this motion.  The only relevant inquiry is whether Plaintiff has "plausibly" stated a claim under Rule 8.  *See Yakas v. Chase Manhattan Bank, U.S.A., N.A.*, No. C 09-02964 WHA, 2010 U.S. Dist. LEXIS 5359, at *8-17 (N.D. Cal. Jan. 25, 2010) (Alsup, J.) (while observing that defendant raised "plausible" arguments, Court held that plaintiff nonetheless "alleged sufficient facts to make her breach-of-contract claim plausible").  Plaintiff has done so.

In response, Defendants first assert Plaintiff must allege that Defendants "*actually offered a better rate to another customer in a specific, comparable transaction.*"  Defs. Br. 8 (emphasis in original); *see also id.* at 9-10 (faulting Plaintiff for purportedly failing to provide "concrete facts" demonstrating Defendants did not provide better rates to Plaintiff than it "would have been able to secure on its own").  But that does *not* reflect the proper motion to dismiss standard.  Plaintiff "is

1   not required to plead [its] evidence 'or specific factual details not ascertainable in advance of

2   discovery.'"  *Sevey v. Soliz*, No. C 10-3677 LHK (PR), 2011 U.S. Dist. LEXIS 71620, at *8 (N.D.

3   Cal. July 2, 2011) (quoting *Gibson v. United States*, 781 F.2d 1334, 1340 (9th Cir. 1986)).  The

4   Complaint alleges, based in part on information provided by corporate whistleblowers in other

5   actions against Defendants as well as Plaintiff's analysis of standing instruction FX trades

6   Defendants executed on its behalf, that Defendants failed to meet their obligation not to subject

7   Plaintiff and the Class to rates less favorable than those in comparable, arm's-length transactions.

8   *See* ¶¶ 25, 47-77.  That is more than sufficient at this stage.

9          Defendants further contend—without any support in the Complaint or elsewhere—the

10  "comparable" transactions to which the FX Procedures referred were "other standing instruction

11  currency exchanges on the same day in the same currency," rather than, as Plaintiff alleges, direct

12  (negotiated) transactions.  *See* ¶¶ 33-46.  Again, Defendants' assertions have no place on this

13  motion, because the Court must look to the Complaint and associated documents to evaluate

14  whether "it is clear that . . . [P]laintiff can prove no set of facts in support of [its] claim that would

15  entitle [it] to relief."  *Autodesk, Inc. v. Dassault Systemes Solidworks Corp.*, No. C 08-04397

16  WHA, 2008 U.S. Dist. LEXIS 109800, at *4 (N.D. Cal. Dec. 18, 2008); *see also id.* at *6-7 ("The

17  well-pled allegations of a complaint, although unsworn, must be liberally construed and presumed

18  correct unless and until *the moving party demonstrates that all factual scenarios within the ambit*

19  *of the claim are shams*.").  Defendants do not meet that stringent burden.

20         Additionally, Defendants assert they cannot be held liable for their alleged failure to

21  execute standing instruction trades in accordance with "best execution standards" or to provide

22  FX services "free of charge" because (i) the subject representations appeared on BNYMC's

23  website rather than directly in the Custody Agreement or the FX Procedures; (ii) the "best

24  execution" language conflicts with "the express terms" of the Custody Agreement and the FX

25  Procedures; and (iii) the "best execution" statement does not impose any obligation on

26  Defendants with respect to FX trading prices.  These arguments lack merit.

27         As to the first, the FX Procedures do not specify how standing instruction FX trades will

28  be priced within the daily range Defendants provided.  The statements BNYMC made on its

1  website concerning standing instruction FX trading, however, (at least arguably) inform that

2  issue. Consideration of those representations therefore is appropriate—even necessary—to

3  construe the parties' obligations under the Custody Agreement. Indeed, Defendants directed

4  Plaintiff and other Class members to BNYMC's FX website, which expressly represented

5  Defendants would apply "best execution standards" to standing instruction FX transactions on

6  their clients' behalf and described FX trading as "free of charge." ¶ 42.[21] Defendants cannot now

7  fault Plaintiff for relying on the very obligations they undertook and marketed to Plaintiff and

8  other Class members.[22]

9        Plaintiff thus has met its burden under Rule 8 in alleging (a) the representations on BNY

10  Mellon Corp.'s website informed Defendants' duties under the custodial agreement, and

11  (b) Defendants acted contrary to those representations. ¶¶ 40, 42. Defendants' interpretation of

12  the parties' agreement does not overcome Plaintiff's allegations, which the Court must accept as

13  true for now. *See Davis v. Chase Bank U.S.A., N.A.*, 650 F. Supp. 2d 1073, 1088 (C.D. Cal.

14  2009) (denying motion to dismiss breach of contract claim, court explained, "[a]lthough

15  Defendant seems to generally challenge Plaintiff's contract interpretation, the Court is not

16  prepared, on the briefing before it, to perform a contract interpretation analysis that would be

17  required in order to determine whether Plaintiff's interpretation of the contract is the proper

18  one."); *Textainer Equip. Mgmt. (U.S.) Ltd. v. TRS Inc.*, No. C 07-01519 WHA, 2007 U.S. Dist.

19

20  [21] The Custody Agreement's "integration clause," on which Defendants rely, does not exclude any reliance on representations contained on BNY Mellon Corp.'s website. The clause provides only that the Custody Agreement "shall constitute the entire agreement of the parties with respect to the subject matter and supersedes all prior oral or written agreements in regard thereto," and that the Agreement "may be amended only by an instrument in writing duly executed by both parties hereto." Custody Agreement ¶ 15. But Plaintiff does not allege that Defendants' representations regarding "best execution standards" and FX trading being "free of charge" "amended" the Custody Agreement or constituted a separate agreement between the parties—only that they informed the Custody Agreement's terms. Defendants' reliance on *EPA Real Estate Partnership v. Kang*, 12 Cal. App. 4th 171, 176-77 (1992), thus is misplaced. Indeed, in *EPA Real Estate*, the California Court of Appeal observed that where a contract is integrated, "extrinsic evidence is admissible . . . to supplement or explain the terms of the agreement . . . where such evidence is consistent with the terms of the integrated document, and . . . the writing is not also intended as an exclusive statement regarding its subject matter." *Id.* at 176-77.

21
22
23
24
25
26

[22] Defendants' observation that BNY Mellon was not contractually obligated to provide Plaintiff and other Class members with time stamps for the FX transactions it had entered into on their behalf is a *non sequitur*. The point is not that Defendants breached the Custody Agreement by failing to include time stamps; rather, the absence of time stamps helped Defendants conceal their breaches of the agreement.

27
28

947107.3                                    - 16 -                    MPA IN OPPOSITION TO MOTION TO DISMISS THE
                                                                      CLASS ACTION COMPLAINT
                                                                      CASE NO. C 11-03620 WHA

1   LEXIS 47527, at *5-7 (N.D. Cal. June 20, 2007) (Alsup, J.) (upholding breach of contract claim,

2   this Court stated the question whether plaintiff and assignor of agreement fulfilled a condition

3   precedent to payment under the contract was "a factual dispute that will be developed later").[23]

4          Regarding Defendants' second assertion, as discussed earlier with respect to Plaintiff's

5   UCL claim, the language to which Defendants point in arguing the FX Procedures "expressly"

6   contemplate rates up to three percent outside the interbank rate is neither express nor as

7   unequivocally broad as Defendants claim.  And even assuming *arguendo* Defendants have raised

8   a plausible argument, Plaintiff's contrary allegations are nonetheless plausible, warranting denial

9   of Defendants' motion.  *See Yakas*, 2010 U.S. Dist. LEXIS 5359, at *8-17.

10         Defendants' third assertion—that the "best execution" language does not relate to FX

11  trade pricing and Plaintiff does not rely on a specific "rule" to the contrary—once again invites

12  the Court to endorse Defendants' statements (which are, at any rate, unsupported) to the exclusion

13  of the allegations in the Complaint.  Furthermore, Defendants' liability does not turn on the

14  existence of a rule or regulation expressly prohibiting the alleged misconduct.[24]

15  **IV.    Plaintiff States A Claim For Breach Of The Implied Covenant Of Good Faith And**
       **Fair Dealing.**

16

17         Plaintiff sufficiently alleges a claim for breach of the implied covenant of good faith and

    fair dealing, which every contract embodies.  *Fortaleza v. PNC Fin. Servs. Grp., Inc.*, 642 F.

18  Supp. 2d 1012, 1021 (N.D. Cal. 2009).  Plaintiff alleges "the existence of a contractual obligation,

19  along with conduct that frustrates [Plaintiff]'s rights to benefit from the contract," *id.* at 1021-22,

20  as well as  a "conscious and deliberate act, which unfairly frustrates the agreed common purposes

21

22  [23] Defendants also contend—incorrectly—that Plaintiff does not claim it relied on the "best execution" statement.  *See* ¶ 100.

23  [24] The caselaw on which Defendants rely does not advance their arguments for dismissal.  In
    *Interactive Intelligence, Inc. v. KeyCorp*, 546 F.3d 897 (7th Cir. 2008), the Seventh Circuit upheld
24  *summary judgment* for defendants where plaintiff (i) claimed it was a third-party beneficiary to an at-
    will employment agreement between defendant KeyBank and one of its employees, (ii) KeyBank
25  negligently supervised the employee, and (iii) KeyBank breached an oral contract.  *Id.* at 899-902.
    The circumstances in that case thus are completely divorced from the alleged facts here.  And the
26  district court in *Lipuma v. American Express Co.*, 406 F. Supp. 2d 1298 (S.D. Fla. 2005), addressing
    the parties' settlement agreement, relied on *Mexico Money Transfer*—which, as discussed above,
27  addressed facts different than those here—and observed that the subject foreign currency conversion
    practices "are disclosed in the cardmember agreements, and cardmembers have an opportunity to
28  understand the information, and several have presented statements indicating such comprehension."
    *Id.* at 1320.  *Lipuma* thus is procedurally and factually inapposite.

MPA IN OPPOSITION TO MOTION TO DISMISS THE
CLASS ACTION COMPLAINT
CASE NO. C 11-03620 WHA

1   and disappoints [Plaintiff's] reasonable expectations," thereby depriving it of "the benefits of the

2   agreement." *Nava v. VirtualBank*, No. 2:08-CV-00069, 2008 U.S. Dist. LEXIS 72819, at *28-31

3   (E.D. Cal. July 16, 2008).  In short, Plaintiff has met its Rule 8 burden by alleging that

4   Defendants failed to exercise the discretion accorded them under the custodial agreement "in a

5   way consistent with the parties' expectations at the time of contracting." *Taheny v. Wells Fargo*

6   *Bank, N.A.*, No. S-10-2123-LKK, 2010 U.S. Dist. LEXIS 138048, at *21 (E.D. Cal. Dec. 22,

7   2010).

8        Defendants' custodial agreements with Plaintiff and other Class members—which

9   Plaintiff alleges were all substantially similar (¶ 110)—conferred discretionary power to

10  Defendants for executing FX trades pursuant to standing instructions.  ¶ 118.  Plaintiff alleges

11  Defendants systematically exercised that discretion in bad faith by using fictitious FX rates to

12  report and charge or credit to Plaintiff and other Class members, against their reasonable

13  expectations, to increase Defendants' profits.  *Id.*  The Complaint thus sets forth an alternative

14  breach of contract claim based on Defendants' breach of the implied covenant of good faith and

15  fair dealing.  ¶¶ 117-19.[25]

16       Defendants' assertion that Plaintiff's implied covenant claim improperly imposes

17  obligations beyond those specifically set forth in the Custody Agreement is unavailing.  Plaintiff

18  does not seek to add terms to the Agreement, only to hold Defendants accountable for failing to

19  meet the "reasonable expectations" of Plaintiff and other Class members that Defendants would

20  not misrepresent FX rates to try to take advantage of them.  *See Nava*, 2008 U.S. Dist. LEXIS

21  72819, at *29.  Moreover, Plaintiff's allegations of "fraudulent" conduct under the UCL support

22  its implied covenant claim.  *See id.* at *27-30 (sustaining implied covenant of good faith and fair

23  dealing claim where defendants' conduct was allegedly fraudulent.).[26]

24  _____

25  [25] Defendants wrongly contend Plaintiff is precluded from alleging a breach of contract under the
    alternative theory of breach of the implied covenant of good faith and fair dealing while
    simultaneously alleging a breach of an express provision of the contract.  *See, e.g.*, *Harvey G.*
26  *Ottovich Revocable Living Trust*, 2010 U.S. Dist. LEXIS 99161, at *7-9 (upholding separate claims
    for breach of contract and breach of the implied covenant of good faith and fair dealing).

27  [26] Defendants' citations on this point are inapposite.  In *Guz v. Gechtel National, Inc.*, 24 Cal. 4th 317
    (2000), the California Supreme Court reaffirmed that an employee cannot invoke the implied
28  covenant to claim "that even if his employment was at will, his arbitrary dismissal frustrated his
    contract benefits and thus violated the implied covenant."  *Id.* at 350.  The Court explained, "Precisely

**V.      Plaintiff States A Claim Under N.Y. General Business Law Section 349.**

Defendants argue that Plaintiff fails to adequately plead its Fifth Claim for Relief under New York General Business Law §§ 349, *et seq.* (the "GBL § 349") for two reasons:  (1) BNY Mellon's standing instruction FX services were not materially misleading; (2) the standing instruction FX services were not "consumer oriented" within the meaning of GBL § 349. Defendants argue that "the New York standard [for whether statements were materially misleading] is similar to the one governing claims under the fraud prong of the UCL, and Plaintiffs' claim fails for the same reasons that the UCL claim fails."  Def. Br. 18.  Defendants' argument fails for the reasons discussed above.  *See* § I.A.  For those same reasons, Plaintiff has satisfied the "materially misleading" prong of GBL § 349.  Thus, Defendants are left solely with the argument that the FX services are not "consumer oriented" within the meaning of GBL § 349. This argument runs contrary to conclusive precedent in New York.

Contrary to Defendants' contention, *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20 (1995), is squarely on point.  In *Oswego* two union pension funds brought a GBL § 349 claim relating to misrepresentations made about savings accounts the pension funds held with their bank.  The Court of Appeals held that the pension funds' claims satisfied the consumer-oriented prong of GBL § 349.  In reviewing a summary judgment order, the Court of Appeals held the record indicated that the bank "dealt with plaintiffs' representative as any customer entering the bank to open a savings account . . . .  Thus, plaintiffs have satisfied the threshold test in that the acts they complain of are consumer-oriented in the sense that they potentially affect similarly situated consumers."  *Id.* at 26-27.

No reasonable distinction can be drawn between the facts in *Oswego* and those present here.  Each plaintiff is a pension fund—not a business—safeguarding and administering the

---

because employment at will *allows* the employer freedom to terminate the relationship as it chooses, the employer does not frustrate the employee's contractual rights merely by doing so."  *Id.* (emphasis in original).  Here, by contrast, Plaintiff's attempt to hold Defendants liable for abusing their discretion under the Custody Agreement does not contravene the Agreement, especially given that the Agreement itself contains no express provision describing the methodology for Defendants' calculation of FX rates.  And in *Storek & Storek, Inc. v. Citicorp Real Estate, Inc.*, 100 Cal. App. 4th 44 (2002), the California Court of Appeal observed that subject the loan agreement "expressly authorized" the alleged offending conduct.  *Id.* at 56-57.  Not so here.

MPA IN OPPOSITION TO MOTION TO DISMISS THE
CLASS ACTION COMPLAINT
CASE NO. C 11-03620 WHA

1  combined retirement savings of its members.[27]  Each plaintiff entered into an account service,

2  available to the public at large, related to safeguarding those retirement savings.  As with the

3  savings account service in *Oswego*, "Defendants' custodian services, including their directed and

4  standing instruction FX services, are aimed at and available to any individual, company or fund

5  needing custody services to safeguard their assets."  ¶ 44.  A more unequivocal indication that the

6  services at issue in this litigation are consumer-oriented is hard to fathom.[28]

7  **VI.    Plaintiff Has Standing To Bring Claims Individually And On Behalf Of The Class.**

8          A class action plaintiff must sufficiently allege that it has standing under Article III of the

9  U.S. Constitution to bring the asserted claims.  *Ellis v. Costco Wholesale Corp.*, No. 07–15838,

10  2011 WL 4336668, at *5-6 (9th Cir. Sept. 16, 2011).  Standing requires that "(1) the plaintiff

11  suffered an injury in fact, *i.e.*, one that is sufficiently concrete and particularized and actual or

12  imminent, not conjectural or hypothetical, (2) the injury is fairly traceable to the challenged

13  conduct, and (3) the injury is likely to be redressed by a favorable decision."  *Id.* (quoting

14  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61) (internal quotation marks omitted).

15  Contrary to Defendants' assertion, Plaintiff has sufficiently alleged its standing to sue and seek

16  redress on behalf of the proposed Class.

17          Plaintiff alleges in detail the unlawful, fraudulent and unfair business and trade practices

18

19  [27] Even if Plaintiff was a business and the custodial services were only available to businesses a GBL § 349 claim would not necessarily be excluded.  *See Interested Underwriters at Lloyd's of London Subscribing to Policy No. 991361018 v. Church Loans & Investments Trust*, 432 F. Supp. 2d 330, 333 (S.D.N.Y. 2006) ("large, sophisticated businesses, commercial entities are not *per se* excluded from bringing an action under § 349 . . .  At the motion to dismiss stage, the Court cannot rule that it is beyond doubt that Church Loans's policy with Lloyd's falls into the excluded class of large business-to-business transactions.")

[28] Defendants' claim that the GBL § 349 claim somehow fails to meet the consumer-oriented prong because the Custody Agreement "is on its face an individually negotiated contract" is an irrelevant diversion.  Not only are Defendants' statements about the nature of Plaintiff's custody agreement made completely without elaboration or support, Defendants' own case highlights that the issue is not whether each contract is identical but rather whether, as repeatedly alleged here, "a party's misrepresentations are boilerplate and have the potential to be repeated in order to deceive numerous similarly situated buyers."  *Exxonmobil Inter-Am., Inc. v. Advanced Info. Eng'g Services, Inc.*, 328 F. Supp. 2d 443, 449 (S.D.N.Y. 2004); *see also Ng v. HSBC Mortg. Corp.*, No. 07 Civ. 5434, 2010 WL 889256, at *15 (E.D.N.Y. Mar. 10, 2010) ("the court is not willing to find as a matter of law that an individual loan transaction cannot be harmful to the public interest generally and therefore cannot be sufficiently 'consumer-oriented'. . . nothing suggests that similarly vulnerable consumers could not fall victim to similar practices, and there is nothing especially unique or unusual about this particular transaction.").

MPA IN OPPOSITION TO MOTION TO DISMISS THE CLASS ACTION COMPLAINT
CASE NO. C 11-03620 WHA

1 | and false advertising in which Defendants engaged throughout the Class Period.  ¶¶ 2-7, 32, 93-

2 | 101, 103-06, 121-22.  Plaintiff further alleges sufficiently concrete, actual harm, as Plaintiff and

3 | other Class members suffered monetary losses as a result of Defendants' misconduct.  ¶¶ 23, 68-

4 | 70, 77, 101, 108, 116, 119, 123; *Watts v. Jackson Hewitt Tax Serv.*, 579 F. Supp. 2d 334, 349

5 | (E.D.N.Y. 2008) (concerning hidden charges).

6 |       Moreover, the injury is more than "fairly traceable" to Defendants' alleged malfeasance:

7 | In the Custody Agreement, as well as in the FX Procedures and the monthly statements

8 | Defendants provided to Plaintiff, Defendants misrepresented to Plaintiff the FX rates at which

9 | Defendants traded on its behalf.  ¶¶ 22-24.  Defendants made similar misrepresentations to other

10 | Class members throughout the Class Period.[29]  ¶¶ 25, 31, 32, 41, 45, 46, 110.

11 |       And, with respect to the final prong of the standing analysis, Plaintiff seeks monetary and

12 | injunctive relief for Defendants' past and continuing misconduct.  ¶¶ 124-130.  A favorable

13 | decision by this Court clearly would redress the damages Plaintiff and other Class members have

14 | suffered.  Defendants' arguments concerning Plaintiff's alleged lack of standing accordingly must

15 | fail.

16 | **VII.    Plaintiff's Allegations Sufficiently Demonstrate The Timeliness Of Its Claims.**

17 |       Plaintiff is not barred from asserting claims for Defendants' alleged misconduct going

18 | back to January 12, 1999 because Defendants' deceptive practices operated to toll any applicable

19 | statutes of limitation under California's "discovery rule."  The discovery rule applies to toll the

20 | statute of limitations of a contract claim where fraudulent misrepresentations are asserted in

21 | conjunction with that claim.  *El Pollo Loco, Inc. v. Hashim*, 316 F.3d 1032, 1039 (9th Cir. 2003).

22 | Where the injury has been "difficult for the plaintiff to detect," the defendants are in a "far

23 |

24 | [29] Defendants, meanwhile, incorrectly assert that Plaintiff cannot sue on transactions that occurred before June 2008 because that is "the earliest date [Plaintiff] can identify any of its standing

25 | instruction FX trades."  Defs. Br. 19.  In fact, as Plaintiff alleges, Plaintiff entered into the Custody Agreement in *2006*.  ¶¶ 16, 36.  Moreover, Plaintiff alleges that the 2008 transactions highlighted in

26 | its analysis of FX trades Defendants executed on its behalf represent a mere sample of the total FX trades Defendants conducted for, and misrepresented to, Plaintiff.  ¶ 77.  Moreover, "a lead plaintiff

27 | with some injuries in fact has established standing for purposes of Article III; once the general standing requirement is satisfied, any additional questions related to particular injuries are relevant

28 | only in the context of class certification under Federal Rule of Civil Procedure 23."  *In re Connectics Corp. Secs. Litig.*, 542 F. Supp. 2d 996, 1004 (N.D. Cal. 2008).

- 21 -

1   superior position to comprehend" it, or defendants "had reason to believe the plaintiff remained

2   ignorant [that] he had been wronged," the discovery rule tolls a plaintiff's breach of contract

3   claim. *Id.* That is precisely what Plaintiff has alleged here: Nothing in the FX rates Defendants

4   reported to Plaintiff and other Class members indicated those rates were false and included

5   hidden and unauthorized mark-ups or mark-downs. ¶¶ 1-3, 5, 6, 30, 31, 41, 46, 62-64.

6        The same rationale applies to Plaintiff's UCL and FAL claims. *See Miller v. Wash. Mut.*

7   *Bank FA*, 776 F. Supp. 2d 1064 (N.D. Cal. 2011) (Alsup, J); *Harshbarger v. Philip Morris, Inc.*,

8   No. 02-05267, 2003 WL 23342396, at *6-7 (N.D. Cal. Apr. 1, 2003).[30]  Plaintiff thus has

9   sufficiently alleged the timeliness of its claims under California statutory and common law.

10        Additionally, while New York courts do not apply a discovery standard to claims under

11   GBL § 349, Plaintiff's entire claim under that statute is timely by virtue of the related doctrine of

12   equitable tolling, whereby plaintiffs may "overcome an expired statute of limitations when they

13   were induced by fraud, misrepresentation, or deception to refrain from timely commencing an

14   action." *M&T Mortg. Corp. v. White*, 736 F. Supp. 2d 538, 555 (E.D.N.Y. 2010), *adopted by*

15   736 F. Supp. 2d 538 (E.D.N.Y. 2010).  The primary consideration in assessing the applicability of

16   the equitable tolling principle "is whether the defendant fraudulently concealed from the plaintiff

17   his cause of action *during the time in which the plaintiff could have brought that action*." *Id.* If

18   so, "the limitations period begins to run when the plaintiff discovered, or by reasonable diligence

19   could have discovered, the basis of the lawsuit." *Id.* at 555-56.  Equitable tolling exists where the

20   plaintiff establishes "the defendant wrongfully deceived or misled the plaintiff in order to conceal

21   a cause of action" and "the failure to initiate the suit in a timely fashion did not result from a lack

22   of diligence." *Id.* at 556 n.12 (New York law equitable tolling is "similar to its federal

23   counterpart").

24        Plaintiff's allegations satisfy both prerequisites to equitable tolling.  Regarding

25   concealment, Plaintiff alleges that Defendants "took affirmative steps to prevent . . . . [P]laintiff's

26   _____

27   [30] *See also Hameed v. IHOP Franchising*, *LLC*, No. 2:10-cv-02276, 2011 WL 590905, at *3-4 (E.D. Cal. Feb. 10, 2011) (observing that federal and California state courts have held that "the statute of limitations for unfair business claims tolls until 'a reasonable person would have discovered the

28   factual basis for a claim'.").  Moreover, this Court's decision in *Miller* was not predicated on the "sophistication" (or lack thereof) of the parties, which Defendants here misguidedly urge is material.

MPA IN OPPOSITION TO MOTION TO DISMISS THE
CLASS ACTION COMPLAINT
CASE NO. C 11-03620 WHA

1    discovery of [its] claim or injury" or that "the wrong itself was of such a nature as to be self-

2    concealing." *Id.* at 556.  The gravamen of Plaintiff's GBL § 349 claim is that Defendants

3    misrepresented the rates they actually used to purchase or sell foreign currency on behalf of their

4    custodial clients.  ¶¶ 47-77, 120-23.  Moreover, the tactics Defendants employed in implementing

5    their scheme, including failing to include time stamps for FX trades in the monthly statements

6    provided to Plaintiff and others (¶¶ 63-64), allowed Defendants to conceal their misconduct.

7              Further, Plaintiff's inability to file within GBL § 349's three-year limitations period did

8    not result from any lack of diligence by Plaintiff.  Nothing in the Complaint indicates Plaintiff

9    was aware Defendants were cheating it out of funds, nor did the monthly FX transaction

10   statements indicate Defendants had actually executed those trades using a different rate than they

11   reported on the statements.  Defendants thus cannot now fault Plaintiff for seeing no red flags

12   when none appeared.  In other words, Plaintiff's ignorance of its claim during the statutory period

13   "is not an obstacle to equitable tolling, where, as here, the wrongdoing is recognized as self-

14   concealing." *Council v. Better Homes Depot, Inc.*, No. 04 CV 5620 (NGG) (KAM), 2006 U.S.

15   Dist. LEXIS 57851, at *31 (E.D.N.Y. Aug. 16, 2006); *see also id.* at *34-36 (applying equitable

16   tolling to Section 349 claim where "the alleged wrongdoing constitute[d] active

17   misrepresentation, to wit, fraudulent misrepresentations of material fact and fraudulent

18   concealment of material facts, intended to induce Plaintiffs to [*inter alia*] purchase property. . .at

19   an inflated price").

20             Because (1) Plaintiff has alleged Defendants misstated or omitted to state material facts

21   regarding FX transactions, (2) the nature of Defendants' misconduct was concealed (both

22   inherently and as a result of Defendants' actions) from Plaintiff, and (3) Plaintiff's filing of its

23   claim more than three years after some of the injurious transactions occurred did not arise from a

24   lack of due diligence by Plaintiff, equitable tolling applies to Plaintiff's GBL § 349 claim.  No

25   portion of that claim, then, is time-barred, as Plaintiff brought its claim well within three years of

26   discovering the unsealed *qui tam* actions earlier this year.  ¶ 91; *see also M&T Mortg.*, 736 F.

27   Supp. 2d at 556 (in instances of concealment, "plaintiffs can be said to have learned of the cause

28   of action or have become aware of it from the time they conferred with an attorney").

947107.3                              - 23 -                    MPA IN OPPOSITION TO MOTION TO DISMISS THE
                                                                        CLASS ACTION COMPLAINT
                                                                        CASE NO. C 11-03620 WHA

1    Defendants argue that the discovery rule (and presumably will likewise assert with respect

2    to equitable tolling) should not apply to toll Plaintiff's claims because Plaintiff did not exercise

3    reasonable diligence in discovering them. Defs. Br. 20.  In support of their argument, Defendants

4    claim "[Plaintiff] had the data to perform the analysis" during the relevant limitations periods. *Id.*

5    This argument lacks merit.  While Defendants provided Plaintiff with the FX rates BNY charged

6    for trades on behalf of the fund during the Class Period that were fictitious, those rates largely fell

7    within the range of the day, so as not to arouse suspicion.  ¶¶ 2-3, 37-70.  Moreover, "the

8    recipient of a fraudulent misrepresentation of fact is justified in relying upon its truth, although he

9    might have ascertained the falsity of the representation had he undertaken an investigation."

10   *Storage Servs. v. Oosterbaan*, 214 Cal. App. 3d 498, 508 (1989).[31]  Plaintiff alleges that it did not

11   discover—and could not have discovered—its claims for relief until the unsealing of the first

12   whistleblower complaint against Defendants in January 2011. ¶ 91.  That unsealing showed, for

13   the first time, that Defendants may have acted unlawfully and breached their contractual

14   obligations to Plaintiff and other members of the Class.  *Id.*

15   Lastly, Plaintiff's claims are timely due to the continual nature of the violations at issue.

16   Plaintiff's claims accrued each time it received the false FX rates (*via* the monthly reports) from

17   Defendants throughout the Class Period.  ¶¶ 6, 30, 31, 63, 64.  *See, e.g., Hernandez v. Attisha*,

18   Case No. 09-CV-2257, 2010 U.S. Dist. LEXIS 20235, *11 (S.D. Cal. Mar. 4, 2010) ("the

19   continuing tort doctrine may delay accrual of the action, if the tort involves a continuing wrong,

20   until the date of the last injury or when the tortious actions cease.").

21   **VIII.   Plaintiff States Claims Against BNYMC And Bank Of New York Co., Inc.**

22   Plaintiff has properly named BNYMC and Bank of New York Co., Inc. ("BNY Co.") as

23   Defendants in this action.  BNYMC is the parent of Defendant Bank of New York Mellon

24   ("BNYM"), and is responsible for holding over $25 trillion in assets under custody.  ¶ 11.

25   Further,  in its 2010 Form 10-K, BNYMC stated its principal assets and sources of income

26   derived from two of its subsidiaries, including BNYM—the entity responsible for providing the

27

28   [31] *See also Van Meter v. Bent Constr. Co.*, 46 Cal. 2d 588, 595 (1956) (permitting even "negligent reliance.").

947107.3                                    - 24 -

1  custodial FX services to Plaintiff and other Class members.  ¶¶ 11-12.  Substantial overlap exists

2  between BNYMC and its principal subsidiary BNYM—in particular,  every current BNYMC

3  executive officer also serves as an officer of BNYM.  ¶ 12.  Since this case arises from BNYM's

4  unfair, fraudulent and unlawful FX practices affecting its custodial clients, BNYMC is properly

5  named as a Defendant due to the custodial banking and FX services it provided to Plaintiff and

6  other Class members through its subsidiary BNYM.

7         Plaintiff also has properly named BNY Co. as a Defendant.  Before the July 1, 2007

8  merger of BNY Co. and Mellon Financial Corporation,  BNY Co.'s principal subsidiary was

9  BNY, which the 2006 Custody Agreement specifically authorized to perform FX transaction

10  services for Plaintiff.  ¶ 14.  Like BNYMC and BNYM, then, BNY Co. is properly named as a

11  Defendant because it provided custodial banking and FX services to Plaintiff and other Class

12  members through its principal subsidiary BNY.

13         Defendants offer no meaningful support for their argument that by asserting claims

14  against BNYMC and BNY Co., Plaintiff seeks to pierce the corporate veil or otherwise disregard

15  the corporate form.[32]  Further, courts typically reserve the question of corporate veil-piercing (to

16  the extent it even applies here) for the jury.  *See, e.g.*, *MSGI Sec. Solutions, Inc. v. Hyundai*

17  *Syscomm Corp.*, No. C 09-03330 RS, 2010 U.S. Dist. LEXIS 68466, at *4-5 (N.D. Cal. July 9,

18  2010) ("While defendants may be correct that [plaintiff]'s allegations in part imply that some of

19  them may be separate entities maintaining appropriate corporate formalities, there is no basis at

20  the pleading stage to foreclose the alter ego claims.").

21                                   **CONCLUSION**

22         For all of the foregoing reasons, Defendants' motion to dismiss the Complaint should be

23  denied in its entirety.  Should dismissal be granted with respect to any of Plaintiff's claims,

24  Plaintiff respectfully  requests the opportunity to amend its complaint.

25

26

27  [32] Defendants' scant authority is inapposite.  *Calvert v. Huckins*, 875 F. Supp. 674 (E.D. Cal. 1995),
    addressed piercing corporate veils and alter egos for jurisdictional purposes. *Brooklyn Navy Yard*

28  *Cogeneration Partners v. Superior Court*, 60 Cal. App. 4th 248 (1997), addressed an attorney's
    professional obligations toward parent and subsidiary corporations.

                                                                    MPA IN OPPOSITION TO MOTION TO DISMISS THE
                                                                    CLASS ACTION COMPLAINT
                                                                    CASE NO. C 11-03620 WHA

Date:  November 4, 2011                    Respectfully submitted,


                                           By:  /s/  Richard M. Heimann
                                           Richard M. Heimann (State Bar No. 063607)
                                           *rheimann@lchb.com*
                                           Lexi J. Hazam (State Bar No. 224457)
                                           *lhazam@lchb.com*
                                           Robert L. Lieff (State Bar No. 037568) (Of Counsel)
                                           rlieff@lchb.com
                                           LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
                                           Embarcadero Center West
                                           275 Battery Street, 29th Floor
                                           San Francisco, CA  94111-3339
                                           Telephone:  (415) 956-1000
                                           Facsimile:   (415) 956-1008

                                           Steven E. Fineman (State Bar No. 140335)
                                           *sfineman@lchb.com*
                                           Daniel P. Chiplock
                                           *dchiplock@lchb.com*
                                           Michael J. Miarmi
                                           *mmiarmi@lchb.com*
                                           LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
                                           250 Hudson Street, 8th Floor
                                           New York, NY  10013-1413
                                           Telephone:  (212) 355-9500
                                           Facsimile:   (212) 355-9592

                                           Michael P. Lehmann (State Bar No. 77152)
                                           *mlehmann@hausfeldllp.com*
                                           Christopher L. Lebsock (State Bar No. 184546)
                                           *clebsock@hausfeldllp.com*
                                           HAUSFELD LLP
                                           44 Montgomery Street, 34th Floor
                                           San Francisco, CA 94104
                                           Telephone:  (415) 633-1908
                                           Facsimile:   (415) 358-4980

                                           Michael D. Hausfeld
                                           *mhausfeld@hausfeldllp.com*
                                           William P. Butterfield
                                           *wbutterfield@hausfeldllp.com*
                                           Ralph J. Bunche
                                           *rbunche@hausfeldllp.com*
                                           HAUSFELD LLP
                                           1700 K Street, NW Suite 650
                                           Washington, D.C.  20006
                                           Telephone:  (202) 540-7200
                                           Facsimile:  (202) 540-7201

947107.3                          - 26 -       MPA IN OPPOSITION TO MOTION TO DISMISS THE
                                               CLASS ACTION COMPLAINT
                                               CASE NO. C 11-03620 WHA

Michael P. Thornton
mthornton@tenlaw.com
Michael A. Lesser
mlesser@tenlaw.com
THORNTON & NAUMES LLP
100 Summer Street, 30th Floor
Boston, MA  02110
Telephone:  (617) 720-1333
Facsimile:   (617) 720-2445

Gregory S. Hach
ghach@hrssclaw.com
Michael A. Rose
mrose@hrssclaw.com
Frank R. Schirripa
fschirripa@hrssclaw.com
HACH ROSE SCHUMACHER
SCHIRRIPA & CHEVERIE LLP
185 Madison Avenue, 14th Floor
New York, New York 10016
Telephone: (212) 213-8311
Facsimile: (212) 779-0028

*Attorneys for Plaintiff and the proposed Class*