Richard M. Heimann (State Bar No. 063607)
Lexi J. Hazam (State Bar No. 224457)
Robert L. Lieff (State Bar No. 037568) (Of Counsel)
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Michael P. Lehmann (State Bar No. 77152)
Christopher L. Lebsock (State Bar No. 184546)
HAUSFELD LLP
44 Montgomery Street, 34th Floor
San Francisco, CA 94104
Telephone: (415) 633-1908
Facsimile: (415) 358-4980

*Attorneys for Plaintiff and the Proposed Class*

[Additional counsel listed on signature page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTERNATIONAL UNION OF OPERATING ENGINEERS, STATIONARY ENGINEERS LOCAL 39 PENSION TRUST FUND, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>THE BANK OF NEW YORK MELLON CORPORATION, THE BANK OF NEW YORK MELLON, THE BANK OF NEW YORK COMPANY, INC., THE BANK OF NEW YORK, and THE BANK OF NEW YORK MELLON TRUST COMPANY, NATIONAL ASSOCIATION,<br><br>Defendants. | Civil Action No. 3:11-cv-03620-WHA<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**(1) VIOLATION OF UNFAIR BUSINESS PRACTICES ACT [BUSINESS & PROFESSIONS CODE SECTION 17200, ET SEQ.]; (2) VIOLATION OF BUSINESS & PROFESSIONS CODE SECTION 17500, ET SEQ.; (3) BREACH OF CONTRACT; (4) BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING; (5) VIOLATION OF N.Y. GENERAL BUSINESS LAW SECTION 349**<br><br>**JURY TRIAL DEMANDED** |

955567.4

1     Plaintiff International Union of Operating Engineers, Stationary Engineers Local

2 39 Pension Trust Fund ("IUOE Local 39" or "Plaintiff"), individually and on behalf of all others

3 similarly situated, for its class action complaint against Defendants The Bank of New York

4 Mellon Corporation, The Bank of New York Mellon, The Bank of New York Company, Inc., The

5 Bank of New York, and The Bank of New York Mellon Trust Company, National Association

6 (collectively, "Defendants"), alleges the following based upon personal knowledge as to itself and

7 its own acts, and upon information and belief or the investigation of counsel as to all other

8 matters:

9 **I.**  **INTRODUCTION**

10    1.  This is an action to recover damages on behalf of Plaintiff and members of the

11 proposed classes, defined below (the "Class"), for harm suffered as a result of Defendants'

12 practice of deceptively assigning fictitious foreign currency exchange ("FX") rates to the Class'

13 purchases and sales of foreign securities that were done pursuant to "standing instructions" (as

14 further described below), in violation of California and New York law.

15    2.  Throughout the Class Period (as defined below), it has been the regular practice of

16 Defendants' FX traders and transaction desks, working in conjunction with their custody

17 department, to leverage every possible FX transaction done under "standing instructions" for the

18 exclusive pecuniary benefit of Defendants.  Knowing the precise foreign exchange needs of a

19 custody client who has agreed to "standing instructions," Defendants have traded to satisfy the

20 client's obligations on the interbank market, but then have deceptively charged or credited a

21 fictitious price to the client for the trade that bears no relation to the price at which the trade was

22 completed.  The fictitious price given to the client has allowed Defendants to keep a significant

23 unlawful and unfair profit on the trade.

24    3.  Defendants have acquired consistent and unlawful profits at the expense of

25 Plaintiff and the Class by consistently charging Plaintiff and the Class for purchases and sales of a

26 foreign currency (under "standing instructions") using FX rates that incorporate hidden and

27 grossly excessive mark-ups or mark-downs relative to the interbank market FX rate applicable at

28 the time of the trade.  In so doing, Defendants have reaped consistent windfalls – which can

955567.4

-1-

AMENDED CLASS COMPLAINT

include thousands of dollars on a single trade – by pocketing the difference between the fictitious and the actual price for the currency obtained or sold for the pension fund client.  Clients such as Plaintiff and the Class have remained unaware of this deceptive practice until the recent unsealing of several whistleblower complaints filed by insiders of one or more of Defendants.

4.       On information and belief, Defendants' deceptive practices date back at least ten years, affect similarly-situated customers throughout California and the nation, and may have yielded hundreds of millions of dollars in unlawful profits to Defendants.  Defendants' activities are currently the subject of whistleblower lawsuits being pursued by the Commonwealth of Virginia,[1] the State of Florida,[2] the State of New York,[3] and various counties of California,[4] as well as an administrative proceeding by the Securities Division of the Office of the Secretary of the Commonwealth of Massachusetts.[5]  In addition, the United States Department of Justice ("DOJ") is pursuing a civil fraud action[6] on behalf of federally insured financial institutions against The Bank of New York Mellon Corp., seeking penalties under the Financial Institutions Reform, Recovery and Enforcement Act, 12 U.S.C. § 1833a ("FIRREA"), as well as injunctive relief under the Fraud Injunction Statute, 18 U.S.C. § 1345 (the "DOJ Action").  The Securities and Exchange Commission ("SEC") is also pursuing its own investigation.

5.       Defendants' deceptive, unlawful and unfair practices throughout the Class Period were in breach of their written representations and statutory duties to Plaintiff and the Class, and occurred despite Defendants' repeated representations as to the benefits of their cutting-edge technology, their advanced claims processing procedures, the competitiveness of their FX rates,

---

[1] *Commonwealth of Virginia, ex. rel. FX Analytics v. The Bank of New York Mellon Corp.*, No. CL-2009-15377 (Va. Cir. unsealed Jan. 21, 2011).

[2] *State of Florida, ex. rel. FX Analytics v. The Bank of New York Mellon Corp.*, No. 2009-ca-4140 (Fla. Cir. unsealed Feb. 7, 2011).

[3] *People of the State of New York, et al., v. The Bank of New York Mellon Corporation*, Index No. 09/114735 (N.Y. Sup. Ct.) ("NYAG Action").

[4] *Bank of New York Mellon Corp. False Claims Act Foreign Exchange Litigation v. BNY Mellon*, No. 3:11-cv-05683-WHA (removed to N.D. Cal. on Nov. 28, 2011)

[5] *In the Matter of The Bank of New York Mellon Corporation*, Docket No. 2011-0044 (administrative complaint filed by the Office of the Secretary of the Commonwealth, Securities Division, on Oct. 26, 2011) (the "Massachusetts Action").

[6] *United States v. BNY Mellon Corp.*, No. 1:11-cv-06969-LAK (S.D.N.Y.).

aggregation and netting[7] of trades "based on guidelines tailored to client needs," and the "best execution standards" that Defendants claimed to follow.  Defendants' acts contravened affirmative representations made to Plaintiff and the Class in Defendants' written FX policies and procedures, advertising, and other written representations concerning the terms that Plaintiff and the Class should reasonably expect for FX transactions conducted by Defendants.

6.      Plaintiff and the other Class members could not reasonably have detected Defendants' deceptive, unlawful and unfair practices.  Nothing in the FX rates that Defendants actually reported to Plaintiff and the Class – which Defendants almost exclusively placed within (though at the extremes of) the trading range of the day – indicated that those rates were false and included hidden and unauthorized mark-ups or mark-downs.

7.      Plaintiff brings this action as a class action on behalf of all similarly affected non-public pension fund institutional investors in foreign securities, including but not limited to private pension funds, mutual funds, endowment funds, investment manager funds, and employee benefit plans covered by the Employee Retirement Income Security Act of 1974 ("ERISA"), for which Defendants performed FX trades pursuant to "standing instructions" in order to recover the proceeds that Defendants improperly obtained from them through the deceptive, unlawful and unfair FX trading practices alleged herein.

## II.    JURISDICTION AND VENUE

8.      This Court has subject-matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action, including claims asserted on behalf of a nationwide class, filed under Rule 23 of the Federal Rules of Civil Procedure; there are hundreds, if not thousands, of proposed Class members; the aggregate amount in controversy exceeds the jurisdictional amount or $5,000,000.00; and at least two of the three Defendants are citizens of a State different from that of Plaintiff and the Class.  This Court also has subject matter jurisdiction over Plaintiff's and the proposed Class' claims pursuant to 28 U.S.C. § 1367(a).

---

[7] "Netting," when actually implemented, allows clients that require FX trades to make one transaction instead of two, thereby reducing costs. When the same currency must be bought and sold, the two positions can be "netted," allowing the transaction to be completed in one trade.

9.     Venue in this judicial district is proper pursuant to 28 U.S.C. §§ 1391(b) and (c).
Plaintiff is a citizen of the state of California and resides in this district.  A substantial part of the
events or omissions giving rise to the claims asserted occurred in this district.  Additionally,
Plaintiff's custodial contract with Defendant The Bank of New York Mellon Trust Company,
National Association provides that any of Plaintiff's claims that are directly or indirectly related
to the contract are to be litigated in a court "located within the State of California," and that the
parties agree that such courts "are the most convenient forum to resolve" such claims.[8]  *See* Exh.
A at § 16(a) – Governing Law; Jurisdiction; Certain Waivers.

### III.     PARTIES

#### A.     Plaintiff

10.     Plaintiff International Union of Operating Engineers Local 39 Stationary
Engineers ("IUOE Local 39") is an employee benefit plan covered by ERISA with principal
offices at 48 Julian Street, San Francisco, California.  IUOE Local 39 provides retirement and
survivor benefits to approximately 17,000 members.  IUOE Local 39's holdings include
international assets that require FX transactions.  Defendants provided custodial services to
Plaintiff during the Class Period, which included executing FX transactions on IUOE Local 39's
behalf pursuant to "standing instructions."  At no time did IUOE Local 39 authorize Defendants
to charge IUOE Local 39 the false FX rates as alleged herein.

#### B.     Defendants

11.     Defendant The Bank of New York Mellon Corporation ("BNY Mellon Corp.") is a
Delaware corporation with headquarters at One Wall Street, New York, New York, 10286.  BNY
Mellon Corp. is the product of the July 1, 2007 merger (the "Merger") of The Bank of New York
Company, Inc. and Mellon Financial Corporation ("Mellon").  BNY Mellon Corp. is the parent of
Defendant The Bank of New York Mellon.  According to BNY Mellon Corp.'s Form 10-K for
the year ended December 31, 2010 (filed with the SEC on February 28, 2011) ("BNY Mellon
Corp. 2010 10-K"), BNY Mellon Corp. had "$1.17 trillion in assets under management and $25.0

---

[8] A copy of the Global Custody Agreement (ERISA) between Plaintiff and The Bank of New
York Trust Company, National Association, dated as of February 14, 2006 ("Custody
Agreement"), is attached as Exhibit A.

1    trillion in assets under custody and administration as of Dec. 31, 2010."  BNY Mellon Corp.'s

2    principal assets and sources of income come from its two principal bank subsidiaries, including

3    Defendant The Bank of New York Mellon.  *See* BNY Mellon Corp. 2010 10-K at 4, 25.

4            12.     Defendant The Bank of New York Mellon ("BNY Mellon"), a New York state

5    chartered bank, is one of two principal bank subsidiaries of BNY Mellon Corp., and is the

6    successor entity (post-Merger) to The Bank of New York.  According to the BNY Mellon Corp.

7    2010 10-K, BNY Mellon "houses [BNY Mellon Corp.'s] institutional businesses, including Asset

8    Servicing, Issuer Services, Treasury Services, Broker-Dealer and Advisor Services, and the bank-

9    advised business of Asset Management."  *Id.* at 4.[9]  BNY Mellon is the principal bank subsidiary

10    of BNY Mellon Corp. responsible, since the Merger, for providing custodial and FX services to

11    institutional investors such as Plaintiff and the Class.  There is substantial overlap between BNY

12    Mellon Corp. and BNY Mellon's leadership.  According to the BNY Mellon Corp. 2010 10-K (at

13    30-32), every current executive officer of BNY Mellon Corp. also serves as an officer of BNY

14    Mellon.

15            13.     Defendant The Bank of New York Company, Inc., through its Investor & Broker-

16    Dealer Services business segment, provided (prior to the Merger) global custody services,

17    securities lending, and FX trading and execution services to institutional investors including

18    Plaintiff and the Class.  *See* The Bank of New York Company, Inc.'s Annual Report on Form 10-

19    K for the year ended December 31, 2006 (filed with the SEC on February 22, 2007) ("BNY 2006

20    10-K") at 14.

21            14.     Prior to the Merger, the Bank of New York Company, Inc.'s principal subsidiary,

22    Defendant The Bank of New York, served clients throughout the world in five primary

23    businesses:  Securities Servicing and Global Payment Services, Private Client Services and Asset

24    Management, Corporate Banking, Global Market Services, and Retail Banking.  *See* The Bank of

25    New York Company, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2003

26    (filed with the SEC on March 10, 2004) ("BNY 2003 10-K") at 2.  The Custody Agreement

27

28    [9] The second of BNY Mellon Corp.'s two principal banks, BNY Mellon, National Association ("BNY Mellon, N.A."), is described by BNY Mellon Corp. as housing its "Wealth Management business," and is not at issue in this case. *Id.*

1   specifically authorized The Bank of New York, described as The Bank of New York Trust

2   Company, National Association's "New York affiliate," to perform or assume any of the duties,

3   obligations or responsibilities of The Bank of New York Trust Company, National Association

4   under the Custody Agreement. *See* Custody Agreement, § 21 – Authorization of The Bank of

5   New York. Among those responsibilities was the provision of foreign exchange services to

6   Plaintiff. *Id.*, § 3(d) – Foreign Exchange Transactions.

7       15.    Defendants The Bank of New York Company, Inc. and The Bank of New York are

8   referred to collectively herein as "BNY," and at all relevant times were headquartered in New

9   York.

10      16.    Defendant The Bank of New York Mellon Trust Company, National Association

11  (the "Bank"), which was known prior to July 1, 2008 as The Bank of New York Trust Company,

12  National Association, is a national bank headquartered at 700 South Flower Street, Suite 200, Los

13  Angeles, California  90017.  BNY Mellon Corp. describes the Bank as a "primary subsidiary" of

14  BNY Mellon Corp. *See* BNY Mellon Corp. 2010 10-K at Exh. 21.1. The Bank is one of two U.S.

15  trust companies of BNY Mellon Corp. that "house trust products and services across the U.S."

16  *Id.* at 4.  Plaintiff entered into the Custody Agreement with the Bank on or about February 14,

17  2006.  The Custody Agreement provided for FX transaction services to be provided by the Bank,

18  its subsidiaries, or affiliates, including BNY (and, subsequently, BNY Mellon).  *See* Custody

19  Agreement, §3(d) – Foreign Exchange Transactions.

20  **IV.   DEFENDANTS' UNLAWFUL SCHEME TO ACQUIRE UNDISCLOSED**

21  **       WINDFALL PROFITS AT THE EXPENSE OF CUSTOMERS**

22      **A.    Background on Defendants' Relationship with Plaintiff and the Class**

23      17.    Defendants provided custodial services for Plaintiff and the other customers that

24  constitute the Class during the Class Period.  A BNY Mellon "Glossary of Investment Terms"

25  defines custodian as "[a] person or other fiduciary institution responsible for safeguarding the

26  property of another person or entity."  The responsibilities entrusted to a custodian include the

27  guarding and safekeeping of securities, delivering or accepting traded securities, and collecting

28  principal, interest, and dividend payments on held securities.  Custodians are typically used by

1   institutional investors who do not wish to leave securities on deposit with their broker-dealers or

2   investment managers.  By separating these duties, the use of custodians – at least in theory – is

3   designed to reduce the risk of fraud or other misconduct.  An independent custodian ensures that

4   the investor has unencumbered ownership of the securities other agents represent to have

5   purchased on its behalf.

6       18.     Defendants, either by themselves or through their subsidiaries and affiliates, have

7   provided custodial services to a large number of pension funds, in particular, across the country

8   throughout the Class Period.  Indeed, Defendant BNY Mellon Corp. touts itself as "the world's

9   largest global custodian," and has $25 trillion in assets under custody.

10      19.     During the past decade, ERISA pension funds and other institutional investors

11  have increasingly looked to overseas companies and securities markets in order to diversify their

12  holdings and maximize investment returns.  The necessity for pension funds, in particular, to

13  invest in foreign securities in order to properly diversify and meet their funding requirements is

14  well-known to and appreciated by custodial services providers such as Defendants.

15      20.     Because foreign investments are bought and sold in the foreign currencies of the

16  nations in which they are issued, U.S.-based investors necessarily must purchase and sell those

17  foreign currencies in order to complete the transactions.  A custodial bank's services accordingly

18  may include undertaking foreign currency exchange transactions necessary to facilitate a client's

19  purchases or sales of foreign securities – as well as the repatriation of interest, dividend, and other

20  payments that result from these investments.

21      21.     In its September 2005 response to Plaintiff's initial Request for Proposals ("RFP")

22  (attached as Exhibit B), BNY stated, in what appears to be form language, "[w]e look to build

23  strategic partnerships with clients that go beyond the traditional role of custodian and settlement

24  agent. We work to become your partner to affect both your long and short-term business goals.

25  We demonstrate this objective through exceptional client service, expertise and flexibility, all

26  with a specific focus on the Fund's needs."  *See* RFP Executive Summary.  In describing its FX

27  transaction procedures, BNY stated: "[o]ur competitive advantage results in improved efficiency

28  providing Stationary Engineers complete control of the execution process."  *See* RFP at p. 51.

22. Plaintiff and the Class reposed a high degree of trust in Defendants. Plaintiff and the Class depended upon Defendants to both execute and report FX trades honestly and accurately, and generally to carry out the trades in a manner consistent with their marketing and advertising, their respective custodial services contracts (including the associated fee schedules), and their written FX policies and procedures.

23. Specifically, throughout the Class Period, Defendants advertised their FX services, specifically those performed under "standing instructions," as benefitting from "best execution standards." Defendants also marketed their FX services as being "free of charge and integrated with the client's activity on the various securities markets." Defendants further stated that "FX standing instruction, is designed to help clients minimize . . . costs related to the foreign exchange . . . ." Defendants also promised aggregation and netting of FX trades based upon client needs.

24. The duty of "best execution," as understood throughout the financial services industry and, as described further herein, recognized by BNY Mellon, requires that a service provider seek to obtain for its customers the most favorable terms reasonably available under the circumstances. At a minimum, therefore, "best execution standards" requires that Defendants execute trades at or near available interbank market rates at the times of the trades. Defendants themselves confirmed this in writing to Class members during the Class Period, at times describing "best execution standards" as designed to "maximize the proceeds of each trade." Additionally, BNY's written Foreign Exchange Policies & Procedures for ERISA plans ("FX Procedures"), which were incorporated by the custody agreements with BNY's customers, promised that under "standing instructions," "[t]he terms of FX Transactions" with any customer "shall not be less favorable" than those "offered by BNY to unrelated parties in a comparable arm's length FX Transaction." *See* FX Procedures, rev. 7/23/03 at p. 2 (attached hereto as Exhibit C) (emphases added). BNY's promise of "arm's length" terms to its custodial customers for "standing instructions" FX trades further bolstered customers' reasonable expectation that they would be charged FX rates that were at or close to interbank market rates.

-8-

AMENDED CLASS COMPLAINT

25.     With respect to those of Defendants' FX clients who were subject to ERISA, the promise to provide terms on FX transactions to custodial customers that were "not . . . less favorable" than those offered or generally available to "unrelated parties" in comparable arm's length transactions is echoed in Section 408(b)(18) of ERISA, which provides a statutory prohibited transaction exemption for FX transactions.  Section 408(b)(18) permits FX transactions to be performed for an ERISA-covered plan by a party in interest, such as a custodial bank or its affiliate, provided that "[a]t the time the [FX] transaction is entered into, the terms of the transaction are ***not less favorable to the plan than the terms generally available in comparable arm's length foreign exchange transactions between unrelated parties*** or the terms afforded by the bank in comparable arm's length foreign exchange transactions involving unrelated parties."  ERISA § 408(b)(18) (emphasis added).  This statutory exemption, which was enacted as part of the Pension Protection Act of 2006, was preceded by a "class exemption" to the same effect published by the U.S. Department of Labor on November 13, 1998 (known as Prohibited Transaction Exemption 98-54 (or "PTE 98-54")), with relevant portions thereof effective beginning January 12, 1999.  This language remains in force today.

26.     The point of the ERISA section quoted above, which governed Defendants' provision of FX services to ERISA funds throughout the Class Period (and still does), is to protect ERISA funds from being taken advantage of.  Although Defendants dropped the explicit references to this ERISA requirement in subsequent iterations of their written FX Procedures (including one published in 2008), this language continued to govern Defendants' provision of custodial FX services to ERISA funds, and accordingly was an implied term of the contracts between Defendants' ERISA fund clients and Defendants.

27.     In addition, the FX Procedures provided that "all income item conversions" involving foreign currency for ERISA fund clients would be "bundled" and "executed" each day at 11:00 a.m. New York time "at or within the range of buy/sell rates in effect at 11:00 a.m. New York time."  The FX Procedures further provided that "[t]he bundling of FX Transactions is done to achieve ***better rates for the benefit of clients***." (Emphases added).  This language, along with the "comparable arm's length transaction" promise described above, was echoed in "Welcome

Packages" (discussed in further detail below) that BNY and BNY Mellon sent to the outside investment managers for Plaintiff and the Class.

28. As discussed further below, and contrary to their written representations and policies, Defendants did not provide Plaintiff and the Class with "best execution standards" when performing FX transactions pursuant to "standing instructions." Nor were such services "free of charge," or done pursuant to terms as favorable as the terms afforded or generally available to unrelated parties in comparable arm's length transactions. Nor did Defendants "achieve better rates for the benefit of clients" through their FX practices as related to income item conversions. Instead, Defendants purposefully manipulated the FX rates charged to Plaintiff and the Class on "standing instructions" FX trades so as to allow for undisclosed risk-free profits to Defendants, at the direct expense of Plaintiff and the Class, in violation of California and New York law.

29. The profits Defendants have realized through their unfair and deceptive practices have been massive, as Defendants have capitalized on the opportunity provided over the past decade by the increasing need for pension funds, in particular, to diversify their investment holdings by investing in foreign securities, thus leading to an increased demand for FX services. As reflected in Defendants' internal documents (discussed below in greater detail), in 2008 alone, BNY Mellon Corp. reported a record $1.5 *billion* in FX and other trading activity revenue – an increase of $676 million (86%) over the previous year. For the years 2002 to 2008, BNY Mellon Corp. and the banks that merged to form it (including BNY) reported more than $5 billion in FX trading revenue. On information and belief, FX revenue is a cornerstone of BNY Mellon Corp.'s annual profits, with "standing instructions" trades generating upwards of 70% of BNY Mellon Corp.'s FX income, and serves as a cash generator responsible for funding the annual bonuses of the entire firm. A significant portion of these revenues were acquired at the unknowing and unlawful expense of Class members who permitted Defendants to conduct FX trades for their accounts pursuant to "standing instructions."

**B.** **"Standing Instructions"**

30. Custodial banks that provide FX services to ERISA pension and other investment funds generally do so in one of two ways. The first way is through "direct" or "negotiated" sales

1    or purchases of foreign or domestic currency, in which the investment staff or outside investment

2    manager for the custodial client directly negotiates, at arm's length, the sale or purchase of

3    foreign currency with the custodial FX services provider.  In this manner, the fund's staff (or the

4    fund's outside investment manager) is involved, in real-time, with the sale or purchase of the

5    particular foreign currency that is necessary for the transaction in a given foreign security to

6    close.  The custodial FX services provider quotes a price for the foreign currency to the custodial

7    client or its representative, which the client or client representative accepts, declines, or negotiates

8    against.  These negotiations may occur on the phone or electronically.  "Direct" transactions in

9    foreign currency traditionally yield modest profits to the purchaser or seller of the currency in

10    question; it is typical for custodial FX services providers to earn modest profits (up 2 to 3 basis

11    points ("bps") on bid and asked spreads), per unit of currency, as compared with the interbank

12    exchange rate applicable to a foreign currency at the time of a direct transaction.  A basis point is

13    equivalent to 1/100 of one percentage point (or .0001).  This modest spread may be considered a

14    proxy for the "market rate," since it is the product of an arm's length negotiation.

15         31.    The second way in which a custodial client may purchase or sell foreign currency

16    is pursuant to "standing instructions."  Under "standing instructions," also known as the

17    "indirect" method of transacting, a custodial FX services provider acquires foreign or domestic

18    currency on an as-needed basis, whenever a custodial client buys or sells foreign securities or

19    receives a dividend on a foreign security, without the direct involvement of either the custodial

20    client's investment staff or outside investment managers.  Institutional investors such as Plaintiff

21    and the Class pay a flat annual fee for custodial FX services that include "standing instructions"

22    FX trade services.  Defendants advertised such "standing instructions" FX services as being "free

23    of charge" (apart from whatever the custodial client paid in annual custodial fees).

24         32.    Without directly negotiating the price of an FX transaction, a custodial client has

25    no other information on which to rely for determining whether, on its "standing instructions"

26    trades, it benefited from "best execution," received "standing instructions" FX services "free of

27    charge," or was afforded terms no less favorable than those offered by Defendants or generally

28    available on an arm's length basis to unrelated parties, other than a monthly report summarizing

1    such trades provided by the custodian.  Plaintiff received such monthly reports during the Class

2    Period.

3          33.    Such monthly reports record the date, amount, and price of an FX transaction, but

4    do not give the times at which such trades were executed.  Defendants did not, at any time during

5    the Class Period, disclose the fact or size of markups or markdowns to "standing instruction" FX

6    trades.  It is accordingly not possible for a custodial client such as Plaintiff to know whether the

7    FX prices have been manipulated in order to create a windfall in profits to the custodian for the

8    FX services, particularly when the prices of the FX trades reported by the custodian fall within

9    the range of the day's exchange rates for the currency in question.  The custodial client

10   accordingly relies on the custodian's good faith execution of its services to the client and the

11   custodian's written representations for its belief that it is not being deceived into paying exchange

12   rates far in excess of interbank market rates for "standing instructions" FX trades.  Plaintiff so

13   relied here.

14         34.    Throughout the Class Period, Defendants purposefully manipulated the FX rates

15   charged or credited to Plaintiff and the Class pursuant to "standing instructions."  Rather than the

16   interbank market rates at the times of the trades, or anything close to them, Defendants applied

17   fictitious FX rates to "standing instructions" trades that resulted in undisclosed profits that were

18   orders of magnitude greater than those they would have earned under "best execution standards"

19   or in comparable arm's length trades with unrelated parties.  As further discussed below, an

20   analysis of Plaintiff's FX transactions for a six-month period during the Class Period shows that

21   Plaintiff's FX trades resulted in profits of ***60 bps*** or more, on average, for Defendants, when

22   compared to either the daily mid-rate for each relevant currency or the prevailing rate for each

23   currency at 11 a.m. New York time in the interbank FX market.  These profits have no rational

24   basis, in that they were not paid in exchange for a service of like-value by Defendants.  Rather,

25   they were unfairly and unlawfully obtained by Defendants at the direct expense of Plaintiff, in

26   exchange for no service of like-value, and contrary both to Defendants' written representations

27   and statutory law.

28

C.      **Defendants' Duties And Representations As To "Standing Instructions"**

35.      The Custody Agreement appointed the Bank as Plaintiff's "Global Custodian," with duties to "maintain one or more accounts . . . for the custody and safekeeping . . . of Securities and non-Cash Distributions which shall from time to time be delivered to or received by" Plaintiff or any of Plaintiff's sub-custodians. *See* Custody Agreement, §2.  The Custody Agreement required the Bank to exercise "reasonable care" in the performance of its duties. *Id.*, §6.

36.      The Custody Agreement authorized the Bank to "enter into spot or forward foreign exchange contracts ('FX Transactions')" with Plaintiff, and provided that "such foreign exchange services" may be provided "through [the Bank's] subsidiaries or affiliates. . ." *See* Custody Agreement, §3(d) – Foreign Exchange Transactions.  The Custody Agreement also specifically authorized that "any of [the Bank's] powers, duties, obligations and responsibilities under this Agreement may be performed or assumed . . . by [the Bank's] New York affiliate, The Bank of New York or any successor thereto." *Id.*, §21 – Authorization of The Bank of New York.

37.      Pursuant to the FX Procedures, "standing instructions" were to apply to "income item conversions," such as dividend or interest payments, or "*de minimis*" FX trades of no more than US $300,000 or the equivalent thereof.  However, the FX Procedures further provided that FX trades "in excess of $300,000" may be treated as "standing instructions" trades (though they would still be termed "direct trades") provided certain conditions were met.

38.      The FX Procedures provided that the terms of all FX transactions, including those done pursuant to "standing instructions," "shall not be less favorable to the Plan [*i.e.*, customer] than terms offered by BNY to unrelated parties in a comparable arm's length FX transaction."  As stated above, this provision echoed a similar requirement under ERISA which has been in place since at least January 1999 and remains in effect as to all ERISA-covered plans.

39.      These FX Procedures further purported to provide "the method for determining the rates at which FX Transactions will be executed under standing instructions."  According to the FX Procedures, income item conversions or orders related to purchases and sales of foreign securities were to be "transmitted by the custody/fiduciary area [of BNY] through an internal

1  system, which will identify the transaction to the BNY FX Transaction Desk ... as an 'ERISA

2  transaction.'" Further, the "range of rates" at which the FX Transaction Desk would effect such

3  transactions were to be "posted in BNY's website" several times a day.

4        40.     The FX Procedures provided that "income item conversions" would be "bundled

5  by the relevant custody/fiduciary area [of BNY] with other like FX Transactions and executed ...

6  at or within the range of buy/sell rates in effect at 11:00 a.m. New York time and posted on the

7  website." This "bundling of FX Transactions," according to BNY, was "done to achieve ***better***

8  ***rates for the benefits of clients***." (Emphases added).

9        41.     The foregoing statement was false. As described herein, Plaintiff was charged

10  spreads in excess of 60 bps, on average, for FX trades done on a "standing instructions" basis,

11  compared to a range of 2-3 bps for FX trades done pursuant to "best execution standards" or

12  under the terms generally available to unrelated parties in a comparable arm's length transaction

13  as described above.

14        42.     The FX Procedures provided that "[o]rders relating to purchases and sales" of

15  foreign securities would be executed "within the range established by such buy/sell rates" in

16  effect at the time of the order or, "[i]f the order is received by the relevant Desk at least one-half

17  hour prior to a fixing," then "at or within the range established by such buy/sell rates next in

18  effect." The FX Procedures further provided that FX trades "in excess of $300,000" could be

19  executed in the same fashion unless the custodial client or its fiduciary "exercised its option to

20  cancel" that arrangement "within one hour of the respective fixing time."[10] As custodial clients

21  such as Plaintiff and the Class had little reason to suspect that they were not benefiting from "best

22  execution standards," they had little reason to exercise the foregoing option and instruct

23  Defendants not to execute larger FX trades under "standing instructions" as well.

24        43.     By stating that "standing instructions" FX trades would be priced "at or within [a]

25  range" of buy/sell rates posted each day, Defendants implied a connection between the rates at

26  which Defendants would be executing the transactions in the market and the rates that they would

27

28  [10] For simplicity's sake, such FX transactions in excess of USD $300,000.00 that Defendants executed in this fashion, without a cancellation request by the custodial client or its fiduciary, are included within the definition of "standing instructions" FX trades in this Complaint.

1    then charge the FX client.  Otherwise, there would have been no point in publishing a "range" –

2    Defendants could simply have posted one "standing instructions" rate for each currency for each

3    day, which the client could then take or leave.  But by instead stating that such FX trades would

4    instead be priced at or within a "range" of rates published each day (combined with their

5    promises of "best execution" and FX services that were "free of charge"), Defendants lulled

6    clients into using "standing instructions" to complete their FX trades, thus enabling Defendants'

7    deceptive profit-making scheme to continue.

8           44.    The reality was that there was no connection whatsoever between the FX rates at

9    which Defendants executed their clients' "standing instructions" FX trades and the rates that they

10   subsequently reported to the clients.  Defendants simply picked the worst rate they thought they

11   could get away with (usually within the range of the day), reported that rate to the clients, and

12   pocketed the difference.  The FX Procedures did *not* disclose to Plaintiff or the Class that buy/sell

13   rates for "standing instructions" trades were any different from those they would receive pursuant

14   to "best execution standards" or on a typical arm's length basis.  Moreover, Defendants did not

15   disclose that they would be taking profits on each "standing instructions" trade, at the direct

16   expense of Plaintiff and the Class, that bore no relation to interbank market rates or what Plaintiff

17   and the Class could expect from "best execution standards."

18          45.    BNY and later BNY Mellon also issued "Welcome Packages" to their custodial

19   clients and their investment managers.  A generic 2007 Welcome Package issued by BNY

20   (attached as Exhibit D) stated that Defendants' "standing instructions" FX services were

21   "operationally simple, *free of charge* and integrated with our mutual client's activity on the

22   various securities markets." (Emphases added).  *See* Exhibit D (Foreign Exchange subheading FX

23   Standing Instructions).

24          46.    Outside of the Custody Agreement and FX Procedures for ERISA Plans,

25   Defendants publicly represented their FX services as successful, award-winning, skillful, and

26   offering a cost-saving benefit, pursuant to "best execution standards," to clients such as Plaintiff

27   and the Class.  For instance, BNY Mellon Corp.'s website stated the following as late as

28   November of 2009 (*see* Exhibits E and F):

- • "Standing Instruction [FX] trading provide[s] a simple, flexible, and complete service solution that automates the capture of all types of custody-related foreign exchange . . . Operationally simple, *free of charge* and integrated with the client's activity on the various securities markets, [FX] standing instruction is designed to help clients minimize risks and costs related to the foreign exchange and concentrate on their core business."

- • Standing Instruction Foreign Exchange "Clients benefit from: . . . [foreign exchange] execution according to *best execution standards* . . ."

(Emphases added).

47.      While Defendants' custodial services, including "standing instructions" FX services, are aimed at and available to any individual, company, or fund needing custody services to safeguard their assets, Defendants specifically touted the strength of their relationship with pension funds, such as Plaintiff, as offering a competitive advantage over other custodial banks.

48.      These statements were false or misleading when made, and aided in the accomplishment of Defendants' deceptive, unlawful and unfair FX trade practices.  Defendants' "standing instructions" FX trading was not done "free of charge," nor was it done pursuant to "best execution standards."

49.      Plaintiff and the Class reasonably expected, because Defendants told them as much, that they would benefit from "best execution standards" on "standing instructions" FX trades.  This expectation was heightened by BNY's (and subsequently BNY Mellon's) position as a "global leader" in custodial services and market-maker in foreign currency exchange.  As recounted in several recently unsealed whistleblower complaints against Defendants, however, Defendants did not perform "standing instructions" trades for Plaintiff and the Class pursuant to "best execution standards," or in a manner that was "free of charge."  Nor did Plaintiff and the Class receive terms on their "standing instructions" FX trades that were as favorable as those offered or generally available to unrelated parties in comparable arm's length FX transactions. Instead, Defendants purposefully manipulated the FX rates charged or credited to Plaintiff and the

1  Class in "standing instructions" trades so as to result in excessive and undisclosed windfall profits

2  to Defendants at the direct expense of Plaintiff and the Class.

3  **D.      How Defendants' FX Scheme Worked**

4       50.     Recently unsealed complaints filed in Florida and Virginia under these states'

5  respective *qui tam* (or False Claims Act-analogous) statutes reveal a sophisticated scheme by

6  which BNY and its successors and affiliates, including Defendants, have reaped massive

7  undisclosed profits, over the period of many years, at the direct expense of the custodial clients

8  they have purported to serve.  This scheme, according to whistleblowers from inside BNY

9  Mellon, has included deceiving clients into believing that they had benefited from "best execution

10  standards" on their "standing instructions" trades.  Defendants have accomplished this scheme

11  through a series of deceptive acts, as follows:

12       51.     A request for a purchase or sale of a foreign security pursuant to "standing

13  instructions," issued by BNY Mellon (and previously BNY) was put into an electronic pipeline

14  (known variously as "GSP" (at BNY) or "CMS" (at BNY Mellon)) for trade execution to fill the

15  request at the FX rate available at or close to that time.  Through CMS, the trade request was

16  routed to BNY Mellon's FX Trading System which was known as "Charlie," which aggregated

17  trades by respective currency pairs.  Defendants thereafter watched the market fluctuation in FX

18  rates related to the transaction over the course of the day (covering as much as a 24-hour period,

19  beginning a 5:00 p.m., Eastern Time, but certainly no less than the time permitted by the FX

20  Procedures) in order to charge or credit to the client a different, less favorable rate than the one at

21  which Defendants actually settled the FX transaction.  Defendants thus falsely claimed to have

22  paid or received a different rate than that which was actually required settle the trade.

23       52.     If the transaction was a "buy" of a foreign currency, Defendants charged the

24  custodial client a higher FX rate available at another time in the day, which caused the custodial

25  client to pay more for the FX transaction than what Defendants actually paid.  Defendants  kept

26  for themselves the difference between the true cost of the trade and the fictitious or false FX rate

27  Defendants claimed to have paid and charged to the client.

28

53.     If the transaction was instead a "sale" of a foreign currency, Defendants falsely credited the custodial client with an FX rate available at another time in the day that was lower than what Defendants actually received in the currency exchange, and remitted to the custodial client an amount less than what Defendants actually received on the client's behalf.

54.     After Defendants made the actual FX transactions necessary to cover their "standing instructions" clients' needs, Defendants' FX traders assigned falsified FX rates to the transactions, determined by looking back to the start of the trading time period allotted by the FX Procedures.  The Defendants' FX Traders assigned fictitious FX rates, a process called, "locking the rates," as follows:

A.     Higher prices to FX buy orders

B.     Lower prices to FX sell orders

55.     The Defendants' global FX operations are managed from New York.  According to the whistleblowers, although the Merger was effective as of July 1, 2007, Defendants have maintained the FX departments that existed at BNY and Mellon Corp. to serve the clients served by each bank prior to the Merger.  Those custodial clients, such as Plaintiff, that previously hired the Bank to be their custodian still have their trades executed by the legacy BNY FX desk in New York; those custody clients that had previously hired Mellon to be their custodian still have their trades executed by the legacy Mellon FX desk.

56.     According to the whistleblowers, since the Merger, a daily "Reconciliation" call between Defendants' New York and Pittsburgh FX trading desks is conducted each day as Defendants begin to choose the FX rates to charge its custodial clients for "standing instructions" FX transactions.  The Pittsburgh FX desk (*i.e.*, legacy Mellon) will call the New York FX desk (*i.e.*, legacy BNY) so that they can synchronize their high and low ranges for each currency pair. According to the whistleblowers, these telephone calls are made on a private, direct line, and may have been shielded from Defendants' customary policy of recording transactional conversations. This call, done at approximately 2:30 p.m. Eastern (U.S.) time, is made so that any discrepancies between each transaction desk's operations are avoided, thus making discovery of Defendants' scheme less likely.

57.     Each "standing instructions" client with a trade in a particular currency pair for that day – except those, as described below, that "ask questions" and then receive more favorable treatment – accordingly receives the same FX rate, as determined by Defendants' cherry-picked range-of-the-day pricing, regardless of when the client's specific trade request was submitted, the size of the trade, the time the actual FX trade occurred, the actual FX rate at the time of that trade, or whatever "best execution standards" should entail.

58.     The only limitation on this false pricing is that Defendants are careful, with some exceptions, to price the trades within the range of the day.  This is done to deceive an audit of the "standing instructions" client's FX transactions, as such audits typically only look to see if an FX transaction is priced within the range of the day on which it occurred.

59.     The foregoing notwithstanding, according to the whistleblowers, it has been Defendants' practice to occasionally take a "standing instructions" FX deal in the morning  New York time and price it using the range that has been observed in London time.  This practice allows a much longer time frame from which to review and take advantage of the volatility of an FX rate, and, as a consequence, take a bigger false FX spread from the "standing instructions" client.

60.     According to the whistleblowers, post-trade cash flow analyses are immediately done by Defendants to tabulate the profits from each completed trade (after the falsified FX rate has been assigned to the custodial client).  The profit from each transaction represents the difference between the falsely high (or low) price assigned to the custodial client and the price the currency actually traded for and paid (or received) by Defendants.

61.     Profit and loss reporting is done by each FX transaction desk by the maintenance of a running Profit/Loss report that can be generated at any time.  The FX traders review this document in order to keep track of their personal Profit/Loss as well as Defendants' Profit/Loss.  In addition, monthly reports are also generated.  Both the monthly and daily reports also show year-to-date reporting.

62.     According to the whistleblowers, profits from "standing instructions" FX trades drive Defendants' decision-making processes.  When the Bank competes for a custodial client,

1   Defendants' FX departments are consulted and asked to estimate what Defendants' profits will be

2   when and if they were to execute the prospective client's FX transactions. Defendants look at

3   what amount of international investments the client presently has and how Defendants might

4   price the deals, directly or indirectly.

5       63.     The FX traders will then give the custody group a conservative estimate of what

6   the FX profit potential will be with the prospective client. The custody group then incorporates

7   this estimate into their pricing structure as they make a flat-fee, all inclusive proposal (including

8   all FX costs and fees) to the prospective custodial client. The FX department shares some of its

9   profits with the custody group because it understands how valuable the stream of "standing

10  instruction" custodial deals, and the profits obtained from unwitting custodial clients, will be to

11  the FX department.

12      64.     Defendants' unlawful scheme of executing FX trades and assigning fictitious FX

13  rates for "standing instructions" pension fund clients was deliberately set up to leverage the day's

14  trading volatility in favor of Defendants and against the financial interest of the custodial clients.

15  At the beginning of the trading day, there is a very narrow trading range for stocks and currencies,

16  as compared with the end of the day. If, at the beginning of the day, a BNY Mellon trader knows

17  that he has to purchase 1,000,000 Euros for a pension fund, the trader also knows that he does not

18  have to book that trade into BNY Mellon's system until many hours later. The trader has been

19  incentivized, *i.e.*, provided a high-paying, stress-free job, by his employer, to wait and assign a

20  fictitious FX rate to the "standing instructions" trade.

21      65.     Defendants themselves have noted that volatility in foreign currencies has

22  contributed to an increase in their FX revenues. What they have not disclosed is that this is

23  particularly true because they have taken undue advantage of such volatility. By fixing their FX

24  positions throughout the day at prices advantageous to themselves, Defendants cannot lose on a

25  "standing instructions" transaction. At worst, Defendants break even. To date, all that

26  Defendants have considered it necessary to do to shield their unlawful and unfair practices from

27  scrutiny by those clients who utilize "standing instructions" FX services has been to price such

28

FX trades, with few exceptions, at or within the range of FX rates for the day on which the transaction was effected.

66.     End-of-month Client Custody Reports are prepared by the Bank on or before mid-month.  These reports list the custodial client's FX trades by date, amount, and price, *i.e.,* the fictitious FX rate (as reported to the custody side of the Bank by its FX traders).  These reports never contain time-stamps for the FX trades, and there is nothing on the report that would lead a custodial client to suspect that it had been unfairly charged exorbitant mark-ups (or mark-downs) on its "standing instructions" FX trades that were orders of magnitude larger than would be reasonably expected under "best execution standards" or on a typical arm's length basis.

67.     By not showing the specific time of day at which the actual, as compared to the feigned, FX trade occurred, Defendants do not have to reveal that a trade they knew about at 11:00 AM Eastern time, and, therefore, could (and should) have executed near that time, has instead been assigned an FX rate that only occurred in the interbank market during mid- or late afternoon.

68.     Additionally, according to the whistleblowers, and as alleged and described in more than one of the government actions pending against BNY Mellon, not all "standing instructions" clients were treated identically.  Certain high-value "standing instructions" clients quietly had the ability to directly negotiate their FX prices with BNY Mellon traders each afternoon, while otherwise keeping their trades within the "standing instructions" channel.  These special clients were known as "opt-out" clients,[11] and thus received better terms on their FX trades while receiving the other benefits of "standing instructions."

69.     In a similar vein, a *Boston Globe* article dated January 4, 2012 entitled "Fidelity Moved Trades Away from BNY Mellon" describes how, according to internal emails among BNY Mellon executives, BNY Mellon made efforts in September 2009 to keep a "powerhouse" client by "slashing prices" on the client's "standing instructions" FX trades, then "return[ed] the prices to 'normal' when the effort failed."

---

[11] These "opt-out" clients should not be confused with clients that invoked the 11:00 a.m. "opt-out" provision described in the FX Procedures.  The special terms afforded these clients did not arise out of any terms made public or otherwise published or promulgated by Defendants.

1      70.      Meanwhile, according to the NYAG Action, BNY Mellon reached secret

2   agreements with at least 62 clients and investment managers that pressed for greater transparency

3   into "standing instructions" pricing while the FX scheme remained hidden to the bulk of BNY

4   Mellon's FX clients.  Rather than answer these high-value clients' questions about how "standing

5   instructions" FX trades were priced, BNY Mellon elected to extend to them a different

6   arrangement that was vastly less profitable to BNY Mellon, known as "benchmark pricing."

7   Under "benchmark pricing," the NYAG alleges, BNY Mellon executed the clients' "standing

8   instructions" trades at a pre-negotiated fixed markup from a public reference price (usually the

9   4:00 pm London fixing) rather than at the high or the low of the day at which "standing

10  instructions" trades were ordinarily executed (and were executed for the bulk of "standing

11  instructions" clients, including Plaintiff).  According to the NYAG's complaint, "benchmark

12  pricing" yielded a margin for BNY Mellon that was substantially less, by more than half, than the

13  margin BNY Mellon typically earned on "standing instructions" FX trades.  According to the

14  NYAG's complaint, an internal Global Markets 2007 Strategic Plan noted this margin difference

15  and its negative impact, stating that, "[i]f a Standing Instruction client converts to benchmark

16  pricing, then the pre-negotiated spread may be as low as 1-3 basis points."

17     71.      According to the NYAG Action, one of the high-value clients for whom BNY

18  Mellon offered "benchmark pricing" is BlackRock, who in 2009 had begun raising questions

19  about transparency in the "standing instructions" space.  According to internal emails at BNY

20  Mellon, rather than permit BlackRock to carry out a "full review of the Brussels [i.e., Standing

21  Instruction] book," BNY Mellon extended "benchmark pricing" to BlackRock, under which

22  BlackRock's "standing instructions" FX trades are priced at just 1.5 basis points above the fixing

23  rate at 4 p.m. London time.

24     72.      Each of Defendants' actions described immediately above were designed to

25  placate high-value "standing instructions" FX customers while keeping the bulk of Defendants'

26  client base in the dark about the massive undisclosed spreads Defendants were charging on

27  "standing instructions" FX trades.

28

73.     The following example, taken from one of the whistleblower complaints, illustrates the alleged illicit profit-taking on "standing instructions" FX trades:  On one trading day, at 9:30 AM Eastern time, BNY Mellon received notice that its clients would be selling approximately $12,500,000.00 United States Dollars.  BNY Mellon would be selling them Canadian Dollars in return, as they were obligated to pay for security transactions that they had already entered into in Canada.

74.     The FX desk accordingly was aware of this net client exposure that would be offset that day by 9:30 AM Eastern time.  The USD/CAD exchange rate had opened that morning in New York at 1.0730 (where it would take 1.0730 CAD to equal 1 USD).  The currency market fluctuated throughout the day and the USD/CAD traded lower, ultimately making a low exchange rate of 1.0682 CAD to 1 USD.  This rate, 1.0682, was the worst possible rate one would have received if selling USD and buying CAD in the New York trading session.  From that low point, the market for USD traded higher, ultimately reaching a high of 1.0847 CAD to 1 USD in the afternoon.

75.     According to the whistleblowers, the FX desk sold $12,500,000.00 USD to the trader that covered the USD/CAD on the spot desk, who covered the position at an average rate of 1.0795.  The rate that the custodial clients that were selling the USD received, however, was the very worst of the day:  1.0682.  In other words, this "standing instructions" trade was hyper-priced to the custodial clients at 113 basis points.  There was no risk on Defendants' side of this trade.  The profit obtained by Defendants from buying $12,500,000 USD/CAD at 1.0682 and selling the USD/CAD at 1.0795 was $130,847.61.  Had the deal benefited from "best execution standards" or been afforded no less favorable terms than those available to unrelated parties in comparable arm's length transactions, the expected spread (or market price) may have been 2 to 3 bps, or nearly fifty times less.

76.     Some examples from Plaintiff's own trading data further illustrate the manner in which custodial FX clients were gouged by Defendants' deceptive and unfair "standing instructions" FX practices.  On June 6, 2008, in 20 trades, Defendants purchased approximately 4,463,907 Euros for Plaintiff at a rate of 1.5775 US Dollars per Euro, paying $7,042,084 for the

transaction.  All of these trades were conducted at the same FX rate.  Had the trades been executed and charged using the FX rate prevailing in the interbank market at 11 a.m. New York time, Plaintiff would have received a lower and more beneficial FX rate of 1.5735 US Dollars per Euro.  This would have cost Plaintiff $6,997,174, or $44,909 less than what Plaintiff was actually charged by Defendants – a more than **63 bps** difference.  Further, on this particular day, the US Dollar/Euro exchange rate of 1.5775 did not occur in the interbank market until approximately 3:30 p.m. New York time, and was barely under the high (or least favorable) rate of 1.5778 that occurred in the last minutes of the trading day.  The foregoing is illustrated in Chart A below:



77.     On June 20, 2008, Defendants sold 122,464 Euros for Plaintiff at a rate of 1.5497 US Dollars per Euro, receiving $189,783 for the transaction.  Had the trade been executed and charged using the FX rate prevailing in the interbank market at 11 a.m. New York time, Plaintiff would have received a higher and more beneficial FX rate of 1.5630 US Dollars per Euro.  Plaintiff would have received $ 191,411, or $1,629 more than what Plaintiff was actually paid by Defendants – a more than **85 bps** difference.  Further, on this particular day, the US Dollar/Euro

1  exchange rate of 1.5497 did not even occur in the market during New York trading hours.  The

2  foregoing is illustrated in Chart B below:

3

4  **6-20-08 SALE OF EURO**



16        78.    Plaintiff and the Class paid millions of dollars in custodial fees to Defendants

17  during the Class Period.  During that time, Defendants deceptively, unlawfully and unfairly

18  generated millions of dollars in additional risk-free revenue.  Plaintiff and the Class have

19  struggled to meet funding requirements in the face of major losses in value attributable to the

20  economic downturn of the last three years.  Money lost due to Defendants' deceptive, unlawful

21  and unfair practices is money that will not earn compounded investment returns for Plaintiff and

22  the Class over the thirty-plus year time horizon that applies to most pension plans, and each such

23  loss will triple each decade.

24        E.    **An Analysis Of Plaintiff's FX Trades**

25        79.    Two analyses of a sample of Plaintiff's FX trades illustrates the extent of the

26  unlawful and undisclosed profits acquired by Defendants, as a result of their unlawful practices,

27  at the expense of custodial clients such as Plaintiff.

28

80.     In the wake of the unsealing of the whistleblower actions described above, Plaintiff analyzed the rates recorded on its FX trades, conducted by Defendants, in five major global currencies (Euros, Japanese Yen, British Pounds, Swiss Francs, and Australian Dollars) for the period from June 2008 through December 2008.[12]  With respect to each trade, Plaintiff compared the FX rate reported by Defendants with (i) the mid-rate of the day for the currency in question and (ii) the actual market FX rates in effect at 11 a.m. Eastern time on the day of the trade.

81.     For the first analysis, Plaintiff adopted the mid-rate of the day as one possible substitute for the actual FX rate that was in effect at the time of each transaction, since the latter information is exclusively available only to Defendants (who, as alleged above, do not provide time-stamps for each FX transaction to custodial clients on their monthly FX reports). For its second analysis, Plaintiff adopted the interbank rates in effect at 11 a.m. New York time on the day of each trade as a comparison, based on the FX Procedures' representation that income item conversions (one variety of standing instructions FX trades) would be executed at 11 a.m. New York time each day.

82.     Plaintiff discovered that the analyzed FX deals were assigned FX rates by Defendants that were more expensive to Plaintiff than the mid-rate of the day by an average of **65 bps** (as compared to the 2 to 3 bps of "spread" that a client may expect to be charged pursuant to "best execution standards" or on a typical arm's length basis).  Using the prevailing interbank rates at 11 a.m. New York time, rather than the mid-rate, as the measuring tool reveals that Plaintiff's FX trades were assigned FX rates by Defendants that were more expensive than the 11 a.m. New York time rates by an average of nearly **60 bps**.

83.     These sizeable "spreads" notwithstanding, almost none of the FX trades that Plaintiff analyzed was assigned an FX rate by Defendants that fell outside the range of the day for the applicable FX rate on the day the trade was executed.[13]  Accordingly, Plaintiff would have

---

[12] This represents only a sample of the FX trades performed by Defendants for Plaintiff (as noted above, Defendants began providing FX services to Plaintiff in 2006).

[13] One of the exceptions (Plaintiff's June 20, 2008 sale of Euros) is discussed above.

had little reason to believe, prior to the unsealing of the whistleblower complaints, that it had been deceptively charged fictitious FX rates on its "standing instructions" FX trades.

84.     The difference in "spreads" charged to Plaintiff's "standing instructions" FX trades (from 60 to 65 bps) and those that would be reasonably expected under "best execution standards" illustrates the extent to which funds such as Plaintiff and the Class were deceptively overcharged for "standing instructions" deals.

85.     The approximate overcharge to Plaintiff for the "standing instructions" deals analyzed for just the 6-month period and five major currencies described above, using either the mid-rate of the day or the 11 a.m. New York interbank prevailing FX rate as a guide, exceeds $150,000.  An analysis of all of Plaintiff's FX trades would cover more than five years of transactions, involving more than five currencies.  Accordingly, Plaintiff's estimated losses from unfair and unlawful FX overcharges for the duration of Defendants' custodial engagement are substantial.

## V.   RECENTLY DISCLOSED EVIDENCE OF DEFENDANTS' KNOWLEDGE AND THE FX SCHEME

86.     As noted above, on October 26, 2011, the Massachusetts Action was commenced, seeking restitution from Defendants for Massachusetts-based public pension fund clients for losses sustained as a result of Defendants' FX practices.  Attached as exhibits to the complaint in the Massachusetts Action (the "Administrative Complaint") are numerous documents, including internal emails and correspondence from Defendants, illustrating Defendants' knowledge of  the FX scheme and the manner in which it was conceived and executed.  In these documents, Defendants unabashedly acknowledge that the lack of transparency under "standing instructions" was key to company profits, and that this lack of transparency needed to be maintained.

87.     As shown by the exhibits to the Administrative Complaint, Defendants recognized that "standing instructions" FX transactions were a major profit center for BNY Mellon Corp.  A December 11, 2008 internal e-mail to the Company's Global Market Management Committee mentioned how, in 2008, in the teeth of the economic downturn, Defendants' FX transactions had made "bundles of cash."  BNY Mellon's 2008 Annual Report indicated that FX transactions and

1   other trading activities revenue, which were reported in the Asset Servicing segment, reached a

2   record $1.5 billion in 2008, an increase of $676 million (or 86%) over 2007.  Even though a

3   downturn was experienced in the following two years, BNY Mellon reported $1 billion in

4   revenues from the Asset Servicing Segment in 2009 and $787 million in 2010.

5           88.     As further illustrated in the exhibits, in order to maintain maximum profits,

6   Defendants wished for clients to continue using "standing instructions" rather than migrate to

7   negotiated FX transactions.  Jorge Rodriguez ("Rodriguez"), Managing Director of BNY Mellon,

8   wrote to Richard Mahoney ("Mahoney"), Chairman of BNY Mellon's United States Foreign

9   Exchange Committee and head of BNY Mellon's Global Markets and Capital Markets Groups

10  (who had the nickname of "Rambo" because of his military background and hard-line tactics), in

11  an e-mail dated February 1, 2008 (attached hereto as Exhibit G):

12              As we all know, Standing Instruction FX is the most profitable
                form of business. ***It offers the traders a free intra-day option to***
13              ***time its currency execution in the marketplace knowing it does***
                ***not have to get back to the customer immediately with the deal***
14              ***price***.  ***Business of this type also allows us to take advantage of***
                ***increased market volatility and wide intra-day trading ranges.***
15              ***All these pricing advantages disappear when a client trades via***
                ***an e-commerce platform and full transparency is achieved***.
16              Based on our actual records, in 2007, non-negotiated business
                generated an average profit of 9 basis points.  (Emphases added).
17

18  BNY Mellon's own records indicate that it earned 10-20 times more on FX trades subject to its

19  "standing instructions" than on negotiated FX trades.

20

21          89.     When a customer migrated to an e-commerce platform, it could comparison shop

22  among banks for the best rate.  As Rodriguez went on to explain:

23              Our experience has demonstrated that when a non-negotiated
                (ultra-friendly) client converts to a multi-bank e-commerce
24              platform (competitive price shopper) ***margins greatly decline as***
                ***the free intra-day option feature previously enjoyed disappears***,
25              the competitive pressure of going up against as many as 10 banks
                at a time, ***and the client's ability to carefully monitor each and***
26              ***every trade at the time of execution reduces margins***
                ***dramatically***. (Emphases added)

27

28

90.     Rodriguez noted that "FX is a pure commodity" and it was up to BNY Mellon's sales team to proactively manage clients to ensure a "fair return" for the bank; "the problem is that in these [negotiated] cases, a fair return is only a fraction of what it could be if the business were awarded to BNY Mellon in a non-negotiated capacity." As Rodriguez subsequently noted in an October 2009 e-mail, "***at the end of the day, it is all about profits***." (Emphases added)

91.     On the same day, Mahoney repackaged Rodriguez's e-mail and transmitted this information in an e-mail of his own to Bob Kelly, the CEO of BNY Mellon Corp. at the time. *See* Exhibit H.

92.     Beginning in 2008, BNY Mellon gave consideration to whether it should be more "transparent" (*i.e.*, honest) with its customers who permitted it to perform "standing instructions" FX transactions.  It created a "Revenue/Fee Disclosure Team" to consider the topic.  On April 11, 2008, Antonio Garcia-Meitin ("Garcia-Meitin") of BNY Mellon's Asset Servicing Global Management department sent an e-mail to the members of that team entitled "Transparency."  It is attached as Exhibit I.  In that e-mail, Garcia-Meitin explained:

> ***In general transparency adversely impacts our revenue stream and any product to distribute fee information would hurt us many times over in reduced revenue. Nothing like a rock and a hard place.*** (Emphases added).

93.     An attachment to this e-mail discussed BNY Mellon's problems, including: "increased demands" from clients for "detailed fee information"; clients trying to obtain more "understanding how we generate revenue from their accounts"; and clients increasingly asking for a "detailed breakdown" of the fee level associated with various services.  BNY Mellon's proposed responses included having its sales force "generate more business to attain [the] same fee level," and communicating with clients on the "value of services rendered beyond price."

94.     A 2009 e-mail from one BNY Mellon officer commenting on a proposal for transparency that was quoted in the DOJ Action conveyed the attitude of many in BNY Mellon's management: "***I do NOT like it. Once pricing spreads are disclosed it will be a race to how quickly clients work it down to zero.***" (Emphases added).  This statement, like many of

1  Defendants' statements contained in the exhibits to the Administrative Complaint in the

2  Massachusetts Action, is completely at odds with "best execution standards."

3       95.    The efforts of BNY Mellon's sales force to assuage custodial clients' concerns

4  were successful.  An e-mail from Rodriguez dated July 21, 2010 (attached as Exhibit J) stated:

5  "FX Sales volumes from the FX Sales force for the first half of 2010 vers[u]s the same period last

6  year are up over $1 Trillion, an amazing 24% growth over the same period last year."  In the same

7  exhibit, Robert Near, Managing Director of BNY Mellon Global Markets, in an e-mail to

8  Rodriguez sent on the same day, attributed this success to BNY Mellon being less transparent

9  than its competitors:

10  > While difficult to quantify, and only having a 'couple' of data
11  > points, I think BNYM has been more successful in maintaining
   > spreads in the SI [Standing Instruction] space compared to these
   > peers [State Street and Northern Trust].  ***Another way to say this***
12  > ***is BNYM is 'late' to the transparency space.***  We are hearing
   > from our clients that our competitors are offering time stamping
13  > and fixed spreads across all currencies.  (Emphases added).

14       96.    Defendants' fraudulent conduct extended to virtually all of their clients who used

15  "standing instructions" for FX transactions, according to a March 29, 2011 letter from a BNY

16  Mellon employee to the Florida Attorney General.  A redacted copy of this letter was very

17  recently obtained through an open records act request by the *Wall Street Journal* and made public

18  in an article published on December 28, 2011. The letter is attached as Exhibit K. The author,

19  who worked closely with Rodriguez and Mahoney, said

20  > ***I was also trained in committing fraud using various strategies []***
21  > ***to the bank's corporate foreign exchange clients....I can tell you***
   > ***firsthand and without any hesitation that the fraud is prevalent***
   > ***throughout BNY Mellon's Foreign Exchange Group. I can also***
22  > ***share with you that top management was aware of the fraud the***
   > ***entire time....BNY Mellon's foreign exchange group was very***
23  > ***small. I was only 1 of 3 people in the entire bank who focused***
   > ***exclusively on the corporate client segment. We used the same***
24  > ***systems and fraudulent strategies on the corporate clients as was***
   > ***used on the pension fund clients.***(Emphases added).

25       97.    As described above, Defendants secured "standing instructions" FX business

26  through a series of material misrepresentations and omissions designed to attract new clients and

27  keep existing clients.  These included: (a) material misrepresentations and omissions in response

28

955567.4                                   -30-

1   to RFPs from custodial clients; (b) material misrepresentations and omissions on Defendants'

2   websites relating to "standing instruction" FX transactions; (c) material misrepresentations and

3   omissions in materials sent to clients' third-party investment managers; (d) false statements in

4   custodial contracts; and (e) concealment of material information to clients and third-party

5   investment managers concerning the pricing and execution of "standing instruction" FX

6   transactions.

7        98.    As examples of false and misleading responses to RFPs, Defendants made the

8   following types of statements concerning "standing instructions" FX services:

9       a.    that "standing instructions" FX trades were performed at the "best rate of

10  the day" for custodial clients, and that Defendants gave their clients "the most

11  competitive/attractive FX rate available";

12      b.    that "standing instructions" FX trades were priced: (i) at levels "reflecting

13  the interbank market at the time the trade is executed"; (ii) "a[t] the prevailing market rates at the

14  time of the client instruction to execute the FX conversion"; or (iii) "based on current foreign

15  exchange rate input";

16      c.    that "standing instructions" FX trades were executed "pursuant to best

17  execution";

18      d.    that Defendants "actively engage[d] in making markets and taking

19  positions in numerous currencies to obtain the best rates for [their] clients";

20      e.    that "standing Instructions" clients were given "the same … competitive

21  pricing" that investment advisors who negotiated prices directly with Defendants' trading desks

22  received;

23      f.    that Defendants executed FX transactions for restricted currencies with

24  local sub-custodians "to ensure that the best rate is attained for our clients"; and

25      g.    that Defendants disclosed to clients any conflict of interest.

26      99.    Attached as Exhibit L is a "BNY Mellon RFP Misrepresentation Log," which was

27  attached as Exhibit 1 to the "Complaint And Superseded Complaint" (October 4, 2011) filed in

28

-31-

AMENDED CLASS COMPLAINT

1    the NYAG Action.  It summarizes, *inter alia*, false and misleading statements made by

2    Defendants in their responses to RFPs from Plaintiff and other members of the putative Class.

3         100.    As discussed above, BNY Mellon stated falsely that "standing instructions" FX

4    trades were "executed according to best execution standards."  This statement was untrue, and

5    Defendants knew it to be untrue.  In a document BNY Mellon generated in or about September

6    2005 and quoted in the DOJ Action, BNY Mellon acknowledged that "best execution

7    encompasses a variety of services designed to maximize the proceeds of each trade."  BNY

8    Mellon likewise recognized therein the "goal of maximizing the value of the client portfolio

9    under [the] particular circumstances of the time."  According to the DOJ Action, BNY Mellon

10   repeated these same representations in a document generated in or around February 2009.

11        101.    Defendants did not execute, or attempt to execute, "standing instructions" FX

12   trades in a manner that would maximize the client's portfolio value.  Instead, eschewing the

13   prices that were available in the market at the time they executed the order, Defendants executed

14   "standing instructions" FX trades for their clients at the worst price at which the currency had

15   traded during the preceding 24 hour trading day.

16        102.    According to the complaint in the NYAG Action, BNY Mellon's head of Business

17   Development for Global FX Sales ultimately admitted that Defendants did *not* execute "standing

18   instructions" FX trades in accordance with "best execution standards":

19             My understanding is that the Bank of New York Mellon does not
               practice best execution . . . . BNY Mellon acts as a counterparty to
20             these trades, not as a fiduciary, and my understanding is that as a
               counterparty it does not have best execution responsibilities.
21
               * * * *
22
               Q. If I understand what you're saying, it's that Bank of New York
23             Mellon does not do best execution with respect to Standing
               Instruction trades because it is a counterparty?
24
               A: My understanding is that Bank of New York Mellon does not
25             have a role in providing best execution.

26        103.    In addition to misrepresenting throughout the Class Period that clients would

27   receive best execution when they utilized "standing instructions," BNY Mellon's website also

28   misrepresented that BNY Mellon would aggregate and net "standing instructions" FX trades,

955567.4                              -32-

1  stating that one of the benefits to clients from using "standing instructions" was the

2  "[a]ggregation and netting of trades based on guidelines tailored to client needs."

3      104.    According to Defendants, when a client gave both buy and sell orders for a

4  particular currency on a given day, Defendants would net the orders and only execute a single buy

5  or a sell order for the net amount.  In truth, however, Defendants often did not net client trades.

6  Instead, when a client submitted both buy and sell orders, they were executed separately and

7  Defendants applied a markup to both transactions.  At other times, Defendants would apply

8  arbitrary spreads to each of the trades that unsuspecting clients believed were not being subject to

9  any trading margin at all.

10      105.    As mentioned above, BNY Mellon's website and other marketing materials also

11  falsely stated that "standing instructions" FX trades were "free of charge."  Defendants in fact

12  charged clients the difference between the market price at the time of execution and the least

13  favorable (to the client) market price at which the currency had traded in the interbank market

14  during the trading day, and pocketed the difference.  As David Nichols, a Managing Director of

15  BNY Mellon, noted in an e-mail: "[w]e charge a premium for our services (*i.e.*, we have the

16  audacity to think we are entitled to a spread on every trade.  How 1990's is that?)"

17      106.    Plaintiff and members of the putative Class were misled by Defendants'

18  representations, acts and omissions and relied to their detriment on Defendants' material

19  misstatements and omissions.

20      107.    Defendants knew that their "standing instructions" FX practices were legally

21  improper and their actions after regulators began challenging these types of transactions are

22  indicative of the deceptive nature of their scheme.

23      108.    On October 29, 2009, the California State Attorney General brought a civil fraud

24  action against State Street Bank & Trust ("State Street"), challenging its "standing instructions"

25  FX services.  BNY Mellon's Director of FX Trading in New York e-mailed a Reuters dispatch

26  about this lawsuit to all of BNY Mellon's FX sales employees with the heading "Oh No."

27      109.    Soon thereafter, BNY Mellon began receiving subpoenas from state and federal

28  regulatory authorities concerning its FX transactions; by May of 2010, it had received 16 of them.

1    Upon hearing of this investigation, Susan Pfister, a veteran at BNY Mellon's Pittsburgh FX

2    trading desk, remarked:  "It's over, it's all over."

3          110.    In late November or early December of 2009, BNY Mellon revised its web page

4    on FX Standing Instructions (portions of which were quoted above) to eliminate any "free of

5    charge" language and to (for the first time) define "best execution" as something other than (a)

6    what it is commonly understood in the financial industry to mean and (b) what Defendants

7    themselves recognized and claimed it meant in numerous RFP responses to its custodial clients

8    (as described above).

9          111.    In response to inquiries from customers about its own "standing instructions" FX

10   practices in the wake of the State Street action, BNY Mellon did not disclose its deceptive and

11   fraudulent conduct.  Mahoney said internally that BNY Mellon's FX Department "owns" how to

12   respond to such inquiries, that "we do not have to tell anyone how much money we make on our

13   dealings" and that customers making inquiries should be told to "go pound sand."

14         112.    This uncompromising stance was reflected in the statements of a BNY Mellon

15   spokesperson who was quoted in a *Wall Street Journal* article published in May of 2011. That

16   spokesperson conceded that Defendants "tend[ed]" to price FX trades at one end of each day's

17   interbank trading range and that clients should have known that "the bank doesn't act in their

18   interests when pricing the [FX] trades." BNY Mellon's current CEO, Gerald Hassell, echoed this

19   view about the supposed knowledge of Defendants' FX customers in remarks following a speech

20   he gave on November 29, 2011 before the Boston College Chief Executives' Club.  The type of

21   statement reported in the May 2011 *Wall Street Journal* article directly contradicts the assertion

22   made in BNY's RFP response to Plaintiff that it would be acting like its "partner," not merely as a

23   custodial agent.

24         113.    Indeed, in an October 4, 2011 press release in response to the New York Attorney

25   General's lawsuit against it concerning its "standing instructions" FX practices, BNY Mellon

26   steadfastly continues to maintain its innocence, saying the Attorney General has a "fundamental

27   misunderstanding" of the role of custodial banks and the operation of institutional FX markets.  It

28

1    asserts falsely that "[a]ll of our FX alternatives offer our clients valuable services at a competitive

2    price in a transparent market."

3    **VI.    CLASS ACTION ALLEGATIONS**

4         114.    This action is brought and may properly be maintained as a class action pursuant

5    to Rules 23(a), 23(b)(2) and/or 23(b)(3) of the Federal Rules of Civil Procedure.  This action is

6    brought pursuant to Rule 23(b)(2) for injunctive or declaratory relief and/or Rule 23(b)(3) for

7    money damages.

8         115.    This suit is a class action brought on behalf of:  (1) with respect to the First and

9    Second Claims for Relief below, a Class consisting of and defined as all California-based non-

10   public institutional investors in foreign securities, including, but not limited to, private pension

11   funds, mutual funds, endowment funds, investment manager funds, and employee benefit plans

12   covered by ERISA, for which Defendants or any of their predecessors, successors or affiliates

13   provided custodial FX services, including executing FX transactions pursuant to "standing

14   instructions," (the "California Class") from January 12, 1999 to the present (the "Class Period");

15   (2) with respect to the Third and Fourth Claims for Relief below, a Class consisting of and

16   defined as all California-based employee benefit plans covered by ERISA for which Defendants

17   or any of their predecessors, successors or affiliates provided custodial FX services, including

18   executing FX transactions pursuant to "standing instructions," (the "California ERISA Class")

19   during the Class Period, and, (3) with respect to the Fifth Claim for Relief below, a Class

20   consisting of all non-public institutional investors in foreign securities, including but not limited

21   to private pension funds, mutual funds, endowment funds, investment manager funds, and

22   employee benefit plans covered by ERISA, wherever situated, whose FX transactions, including

23   those executed pursuant to "standing instructions," were executed in New York by the

24   Defendants' New York FX desk (the "New York Class") during the Class Period.  References

25   herein to the "Class" encompass the California Class, the California ERISA Class, and the New

26   York Class, except where otherwise stated.

27

28

1  116. Excluded from the Class are Defendants, any entity in which any Defendant has a

2 controlling interest, and the officers, directors, legal representatives, heirs, successors,

3 subsidiaries and/or assigns of any such individual or entity.

4  117. The members of the Class are so numerous that joinder of all members

5 individually, in one action or otherwise, is impracticable. Plaintiff believes that there are

6 hundreds (if not thousands) of proposed Class members.

7  118. There are numerous questions of law and fact common to Plaintiff and the Class,

8 including:

9  a. whether Defendants, or any of them, violated Cal. Bus. & Prof. Code

10 § 17200, *et seq.*, Cal. Bus. & Prof. Code § 17500, *et seq.*, and/or New York's General Business

11 Law § 349 by charging, and retaining the margin from, FX rates that did not reflect interbank

12 market rates or "best execution standards" at the time the clients' "standing instructions" FX

13 trades were executed, without disclosure of same;

14  b. whether Plaintiff and the Class suffered monetary damages as a result of

15 the Defendants' deceptive, unlawful and unfair actions and, if so, the proper measure of those

16 damages; and

17  c. whether the Class is entitled to injunctive relief;

18  d. whether the Bank and other Defendants owed contractual duties to the

19 Bank's California-based ERISA-covered custodial clients;

20  e. whether these Defendants violated the contractual obligations owed to their

21 California-based ERISA-covered custodial clients by charging FX rates that bore little or no

22 relation to interbank market rates at the time the clients' "standing instructions" FX trades were

23 executed;

24  f. whether these Defendants violated the contractual obligations owed to their

25 California-based ERISA-covered custodial clients by retaining, without proper disclosure, the

26 margin between the actual (or market) FX rate when executing a "standing instructions" FX

27 transaction for a custodial client and the rate actually charged the client.

28

119.    Plaintiff's claims are typical of the claims of the members of the Class, and it is a member of the Class described herein.

120.    Plaintiff is willing and prepared to serve the proposed Class in a representative capacity with all of the obligations and duties material thereto.  Plaintiff will fairly and adequately protect the interests of the Class and has no interests adverse to, or which conflict with, the interests of other members of the Class.

121.    Plaintiff's interests are co-extensive with and not antagonistic to those of the absent Class members.  Plaintiff will undertake to represent and protect the interests of absent Class members.

122.    Plaintiff has engaged the services of the undersigned counsel.  Counsel is experienced in complex class action litigation, will adequately prosecute this action, and will assert and protect the rights of, and otherwise represent, Plaintiff and absent Class members.

123.    The questions of law and fact common to the Class, as summarized above, predominate over any questions affecting only individual members, in satisfaction of Rule 23(b)(3), and each such common question warrants class certification under Rule 23(c)(4).

124.    A class action is superior to other available methods for the adjudication of this controversy.  Individualized litigation increases the delay and expense to all parties and the court system given the complex legal and factual issues of the case, and judicial determination of the common legal and factual issues essential to this case would be far more fair, efficient, and economical as a class action maintained in this forum than in piecemeal individual determinations.

125.    Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.  Compared to individualized actions, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

126.    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class.

955567.4

-37-

1

## VII.   TOLLING OF STATUTES OF LIMITATION

2        127.    The applicable statutes of limitation for each of the claims for relief asserted herein

3   have been tolled by Defendants' acts of fraud, concealment, and intentional misrepresentation as

4   described herein.  Plaintiff reasonably relied on Defendants' misrepresentations concerning their

5   "standing instructions" custodial FX practices, and could not have discovered, exercising

6   reasonable diligence, any of the claims for relief pleaded herein against Defendants prior to the

7   unsealing of the first whistleblower complaint against one or more of Defendants on January 21,

8   2011.  Plaintiff in fact did not discover any of the claims for relief pleaded herein until after such

9   time, and after conducting the empirical analyses of its FX trading data as described above.

10   ### CLAIMS FOR RELIEF

11
12   ### FIRST CLAIM FOR RELIEF
**Violation of Cal. Bus. & Prof. Code § 17200, *et seq.* - Unlawful, Fraudulent, and Unfair
Business Acts and Practices**
13   **[Against All Defendants on behalf of the California Class]**

14        128.    Plaintiff repeats and incorporates by reference each of the foregoing allegations of

15   this Complaint.  This claim for relief for violation of California's Unfair Competition Law

16   ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*, is asserted against all Defendants on behalf of

17   the California Class.

18        129.    Defendants' conduct alleged herein constitutes unfair and deceptive business acts

19   and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*  Such conduct includes, but

20   is not limited to, (a) misrepresenting to Plaintiffs and the California Class the true costs of

21   "standing instructions" FX trading services; (b) assigning and reporting fictitious FX rates to

22   "standing instructions" FX trades executed for Plaintiff and the California Class; and (c)

23   pocketing the difference between the actual FX rates at which Plaintiff's and the California Class'

24   "standing instructions" FX trades were completed and the fictitious FX rates that were reported to

25   Plaintiff and the California Class, to the direct financial detriment of Plaintiff and the California

26   Class.

27        130.    Further, the conduct alleged herein also constitutes fraud, intentional

28   misrepresentation, breach of contract, breach of the implied covenant of good faith and fair

1    dealing, is violative of ERISA (as to ERISA plans), and violates Cal. Bus. & Prof. Code § 17500,

2    *et seq.*, as set forth below.

3            131.    The conduct herein is "unfair" because it offends established public policy and/or

4    is immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to custodial

5    customers.

6            132.    Defendants' unfair, unlawful, and deceptive acts and practices alleged herein were

7    "fraudulent" and have deceived and/or are likely to deceive Plaintiff and other reasonable

8    consumers.

9            133.    Defendants' unfair, unlawful, and deceptive acts and practices alleged herein were

10   specifically designed to induce Plaintiff and the California Class to permit their FX trades to be

11   executed pursuant to "standing instructions."

12           134.    Defendants' misrepresentations and omissions alleged herein were material in that

13   a reasonable person would attach importance to such information and would be induced to act

14   upon such information in making decisions concerning purchases of FX custodial services.

15           135.    Defendants' misrepresentations and omissions alleged herein are objectively

16   material to the reasonable consumer, and therefore reliance upon such misrepresentations may be

17   presumed as a matter of law.

18           136.    Plaintiff and the California Class relied to their detriment on Defendants'

19   misrepresentations and omissions in conducting FX trades pursuant to "standing instructions."

20           137.    Plaintiff and each member of the California Class have lost money and been

21   damaged as a result of Defendants' unfair, unlawful, and deceptive conduct alleged herein.  They

22   are accordingly entitled to injunctive relief and restitution, in an amount to be proven at trial.

23                           **SECOND CLAIM FOR RELIEF**
                **Violation of Cal. Bus. & Prof. Code § 17500, *et seq*. – False Advertising**
24                  **[Against All Defendants on behalf of the California Class]**

25           138.    Plaintiff repeats and incorporates by reference each of the foregoing allegations of

26   this Complaint.  This claim for relief for violation of Cal. Bus. & Prof. Code § 17500, *et seq.*, is

27   asserted against all Defendants on behalf of the California Class.

28

955567.4                                       -39-

139.   Defendants have committed acts of untrue and misleading advertising, as defined by Cal. Bus. & Prof Code § 17500, *et. seq.*, by, *inter alia*: (a) falsely advertising, in their written FX Procedures, on their respective websites, and elsewhere that "[t]he terms of FX Transactions with any Plan shall be not less favorable to the Plan than terms offered by BNY to unrelated parties in a comparable arm's length FX Transaction," that such Plaintiff and the Class would receive the benefits of "best execution standards" by Defendants when Defendants executed FX trades pursuant to "standing instructions," and that such services were "free of charge"; (b) concealing material information about the actual costs to Plaintiff and the Class for permitting Defendants to execute FX trades for them pursuant to "standing instructions"; and (c) concealing the manner in which FX rates were derived and charged to custodial customers such as Plaintiff and the Class for FX trades done pursuant to "standing instructions."

140.   Defendants knew, or through the exercise of reasonable care should have known, that their statements or omissions were materially misleading or omitted material facts which made them misleading.

141.   Defendants' misrepresentations and omissions alleged herein deceive or have the tendency to deceive the general public regarding the benefits of FX custodial services and "standing instructions" FX trades in particular, and did deceive and mislead Plaintiff and the members of the proposed Class.

142.   Defendants' misrepresentations and omissions alleged herein were the type of misrepresentations and omission that are material—*i.e.*, a reasonable person would attach importance to them and would be induced to act on the information in paying for custodial FX services and "standing instructions" FX trades in particular.  Defendants knew that their omissions and misrepresentations were material when they made them.

143.   Defendants' misrepresentations and omissions alleged herein are objectively material to the reasonable consumer, and therefore reliance upon such misrepresentations may be presumed as a matter of law.

144.    Defendants' false advertising is ongoing.  Unless restrained by this Court, Defendants could continue to engage in untrue and misleading advertising, as alleged above, in violation of Cal. Bus. & Prof Code § 17500, *et. seq.*

145.    As a result of the foregoing, Plaintiff and each member of the Class have been injured and have lost money or property, and are entitled to restitution and injunctive relief.

<div align="center">

**THIRD CLAIM FOR RELIEF**
**Breach of Contract**
**[Against Defendants The Bank of New York Mellon Trust Company, National Association, BNY Mellon, and The Bank of New York on behalf of the California ERISA Class]**

</div>

146.    Plaintiff repeats and incorporates by reference each of the foregoing allegations of this Complaint.  This claim for relief for breach of contract is asserted against Defendants The Bank of New York Mellon Trust Company, National Association, BNY Mellon, and The Bank of New York on behalf of the California ERISA Class.

147.    Plaintiff entered into a contract with Defendants on or about February 14, 2006 for Defendants to provide global custodial FX services.  This contract incorporated by reference the terms contained in the written FX Procedures.  During the Class Period, members of the California ERISA Class entered into contracts with Defendants containing the same or substantially similar terms relating to global custodial FX services, particularly with respect to "standing instructions" FX trades.

148.    Defendants' contracts with Plaintiff and the California ERISA Class allow for the provision of global custodial FX services, including the execution of FX trades pursuant to "standing instructions" where the amounts concerned fall below USD $300,000.00 or its equivalent, or where the ERISA fund client does not exercise its option to cancel the pricing of an FX trade for an amount exceeding USD $300,000.00 along the same lines as "standing instructions" trades.

149.    Throughout much of the Class Period, the FX Procedures, which were incorporated by the contracts and were "the exclusive means by which" Defendants could "enter into an FX Transaction with a[n ERISA] plan," promised that "[t]he terms of FX Transactions with any Plan shall not be less favorable to the Plan than terms offered by BNY to unrelated

1    parties in a comparable arm's length FX Transaction."   Section 408(b)(18) of ERISA, which

2    provides a statutory prohibited transaction exemption for FX transactions, permits FX

3    transactions to be performed for an ERISA-covered plan by a party in interest, such as a custodial

4    bank or its affiliate, provided that "[a]t the time the [FX] transaction is entered into, the terms of

5    the transaction are ***not less favorable to the plan than the terms generally available in***

6    ***comparable arm's length foreign exchange transactions between unrelated parties*** or the terms

7    afforded by the bank in comparable arm's length foreign exchange transactions involving

8    unrelated parties."   ERISA § 408(b)(18) (emphasis added).   This statutory exemption, which was

9    enacted as part of the Pension Protection Act of 2006, was preceded by a "class exemption" to the

10   same effect published by the U.S. Department of Labor on November 13, 1998 (known as

11   Prohibited Transaction Exemption 98-54 (or "PTE 98-54")), with relevant portions thereof

12   effective beginning January 12, 1999.   This language remains in force today.

13           150.    The point of the ERISA section quoted above, which governed Defendants'

14   provision of FX services to ERISA funds throughout the Class Period (and still does), is to

15   protect ERISA funds from being taken advantage of.   Although Defendants dropped the explicit

16   references to this ERISA requirement in subsequent iterations of their written FX Procedures

17   (including one published in 2008), this language continued to govern Defendants' provision of

18   custodial FX services to ERISA funds, and accordingly was an implied term of the contracts

19   between Defendants' ERISA fund clients (including Plaintiff) and Defendants.

20           151.    The contracts also required Defendants to exercise "reasonable care" in the

21   performance of their duties.

22           152.    Defendants have breached their contracts with Plaintiff and the California ERISA

23   Class by selecting fictitious FX rates to report and charge or credit to Plaintiff and the California

24   ERISA Class for "standing instructions" FX trades, against the reasonable expectations of

25   Plaintiff and the California ERISA Class, in order to unfairly and unlawfully increase their profits

26   at the expense of Plaintiff and the California ERISA Class.   In so doing, Defendants, failed to

27   offer terms to Plaintiff and the California ERISA Class, on their "standing instructions" FX

28   trades, that were not less favorable to Plaintiff and the California ERISA Class than the terms

1   offered by Defendants or generally available to unrelated parties in comparable arm's length FX

2   transactions, including (but not limited to) those special "opt-out" or "benchmark pricing" clients

3   that received more favorable terms on their "standing instructions" FX trades.

4       153.   Meanwhile, Plaintiff and the California ERISA Class have performed all, or

5   substantially all, of the obligations imposed on them under their contracts with Defendants.

6       154.   Plaintiff and the members of the California ERISA Class have been damaged as a

7   result of Defendants' breaches of contract by paying falsely inflated prices, or being paid falsely

8   deflated prices, for "standing instructions" FX trades.  These false charges and falsely deflated

9   prices constitute damages to Plaintiff and the California ERISA Class that they otherwise would

10  not have incurred, for which Plaintiff and the California ERISA Class seek relief as prayed below.

11                      **FOURTH CLAIM FOR RELIEF**
                **Breach of Implied Covenant of Good Faith and Fair Dealing**
12  **[Against Defendants The Bank of New York Mellon Trust Company, National**
                **Association, BNY Mellon and The Bank of New York**
13                      **on behalf of the California ERISA Class]**

14      155.   Plaintiff repeats and incorporates by reference each of the foregoing allegations of

15  this Complaint.  This claim for relief for breach of implied covenant of good faith and fair dealing

16  is asserted against Defendants The Bank of New York Mellon Trust Company, National

17  Association, BNY Mellon, and The Bank of New York on behalf of the California ERISA Class.

18      156.   Under California law, where a contract confers on one party a discretionary power

19  affecting the rights of the other, a duty is imposed to exercise such discretion in good faith and in

20  accordance with fair dealing.  Here, Defendants' contracts with Plaintiff and the California

21  ERISA Class confer discretionary power to Defendants for executing FX trades pursuant to

22  "standing instructions" where the amounts concerned fall below USD $300,000.00 or its

23  equivalent, or (with respect to amounts above USD $300,000.00) where the fund client does not

24  exercise its option to cancel the pricing of its FX trade along the same lines as "standing

25  instructions" trades.   However, Defendants have exercised this discretion in bad faith, as they

26  have selected fictitious FX rates to report and charge or credit to Plaintiff and the California

27  ERISA Class for "standing instructions" FX trades, against the reasonable expectations of

28

1   Plaintiff and the California ERISA Class, in order to unfairly and unlawfully increase their profits

2   at the expense of Plaintiff and the California ERISA Class.

3           157.    Meanwhile, Plaintiff and the California ERISA Class have performed all, or

4   substantially all, of the obligations imposed on them under their contracts with Defendants.

5   Plaintiff and the members of the California ERISA Class have been damaged as a result of

6   Defendants' breaches of the implied covenant of good faith and fair dealing by paying falsely

7   inflated prices, or being paid falsely deflated prices, for "standing instructions" FX trades.  These

8   false charges and falsely deflated prices constitute damages to Plaintiff and the California ERISA

9   Class that they otherwise would not have incurred, for which Plaintiff and the California ERISA

10  Class seek relief as prayed below.

11                          **FIFTH CLAIM FOR RELIEF**
                    **Violation of N.Y. General Business Law § 349, *et seq.***
12  **[Against Defendants The Bank of New York Mellon Corporation, The Bank of New York**
    **Mellon, The Bank of New York Company, Inc., and The Bank of New York on behalf of the**
13                          **New York Class]**

14          158.    Plaintiff repeats and incorporates by reference each of the foregoing allegations of

15  this Complaint.  This claim for relief for violation of N.Y. General Business Law § 349, *et seq.* is

16  asserted against Defendants The Bank of New York Mellon Corporation, The Bank of New York

17  Mellon, The Bank of New York Company, Inc., and The Bank of New York (the "New York

18  Defendants") on behalf of the New York Class.

19          159.    The New York Defendants' actions constitute unfair, unconscionable and/or

20  deceptive trade practices in the course of their business and in the conduct of trade or commerce,

21  in violation of the New York Deceptive Trade Practices Act, N.Y. Gen. Bus. L. § 349, *et seq.*  In

22  that regard, the New York Defendants' actions have caused and will continue to cause financial

23  harm to Plaintiff and the New York Class.

24          160.    The New York Defendants' conduct has caused, and continues to cause, harm to

25  the public.  The harm to the public includes overcharging, or under-crediting, custody clients on

26  their "standing instructions" FX transactions for a period spanning over a decade.  The number of

27  affected employee beneficiaries of affected funds, nationwide, is in the millions.  The number of

28  affected FX transactions during the Class Period is likely in the hundreds of thousands, if not

1    millions.  The amount of the unlawful profits obtained by the New York Defendants as a result of

2    their practices, during the Class Period, is likely in the hundreds of millions of dollars.  This is

3    money directly taken from the coffers of pension funds, which have struggled (particularly during

4    the last three years) to meet their funding obligations in the midst of a deep recession.

5            161.    The New York Defendants' conduct as alleged herein has damaged and will

6    continue to damage Plaintiff and the New York Class in an amount that is unknown at the present

7    time.

8                                    **PRAYER FOR RELIEF**

9            WHEREFORE, Plaintiff prays for judgment against Defendants, and requests as

10   follows:

11           162.    that the unlawful acts alleged in this Complaint be adjudged and decreed to be

12   unfair and deceptive business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et*

13   *seq*.;

14           163.    that the unlawful acts alleged in this Complaint be adjudged and decreed to be

15   untrue and misleading advertising in violation of Cal. Bus. & Prof. Code § 17500, *et seq*.;

16           164.    that the unlawful acts alleged in this Complaint be adjudged and decreed to be

17   unfair, unconscionable and/or deceptive trade practices in violation of the New York Deceptive

18   Trade Practices Act, N.Y. Gen. Bus. L. § 349, *et seq.;*

19           165.    that the Court certify this action as a class action, proper and maintainable

20   pursuant to Rule 23 of the Federal Rules of Civil Procedure, and declare that Plaintiff is a proper

21   Class representative;

22           166.    that the Court grant such preliminary and permanent equitable relief, including

23   imposition of a constructive trust, as is appropriate to preserve the assets wrongfully taken from

24   Plaintiff and the Class;

25           167.    that the Court award compensatory, consequential, and general damages in an

26   amount to be determined at trial;

27

28

955567.4                                    -45-

1    168.    that the Court order disgorgement and restitution of all earnings, profits,

2   compensation and benefits received by Defendants as a result of their unlawful acts, omissions,

3   and practices;

4    169.    that the Court award to Plaintiff the costs and disbursements of the action, along

5   with reasonable attorneys' fees;

6    170.    that the Court award pre- and post-judgment interest; and

7    171.    that the Court grant all such other relief as it deems just and proper.

8                                **<u>DEMAND FOR JURY TRIAL</u>**

9    Plaintiff respectfully demands a jury trial on all matters so triable.

Dated: January 5, 2012                 Respectfully submitted,

Richard M. Heimann (State Bar No. 063607)
*rheimann@lchb.com*
Lexi J. Hazam (State Bar No. 224457)
*lhazam@lchb.com*
Robert L. Lieff (State Bar No. 037568) (Of Counsel)
rlieff@lchb.com
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:   (415) 956-1008

Michael P. Lehmann (State Bar No. 77152)
*mlehmann@hausfeldllp.com*
Christopher L. Lebsock (State Bar No. 184546)
*clebsock@hausfeldllp.com*
HAUSFELD LLP
44 Montgomery Street, 34th Floor
San Francisco, CA 94104
Telephone:  (415) 633-1908
Facsimile:  (415) 358-4980


By: */s/ Michael P. Lehmann*
                Michael P. Lehmann

Michael D. Hausfeld
*mhausfeld@hausfeldllp.com*
William P. Butterfield
*wbutterfield@hausfeldllp.com*
Ralph J. Bunche
*rbunche@hausfeldllp.com*
HAUSFELD LLP
1700 K Street, NW Suite 650
Washington, D.C.  20006
Telephone:  (202) 540-7200
Facsimile:  (202) 540-7201

Steven E. Fineman (State Bar No. 140335)
*sfineman@lchb.com*
Daniel P. Chiplock
*dchiplock@lchb.com*
Michael J. Miarmi
*mmiarmi@lchb.com*
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY  10013-1413
Telephone:  (212) 355-9500
Facsimile:  (212) 355-9592

955567.4                                    -47-

Michael P. Thornton
*mthornton@tenlaw.com*
Michael A. Lesser
*mlesser@tenlaw.com*
THORNTON & NAUMES LLP
100 Summer Street, 30th Floor
Boston, MA  02110
Telephone:  (617) 720-1333
Facsimile:   (617) 720-2445

Gregory S. Hach
*ghach@hrsclaw.com*
Michael A. Rose
*mrose@hrsclaw.com*
Frank R. Schirripa
*fschirripa@hrsclaw.com*
HACH ROSE  SCHIRRIPA & CHEVERIE LLP
185 Madison Avenue, 14th Floor
New York, New York 10016
Telephone: (212) 213-8311
Facsimile: (212) 779-0028

*Attorneys for Plaintiff and the proposed Class*

AMENDED CLASS COMPLAINT

# EXHIBIT A

0605

GLOBAL CUSTODY AGREEMENT (ERISA)

between

STATIONARY ENGINEERS LOCAL 39 PENSION TRUST FUND

and

THE BANK OF NEW YORK TRUST COMPANY, NATIONAL ASSOCIATION

Dated as of _____FEBRUARY    14_, 200 6

ACCOUNT NUMBER(S) _____

GLOBAL CUSTODY AGREEMENT dated as of *FEBRUARY 14* 2006 by and between *PAUL BENSI*, AND *JERRY KALMAR* trustees of the Stationary Engineers Local 39 Pension Trust Fund ("Customer") and **THE BANK OF NEW YORK TRUST COMPANY, NATIONAL ASSOCIATION**, a limited purpose national banking association with trust powers ("**BNYTC**").

WHEREAS, Customer desires to establish one or more custody accounts with BNYTC to hold assets of the plan(s) (hereinafter referred to as the "Plan") for which it is trustee;

NOW, THEREFORE, in consideration of the premises and of the mutual promises and covenants contained herein, the parties hereto agree as follows:

1. Definitions.

Whenever used in this Agreement, the following terms shall have the meaning set forth below:

(a) **"Accounts"** shall collectively mean the accounts and sub-accounts established in accordance with paragraph 2(a) hereof and reference to an "Account" shall be construed accordingly.

(b) **"Act"** shall mean the Employee Retirement Income Security Act of 1974, as amended.

(c) **"Authorized Person"** shall mean any person who, from time to time, is designated in writing by Customer (including any Investment Manager or member of an Investment Committee appointed by Customer pursuant to paragraph 10 hereof and whether or not such person is a trustee of the Plan or an officer or employee of Customer) to give Instructions to BNYTC under the terms of this Agreement and any Account established hereunder.

(d) **"BNYTC"** shall mean The Bank of New York Trust Company, National Association and any affiliate thereof (including The Bank of New York) and any affiliate, subsidiary or entity controlled by The Bank of New York Trust Company, National Association or The Bank of New York or under the common control of an entity that controls The Bank of New York Trust Company, National Association or The Bank of New York or any branch of any of the foregoing (including branches of The Bank of New York in London and Brussels).

(e) **"Business Day"** shall mean any day on which BNYTC and any Subcustodian or Depository is open for business in its respective markets.

(f) **"Cash"** shall collectively mean the currency of any jurisdiction which BNYTC accepts for deposit in a Cash Account (as defined in paragraph 2(a)hereof).

(g) **"Cash Accounts"** shall have the meaning set forth in paragraph 2(a) hereof.

(h) **"Depositories"** shall collectively refer to Transnational Depositories and Local Depositories.

(i) **"Distribution"** shall mean all interest, dividends and other income distributed or paid with respect to Cash and Securities.

(j) **"FX Transactions"** shall have the meaning set forth in paragraph 3(d) hereof.

(k) **"Instructions"** shall collectively refer to Oral Instructions and Written Instructions. All Instructions shall be in English.

(l) **"Investment Committee"** shall mean a committee appointed by Customer to manage the Property in the Accounts as specified in paragraph 10 hereunder.

(m) **"Investment Manager"** shall mean any person or entity appointed by Customer to manage the Property in the Accounts as specified in paragraph 10 hereof.

(n) **"Local Depositories"** shall mean any central securities depository, clearing agency, book-entry system or other entity that provides handling, clearing or safekeeping services (including The Depository Trust Company ("DTC"), The Participants Trust Company, the Federal Reserve/Treasury Book Entry System, CREST and CMO) and in which BNYTC or any Subcustodian participates as a customer or member.

(o) **"Losses"** shall mean any and all claims, losses, liabilities, damages, costs, expenses and judgments (including reasonable attorneys' fees and expenses) sustained by either party hereto.

(p) **"Oral Instructions"** shall mean verbal instructions or directions received by BNYTC from an Authorized Person or a person reasonably believed by BNYTC to be an Authorized Person.

(q) **"Property"** shall collectively refer to Securities, Cash and Distributions.

(r) **"Securities"** shall mean all common and preferred stock, bonds, debentures and debt and equity securities, notes, instruments and other intangible assets (including instruments representing the right to receive, purchase or subscribe to the foregoing or representing other rights or interests in the foregoing) as may be agreed upon from time to time by BNYTC and Customer and which shall from time to time be delivered to or received by BNYTC and any Subcustodian for deposit in the Securities Accounts (as defined in paragraph 2(a) hereof).

(s) **"Securities Accounts"** shall have the meaning set forth in paragraph 2(a) hereof.

(t) **"Subcustodian"** shall mean a bank or financial institution other than Depositories identified on Schedule A annexed hereto (as such schedule may be amended from time to time).

(u) **"Transnational Depositories"** shall mean Euroclear, Clearstream, Luxembourg, and any other transnational securities depository, clearing agency, book-entry system or other entity that provides handling, clearing or safekeeping services and in which BNYTC or Subcustodian participates as a customer or member.

(v) **"Written Instructions"** shall mean any notices, directions, instructions or other instruments (i) in writing received in accordance with paragraph 9 hereof by BNYTC from an Authorized Person or from a person reasonably believed by BNYTC to be an Authorized Person or (ii) received through the Computer Services (as defined in Section 8 hereof).

2.      Appointment of BNYTC as Global Custodian; Subcustodian Network.

(a) BNYTC is hereby authorized and directed to, and shall, open and maintain one or more accounts and sub-accounts in such name or names as Customer may, from time to time, direct for the custody and safekeeping, in accordance with the terms hereof, of Securities and non-Cash Distributions which shall from time to time be delivered to or received by it or any Subcustodian or Depository in a country approved by Customer for the holding of Securities ("Securities Accounts"). BNYTC is further authorized to open and maintain, in its capacity as a banker, one or cash accounts ("Cash Accounts") in its books in the name of Customer or its nominee and pay into such Cash Accounts all Distributions, Cash and monies received for the account of Customer or its nominee. BNYTC may deposit any such Cash with itself as banker or with Subcustodians on behalf of Customer.

(b) The Property shall be invested, without distinction between principal and income, as BNYTC shall be directed by Customer, or if an Investment Manager or Investment Committee shall be appointed pursuant to Article X by such Investment Manager or Investment Committee. To the extent permitted by Section 404(b) of the Act and pursuant to the representations and warranties of Customer under Section 20(b), BNYTC is hereby authorized and directed to, and shall, hold Property (i) in the United States and the United Kingdom at BNYTC and Local Depositories in such countries and (ii) outside the United States and the United Kingdom at branches of BNYTC and Transnational Depositories and Subcustodians set forth on Schedule A annexed hereto, which Schedule A may be amended (by deleting, adding or changing Subcustodians and Transnational Depositories or deleting countries) from time to time by BNYTC without Customer approval. As soon as reasonably practicable, BNYTC shall notify (either orally or in writing) Customer of any amendment or change to Schedule A. Property may be held only with Subcustodians which have entered into a written Subcustodian Agreement with BNYTC and

2

subject to the terms and conditions of such Agreements and with Depositories, provided, however, that Subcustodians may, and are hereby authorized to, hold Property in Depositories in which such Subcustodians participate or are a member.

(c) BNYTC shall exercise reasonable care in selecting and continuing to use Subcustodians in each country in light of the customary or established rules, practices and procedures then prevailing in each such country.

(d) Property held in Depositories shall be held in accordance with, and subject to, the agreements, rules, regulations and conditions imposed by such Depositories.

(e) Unless otherwise agreed in writing by Customer and BNYTC, or otherwise required by applicable law or practice or a particular Subcustodian Agreement or the rules of a particular Depository, Securities held with Subcustodians and Depositories will be recorded, on the books and records of each Subcustodian or Depository, as the case may be, in a commingled account (with securities of other customers of BNYTC or of the Subcustodian in the relevant Depository) and will be treated as fungible with all other securities of the same issue held in such account by BNYTC or the Subcustodian. BNYTC will identify the Securities in its books and records as being beneficially owned by Customer or, if Customer has advised BNYTC that Customer is acting on behalf of others, by such others. No Securities Account on the books of BNYTC or a Subcustodian shall hold securities beneficially owned by BNYTC or such Subcustodian, as the case may be.

(f) BNYTC will endeavor, to the extent practicable, to hold Securities in the country or other jurisdiction in which the principal trading market for such Securities is located, where such Securities are to be presented for cancellation and/or payment and/or registration, or where such Securities are acquired.

(g) BNYTC may hold Cash in any currency and may deposit such Cash with, and effect transactions through, Subcustodians and Depositories. In each country in which Cash is held, it will be held in currencies which may be legally held in such country and (except as otherwise be provided in paragraph 3(h) hereof) may be held in non-interest bearing commingled bank accounts in the name of BNYTC and BNYTC will record, on its books and records, Customer's entitlement to such Cash.

(h) BNYTC assumes no obligation to review investments in the Accounts or to recommend the purchase, retention or sale of any Property unless provided for by a separate written agreement between the parties.

3.    Duties and Responsibilities of BNYTC.

(a) General Standing Instructions. Subject to and in accordance with Customer's instructions, BNYTC is hereby authorized and empowered to, and shall, and (with respect to Securities held with Subcustodians and Depositories) authorize, empower and instruct Subcustodians and Depositories to:

(i)    receive and deliver Property, and settle the purchase and sale of Securities transactions, in accordance with the laws, regulations, rules, practices, customs and procedures in the relevant jurisdiction or market in which the transaction occurs;

(ii)    receive all payments of principal and Distributions payable with respect to Property (including presenting certificates, coupons and other appropriate documentation to the issuer of Securities or its paying agent);

(iii)    exchange Securities in temporary or bearer form for Securities in definitive or registered form; effect an exchange of Securities pursuant to non-discretionary exchange offers and where the par value of such Securities is changed; surrender Securities at maturity or earlier when advised of a call for mandatory redemption and otherwise participate in non-discretionary corporate actions in accordance with customary or established rules, practices and procedures in the relevant jurisdiction or market (provided, however, that BNYTC shall not be liable for failure to so exchange or surrender any Security or take other action (A) if notice of such

3

exchange or call for redemption or other action was not actually received by BNYTC from the issuer (with respect to Securities issued in the United States and the United Kingdom) or from one of the nationally or internationally recognized bond or corporate action services to which BNYTC subscribes or from Customer or (B) if, at the time of deposit, any Security so deposited is subject to call, exchange, redemption or similar action, unless specifically instructed to do so by Customer);

     (iv) hold Property (A) with the issuer in non-certificated form or (B) with the prior written approval of Customer at any other location;

     (v) register and/or hold Property in the name of any nominee (as a holder of record) of BNYTC or its Subcustodians or any Depository, as may otherwise required by local law, or as may otherwise be agreed to by the parties hereto;

     (vi) when fractional shares of any Security are received as a Distribution, sell the fractional shares and credit the relevant Cash Account;

     (vii) upon receipt of notification of a partial redemption, partial payment or other action affecting less than all Securities of a particular class, BNYTC and Subcustodian may select the Securities to be tendered in any non-discriminatory manner that each customarily uses to make such selection;

     (viii) hold any Security in bearer form;

     (ix) in connection with the receipt of Securities, accept documents in lieu of such Securities as long as such documents contain the agreement of the issuer thereof to hold such Securities subject to BNYTC's sole order;

     (x) make, execute, acknowledge and deliver as agent, any and all documents or instruments (including but not limited to all declarations, affidavits and certificates of ownership) that may be necessary or appropriate to carry out the powers granted herein;

     (xi) employ and consult with, and obtain advice from, suitable agents, including auditors and legal counsel (who may be counsel to Customer or to BNYTC) or other advisers with respect to questions and issues relating to the Accounts, and BNYTC shall incur no liability in acting in accordance with the reasonable advice and opinion of such agents or advisers;

     (xii) credit or debit the Cash Accounts with all Distributions provided that, unless BNYTC in its discretion advances funds in accordance with paragraph 7(b) hereof, the Cash Accounts will only be debited if there shall be sufficient funds (which satisfy the definition of final payment set forth in paragraph 7(b) hereof) in the relevant Cash Account equal to the value of the sum to be so debited;

     (xiii) debit the Cash Accounts, even if, at the sole discretion of BNYTC, such debit creates or increases any overdraft or net debit as BNYTC determines is appropriate when instructed by Customer to receive Securities for the Custody Accounts against payment by BNYTC on behalf of Customer as contemplated by paragraph 7(b) hereof;

     (xiv) deduct or withhold any sum on account of any tax (including money held in a Cash Account) (A) required or which in BNYTC's view is required to be so deducted or withheld or (B) for which BNYTC is or is in its view liable or accountable, by law or practice of any relevant revenue authority of any jurisdiction, and in each case in accordance with BNYTC's or the Subcustodian's usual and customary business practice;

     (xv) make any payments incidental to or in connection with this paragraph 3(a) hereof; and

     (xvi) exercise all other rights and powers and to take any action it deems necessary in carrying out the purposes of this Agreement.

4

(xvii)    to the extent permitted under the Act (including exemptions thereto), BNYTC is further authorized and empowered, at the direction of any securities lending agent (including BNYTC) designated by Customer, to lend Property in the Securities Account to brokers, dealers, banks or other financial institutions.

### (b) Discretionary Corporate Action.

(i)    Whenever Securities (including, but not limited to, warrants, options, conversions, subscriptions, takeovers, other forms of capital reorganizations, redemptions, tenders, options to tender or non-mandatory puts or calls) confer optional rights on Customer or provide for discretionary action or alternative courses of action by Customer, Customer shall be responsible for making any decisions relating thereto and for instructing BNYTC to act. In order for BNYTC to act, it must receive Customer's Written Instructions at BNYTC's offices, addressed as BNYTC may from time to time request, by the deadline specified by BNYTC, in its sole discretion, from time to time. If BNYTC does not receive such Written Instructions prior to its specified deadlines, BNYTC shall not be liable for failure to take any action relating to or to exercise any rights conferred by such Securities.

(ii)    BNYTC shall endeavor to notify Customer of such rights or discretionary actions or of the date or dates by when such rights must be exercised or such action must be taken provided that BNYTC has received, with respect to Securities issued in the United States and the United Kingdom, from the issuer, or, with respect to Securities issued in the United States, United Kingdom and in any other country, from one of the nationally or internationally recognized bond or corporate action services to which BNYTC subscribes, timely notice of such rights or discretionary corporate action or of the date or dates such rights must be exercised or such action must be taken. If BNYTC shall not actually receive such notice, BNYTC shall have no liability for failing to so notify Customer.

(c) Voting. With respect to all Securities, however registered, the voting rights are to be exercised by Customer or its designee. With respect to Securities issued in the United States and the United Kingdom, BNYTC's only duty shall be to mail to Customer any documents (including proxy statements, annual reports and signed proxies) relating to the exercise of such voting rights. With respect to Securities issued outside of the United States and the United Kingdom, at the request of Customer, BNYTC will provide Customer with access to a provider of global proxy services (the cost of which will be paid by Customer). Other than providing access to such provider of global proxy services BNYTC shall have no obligations with respect to voting.

(d) Foreign Exchange Transactions. In connection with the Accounts, BNYTC is authorized to enter into spot or forward foreign exchange contracts ("**FX Transactions**") with Customer and may provide such foreign exchange services to Customer through BNYTC's subsidiaries or affiliates, through Subcustodians or as may otherwise be agreed upon by BNYTC and Customer. Such contracts may be entered into with BNYTC, any Subcustodian or any affiliate or subsidiary thereof acting as principal or otherwise through customary banking channels and they may retain any profits from such FX Transactions. Written Instructions, including standing instructions, may be issued with respect to such contracts, but BNYTC may establish rules or limitations concerning any foreign exchange facility made available to Customer. In all cases in which BNYTC, Subcustodian or their respective subsidiaries or affiliates enter into FX Transaction relating to an Account, the terms and conditions of such foreign exchange contracts shall apply to such transaction. Neither BNYTC nor any Subcustodian shall be liable for any fluctuations or changes in foreign exchange rates, which shall be the sole risk and liability of Customer, nor shall be required to substitute one currency for any other currency in a Cash Account.

### (e) Settlement of Transactions.

(i)    In order for BNYTC or any Subcustodian to receive and deliver any Security or to settle any Securities transaction in a timely manner, Customer is responsible for providing BNYTC with sufficient advance notice thereof and all relevant information, as specified by BNYTC, necessary to effect the foregoing. Unless otherwise agreed by BNYTC and subject to paragraph 3(a)(xii) hereof, Property shall be credited to the Securities Account, or as the case may be, the Cash Account only when actually received by BNYTC.

(ii)    Settlement of and payment for Securities received for, and delivered from, the Securities Accounts may be made in accordance with the customary or established securities trading or securities

5

processing practices and procedures in the jurisdiction or market in which the transaction occurs, including without limitation, the delivery of Securities to a purchaser, broker, dealer or their respective agents either against a receipt for future payment or without any payment (so-called "free delivery").

(iii) For the purpose of settling Securities and foreign exchange transactions, Customer shall provide BNYTC with sufficient immediately available funds by such time and date as is required to settle such Securities and foreign exchange transactions in the country of settlement and in the currency to be used to settle such transaction. Without prejudice to paragraphs 3(a)(xiii) and 3(e)(iv) hereof, in the event Customer does not have sufficient funds in the currency required to settle the transaction, Customer shall deliver to BNYTC immediately available funds in an amount sufficient to purchase the currency necessary to settle such Securities and foreign exchange transactions. BNYTC, however, shall have no obligation to advance funds for the settlement of such transaction.

(iv) BNYTC may reverse any entries to the Securities Accounts or Cash Accounts valued back to the effective date of such credit. Customer shall repay to BNYTC the amount advanced by BNYTC as a result of such credit and except to the extent prohibited by the Act, interest thereon calculated from the effective date of such credit.

(f) Taxes. (i) Customer is solely responsible and liable for the payment of and obtaining reclaims, refunds and credits, where applicable, of all taxes assessments, duties, and other governmental charges (including any interest or penalties with respect thereto) with respeet to the Property or any Account. (ii) With respect to the payment of taxes, in the event BNYTC or any Subcustodian is required under applicable law to pay any tax, duty or other governmental charge or any interest or penalty with respect thereto in connection with its services hereunder, BNYTC is hereby authorized to debit the relevant Cash Account in the amount thereof and to pay such amount to the appropriate taxing authority. (iii) With respect to tax reclaims, refunds and credits, for each country in which Customer holds Securities and a tax reclaim, refund or credit may be available, BNYTC will submit such forms as are necessary to the appropriate tax or other governmental authorities and take such action as is reasonable to obtain such benefits and, where such forms must be completed by Customer, will provide Customer with the appropriate forms and otherwise assist Customer to obtain such tax benefits.

(g) Valuation/Pricing Services. To the extent that BNYTC provides values of, and pricing information with respect to, Securities, BNYTC is authorized to use generally recognized pricing services (including brokers, dealers and market makers). BNYTC shall not be liable or responsible for or be under any duty to inquire into, nor be deemed to make any assurances or warranties with respect to, the accuracy or completeness of such values or information, even if BNYTC, in performing services for itself and others, including services similar to those performed for Customer, receives different valuations of the same or similar Securities of the same issuer. In the event that such pricing services are unable to provide a value of or pricing information with respect to Securities and BNYTC provides values and pricing information, BNYTC shall so advise Customer, but shall have no other obligation or liability with respect to such valuation or pricing information.

(h) Cash Management. BNYTC shall invest Cash balances held in the United States, in the United Kingdom and in those countries in which BNYTC provides such investment service. BNYTC shall advise Customer of the countries in which such investment service is available and the manner of investment. BNYTC is authorized to invest such Cash balances in investment companies, mutual funds and other pooled investment vehicles for which BNYTC or any of its affiliates or subsidiaries act as investment adviser or provide other services and for which BNYTC or its affiliates or subsidiaries receive compensation (including, by way of example and not by way of limitation, investment advisory fees and so-called "12b-1" fees and servicing fees). BNYTC and its affiliates are authorized to retain, for their own account, any fees, compensation or similar payments so received. Further, Cash balances may be invested in any collective investment trust for short-term investments created and administered by The Bank of New York or The Bank of New York Trust Company, National Association for the collective investment of the property of employee benefit trusts of which The Bank of New York Trust Company, National Association or The Bank of New York is trustee or agent, provided that such fund is qualified under the provisions of Section 401(a) of the Internal Revenue Code (the "Code") and exempt under the provisions of Section 501(a) of the Code. To that end, BNYTC is hereby authorized to permit the commingling of any or all Cash balances with the assets of other trusts eligible to participate in such collective investment trusts. To the extent that Cash balances are invested in any such collective investment trust, the declaration of trust pertaining to such


collective investment trust, as amended from time to time and the trust thereby created, shall be a part of this Agreement and of the investing retirement plan. BNYTC shall not be liable for interest on any Cash balances it may be authorized to invest in its discretion and may hold uninvested as it deems to be in the best interest of Customer. BNYTC shall not be liable for interest on any cash balance it holds uninvested pending receipt of directions from Customer, the Investment Manager or the Investment Committee to invest the same. BNYTC shall be entitled to investment management fees in respect of Cash balances which are invested hereunder pursuant to this Section at the discretion of BNYTC.

(i) "Not in Bank" Property. As an accommodation to Customer, BNYTC may provide consolidated recordkeeping services pursuant to which BNYTC reflects, on Statements of Assets and Statements of Account, Securities positions for which BNYTC has no safekeeping or other responsibility under this Agreement (**"Non-Custody Securities"**).[1] Non-Custody Securities shall be designated on BNYTC's books as "shares not held by BNYTC" or by other similar characterization. Customer acknowledges and agrees that BNYTC shall rely, without independent verification, on information provided by Customer or its agents regarding Non-Custody Securities (including but not limited to Securities Account positions and market valuations) and shall have no responsibility whatsoever with respect to Non-Custody Securities or the accuracy of any information received by BNYTC and maintained on BNYTC's books or set forth in a statement of account described in Section 8 concerning Non-Custody Securities.

(j) Funds Transfer Services.

(i) With respect to instructions for a funds transfer, when instructed to credit or pay a party by both name and a unique numeric or alpha-numeric identifier (e.g., ABA number or account number), BNYTC, and any other bank participating in the funds transfer, may rely solely on the unique identifier, even if it identifies a party different from the party named. Such reliance on a unique identifier shall apply to beneficiaries named in such instructions as well as any financial institution which is designated in such instructions to act as an intermediary in a funds transfer.

(ii) It is understood and agreed that unless otherwise specifically provided herein, and to the extent permitted by applicable law, the parties hereto shall be bound by the rules of any funds transfer system utilized to effect a funds transfer hereunder.

4. General Authorizations.

(a) BNYTC or any of its affiliates may act as agent for, provide banking, investment advisory, investment management and other services to, and generally engage in any kind of business with, others (including without limiting the generality of the foregoing issuers of Securities, of money market instruments or of other Property purchased for and on behalf of Customer) to the same extent as if BNYTC was not a custodian hereunder. Nothing in this Agreement shall in any way be deemed to restrict the right of BNYTC to perform such services for any other person or entity, and the performance of such services for others will not be deemed to violate or give rise to any duty or obligation to Customer not specifically undertaken by BNYTC hereunder. BNYTC and any BNYTC affiliate may receive a fee or other compensation with respect to any service, business or activity referred to in this sub-paragraph, and are authorized to retain for their own any such fees or compensation so received. This Section 4(a) shall not be deemed to authorize any transaction prohibited by the Act.

(b) With respect to Securities issued in the United States, BNYTC [ ] may [ ] may not release the identity of Customer to an issuer which requests such information pursuant to the Shareholder Communications Act of 1985 for the specific purpose of direct communications between such issuer and Customer. IF NO BOX IS CHECKED, BNYTC SHALL RELEASE SUCH INFORMATION UNTIL IT RECEIVES A CONTRARY INSTRUCTION FROM CUSTOMER. With respect to Securities issued outside of the United States, information shall be released to issuers only if required by law or regulation of the particular country in which Property is located.

(c) BNYTC is authorized to disclose information concerning the Accounts and Property to its subsidiaries and affiliates and to Subcustodians and other providers of services as may be necessary in connection with the administration of the Property or performance of this Agreement (including, by way of example and not by

way of limitation, attorneys and accountants for BNYTC) and may disclose to third parties that it is providing to Customer the services contemplated by this Agreement. For the avoidance of doubt, BNYTC shall not be held responsible for information held by such persons or of which BNYTC is not aware by virtue of restricted access or "Chinese Wall" arrangements. If BNYTC becomes aware of confidential information which it believes prevents it from effecting a particular transaction under this Agreement, then BNYTC may refrain from effecting that transaction.

5.  Compensation; Fees and Expenses.

(a) In consideration of the services to be rendered pursuant to this Agreement, Customer shall pay BNYTC in accordance with the Fee Schedule annexed hereto as **Schedule B**, which Fee Schedule may be amended by BNYTC from time to time upon thirty (30) days' prior written notice to Customer.

(b) In addition, Customer shall be responsible for and shall reimburse BNYTC for all costs and expenses incurred by BNYTC in connection with this Agreement, including (without limiting the generality of the foregoing) all brokerage fees and costs and transfer taxes incurred in connection with the purchase, sale or disposition of Property, and all income taxes or other taxes of any kind whatsoever which may be levied or assessed under existing or future laws upon or in respect to the Property, and all other similar expenses related to the administration of the Accounts incurred by BNYTC in the performance of its duties hereunder.

(c) Fees and reimbursement for costs and expenses shall be paid quarterly after the last business day of each calendar quarter, with the first payment for the calendar quarter ending $\mathcal{JUNE}\ \underline{30}$, 20$\underline{06}$ BNYTC is hereby authorized to debit the Cash Accounts for such fees, costs and expenses.

(d) In the event services are rendered for less than a calendar quarter or this Agreement is terminated prior to the end of a calendar quarter, Customer shall pay BNYTC's fee prorated for the portion of the calendar quarter such services are rendered or the Agreement is in effect, plus any costs and expenses incurred by BNYTC for Customer's Accounts for the period before or after the date of termination.

6.  Limitation of Liability; Indemnification.

(a) BNYTC shall perform its duties under this Agreement with reasonable care, and with respect to actions taken pursuant to Section 3(h), in accordance with the fiduciary standards of Part 4 of Title I of the Act. BNYTC shall not be liable for any Losses or action taken or omitted or for any loss or injury resulting directly from its or its nominees' actions or its or its nominees' performance or lack of performance of their respective duties hereunder in the absence of fraud, negligence or willful misconduct on their respective parts. With respect to Losses incurred by Customer as a result of the acts or the failure to act by any Subcustodian, BNYTC shall take appropriate action to recover such Losses from such Subcustodian; and BNYTC's sole responsibility and liability to Customer shall be limited to amounts so received from such Subcustodian (exclusive of costs and expenses incurred by BNYTC). In no event shall BNYTC or any Subcustodian be liable (i) for acting in accordance with Instructions from Customer, any Investment Manager, the Investment Committee or any agent of Customer, (ii) except to the extent required by the Act, for special, consequential, punitive or indirect damages or for any loss of business or profits or loss of opportunity, (iii) for the acts or omissions of its nominees, correspondents, agents (other than as specified herein) or any Depository, (iv) for the acts or omissions of brokers or dealers, (v) for holding Property in any particular country, including, but not limited to, Losses resulting from nationalization, expropriation or other governmental actions; regulation of the banking or securities industry; exchange or currency controls or restrictions, devaluations or fluctuations; availability of Cash or Securities or market conditions which prevent the transfer of Property or the execution of Securities transactions or affect the value of Property, or (vi) for any Losses due to forces beyond the control of BNYTC or any Subcustodian, including without limitation strikes, work stoppages, acts of war or terrorism, insurrection, revolution, nuclear or natural catastrophes or acts of God, the insolvency of any Subcustodian or Depository, and interruptions, loss or malfunctions of utilities, communications or computer (software and/or hardware) services. Supervision of Investment Managers and the Investment Committee shall be the exclusive responsibility of Customer. BNYTC shall be under no duty or obligation to review any investment or reinvestment made or received at the direction of Customer, an Investment Manager or the Investment Committee nor to make any recommendation as to the disposition or continued retention thereof. Without limiting the generality of the foregoing, in the case of any transaction which is directed by Customer, the Investment Manager or

8

the Investment Committee, Customer, the Investment Manager or the Investment Committee shall have entire responsibility for assuring that the transaction does not violate the prohibitions of any applicable state or federal law, including Section 406 and 407 of the Act. For the avoidance of doubt, BNYTC shall have no liability for any Losses or for the payment or repayment of any Cash or sums arising from the application of any law or regulation now or hereafter in effect, or from the occurrence of any event, in the country in which such Cash is held which may affect, limit, prohibit or prevent the transferability, convertibility, availability, payment or repayment of any Cash or sums until such time as such law, regulation or event shall no longer affect, limit, prohibit or prevent such transferability, convertibility, availability, payment or repayment and in no event shall BNYTC be obligated to substitute another currency for a currency whose transferability, convertibility or availability has been affected, limited, prohibited or prevented by such law, regulation or event.

(b) The Trustees agree that the Account will be liable for and will indemnify and keep fully indemnified (on an after-tax basis), BNYTC and its nominees and hold them harmless from and against, any and all Losses howsoever arising from or in connection with this Agreement or the performance of their duties hereunder (including disputes between the parties or enforcement of this Agreement), provided, however, that nothing contained herein shall require that BNYTC or its nominees be indemnified for their respective fraud, negligence or willful misconduct or, solely with respect to actions taken by BNYTC pursuant to Section 3(h), if due to BNYTC's failure to act in accordance with the requirements of Part 4 of Title I of the Act. Nothing contained herein shall limit or in any way impair the right of BNYTC to indemnification under any other provision of this Agreement.

(c) Where an event has occurred (including an omission) for which BNYTC is liable under this Agreement, BNYTC may take such steps as it considers appropriate to correct the situation and, provided that Customer is put in the same position as it would have been in if the event had not occurred, the consequences of taking such steps (whether favorable or unfavorable) shall be solely for the account of BNYTC, which shall not be liable to account to the Customer for any benefit received by it as a result of taking such action.

(d) Neither BNYTC nor any Subcustodian shall have any liability for Losses incurred by Customer or any other person as a result of the receipt or acceptance of fraudulent, forged or invalid Securities (or Securities which are otherwise not freely transferable or deliverable without encumbrance in any relevant market).

(e) BNYTC shall have no responsibility for the accuracy of any information provided to Customer that has been obtained from, or provided to BNYTC by, any other entity.

(f) BNYTC's duties and responsibilities are solely those set forth herein and it shall not be obligated to perform any services or take any action not provided for herein unless specifically agreed to by it in writing.

7.      Advances; Overdrafts and Indebtedness.

(a) Customer understands that when BNYTC is instructed to deliver Securities against payment or in exchange for Cash (for example in connection with the settlement of a Securities transaction or a redemption, exchange, tender offer or similar corporate action), such payment or exchange of Cash may not occur simultaneously with the delivery of Securities and that BNYTC may deliver such Securities prior to actually receiving final payment. Consequently, as a matter of bookkeeping convenience, BNYTC may credit Customer's Cash Account with the anticipated receipt of payment prior to actual receipt of final payment. The risk of non-receipt of payment shall be Customer's and BNYTC shall have no liability therefor.

(b) All credits to a Cash Account in anticipation of receipt of final payment of proceeds of sales and redemptions of, and similar corporate actions with respect to, Securities and Distributions shall be conditional upon receipt by BNYTC of final payment and may be reversed to the extent final payment is not received. In the event that BNYTC in its discretion advances funds to Customer to facilitate the settlement of any transaction, or elects to permit Customer to use funds credited to a Cash Account in anticipation of final payment, or if Customer otherwise becomes indebted to BNYTC (including indebtedness as a result of overdrafts in the Cash Accounts), Customer shall, immediately upon demand, reimburse BNYTC for such amounts (in the same currency if legally available) plus, except to the extent prohibited by the Act, any interest thereon. For purposes of this Agreement, payment will not be "final" until BNYTC or a Subcustodian has received immediately available funds which, under

9

applicable local laws, regulations, rules, customs or practices, are not reversible and not subject to any encumbrance. Any interest charged by BNYTC in relation to any such debits or overdrafts shall be charged at a rate separately agreed between BNYTC and the Customer.

(c) Except to the extent prohibited by the Act, in addition to any rights which BNYTC may have under applicable law or pursuant to other agreements, BNYTC shall have the right to, and may, without notice to Customer, combine, consolidate or merge all or any of Customer's Cash Accounts with, and liabilities to, BNYTC and may set-off from or transfer any Cash (in any currency) held for Customer or standing to the credit of any such Accounts in or towards the satisfaction of any liability of Customer to BNYTC whether arising from or as a result of an FX Transaction, a Securities transaction or this Agreement, and may do so notwithstanding that Cash held for Customer or the balances of such Accounts may be held or deposited at different branches of BNYTC or at any Subcustodian and may not be expressed in the same currency as the currency of Customer's liability to BNYTC, and BNYTC is hereby authorized to effect any necessary conversions at the BNYTC's own rate of exchange then prevailing.

(d) In addition to any rights which BNYTC may have under applicable law or pursuant to otheragreements, BNYTC shall, to the extent permitted under the Act, have the right to, and may, without notice to Customer, combine, consolidate or merge all or any of Customer's Cash Accounts with, and liabilities to, BNYTC and may set-off from or transfer any Cash (in any currency) held for Customer or standing to the credit of any such Accounts in or towards the satisfaction of any liability of Customer to BNYTC whether arising from or as a result of an FX Transaction, a Securities transaction, this Agreement or otherwise, and may do so notwithstanding that Cash held for Customer or the balances of such Accounts may be held or deposited at different branches of BNYTC or at any Subcustodian and may not be expressed in the same currency as the currency of Customer's liability to BNYTC; and BNYTC is hereby authorized to effect any necessary conversions at the' BNYTC's own rate of exchange then prevailing.

8 . Reports; Statements of Account; Computer Services; Analytic Tools.

(e) Written· Reports. BNYTC shall keep accurate and detailed accounts of all investments, receipts, disbursements and other transactions hereunder, accounting separately for each Account, and all of BNYTC's accounts, books and records relating thereto shall be open to inspection and audit at all reasonable times by any person designated by Customer. Within 90 days after the close of each fiscal year of the Plan (or such other date as may be agreed upon in writing between Customer and BNYTC), and within 120 days after the effective date of the termination of this Agreement as provided in Section 12 hereof, BNYTC shall file with Customer a written account, setting forth all investments, receipts, disbursements and other transactions effected by it during the year (in the case of a termination, the portion of a year) ending on such date. Such account may incorporate by reference any statements that BNYTC has furnished to Customer prior to the filing of such account. To the extent that BNYTC shall be required to provide values of, or pricing information with respect to, securities or other instruments, BNYTC is authorized to utilize generally recognized pricing services (including brokers, dealers, and market makers). BNYTC shall not be liable or responsible for the accuracy or completeness of such values or information. In the event such services are unable to provide a value of or pricing information with respect to securities and other instruments and BNYTC provides values and pricing information, BNYTC shall so advise Customer, but shall have no other obligation or liability with respect to such valuation or pricing information. BNYTC may rely for all purposes of this Agreement upon any certified appraisal or other form of valuation submitted to it by the Trustees, any Investment Manager or the Investment Committee.

(f) Other Accountings. BNYTC shall also submit such other reports to Customer as may be agreed upon from time to time between the Custodian and Customer. Customer agrees to examine each such report promptly and to file any exceptions thereto within 90 days of the date thereof.

(g) Settlement of Accounts. Upon the expiration of 90 days after receipt by Customer of any account or report submitted by BNYTC, Customer shall be deemed to have approved the same, BNYTC shall be forever released and discharged from all liability and accountability to Customer with respect to its acts, omissions, transactions, duties, obligations or responsibilities as shown in or reflected by such account or report, except those

as to which Customer shall have filed written objections with BNYTC within such 90-day period. Nothing herein contained shall impair the right of BNYTC to a judicial settlement of any account of proceedings rendered by it. Computer Services. BNYTC may provide Customer and its Investment Manager, if any are appointed, with certain computer services as may be mutually agreed upon by BNYTC and Customer from time to time ("Computer Services"). Customer's and its Investment Manager's use of such Computer Services shall be governed by Appendix I annexed hereto. BNYTC may terminate Computer Services provided pursuant to this Agreement at any time in its sole discretion or upon direction from Customer.

(h) Analytic Tools. From time to time BNYTC may make available to Customer certain Investment and Analytic Tools ("Tools") which may be used by Customer to evaluate Securities in Customer's Account, Customer's Investment Managers, compliance with Customer's investment guidelines and investment criteria; and BNYTC may assist Customer in modifying such Tools to meet specific needs of Customer. Such Tools are provided "AS IS" and BNYTC DISCLAIMS ANY AND ALL WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO THE TOOLS, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY, TITLE, NON-INFRINGEMENT AND FITNESS FOR A PARTICULAR PURPOSE. BNYTC ASSUMES NO LIABILITY FOR ANY LOSS, DAMAGE, COST, EXPENSE OR LIABILITY INCURRED BY CUSTOMER OR ANY OTHER PERSON AS A RESULT OF CUSTOMER'S USE OF OR RELIANCE UPON ANY TOOLS OR ANY ASSISTANCE PROVIDED BY BNYTC IN MODIFYING ANY TOOLS.

9. Notices; Instructions and Other Communications. (a) Unless otherwise specified herein, all account statements pursuant to Section 8 and confirmations shall be in writing and all notices, Instructions or other communications shall be in English and may be given either orally or in writing (including by tested telex, telecopy, facsimile or other electronic transmission, which may include transmission through Computer Services and Trade Reports issued by the Institutional Delivery System of Depository Trust Company). All Statements of Assets, Statements of Account, Confirmations, notices, Instructions and other communications shall be delivered to the address (post office, telephone, telex or other electronic address) set forth on **Schedule C** annexed hereto, which address may be changed upon thirty (30) days' prior written notice to the other party. Customer shall furnish, and shall cause each Investment Manager or the Investment Committee to furnish, to BNYTC a certificate (in the form annexed hereto) containing the names and specimen signatures of each Authorized Person. BNYTC is authorized to comply with and rely upon any such notices, Instructions or other communications believed by it to have been sent or given by an Authorized Person. Customer and any Investment Manager or the Investment Committee may amend such certificate or add any person to or delete any person from such certificate by delivering a replacement certificate to BNYTC. However, until BNYTC actually receives such replacement certificate, BNYTC shall be authorized to rely upon, and shall incur no liability for relying upon, the original certificate.

(b) Customer shall use all reasonable endeavors to ensure that Instructions transmitted to BNYTC pursuant to this Agreement are correct and complete. Any Instructions (written or oral or transmitted by tested telex, telecopy, facsimile or any other electronic means acceptable to BNYTC), shall be conclusively deemed to be valid Instructions from Customer to BNYTC for the purposes of this Agreement. BNYTC may in its discretion decline to act upon any Instructions which are insufficient or incomplete or are not received by BNYTC in sufficient time for BNYTC to act upon or in accordance with such Instructions. If Customer elects to give BNYTC Oral Instructions and BNYTC in its discretion elects to act upon such Oral Instructions, BNYTC's understanding of such Oral Instruction shall be deemed controlling. BNYTC shall not be liable for any Losses arising directly or indirectly from BNYTC's reliance upon and compliance with such Oral Instruction notwithstanding such Oral Instruction conflicts or is inconsistent with a subsequent Written Instruction.

(c) Whenever BNYTC is required to take any action hereunder based upon the receipt of notice or information from an issuer of a Security or other entity which is not a party to this Agreement, BNYTC's obligation to so act is conditional upon the receipt of such notice or information by the department of BNYTC responsible for processing such notice or information or for providing notice to Customer.

10. Appointment of Investment Manager or Investment Committee. Customer may, from time to time, appoint one or more Investment Managers or an Investment Committee to manage the Property in an Account and give Instructions in respect of such Property, to vote securities in a Securities Account, to purchase, sell or otherwise acquire or dispose of Property in an Account, and to engage in FX Transactions on behalf of Customer.

11

Upon receipt of notice of the appointment of any Investment Manager or Investment Committee, which notice shall be annexed hereto as **Schedule D** (as such Schedule may be amended from time to time by Customer), and except as otherwise provided herein, BNYTC is to rely upon and comply with (and shall have no liability for relying upon and complying with) Instructions from the Investment Manager or the Investment Committee (including Instructions with respect to the voting of Securities in a Securities Account, the purchase, sale or other acquisition or disposition of Property in an Account and the furnishing of information and records relating to an Account to the Investment Manager and Instructions communicated by any means or methods authorized herein for communicating with Customer) to the same extent as if such Instructions were given by Customer and BNYTC shall have no duty or obligation to determine the propriety or appropriateness of such Instructions. Any such appointment shall remain in full force and effect unless and until BNYTC actually receives written notice from Customer to the contrary and BNYTC shall incur no liability for relying upon the existing authorizations.

11.     Accounts; Payments. (a) BNYTC may maintain one or more accounts for the purpose of making payments and disbursements and such other purposes, if any, as may be reasonably required for the convenient administration of the Plan or the trust(s) thereunder. BNYTC shall not be required to maintain any separate records of accounts with respect to the participants in the Plan (or their beneficiaries), and any such records or accounts required to be maintained pursuant to the terms of the Plan shall be maintained by Customer. BNYTC may transfer the amount of such payments and disbursements to one or more accounts (collectively, the "Disbursement Account") maintained at The Bank of New York Trust Company, National Association or The Bank of New York. Disbursements and payments from the Disbursement Account may be made by wire transfer or checks of BNYTC in accordance with Section 11(b) hereof.

        (b)     BNYTC, from time to time, upon receipt of a written direction from Customer, shall make payments and disbursements from the Accounts to such persons and in such amounts as Customer shall direct. Such directions need not specify the purpose of the payments or disbursements so directed, and BNYTC shall not be responsible in any way, including any duty of inquiry, respecting the purpose or propriety of such payments or disbursements or for the administration of the Plan or the trust thereunder. Any such written direction shall constitute a certification that the payment or distribution so directed is one which Customer are authorized to direct. If a dispute arises as to who is entitled to or should receive any benefit or payment or disbursement, BNYTC may withhold such payment until the dispute has been resolved.

        (i)     It is understood and agreed that, in connection with each payment and disbursement, the amount of such payment and disbursement (the "Disbursement Amount") shall be transferred from the Accounts into the Disbursement Account. It is also understood and agreed that, so long as the Disbursement Amount remains in the Disbursement Account, any amounts earned by BNYTC on such Disbursement Amount shall inure solely and exclusively to the benefit of BNYTC and shall constitute compensation to BNYTC in addition to that specified in Schedule B annexed hereto.

        (c)     In the event that any payment or disbursement directed by Customer shall be distributed or mailed by BNYTC and (i) such payment or disbursement shall be returned to BNYTC because the payee or the payee's account cannot be located at such address, or (ii) any check so mailed shall not be presented for payment within six months of the date thereof, BNYTC shall notify Customer of such return or failure to present. The Disbursement Amount of such payment or disbursement shall remain in the Disbursement Account as specified in and in accordance with Section 11(b) hereof unless and until a written direction is received by the BNYTC from Customer with respect to such Disbursement Amount. BNYTC shall maintain records of all payments and disbursements that are returned or not presented for payment, which records shall specify the name, address and tax identification number of each such payee, the Disbursement Amount, and the date when such Disbursement Amount was first transferred to the Disbursement Account and shall periodically report such information to Customer. BNYTC shall not be obligated to search for or ascertain the whereabouts of any payee entitled to payments hereunder (or his/her duly appointed representative).

12.     Termination; Variation and Confidentiality.

        (a) This Agreement shall be continuing and shall remain in full force and effect until terminated by BNYTC or Customer at any time and for any reason or for no reason upon delivery of thirty (30) days' prior written notice to the other party or automatically upon the dissolution of Customer if Customer is a body corporate

or partnership or upon Customer being subject to insolvency, or analogous, proceedings in any jurisdiction. The provisions of paragraphs 5, 6, 7, 8(c), 16, 17,20 and 21 hereof and the indemnity and limitation of liability provisions set forth herein shall survive such termination.

(b) Upon termination of this Agreement and payment of all amounts due and owing to BNYTC, BNYTC shall deliver the Property and all records relating to the Property pursuant to Customer's Written Instructions. Customer shall be responsible and liable for any shipping and insurance costs associated with such delivery.

(c) It may be desirable or necessary for BNYTC to amend this Agreement from time to time in order to comply with or complement the rules and requirements of governmental agencies or regulatory authorities. Therefore, this Agreement shall be amended from time to time by BNYTC in accordance with terms which BNYTC provides to Customer in order that this Agreement, BNYTC, Customer and any other relevant person shall comply with or complement (as the case may be) any such rules or requirements.

(d) Subject to paragraph 4(d) hereof, BNYTC will at all times respect the confidentiality of this Agreement and any arrangements or agreements made or entered into in connection with this Agreement and will not disclose to any other person any information acquired as a result of or pursuant to this Agreement unless required to do so by law, a regulatory authority, revenue authority, governmental body or an order of a court or regulatory authority or as authorized by Customer.

13.     Assignment. Neither party may assign, transfer or change all or any of its rights or benefits hereunder without the written consent of the other party, provided, however, that BNYTC may upon prior written notice to Customer assign this Agreement to any affiliate, subsidiary or entity controlled by BNYTC or by an entity that controls BNYTC or to any entity with which BNYTC is merged or to whom BNYTC transfers all or substantially all of its custody business.

14.     Headings. The section and paragraph headings contained herein are for convenience and reference only and are not intended to define or limit the scope of any provision of this Agreement.

15.     Entire Agreement; Amendment. This Agreement shall constitute the entire agreement of the parties with respect to the subject matter and supersedes all prior oral or written agreements in regard thereto. Except as otherwise provided in Sections 2(b), 5(a), 9 and 12 hereof, this Agreement may be amended only by an instrument in writing duly executed by both parties hereto. The provisions of Appendix 1 hereto shall be deemed to be a part of this Agreement

16.     Governing Law; Jurisdiction; Certain Waivers.

(a) This Agreement shall be interpreted and construed in accordance with the internal substantive laws (and not the choice of law rules) of the State of California. All actions and proceedings brought by BNYTC relating to or arising from, directly or indirectly, this Agreement may be litigated in courts located within the State of California. Customer hereby submits to the personal jurisdiction of such courts; hereby waives personal service of process upon it and consents that any such service of process may be made by certified or registered mail, return receipt requested, directed to Customer at its address last specified for notices hereunder, and service so made shall be deemed completed five (5) days after the same shall have been so mailed; and hereby waives the right to a trial by jury in any action or proceeding with BNYTC. Except as otherwise required under ERISA, all actions and proceedings brought by Customer against BNYTC relating to or arising from, directly or indirectly, this Agreement shall be litigated only in courts located within the State of California. In this regard, the parties agree that the courts of the State of California are the most convenient forum to resolve such actions and, accordingly, will not argue to the contrary in such actions or proceedings.

(b) The invalidity, illegality or unenforceability of any provision of this Agreement shall in no way affect the validity, legality or enforceability of any other provision; and if any provision is held to be unenforceable as a matter of law, the other provisions shall not be affected thereby and shall remain in full force and effect.

(c) *For Governmental Entities Only*: To the extent that, in any jurisdiction, Customer has or hereafter may acquire, or is or hereafter may be entitled to claim, for itself or its assets, immunity (sovereign or otherwise) from suit, execution, attachment (before or after judgment) or any other legal process, Customer irrevocably agrees not to claim, and hereby waives, such immunity.

17.     Conditions Precedent. This Agreement is conditional upon Customer providing to BNYTC or BNYTC obtaining, as the case may be, the documents set out in the Schedule headed "Condition Precedent Documents Schedule" annexed to this Agreement. In the event that the condition set out in the immediately preceding sentence is not fulfilled, BNYTC may elect to terminate this Agreement whereupon this Agreement shall have no further effect and all the liabilities and obligations of BNYTC and Customer shall cease.

18.     Rights and Remedies. Each and every right granted to either party hereunder or any document delivered hereunder or in connection herewith, or allowed by law or equity, shall be cumulative, and the exercise or waiver of any such right or remedy shall not preclude or inhibit the exercise of any additional rights or remedies. The waiver of or failure or delay by any party in exercising, or any single or partial exercise by either party of, any right or remedy hereunder shall not preclude or inhibit the subsequent exercise of such right or remedy.

19.     Partial Invalidity. The invalidity, illegality or unenforceability of any provision of this Agreement shall in no way affect the validity, legality or enforceability of any other provision; and if any provision is held to be unenforceable as a matter of law, the other provisions shall not be affected thereby and shall remain in full force and effect.

20.     Representations and Warranties.

(a) The representations and warranties set out in this paragraph 20 shall survive the acceptance of the terms of this Agreement by Customer.

(b) Customer hereby represents and warrants, each of which shall be continuing and deemed repeated on each day on which BNYTC holds any Property hereunder:

(i) '    It is a fiduciary within the meaning of Section 3(21) of the Act of the Plan and is vested with authority to control and manage the operation of the Plan and to execute this Agreement as trustee of the Plan.

(ii)     This Agreement has been duly authorized, executed and delivered on its behalf and constitutes the legal, valid and binding obligation of Customer and of the Plan. The execution, delivery and performance of this Agreement by Customer do not and will not violate any applicable law or regulation and do not require the consent of any governmental or other regulatory body except for such consents and approvals as have been obtained and are in full force and effect.

(iii)     The Securities (whether beneficially owned by Customer or by others on whose behalf Customer is acting) are free and clear of all liens, claims, security interests and encumbrances (except for those granted herein). If Customer is acting on behalf of others, Customer is fully authorized and empowered by such others and such others have the capacity to engage in the transactions contemplated by this Agreement (including for the avoidance of doubt FX Transactions) and to grant the lien and Security interest and rights of set-off as set forth herein.

(iv)     In relation to data disclosed to BNYTC in connection with this Agreement, or any previous custody arrangements, both BNYTC and any other person designated by Customer to send Instructions to BNYTC on Customer's behalf, has complied with, and shall continue to comply with the provisions of all relevant data protection laws and regulations and shall not do anything, or permit anything to be done which might lead to a breach of such laws or regulations by BNYTC.

(v)     If Customer is acting on behalf of others,

14

(A)     Customer has established and presently maintains policies and procedures (a copy of which will be provided to BNYTC) which require Customer to obtain and verify information about the identity of each such other persons and which are reasonably designed to ensure that Customer is not being used by any such other person as a conduit for money laundering or other illegal or illicit purposes;

(B)     Customer has verified the identity of each person on whose behalf Customer is acting and, to the best of Customer's knowledge, no transaction undertaken with respect to the Account is prohibited by applicable law, regulation or rule and no Property held in the Account is derived from any activity prohibited by applicable law, regulation or rule.

(vi)     All Property of the Plan to be held hereunder outside the jurisdiction of the district courts of the United States is Property described in 29 C.F.R. of 2550.404b-1(a)(1).

(vii)     An entity specified in 29 C.F.R. §2550.404b-1(a)(2)(i) has "management and control" of Property deposited or from time to time held hereunder within the meaning of 29 C.F.R. §2550.404b-1(c)(1).

(viii)     Each spot or forward foreign exchange contract between Customer and BNYTC shall be permitted by and in accordance with the Act and regulations and exemptions thereunder.

(c)  BNYTC hereby represents and warrants:

(i)     The Bank of New York Trust Company, National Association is a limited purpose national banking association with trust powers

(ii)     This Agreement has been duly authorized, executed and delivered on its behalf and constitutes the legal, valid and binding obligation of BNYTC. The execution, delivery and performance of this Agreement by BNYTC do not and will not violate any applicable law or regulation and do not require the consent of any governmental or other regulatory body except for such consents and approvals as have been obtained and are in full force and effect.

21.     Authorization of The Bank of New York. Customer hereby specifically authorizes that any of BNYTC's powers, duties, obligations and responsibilities under this Agreement may be performed or assumed, to the extent determined by BNYTC in its sole and absolute discretion and without any further notice to the Customer, by BNYTC's New York affiliate, The Bank of New York ("BNY (New York)") or any successor thereto. Customer agrees to be bound by all actions taken by BNY (New York) pursuant to the preceding sentence to the same extent as if they were taken by BNYTC. Customer further agrees that BNY (New York) shall be entitled to all of the protections accorded to BNYTC under this Agreement (including without limitation the protections and indemnities set forth under Section 6 and the rights set forth under Section 7(d) hereof) and that the performance of any action by BNY (New York) shall not enlarge the responsibilities of BNY (New York) under this Agreement beyond the responsibilities of BNYTC. If so advised by BNYTC, Customer shall provide directions or information to BNY (New York) rather than to BNYTC.

22.     Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but such counterparts shall, together, constitute only one instrument.

15

IN WITNESS WHEREOF, this Agreement has been executed and attested, as of the day and year first above written, by the duly authorized officers of Customer and BNYTC.

STATIONARY ENGINEERS
LOCAL 39 PENSION TRUST FUND

THE BANK OF NEW YORK TRUST
COMPANY, NATIONAL ASSOCIATION

(Name of Customer)

By: Paul Bensi
Name:
Title: President

By: Paul Bensi

By: ~~~~
Name: JANET PORTER
Title: MANAGING DIRECTOR

Tax Identification Number: 94-6118939

mam\models2k\bnytc na\glberisabnytc.doc\110104

STATE OF California )
                          ) ss.:
COUNTY OF San Francisco )

On the 14 day of Feb , 20__, before me personally came Paul Densi , to me known, who, being by me duly sworn, did depose and say that he/she resides at , that he/she is a trustee of the _____ , the trust described in and on whose behalf he/she executed the foregoing instrument; and that he/she signed his/her name thereto by authority of the instrument creating such trust.

                                                    _____
                        PATRICIA J. RICHMAN  Notary Public
                        COMM. #1578141
                        Notary Public - California
                        San Francisco County
                        My Comm. Expires May 12, 2009

STATE OF California )
                          ) ss.:
COUNTY OF Alameda )

On the 16th day of February 28 , before me personally came Jerry Kalman , to me known, who, being by me duly sworn, did depose and say that he/she resides at Alameda, California , that he/she is a trustee of the Alameda Engineers, Inc. K Trust the trust described in and on whose behalf he/she executed the foregoing instrument; and that he/she signed his/her name thereto by authority of the instrument creating such trust.

                                                    Janet E. Parker
                        JANET E. PARKER          Notary Public
                        COMM. # 1508996
                        NOTARY PUBLIC - CALIFORNIA
                        ALAMEDA COUNTY
                        My Comm. Expires September 18, 2008

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of **SAN FRANCISCO**

} ss.

On **FEBRUARY 17, 2006** before me, **\*\*\*JOSEPHINE S. LIBUNAO\*\*\*\***
Date                                             Name and Title of Officer (e.g., "Jane Doe, Notary Public")

personally appeared **\*\*\*\*JANET POTTER\*\*\*\*\***
                                             Name(s) of Signer(s)

**xx**personally known to me
☐ proved to me on the basis of satisfactory
evidence

to be the person(s) whose name(s) is/are
subscribed to the within instrument and
acknowledged to me that he/she/they executed
the same in his/her/their authorized
capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s), or
the entity upon behalf of which the person(s)
acted, executed the instrument.

JOSEPHINE S. LIBUNAO
Commission # 1568376
Notary Public - California
San Francisco County
My Comm. Expires Apr 11, 2009

WITNESS my hand and official seal.

Signature of Notary Public

--------- **OPTIONAL** ---------

Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent
fraudulent removal and reattachment of this form to another document.

## Description of Attached Document

Title or Type of Document: **GLOBAL CUSTODY AGREEMENT**

Document Date: **FEBRUARY 14, 2006**                          Number of Pages: _____

Signer(s) Other Than Named Above: _____

## Capacity(ies) Claimed by Signer

Signer's Name: _____

☐ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney-in-Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

Signer Is Representing: _____

RIGHT THUMBPRINT
OF SIGNER
Top of thumb here

© 1999 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org          Prod. No. 5907          Reorder: Call Toll-Free 1-800-876-6827

## APPENDIX I

## THE BANK OF NEW YORK TRUST COMPANY, NATIONAL ASSOCIATION ON-LINE COMMUNICATIONS SYSTEM (THE "SYSTEM")

### TERMS AND CONDITIONS

1.    License; Use.

(a)    This Appendix I shall govern Customer's use of the System and any computer software provided by BNYTC to Customer in connection herewith (collectively, the "Software"). In the event of any conflict between the terms of this Appendix I and the main body of this Agreement with respect to Customer's use of the System, the terms of this Appendix I shall control. Terms not defined in this Appendix shall have the meaning set forth in the main body of this Agreement.

(b)    Upon delivery by BNYTC of Software and/or System access codes, BNYTC grants to Customer a personal, nontransferable and nonexclusive license to use the Software and the System solely for the purpose of transmitting written instructions, receiving reports, making inquiries or otherwise communicating with BNYTC in connection with the Account. Customer shall use the Software and the System solely for its own respective internal and proper business purposes and not in the operation of a service bureau. Except as set forth herein, no license or right of any kind is granted to Customer or its Investment Manager with respect to the Software or the System. Customer acknowledges that BNYTC and its suppliers retain and have title and exclusive proprietary rights to the Software and the System, including any trade secrets or other ideas, concepts, know-how, methodologies, or information incorporated therein and the exclusive rights to any copyrights, trademarks and patents (including registrations and applications for registration of either), or other statutory or legal protections available in respect thereof. Customer further acknowledges that all or a part of the Software or the System may be copyrighted or trademarked (or a registration or claim made therefor) by BNYTC or its suppliers. Customer shall not take any action with respect to the Software or the System inconsistent with the foregoing acknowledgements. Customer shall not attempt to decompile, reverse engineer or modify the Software. Except as otherwise expressly permitted in this Appendix, Customer may not copy, sell, lease or provide, directly or indirectly, any of the Software or any portion thereof to any other person or entity without BNYTC's prior written consent. Customer may not remove any statutory copyright notice or other notice included in the Software or on any media containing the Software. Customer shall reproduce any such notice on any reproduction of the Software and shall add any statutory copyright notice or other notice to the Software or media upon BNYTC's request.

(c)    Customer may, subject to the terms of this Appendix and the main body of this Agreement and upon advance written notice to BNYTC, provide a copy of the Software (or arrange for BNYTC to provide a copy of the Software) and access to the System to Customer's Investment Managers that require access to the System and the Software to act on Customer's behalf, provided that Customer shall ensure that such Investment Managers agree in writing to be bound by the terms of this Appendix. Customer shall include on any such copy of the Software all of BNYTC's proprietary notices. Upon cessation of any Investment Manager's services, Customer shall terminate such Investment Manager's access to the System and shall retrieve from said Investment Manager any copies of the Software and destroy them (and provide to BNYTC evidence of such destruction) and shall retrieve and return to BNYTC any physical security devices provided to the Investment Manager. Customer shall be fully responsible for any Investment Manager's use of or access to the System or the Software.

(d)    If Customer subscribes to any database service provided by BNYTC in connection with its use of the System, delivery of such database to Customer shall constitute the granting by BNYTC to Customer of a non-exclusive, non-transferable license to use such database for so long as this Appendix I is in effect. It is understood and agreed that any database supplied by BNYTC is derived from sources which BNYTC believes to be reliable but BNYTC does not, and could not for the fees charged, guarantee or warrant that the data is correct, complete or current. All such databases are provided as an accommodation by BNYTC to its customers and are compiled

1

without any independent investigation by BNYTC. However, BNYTC will endeavor to update and revise each database on a periodic basis as BNYTC, in its discretion, deems necessary and appropriate. Customer also agrees that Customer will promptly install all updates and revisions to each database which BNYTC provides and that BNYTC cannot bear any responsibility whatsoever for Customer's failure to do so. BNYTC IS NOT RESPONSIBLE FOR ANY RESULTS OBTAINED BY CUSTOMER FROM USE OF DATABASE SERVICES PROVIDED BNYTC.

2.      Equipment. Customer shall obtain and maintain at its own cost and expense all equipment and services, including but not limited to communications services, necessary for it to utilize the Software and obtain access to the System, and BNYTC shall not be responsible for the reliability or availability of any such equipment or services.

3.      Proprietary Information. The Software, any data base and any proprietary data, processes, information and documentation made available to Customer (other than which are or become part of the public domain or are legally required to be made available to the public) (collectively, the "Information"), are the exclusive and confidential property of BNYTC or its suppliers. However, for the avoidance of doubt, reports generated by Customer containing information relating to the Account are not deemed to be within the meaning of the term "Information." Customer shall keep the Information confidential by using the same care and discretion that Customer uses with respect to its own confidential property and trade secrets, but not less than reasonable care. Upon termination of the Agreement or the licenses granted herein for any reason, Customer shall return to BNYTC any and all copies of the Information which are in its possession or under its control. The provisions of this Section 3 shall not affect the copyright status of any of the Information which may be copyrighted and shall apply to all information whether or not copyrighted.

4.      Modifications. BNYTC reserves the right to modify the Software and the System from time to time and Customer shall install new releases of the Software as BNYTC may direct. Customer shall not modify or attempt to modify the Software without BNYTC's prior written consent. Any modifications to the Software, whether by Customer or BNYTC and whether with or without BNYTC's consent, shall become the property of BNYTC.

5.      NO REPRESENTATIONS OR WARRANTIES. BNYTC AND ITS MANUFACTURERS AND SUPPLIERS MAKE NO WARRANTIES OR REPRESENTATIONS WITH RESPECT TO THE SOFTWARE, THE SYSTEM, ANY SERVICES OR ANY DATABASE, EXPRESS OR IMPLIED, IN FACT OR IN LAW, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. CUSTOMER ACKNOWLEDGES THAT THE SOFTWARE, THE SYSTEM, ANY SERVICES AND ANY DATABASE ARE PROVIDED "AS IS." TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN NO EVENT SHALL BNYTC OR ANY SUPPLIER BE LIABLE FOR ANY DAMAGES, WHETHER DIRECT, INDIRECT SPECIAL, OR CONSEQUENTIAL, WHICH CUSTOMER MAY INCUR IN CONNECTION WITH THE SOFTWARE, THE SERVICES OR ANY DATABASE, EVEN IF BNYTC OR SUCH SUPPLIER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN NO EVENT SHALL BNYTC OR ANY SUPPLIER BE LIABLE FOR ACTS OF GOD, MACHINE OR COMPUTER BREAKDOWN OR MALFUNCTION, INTERRUPTION OR MALFUNCTION OF COMMUNICATION FACILITIES, LABOR DIFFICULTIES OR ANY OTHER SIMILAR OR DISSIMILAR CAUSE BEYOND THEIR REASONABLE CONTROL.

6.      Security; Reliance; Unauthorized Use.

(a)      BNYTC will establish security procedures to be followed in connection with the System. Customer understands and agrees that the security procedures are intended to determine whether instructions received by BNYTC through the System are authorized but are not (unless otherwise specified in writing) intended to detect any errors contained in such instructions. Customer will cause all persons utilizing the Software and the System to treat all applicable user and authorization codes, passwords and authentication keys with the highest degree of care and confidentiality. BNYTC is hereby irrevocably authorized to comply with and rely upon instructions, whether or not authorized, received by it through the System in accordance with the security procedures. Customer acknowledges that it is its sole responsibility to assure that only Authorized Persons use the System and that to the fullest extent

2

permitted by applicable law BNYTC shall not be responsible or liable for any unauthorized use thereof or for any losses sustained by Customer arising from or in connection with the use of the System or BNYTC's reliance upon and compliance with instructions received through the System.

(b)     The Software and the System may contain features designed to encrypt portions of certain communications between Customer and BNYTC. BNYTC may also make hardware encryption devices available to Customer for an additional charge. Certain browser-based versions of the System may utilize encryption capabilities offered by the Customer's web browser software, and Customer is solely and fully responsible for ensuring that such capabilities are adequate for Customer. Encryption may not be available for every type of communication or for all data. Customer agrees that BNYTC may deactivate any encrypting features at any time, without notice or liability to Customer, for the purpose of maintaining, repairing or troubleshooting the Software, the System or any BNYTC equipment.

7.     System Acknowledgments.  BNYTC shall acknowledge through the System its receipt of each transmission communicated through the System and, in the absence of such acknowledgment, BNYTC shall not be liable for any failure to act in accordance with such transmission and Customer may not claim that such transmission was received by BNYTC.

8.     EXPORT RESTRICTIONS.  EXPORT OF THE SOFTWARE IS PROHIBITED BY UNITED STATES LAW.  CUSTOMER MAY NOT UNDER ANY CIRCUMSTANCES RESELL, DIVERT, TRANSFER, TRANSSHIP OR OTHERWISE DISPOSE OF THE SOFTWARE (IN ANY FORM) IN OR TO ANY OTHER COUNTRY.  IF BNYTC DELIVERED THE SOFTWARE TO CUSTOMER OUTSIDE OF THE UNITED STATES, THE SOFTWARE WAS EXPORTED FROM THE UNITED STATES IN ACCORDANCE WITH THE EXPORT ADMINISTRATION REGULATIONS.  DIVERSION CONTRARY TO U.S. LAW IS PROHIBITED. Customer hereby authorizes BNYTC to report its name and address to government agencies to which BNYTC is required to provide such information by law.

9.     On-Line Inquiry and Modification of Records.  In connection with Customer's use of the System, BNYTC may, at Customer's request, permit Customer to enter data directly into a BNYTC database for the purpose of modifying certain information maintained by BNYTC's systems, including, but not limited to, change of address information. To the extent that Customer is granted such access, Customer agrees to indemnify and hold BNYTC harmless from all loss, liability, cost, damage and expense (including attorney's fees and expenses) to which BNYTC may be subjected or which may be incurred in connection with any claim which may arise out of or as a result of changes to BNYTC database records initiated by Customer.

3

SCHEDULE A

THE BANK OF NEW YORK TRUST COMPANY, NATIONAL ASSOCIATION

GLOBAL CUSTODY AGREEMENT

GLOBAL CUSTODY NETWORK
COUNTRIES AND SUBCUSTODIANS

FOR

_____
[Insert Name of Client]

_____, 20____

OBTAIN CURRENT LIST OF SUBCUSTODIANS

## SCHEDULE B

### THE BANK OF NEW YORK TRUST COMPANY, NATIONAL ASSOCIATION

### GLOBAL CUSTODY AGREEMENT

#### WITH

### STATIONARY ENGINEERS LOCAL 39 PENSION TRUST FUND

#### FEE SCHEDULE

\*   \*   \*   \*

#### FEBRUARY 14, 2006

\*   \*   \*   \*





# THE BANK OF NEW YORK TRUST COMPANY, N.A.
## US CUSTODY SERVICES FEE SCHEDULE
### For
## STATIONARY ENGINEERS LOCAL 39
## PENSION TRUST FUND

**Dated:**

### SECURITIES SETTLED AND SAFEKEPT WITHIN THE UNITED STATES

The Bank of New York Trust Company N.A. fee for custody services for each account is as follows:

- **Administration/Safekeeping Fee:**

All inclusive 1.50 basis points per annum calculated on the month-end/ period-end market value of the portfolio for Book Entry Securities (DTC/FED*).

*For DTC non-transferable assets: securities that have been non-transferable for more than 6 years. BNY's policy is to remove these securities from BNY client's account. Clients who decide to keep in their account a security identified as non-transferable for more than 6 years will be charged a fee of $5.00 per security.*

### Investment Accounting Fees

- **Investment Accounting**

The provisions of accounting services are inclusive.

### Communication Fees

- **INFORM**
The provision of access to The Bank of New York's proprietary application - INFORM – including installation and training for standard custody instructions and reporting is included.

✓ Art → 415-263-2422

1

**STATIONARY ENGINEERS LOCAL 39**



*The* **BANK**
*of* **NEW YORK**

Out of Pocket Expenses - Charges incurred by The Bank of New York Trust Company N.A. for local taxes, stamp duties or other local duties and assessments, stock exchange fees, postage and insurance for shipping, facsimile reporting, extraordinary telecommunications fees or other expenses which are unique to a country in which the client or its clients is investing will be passed along as incurred.

### Terms and Conditions of this Proposal

- The Bank of New York Trust Company, N.A. reserves the right to amend the fees from those quoted should the actual business awarded differ significantly to the information on which this proposal was based.
- All of the information contained within this schedule is confidential and should not be made available to third parties prior to reference to The Bank of New York Trust Company, N.A.
- Once signed the proposal shall remain valid for a period of not less than 3 (three) years.

Agreed and accepted by:

### Stationary Engineers Local 39 Pension Trust Fund

By: (signature) *Paul Bensi*

Name: *Paul Bensi*
(Please print)

Title: *Chairman*

Date: *2-14-06*

By: (signature)

Name: *Gerry Palmar*
(Please print)

Title: *Secretary*

Date: *2-16-06*

### The Bank of New York Trust Company, N.A.

By: (signature)

Name: *JANET E POTTER*
(Please print)

Title: *MANAGING DIRECTOR*

Date: *2-17-06*

2

**STATIONARY ENGINEERS LOCAL 39**

## SCHEDULE C

### THE BANK OF NEW YORK TRUST COMPANY, NATIONAL ASSOCIATION

#### GLOBAL CUSTODY AGREEMENT

#### WITH

#### STATIONARY ENGINEERS LOCAL 39 PENSION TRUST FUND

#### NOTICES

\*  \*  \*  \*

#### FEBRUARY 14, 2006

\*  \*  \*  \*

TO: THE BANK OF NEW YORK TRUST COMPANY, NATIONAL ASSOCIATION

| | |
|---|---|
| Post Office Address: | 550 Kearny Street, Suite 600<br>San Francisco, CA 94108-2527<br>Attn: Arthur A. Londos, Vice President & Relationship Manager |
| Telephone: | (415) 263-2422 |
| Telecopy: | (415) 263-2071 |

TO: STATIONARY ENGINEERS LOCAL 39 PENSION TRUST FUND

| | |
|---|---|
| Post Office Address: | c/o ATPA<br>1640 South Loop Road<br>Alameda, CA 94502<br>Attn: Michael Schumacher, Plan Manager |
| Telephone: | (510) 337-3330 |
| Telecopy: | (510) 337-3060 |

SCHEDULE D

THE BANK OF NEW YORK TRUST COMPANY, NATIONAL ASSOCIATION

GLOBAL CUSTODY AGREEMENT

WITH

[Insert Name of Customer]

INVESTMENT MANAGERS

* * * *

_____, 20__

* * * *

INVESTMENT COMMITTEE

Members as of

_____, 20__

* * * *

**CONDITIONS PRECEDENT DOCUMENTS SCHEDULE**
**(Global Custody Agreement No:..........................)**

1.    In relation to the Customer,:

(i) an incumbency and signature certificate of the trustees of the Plan that constitutes the Customer including a certification that the trustees will provide notice of appointment and specimen signatures of any Investment Manager or Investment Committee appointed herein (a sample of which is attached hereto). (ii)a copy of a resolution of the trustees of the Plan that constitutes the Customer authorizing the execution and delivery of this Agreement and the performance of its terms and authorizing a named person or persons to sign this Agreement and any documents to be delivered by the Customer pursuant thereto and a copy of the resolution of the Company authorizing the indemnification set forth in Section 6(b); each resolution should be certified as a true copy by an authorized trustee of the Plan the Company Secretary or other duly authorized officer of the Company (a sample of which is attached hereto); and

2.    Such other documents and legal opinions (such legal opinions to be obtained and furnished at the cost of the Customer) as BNYTC may reasonably require in relation to this Agreement.

## INCUMBENCY AND SIGNATURE CERTIFICATE

The undersigned hereby certifies to The Bank of New York Trust Company, National Association that I am a trustee of the Stationary Engineers Local 39 Pension Trust Fund, that, as such, I am duly authorized to execute this Certificate on behalf of the trustees of the Plan and of the Plan and further certifies that each of the following persons, as of the date hereof, are all of the duly qualified trustees of the Plan:

| Name | Office | Signature |
|------|--------|-----------|
| | Trustee | |
| | Trustee | |
| | Trustee | |
| | Secretary | |

I further certify that the Trustees of the Plan will provide notice of appointment and appropriate specimen signatures of any Investment Manager or Investment Committee appointed pursuant to Section 10.

_____
Trustee

## RESOLUTION (TRUSTEE)

The undersigned hereby certifies to The Bank of New York Trust Company, National Association that the trustees of _____ Plan, duly adopted the following resolutions on the _____ day of _____, 20___ and that such resolutions are in full force and effect:

RESOLVED that any _____ of the following trustees of the Plan, acting (alone)(jointly), be and hereby (is)(are) authorized and empowered to enter into a Global Custody Agreement with The Bank of New York Trust Company, National Association substantially in the form attached hereto with such changes thereto as the person executing the same shall deem advisable. The execution of such Agreement by such person to be conclusive evidence of such approval.

Name                                      Title

and RESOLVED that any _____ of the following persons, acting (alone)(jointly), be and hereby (is)(are) authorized from time to time to designate in writing to The Bank of New York Trust Company, National Association those officers, employees and other agents of this corporation authorized to issue Instructions under such Agreement, including, without limitation, with respect to the deposit or withdrawal of cash and the deposit, withdrawal, purchase or sale of securities and other property without limitation as to price, items or conditions and otherwise to deal therewith, all pursuant to the provisions of such Global Custody Agreement:

Name                                      Title

and RESOLVED that notice of any change in these resolutions be communicated in writing to The Bank of New York, and, until The Bank of New York Trust Company, National Association has actually received such notice, it is authorized to act pursuant to these resolutions.

(CORPORATE SEAL)

_____
Trustee

STATE OF       )
               ) ss.:
COUNTY OF   )

      On the   day of    , 20__, before me personally came      , to me known, who, being by me duly sworn, did depose and say that he/she resides at     , that he/she is of     CORPORATION, the corporation described in and which executed the foregoing instrument; that he/she knows the seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it was so affixed by authority of the By-laws of said corporation, and that he/she signed his/her name thereto by like order.

_____
Notary

STATE OF       )
               ) ss.:
COUNTY OF   )

      On the   day of    , 20__, before me personally came      , to me known, who, being by me duly sworn, did depose and say that he/she resides at     , that he/she is     of THE BANK OF NEW YORK TRUST COMPANY, NATIONAL ASSOCIATION, the corporation described in and which executed the foregoing instrument; that he/she knows the seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation, and that he/she signed his/her name thereto by like order.

_____
Notary

# EXHIBIT B



**SECURITIES SERVICING**

MASTER CUSTODY SERVICES SOLUTIONS FOR

## Stationary Engineers Local 39 Pension Trust Fund

SEPTEMBER 2005



*The* BANK
*of* NEW YORK

Stationary Engineers Local 39 Pension Trust Fund

**Table of Contents**

| **Section** | **Tab** |
|---|---|
| Executive Summary | I |
| Proposal | II |
| Fee Schedule | III |
| Master Custody Agreement | IV |
| STIF Fund Fact Sheets | V |
| Sample INFORM Accounting Reports | VI |
| Sample INFORM Custody Reports | VII |
| Sample Performance Measurement Reports | VIII |
| Subcustodian Network & Agent Banks | IX |
| Instruction Deadlines | X |
| Income Crediting Policy | XI |
| INFORM Compliance Reports | XII |
| INFORM Securities Lending Reports | XIII |
| Sample Transition Schedule | XIV |



*The* **BANK**
*of* **NEW YORK**

Stationary Engineers Local 39 Pension Trust Fund

| **Proposal Contents** | **Section** | **Page** |
|---|---|---|

General Information:................................................................1

Client Relations:...................................................................13

Data Processing & Systems: ..................................................14

Securities Processing: ...........................................................26

Accounting & Reporting:.......................................................36

Global Custody: ...................................................................42

Securities Lending: ..............................................................56

Transition Management: ........................................................66

Fees: ...................................................................................70

*The* **BANK**
*of* **NEW YORK.**

Stationary Engineers Local 39 Pension Trust Fund

# Executive Summary

We are pleased to submit our proposal to provide Master Custody services to the Stationary Engineers Local 39 Pension Trust Fund (the "Fund"). When clients turn to us, they come to rely on us, having benefited firsthand from our long-standing tradition of collaboration and innovation, our individualized approach to designing solutions and our record of delivering on our promises. The unique combination of capabilities and experience of The Bank of New York's service will benefit the Fund in several ways:

## Customized Client Service

We look to build strategic partnerships with clients that go beyond the traditional role of custodian and settlement agent. We work to become your partner to affect both your long and short-term business goals. We demonstrate this objective through exceptional client service, expertise and flexibility, all with a specific focus on the Fund's needs. Your Client Service Team would be equipped to support virtually every aspect of your business, from successful transitions of your custody, comprehensive reporting, securities lending and benefit disbursement services to interfaces and investment management reconciliations.

## Superior Information Delivery & Access

INFORM, our interactive Internet-enabled platform, provides access to on-line, real-time audited accounting and performance information. INFORM also provides the Fund easy access to a host of other capabilities from a single platform. With these sophisticated tools readily available at your site, the Fund can focus on its oversight responsibilities for investment managers such as monitoring guideline compliance, reviewing performance and exposure to risk. Our integrated technology architecture allows for seamless operations among the Bank's systems and applications, outside entities and our clients. Very simply, we bring advanced technologies within reach so that our customers snch as the Fund can exercise its responsibilities more timely and efficiently.

## Securities Lending

> *Only The Bank of New York offers the combination of unblemished investment performance, an unquestioned institutional commitment to the securities processing marketplace and the superior positioning of a major Wall Street bank.*

A dedicated, separately managed division of seasoned and tenured professionals has managed client securities lending activities for over 28 consecutive years. Today, daily outstandings average over $300 billion for 277 relationships. We design a program for each client that meets their requirements and risk tolerances with full indemnification against borrower default. Our program received the #1 **ranking** for securities lending for the second consecutive year in *Global Custodian's annual survey (August 2005)* and ranked #1 in *Institutional Securities Finance survey (March 2005).*

## The Bank of New York Difference

The Fund can rely on The Bank of New York as a long-term partner; a partner that creates value for your servicing needs. Every aspect of our business model differentiates us from our competitors, but nothing drives our uniqueness more than our core values – integrity, respect, personal responsibility, teamwork and excellence. These values form the basis of everything we do, and our commitment to these values means that we will always put your interests first.



The BANK
of NEW YORK

# General Information:

**1.    Please provide the name, title, address, telephone and fax nnmber, and email address for the person submitting this proposal.**

Mr. David P Corrado
Vice President
The Bank of New York
One Wall Street
New York, NY 10286
Phone: 212.635.8559
Fax:    212.635.7334
Email: dcorrado@bankofny.com

**2.    Please provide a brief overview of the bank.**

The Bank of New York Company, Inc. (NYSE: BK) is a global leader in providing a comprehensive array of services that enable institutions and individuals to move and manage their financial assets in more than 100 markets worldwide. The Company has a long tradition of collaborating with clients to deliver innovative solutions through its core competencies: securities servicing, treasury management, investment management, and individual & regional banking services. The Company's extensive global client base includes a broad range of leading financial institutions, corporations, government entities, and endowments and foundations. Its principal subsidiary, The Bank of New York, founded in 1784, is the oldest bank in the United States and has consistently played a prominent role in the evolution of financial markets worldwide.

Please refer to the following timeline for details on the history and development of the Bank's Master Trust/Master Custody services and important other capabilities.



*The* BANK
*of* NEW YORK

## History and Development of Master Trust/Master Custody Services

**1784** - The Bank of New York is founded

**1792** - First corporate stock traded on the NY Stock Exchange

**1922** - Trust and Custody services offered

**1960s** - Foreign Exchange services offered
- Automated clearing and processing system developed
   - Global Custody services offered



**1970s** - Automated accounting system developed
- Master Trust/Custody services established
   - Benefit Payment services offered
- Performance Measurement and Portfolio Analytics services offered
- Short-Term Cash Management services offered
- Domestic Securities Lending services offered
- Daily Valuation services offered



**1980s** - Performance Measurement Consulting services added
   - Multicurrency accounting system - full accrual, trade date system
- Acquired Irving Trust to expand our custody business
- Global Securities Lending services offered
   - Derivatives processing
   - Establish own global subcustodian network
   - Develop new securities movement and control system

**1990s** - Developed new system architecture to support relational database of
securities information
- Plan Accounting services
- Rollout of Windows-based on-line system to clients
- Relational client database warehouse constructed
- Rollout of Windows-based Custody Reporting Workstation
- Acquired JP Morgan and Bank of America custody businesses, expanding our
presence domestically and internationally, and opened regional operating centers
- Enhanced daily valuation platform
- Rollout of INFORM - Internet portal to the Bank
- Introduced on-line investment compliance monitoring
- Unitized Plan Accounting
- Acquired securities lending unit of Swiss Bank Corporation to create a third-party securities
lending program
- Acquired RBS Trust Bank - expanding international capabilities to pension funds and fund managers
- Developed iFX Manager™ for FX research, interest rate and trade execution via Internet



**2000s** - Real-time instruction entry module to facilitate STP



- Fully integrated global warehouse of securities and pricing information
- Web-based system architecture created for more flexible access to data
- Created information vault for clients' cash and securities information
- Introduced alternative asset accounting and reporting system with drill down functionality
- Rollout of iPFMTM - web-based tool for real-time illustrations of crossborder capital flows
- INFORM Instruction Capture for real-time securities and multicurrency cash instruction
communication
- Expanded Global Markets website with more FX rates, trade execution & research info real-time
- Developed MoneyFundsDIRECTSM – direct Internet access to multiple STIFs through single source



**2000s** - Introduced PrivateAnalyst - Alternative Asset Accounting and Reporting system

**Cont'd** - Strategic alliance with ING Group for sales, marketing and securities servicing iu the Benelux,
            Germany, and Central and Eastern Europe markets
          - New INFORM public website & INFORM accepts 15022 formatted messages
          - Enhanced INFORM's global navigation capabilities, report options, library of
            market/industry info., and user preference customization
          - Strategic partnership with Netik for data management & consolidated reporting through a data
            warehouse
          - Launehed commercial paper trading capabilities through MoneyFundsDIRECT.com
          - Strategic alliance with Wilshire Associates to provide dynamic performance and risk analytie
            services by integrating the global risk capabilities of both firms
          - Outsourced proxy services to ADP® for expansive market coverage and on-line voting
            and reporting and proxy monitoring. Coverage expanded to 74 markets.
          - Enhanced class action services and reporting
          - Developed precious metals depository service for U.S. domiciled clients.       
          - Launched online access to the TUCS database via INFORM.
          - Joint alliance with KPM Technologies for donor accounting and
            reporting software (Endowment Manager)

Additional information is available at www.bankofny.com.

**3.    How long have you been providing master trustee/custody services?  Describe the
       contractual arrangement under which you normally operate.  Include a copy of your
       standard agreement.**

The Bank of New York first offered trust/custody services in the 1920s, initiated global
custody servicing in 1968, and added master trust/master custody services in 1975.

Please refer to Tab IV for a copy of our standard custody agreement.

**4.    Will any of the requested services, (i.e. domestic custody, global custody, securities
       lending) be subcontracted or otherwise provided through other organizations?  If so,
       describe how responsibilities and authority will be divided between the parties.**

No.  The Bank of New York does not subcontract the services requested in this proposal.

**5.    Describe any organizational changes that oceurred or were announced dnring the past
       three years (e.g. mergers, acquisitions, structural changes).**

The Bank of New York has made several key acquisitions and established strategic alliances
in recent years that enhance our services.  Separately, these activities have firmly secured the
foundation and direction of our securities services by significantly enhancing our service
offering and service quality.

Focused acquisitions will continue on a global scale and are an important growth strategy for
the Bank.  We will consider an acquisition for its strategic benefits, where we can: add new
product-service capabilities, expand our client base, increase the use of our securities



processing franchise realizing economies of scale, increase our overall profitability; and, maintain our position as the leading provider of securities services.

Acquisitions and strategic alliances in the last three years include the following:

| Year | Acquisitions/Alliances |
|------|------------------------|
| **2005** | ■ Our strategic alliance with Clearwater Analytics has created a new breed of services designed to meet the special requirements associated with corporate treasury assets. These services provide our clients daily, real-time corporate treasury reporting and accounting functionality, inclusive of FAS 95, FAS 115, and 4-4-5 reporting. |
| | ■ A strategic alliance between The Bank of New York and NYLIM offers bundled retirement services inclusive of trust services, actuarial, administration, investment management and plan education. This program provides plan sponsors the support and tools to smoothly run their plans while realizing savings in both cost and time. |
| | ■ Strategic alliance with Nordea, the leading financial services provider in the Nordic region, to provide global custody and selected related services to Nordea's institutional clients in the Nordic and Baltic Sea regions. |
| | ■ Acquired Lynch, Jones & Ryan, Inc. (LJR), a leading global provider of commission recapture services for the plan sponsor and institutional fund community. This expands and strengthens the Bank's core capabilities and increases the value it delivers to plan sponsor clients. |
| | ■ Established BHF BNY Securities Services GmbH as a jointly held subsidiary with BHF Bank. Based in Frankfurt am Main, this new company will market Global Custody *(Depotbank)* services for German investment companies, and securities custody and settlement services for the national and international direct investments of institutional investors giving clients a single point of contact that will coordinate all services on their behalf. BHF-BANK and The Bank of New York each hold a 50 % stake in the new company. |



The BANK of NEW YORK

| Year | Acquisitions/Alliances |
|------|------------------------|
| **2004** | ▪ Strategic alliance with New York Life Investment Management (NYLIM) to provide a fully bundled solution for custody, investment management and participant recordkeeping services for small to mid-sized defined contribution plans. |
| | ▪ Strategic alliance with Clearwater Advisors to provide specialized FAS 95 and FAS 115 reporting for corporate cash custody relationships. |
| | ▪ Strategic alliance with Wilshire Associates, Inc. to provide an expansive selection of global risk services, including performance measurement, analytics, fixed income and equity attribution, universe comparisons, compliance, risk budgeting, and advanced risk measures to the Bank's clients. The combined services are designed to meet the increasingly sophisticated risk management needs of institutional investors. |
| | ▪ Strategic investment in the data hub and warehouse business of the London based Netik, LLC to support their continued growth in the data management and consolidated reporting marketplace. The Bank of New York and Netik are also partnering to provide integrated data solutions to financial institutions. |
| | ▪ Acquired Pershing LLC – a leading provider of clearing services and outsourcing solutions for broker-dealers and financial intermediaries. |
| **2003** | ▪ Strategic alliance with ING to create a European commercial alliance (ING/BNY Securities Services) to focus on sales, marketing and servicing of global custody and related services, such as compliance monitoring, investment accounting, performance measurement and analytics to institutional clients in Germany, the Benelux and Eastern Europe. In Germany, it will also offer depot-banking services via ING's subsidiary bank BHF Bank. |

Outside of our trust and custody acquisitions, we have made acquisitions with regards to investment management, correspondent clearing, and unit investment trust services.

6. **Briefly describe your master custody service capabilities including those items that currently set you apart from your competition.**

The scale and diversity of our business demonstrates our ability to effectively and efficiently settle and report on any type of security, for any fund structure, in any market. We ensure clients of continued applied knowledge and expertise through our relationships with investment bankers, dealers and institutional clients, as well as our involvement in industry committees and associations.

> *We provide Stationary Engineers the products and services needed to reduce the administrative burden and related costs of portfolio investing which allows you to focus on your core business.*



*The* BANK
*of* NEW YORK

The Bank of New York offers an array of quality products, services and capabilities recognized by the industry and our clients that meet and exceed their expectations. Our flexible technology allows you to designate the type and level of service required at the portfolio level. Services include:

| Broad Range of Services | | |
|---|---|---|
| • Custody | • Corporate Trust | • Offshore Fund Servicing |
| • Asset Management | • Currency Overlay | • Investment Manager Outsourcing |
| • Bond Net | • Depositary Receipts | • Portfolio Transition Services |
| • Brokerage Services | • Fixed Income Securities | • Performance Measurement/ Portfolio Analytics |
| • Cash Management | • Foreign Exchange | • Securities Clearance |
| • Collateral Management | • Interest Rate Derivatives | • Securities Lending |
| • Commission Recapture | • Exchange Traded Funds | • Stock Transfer |
| • Compliance Monitoring | • Global Trade | • Value at Risk |

Our operations centers and offices in over 30 countries service clients and investment managers in their local markets and local languages. Our regional processing centers in New York, Brussels, Singapore and London are staffed by professionals who speak over 27 different languages. Additionally, our staff understands different markets and their credit risks, global regulatory issues and local tax laws coupled with our ability to manage a growing subcustodian network ensure that we deliver consistent service worldwide.

### Distinguishing Capabilities

The Bank of New York:

- Effectively safekeeps, services and reports any type of investment, for any portfolio structure for assets held in any market. Today it services $10.3 trillion worldwide.

- Provides reliable settlements with an overall fail rate well below industry standards for U.S. issues - 0.34% for purchases and 0.32% for sales

- Provides an auto credit of income in every market possible (51 markets) to maximize your portfolio's investment potential.

- Boasts automated and comprehensive derivatives processing that ensures handling of even the most complex instruments

- Delivers reliable, timely reports. Accounting reports generated average over 99.4% efficiency

- Develops custom general ledger interfaces that map to Stationary Engineers's chart of accounts.

- Ensures maximum investment potential with the industry's most aggressive and responsive tax reclaim policies



- Delivers advanced reporting capabilities for alternative investments that help you track investments and activities. "Look through" capabilities monitor underlying investments and provide exposure analysis

- Provides interactive internet-based compliance monitoring tools so you can actively monitor adherence to guidelines daily, automatically

- Issues timely corporate action and proxy notifications, including class action reporting, keeping you alerted to these events

- Offers the most comprehensive suite of e-FX services available from a single provider giving you assured control over the FX process and provides critical investment research and market expertise

- Provides 24 hour, worldwide market coverage for clients and investment managers with trading desks, lending desks, client service locations worldwide.

### Top Rankings for The Bank of New York in Industry Surveys

- The success of our approach is underscored by the fact that our most important sources of new business are referrals and recommendations from existing clients. This success is further validated by industry recognition for service excellence and innovation. The Bank of New York's industry honors include:

- Best Custody Bank for the fifth consecutive year (*Global Finance's* Survey of Best Global Banks, October 2004).

- #1 overall *(Global Custodian's* Global Custody Survey, Fall 2005).

- Top Rated by Institutional Investors *(Global Custodian's* Global Custody Survey, Fall 2005).

- Best Sub Custodian Bank - United States for the second consecutive year (*Global Finance*, July 2004).

- Custodian of the Year - UK Pensions Awards (*Professional Pensions April 2005*)

- Commended in U.S. Custody (*Global Custodian's* Agent Banks in Major Markets Survey, Fall 2005).

- Best Global Custodian in Japan (*Asiamoney Magazine,* March 2004).

- #1 overall in Securities Lending *(Global Custodian's* Global Custody Survey, Fall 2005).

- #1 Lender Overall (*ISF/Global Investor's* Securities Lending Survey, March 2005).

- #1 in Income Generated, Settlement and Responsiveness to Recalls, Handling of Corporate Actions and Dividends, and Costs (Fees) (*ISF/Global Investor's* Securities Lending Survey, March 2005).

- Best FX Service Provider in the Overall Weighted category in for the fourth consecutive year (*Global Investor* FX Survey, March 2005).



*The* BANK *of* NEW YORK

# Industry Recognition for Excellence & Innovation - 2005





*The* BANK *of* NEW YORK

7. **Show the market value of your master trust/custody assets as of the end of the last five calendar years and the number of labor management client relationships they represent.**

| Master Trust/Custody Asset Value (in $billions) | | | | |
|---|---|---|---|---|
| | 2000 | 2001 | 2002 | 2003 | 2004 |
| MT/MC | $2,116* | $1,909 | $1,024* | $1,048 | $1,162 |
| Taft Hartley | $79 | $64 | $66 | $68 | $70 |
| Number of Client Relationships | | | | |
| MT/MC | 1,258 | 1,310 | 1,345 | 1,369 | 1,392 |
| Taft Hartley | 180 | 182 | 185 | 188 | 193 |

*\* The decrease in market value was due to a reclassification of relationships serviced by the master trust/master custody servicing group in 2000 and by the dip in the equity markets in 2002 which changed the composition of clients' overall portfolio holdings.*


*The* BANK *of* NEW YORK.

8. **As of December 31, 2004, provide a breakdown of custody assets, at market value, based on size of account in the following categories:**

| Master Trust/Master Custody | Assets $Millions |
|---|---|
| less than $100 million | $ 97,330 |
| $100-500 million | $ 217,972 |
| $500 – 1,000 million | $ 178,831 |
| $ 1-5 billion | $ 208,425 |
| $5 billion and over | $ 459,657 |
| **Total** | **$1,162,215** |

9. **Provide at least two client references whose circumstances and requirements closely parallel those of these trust funds.**

**Northern California Glaziers Trust Funds**
c/o Zenith Administrators
John P. Locke
Senior Vice President
221 Main Street, 2nd Floor
San Francisco, CA 94105
Phone: 415.536.8240
Fax: 415.546.0600
Email: jlocke@zenithadmin.com

**Northern California Sheet Metal Workers Trust Funds**
c/o BeneSys
Bonnie L. Maraia
Administrative Manager
2610 Crow Canyon Road, Suite 200
San Ramon, CA 94583-1599
Phone: 925.208.9999
Fax: 925.362.8564
Email: bonnie.maraia@benesysinc.com

10. **Please provide a list of all insurance coverage applicable to Master Trust services.**

The Bank of New York maintains comprehensive insurance coverage to ensure the continual delivery of our services. All coverage is continually reviewed and renewed prior to expiration dates. Our policies are stand-alone policies and loss limits are not combined which gives the Company the highest level of insurance coverage for the areas noted.



*The* **BANK**
*of* **NEW YORK**.

Stationary Engineers Local 39 Pension Trust Fund                    Page 10

| Financial Institutions Bond/Computer Crime Includes Safe Deposit Box Coverage | |
|---|---|
| Per Loss Limit: | $125,000,000 |
| Deductible: | $10,000,000 |
| Safe Deposit Box Coverage Deductible | $1,000,000 |
| Carrier: | Lloyd's |
| Coverage Type: | a) Dishonesty of Employees |
| | b) Forgery of securities, checks, drafts or other written instruments |
| | c) Loss or destruction of securities on or off the premises. |
| Expiration: | 12/1/05 |

| Excess J-Form and Transit All Risk Money and Securities Coverage (On premises and in transit) Excess of the F. I. Bond | |
|---|---|
| Per Loss Limit: | $400,000,000 |
| Deductible: | None |
| Carrier: | Lloyd's |
| Coverage Type: | Loss or destruction of cash or securities on or off premises (including securities or others held in custody). |
| Expiration: | 12/1/07 |

| Mail Insurance (per envelope limit) | |
|---|---|
| Per Envelope Limit: | $100,000,000 non-negotiable $10,000,000 negotiable |
| Deductible: | None |
| Carrier: | St Paul Travelers |
| Coverage Type: | All risk of physical loss of property sent by registered mail or overnight courier. |
| Expiration: | Continuous |



The BANK of NEW YORK

### Bankers Professional Liability

| | |
|---|---|
| Per Loss Limit: | $25,000,000 |
| Deductible: | $20,000,000 |
| Carrier: | Lloyd's |
| Coverage Type: | Losses due to errors or omissions |
| Expiration: | 12/1/05 |

### Directors and Officers Liability

| | | |
|---|---|---|
| Per Loss Limit: | Corporate: | $20,000,000 |
| | Individual: | $20,000,000 |
| Carrier: | National Union & Various Other Carriers | |
| Coverage Type: | Coverage for wrongful acts in respective capacities of Directors or Officers of the Company | |
| Expiration: | 12/1/05 | |

### Primary Liability

| | |
|---|---|
| Limit: | $1,000,000 |
| Carrier: | Federal Insurance |
| Coverage Type: | Bodily Injury / Property Damage |
| Expiration: | 4/1/06 |

### Excess Liability

| | |
|---|---|
| Per Loss Limit: | $25,000,000 |
| Carrier: | National Union |
| Coverage Type: | Liability coverage in excess of primary coverage |
| Expiration: | 4/1/06 |



*The* BANK
*of* NEW YORK

| **Property** | | |
|---|---|---|
| Per Loss Limit: California | $600,000,000 | |
| Earthquake | $25,000,000 | |
| Japan Earthquake | $5,000,000 | |
| Terrorism | $600,000,000 | |
| Carrier: | AIG, Chubb, Ace, & Various Other Carriers | |
| Coverage Type: | All Risk of physical damage to real and personal property including Data Processing, Business Interruption, Boiler and Machinery Service Interruption / Extra Expense, Earthquake / Flood, Fine Arts | |
| Expiration: | 6/1/06 | |

| **Workers Compensation** | |
|---|---|
| Carrier: | AIG |
| Coverage Type: | Job related injuries. Statutory |
| Expiration: | 4/1/06 |

The insurance coverage listed provides protection for The Bank of New York Company, Inc. and all other corporations, companies, firms, enterprises, or entities which are subsidiaries of, and in which the named insured has more than 50% ownership. All carriers are rated A- or better by A.M. Best.

**11. In the event your services were terminated in the future, state fully the following:**

**(a) What is the notification period required to execute a termination?**

Please refer to our sample custody agreement in Tab IV for our termination notification period.

**(b) The charges, if any, your organization levies for such termination.**

None.

**(c) Any noteworthy restrictions or requirements imposed on a client wishing to terminate your services.**

Please refer to our sample custody agreement in Tab IV for imposed restrictions or requirements regarding termination.



The BANK
of NEW YORK.

# Client Relations:

**1.    Who will be the primary person(s) assigned to our relationship?  Please provide their names, length of tenure in that position, and years with your company.**

| Name | Position | Tenure | Years with Bank |
|------|----------|--------|-----------------|
| Arthur Londos | Relationship Manager | 8 Years | 8 Years |
| Elaine White | Client Service Manager | < 1 Year | < 1 Year |
| Elba Montero | Client Service Team Leader | 16 Years | 19 Years |
| David King | Client Service Representative | < 1 Year | < 1 Year |

**2.    How many accounts does your typical account representative manage?  What level of back-up support is available for your account representative?**

Each Client Service Team member is assigned a manageable number of accounts that can be supported while maintaining high quality servicing.  Relationship Managers are assigned an average of 3-7 relationships, Client Service Representatives are assigned an average of 10-12 relationships, and Accountants are assigned an average of 4-8 relationships (100-120 accounts).

This sensitivity to our clients needs is also applied to our review of Relationship Manager account responsibilities. Continuous review of evolving relationships allows us to ensure that the appropriate mix of Relationship Manager and Client Service Team support is being achieved. Our mechanism for routine internal account reviews allows us to constantly fine tune the resources we allocate to each relationship. This emphasis on compatibility has enabled us to maintain strong and lasting relationships with our clients.

In line with our continuing commitment to client service, we ensure that all Client Service Personnel and Relationship Managers have a back-up.  These back-up personnel are continually updated, as to ensure a seamless service provision in the absence due to vacations, leave etc. of your primary contact.  By design, the team concept creates tiered back-up for each relationship with each team member having detailed account knowledge. Each team member is supported by an equivalent colleague, conversant with your relationship.

**3.    Will a representative of your organization be available to attend Trustee meetings if requested?**

Yes.  Your Relationship Manager can attend Trustee meetings, if requested.

**4.    What is the location of the office that will service this account?**

Art Londos, your relationship manager, will service this account from our San Francisco office.



*The* **BANK**
*of* **NEW YORK**

# Data Processing & Systems:

1.  **Describe your computer system's hardware and software capabilities. How long have the various current systems been in place?**

    The Bank of New York's technology architecture integrates innovative processing platforms dedicated to securities servicing, which includes custody. Our sophisticated front-end systems are designed for ease of use and flexibility. While we strive to meet the expanding needs of our clients, we have engineered our client-facing tools to be flexible and adaptable. Integrated information is delivered to clients around the clock through a single portal on the Internet, called INFORM and through a variety of formats compatible with their processes. The Bank's clients rely on its technology and expertise to help them navigate the complexities of the global markets with unmatched ease, efficiency and confidence.

    The nature of our automation supports high STP rates with actual rates dependent solely on the quality of instructions delivered by our clients. We place a strong emphasis on working with our subcustodians to improve the quality of our own SWIFT instructions, such that they obtain high STP rates into their own processing systems and onwards to the local depository or clearing system. In this way, we aim to ensure that client instructions reach the market as soon as possible in order to take advantage of local market matching conventions.

    The velocity and volume of today's trading on the world's exchanges requires a large fixed infrastructure. Our infrastructure can process large volumes of data, aggregate and deliver information to clients around the clock, around the world. The common architecture is designed such that no redundant data exists thereby assuring that the elemental data maintained in the central data warehouses is consistent. The stringent application of client rules, asset classifications and database standards ensures that all information is in accordance with client requirements. We are therefore able to leverage technology and data across functionally specific applications that meet market specific information requirements.



The BANK
of NEW YORK.

# Common Technology Platforms



*Enhancing efficiency and ensuring data integrity*

With 24-hour daily processing, clients can access up-to-the-minute portfolio data no matter where they are located around the globe.

The technology platforms detailed in the following matrix support our custody services and when each was developed.

| Platform | Function | Development |
|---|---|---|
| **Common Messaging Services** | Middleware system that enhances message delivery and standardizes message movement, routing, archival, monitoring and problem reporting. Facilitates exchange of messages with different layouts and data representations, and can process messages from different computing platforms. | Installed in 1996. Enhanced in 1999 for EuroCompliance and Y2K compliance. Enhanced again in 2001. Uses a third party vendor software: TSI's Mercator product and IBM's MQ Series product. |
| **Core Securities Processing** | Securities Movement and Control - Performs all trade processing including entry, settlement and position update. | Developed with Vista Concepts in 1986 and enhanced regularly ever since. Integrated reporting onto INFORM platform in 1997. Enhanced in 1999 for EuroCompliance and Y2K compliance. Enhanced for new SWIFT message formats. T+1 compliance enhancements underway. Incorporate ISO 15022 into SWIFT messages. |



*The* BANK *of* NEW YORK.

| Platform | Function | Development |
|---|---|---|
| | Cash Management - Performs all cash only transactions as well as cash processing associated with securities trades. | Developed in 1983 and enhanced in 1986 and 1991. Enhanced in 1999 for EuroCompliance and Y2K compliance. |
| | Securities Lending - Tracks all loans and collateral, monitors credit limits by dealer, performs daily mark to market by loan and dealer, and provides comprehensive reporting. | Installed Dollar Market Logic system in 1982, global lending added in 1988, major enhancement in 1990. Enhanced in 1999 for EuroCompliance and Y2K compliance. Integrated reporting onto INFORM platform in 2001. |
| Accounting | Multicurrency investment accounting and reporting -- fully accrued valuations, choice of inventory and amortization methods. Complete financial statement reporting. Reporting, querying and archiving available through INFORM. | Developed the core foundation internally in 1974. In 1987, added multi-currency functionality. In 1994 upgraded for more comprehensive reporting. Integrated reporting onto INFORM platform in 1997, including unitization. In 1999 introduced artificial intelligence into the system. Enhanced in 1999 for EuroCompliance and Y2K compliance. In 2003 and 2004 enhanced global navigation and reporting functionality via INFORM. |
| Risk Management / Performance Analytics | Performance Measurement and Analytics - Provides rates of return for portfolios, universe comparisons, performance attribution analyses, asset/liability analysis, and customized performance and risk analysis reports. Now delivered through INFORM Performance and Risk Analytics. | Installed in 1988, enhanced in 1990, on-line access in 1991, client server functionality and additional analytics in 1996. In 1997 integrated onto INFORM platform. Enhanced in 1999 for EuroCompliance and Y2K compliance. |
| | Value-at-Risk (VAR) - Provides a practical VAR calculator & report generator. Sets the standard in the industry as a flexible, transparent, & comprehensive risk management program. | Developed by JPMorgan. Strategic alliance with RiskMetrics since 1998. |
| Common Reference Databases | Securities Master DataBase - Centralized securities reference warehouse of securities, pricing and corporate action data. The quality and real-time availability of this information to our processing engines is an all-important element of our STP strategy. | Created internally in 2000. |
| Data Warehousing/ Information Delivery | Client Data Warehouse - Comprehensive repository for all transactions, positions, balances and related information. Provides intraday information on trades and end of day cash balances. Enables raw data to upload to clients for subsequent use. | Developed internally in 2001. |



The BANK of NEW YORK.

| Platform | Function | Development |
|----------|----------|-------------|
| **INFORM** | End-user Internet portal. Real-time reporting, trade entry and validation, custom reports, audited accounting data, data file exports, automated remote printing, performance measurement and universe comparisons, local market information, and compliance reporting. | Created internally in 1995 as an intranet. Released to clients in 1997. Leverages several third-party software tools such as industry standard browsers for control functions and the Adobe Acrobat Reader to facilitate report handling. Enhanced in 1999 and 2000 with greater functionality and for EuroCompliance and Y2K compliance. ISO15022 messaging functionality added in 2002. Enhanced Reporting in 2003. In 2004 INFORM enhanced with a new homepage design, more intuitive global navigation for streamlined maneuverability, expanded documentation library, and instant notifications in the message center. |

2. **What kind of systems do you currently have in place for protecting accounting information from unauthorized users and accidental loss?**

### Safeguards to Privacy of Data

We strictly adhere to our policy of client confidentiality. We have multiple controls to protect client information / client names from circulating both within and outside the Bank. We will not release any Stationary Engineers client account information to outside parties without prior approval from Stationary Engineers. Only authorized Bank of New York client service staff are have access to account data. When requested, we replace client names with the account number on all security activity reports - this ensures concealment of client identity as information regarding client activity is processed through the Bank. Numbered accounts are used for transactions both internally and externally to provide confidentiality. In addition to the controls used in monitoring securities and access to on-line information by a client, we do not release any information regarding a client without their prior permission.

### Safeguards Against Unauthorized Access

The Bank of New York's system contains comprehensive, fully tested built-in security procedures and firewalls to ensure data accuracy, prevent unauthorized access to data, and protect client information and instructions. Multiple levels of user identification and password control limit access by account and functionality to The Bank of New York's system. Our Corporate Information Protection Program (CIPP) includes an Internet security policy.

Safeguards in place to protect confidentiality and prevent unauthorized access include encryption of data while in transit, identification and authentication of all users requiring access to the data, access control facilities to limit permissions and authorizations, and centralized user administration to ensure adequate separation of duties. Systems staff is prohibited from accessing production programs and data files.



*The* BANK
*of* NEW YORK

Intrusion detection software monitors the network and critical host systems for unauthorized activity. Alerts are automatically sent to appropriate staff when necessary. Antivirus and personal firewall software is installed company-wide on desktop systems and servers and is centrally managed. All electronic mail is scanned at the mail gateways for viruses. A Computer Security Incident Response Team responds to security incidents using a documented Incident Response Plan.

We manage the information security process through a dedicated Information Security Division, mandated to create, support and promote the tenets of our Corporate Information Protection Policy. The Bank's internal auditors ensure that physical and logical security controls of the data environment and data files are adequate and functioning as intended.

### Adherence to Gramm-Leach-Bliley Privacy Act

To comply with Gramm-Leach-Bliley Customer Privacy Act the Bank has implemented an information security program to ensure the confidentiality of client information. The program is composed of multiple components to manage access to information on a need-to-know basis, and includes controls such as identification and authentication, authorization, monitoring, change management, reporting, intrusion detection, data confidentiality and integrity, incident reporting and response, security awareness and training, and others. A high-level committee representing Legal, Compliance, Audit, Information Security, and business units monitors privacy issues and concerns, and advises Information Security and other areas of the Bank as necessary. Internal and External Audit functions ensure that controls are adequate and adhered to, and report to management on deficiencies and other findings. Audit findings are tracked and resolution efforts are monitored.

Systems are centrally managed and monitored. All external telecommunications are fire walled from the internal network and monitored for unauthorized activities using automated intrusion detection and prevention capabilities. Internal staff periodically scans the network and assess network devices and servers for vulnerabilities. The Bank of New York also uses third-parties for periodic system and application vulnerability assessments.

**3.     Please describe your backup support system in the event of an earthquake or other natural disaster.**

We promote and facilitate continuity through a detailed and centrally coordinated business continuity program, which is continually updated and tested to respond to market and industry changes. Our philosophy calls for continuity of communications and business operations via our worldwide recovery processes.

We manage our worldwide contingency planning through a Central Office for Business Continuity in the U.S., complemented by dedicated staff in Europe. In addition, there are approximately 200 business line professionals involved in the development and coordination of individual business line plans. This approach provides global expertise, regional focus and local support.



*The* BANK *of* NEW YORK.

The Bank of New York's continuity specialists and client service staff carefully plan for contingency in an effort to ensure uninterrupted service for our clients. In the case of an emergency, a Crisis Management Team will oversee the Bank's recovery and direct Corporate Support Teams to initiate required recovery procedures. The scope of the contingency plan includes:

- Business Impact Analyses
- Identifying Critical Requirements
- Initial Response and Notification
- Relocation and Recovery
- Contact information for employees, vendors and clients
- Application recovery information

## Business Continuity Plan

### 1. Business Unit Recovery

*A substantial inventory of contingency positions and geographic diversification promotes continuous or rapid recovery of staff operations.*

Detailed contingency plans focus on the organized relocation of staff to one of several back-up facilities that are configured contingency facilities with PCs, telephone service and network connections that can be immediately activated. These sites are primarily bank-owned with some third party contracted facilities, and situated at appropriate distances from the Bank's offices and branches around the world. The geographic diversification and availability of these facilities assures continued operation. Our Business Continuity Planniug Office and business units jointly prioritize the assignment of relocated staff.

### 2. Processing Centers

*Real-time remote mirroring of data promotes rapid resumption of processing without loss of information.*

The Bank of New York's processing centers are strategically separated from business operating units and dedicated solely to processing functions. Synchronous replication of data provides rcovery to point of failure for nearly all of our applications. In addition, remote tape backups occur nightly.

Our core U.S. technology processing sites recover to the Bank's new Central New Jersey Processing Center (CNJPC). This state-of-the-art facility provides not only disaster recovery services, but also a computer operations command center and a crisis situation event room. Importantly, it is designed to handle significant expansion. CNJPC is a dedicated contingency facility controlled and supported by The Bank of New York. Recovery to a dedicated site such as this one eliminates issues inherent in using a shared facility, and gives us the capability to improve our recovery times. Within the U.S., we have added more geographically dispersed processing centers in New York, Tennessee and Florida ensuring improved survivability in the case of future disasters. Recovery facilities for regional satellite processing centers in Europe and Asia are provided by third-party vendors. The more critical of these are dedicated solely to The Bank of New York.



*The* BANK *of* NEW YORK.

Our target recovery times for most mainframe applications is 4 hours and 12-24 hours for INFORM.  Our business continuation plans are based on maintaining a production configuration to support quick mission-critical application resumption.   We use the following techniques to enhance business resumption:  remote real-time mirroring of programs and data, which protects against loss of any data, automated disk/tape libraries, dedicated stand-by processors, duplicate hardware, leased circuits, fiber diversity use ring architecture, multiple T3 back-up, and private point-to-point fiber network.  These practices not only connect production and contingency sites, but, more importantly, provide better and quicker recoverability to meet our clients' needs.

For additional protection, another copy of the most current version of application program files, and master data files and transaction records are electronically vaulted at an alternate site.  The alternate site and data files stored there can be connected to our recovery systems at the time of the crisis.

### 3. Telecommunications

> *The Bank of New York is regarded as an industry expert in regard to telecommunications strategies.*

We have established a proactive management program intended to assure diversity of telecommunications circuits for continuous connectivity to our clients and third-party providers.  We specify route diversity when ordering back-up circuits and dedicated staff perform audits to confirm that our carriers maintain that diversity continuously.  All back-up circuits are dedicated leased lines. In addition, major facilities and processing centers are connected via high-speed redundant fiber optics.

**4.      What depth of support staff is available for data processing and programming?**

The Bank of New York's  technology professionals continually focus on developing new and creative ways to meet our clients' needs and are dedicated to ensuring that our technology supports back-office and front-office processing activities.  Our technology organization is supported worldwide by over 4,000 technology professionals – one out of every six employees - all equipped with the latest IT tools, resources and training.  The Infrastructure and Technology Sector of the Bank is the heart of our technology organization and within this Sector, specific resources are dedicated to support our securities servicing business, allocated as follows:

| | |
|---|---:|
| Management | 50 |
| Accounting Functions | 160 |
| Securities Movement and Control | 300 |
| Securities Processing Applications Architecture | 200 |
| Information Delivery Systems | 150 |
| Quality Assurance and Testing | 15 |
| Systems Software Datacomm & DataCenter Operations | 500 |



A staff of 27 in our INFORM*ation* Solutions Group is devoted to our institutional investor clients to support their data communications interface needs. This group builds customized solutions on any appropriate technology platform to meet client-specific information needs. This group works with the rest of the Client Service Team and your staff to understand information requirements, internal and external data flows, system infrastructure, and long-term technology goals to build appropriate interfaces.

## 5.    What, if any, facilities arc available for on-line access to the Fund's records?

INFORM, The Bank of New York's proprietary Internet portal, leverages the power of the Internet to provide a single gateway to the Bank's products and services. Stationary Engineers can use INFORM's on-line tools for queries, reporting, accounting, file export, performance measurement, compliance monitoring and trade execution. Stationary Engineers can also review the latest product and system developments and connect to other Bank of New York websites. Key advantages of INFORM's capabilities include full Internet readiness, the convenience of one platform for



all applications and flexible and customizable reporting options that can be shared by multiple users.

> *INFORM helps you shape the decisions that unlock your investment potential.*

INFORM is:

- **Reliable -** in providing accurate data through a highly secure distribution network.

- **Flexible** - in allowing customization for insightful investment information.

- **Invaluable** - in helping you meet today's need for real-time data management and information access.

### Key Components of INFORM

Stationary Engineers can leverage INFORM's portal technology and select from the following information solutions:

| Asset Servicing | Review comprehensive real-time cash and trade positions, projections and settlement information in multiple currencies. Review daily, positions, accruals, projections, registration status, asset valuations, redemptions, income and foreign exchange transactions. Facilitate transaction reconciliation using INFORM's asset servicing data. |
|---|---|



*The* BANK *of* NEW YORK

| Accounting | Receive industry standard, trade date multi-currency reporting with timely, accurate, independent audit information in flexible reporting formats for a broad range of investment structures. Review third-party positions and other not-in-bank assets consolidated into all reporting. Review unreconciled accounting information daily. |
|---|---|
| Performance and Risk Analytics | Evaluate portfolio performance with granular levels of rate of return detail over any time period for any portfolio, group of portfolios or index (standard or blended). Analyze target allocations and universe peer groups, detailed attributions by sector, security and currency. Drill down rates of return and characteristics from the portfolio level through the segment level to the individual security. Review returns before or after currency adjustments. |
| Compliance Monitoring | Create investment guidelines for your portfolio and monitor portfolios daily for adherence to investment guidelines and to review elements of investment risk. Receive immediate electronic alert notification of violations or guideline results. |
| Corporate Actions Notification and Reporting | Receive timely notification of corporate action events and send response instructions back to The Bank of New York. |
| Class Action Reporting and Inquiries | Query and sort class action information when you subscribe to our class action reporting service. Identify a class action's impact, or a potential class action's impact, on your portfolio by account(s), security(ies) and date range using our query and reporting functionality. |
| Tax Reclaims | *Reporting*: Monitor the status of any outstanding reclaims daily. Review tax reclaim applications, applicable tax rates, availability of exemptions and reclaims, and processing procedures by market. Access news related to changes in settlement procedures, repatriation and foreign exchange regulations, and local tax and tax treaty changes.<br><br>*Documentation:* Retrieve the required documentation, and related information/instructions, for receiving reduced tax rates on dividend and interest payments. |
| Instruction Capture | Streamline instruction entry with real-time entry and validation of securities related transaction instructions. Import trade instruction files from your trade execution system using proprietary or customized message formats. Enter foreign exchange instructions that are automatically linked to the securities trade. |
| Foreign Exchange Executions | Access gm.bankofny.com for the most comprehensive suite of Internet FX services available from a single provider. Access the Bank's automated foreign exchange (FX) trade order management and trade execution system with real-time quotes and charts. |



*The* BANK *of* NEW YORK.

| Benefit Disbursements Administration | Review interactive benefit disbursements reports, inquire into participant/retiree information, establish new participants and payment frequencies and change participant/retiree profile and payments. |
|---|---|
| Securities Lending Reporting | Review daily and monthly investment, liability, earnings, compliance and collateral activity to monitor program performance. |
| Market Intelligence | Access time-sensitive information related to market practices, essential to comprehensive risk assessment. Review settlement procedures, trade deadlines, agent profiles, changes in the registration process and account opening documentation for any agent in the Bank's subcustodian network. |
| Inquiry Tracking | Euter inquiries on-line to route to appropriate Bank of New York groups for resolution. Review the current status of each inquiry. |
| Data Export | Import data files from INFORM into all commonly used spreadsheet programs, such as MS Excel, or relational database management applications, such as MS Access, Oracle and Sybase, to support internal trading, cash, transaction processing, portfolio management and reconciliation systems. |
| BNY Brokerage Client Reporting Portal | Manage your commission recapture spending and directed brokerage practices more efficiently. Access additional BNY Brokerage services including a bill processing workflow module for tracking invoices and a centralized database of independent research and third-party service providers. |

**Additional Information Interfaces**

In addition to the interactive functionality of INFORM, we can support interfaces with virtually every industry standard trading system, including client developed proprietary systems. Our advanced technology permits us to adapt our methods of communication to fit your particular instruction entry, on-line access and reporting/data transmission needs. Custom data extract files are available in a wide variety of file formats, data content, frequency and delivery methods.

Our INFORM*ation* Solutions Team will work with you in the creation, integration and implementation of system interfaces or extract files for reconciliation. We will obtain any necessary software or hardware on our end to ensure compatibility with your configuration.

**6.    What information is available on-line to clients?**

Please refer to our response to Question 5 above.



7.    **How soon and for how many hours per day is data available?**

Fully audited accounting reports are available 3-7 business days after month- or quarter-end, based on your specific reporting time requirements. Audited accounting reports are available on-line via INFORM the same day that hard copy reports are mailed to you (thus saving one business day).

Master Trust Allocation (plan accounting) reports are available on the same schedule as the audited accounting reports. All transaction information available by the end of the last business day of the accounting period will be included in these reports.

INFORM, is available 24/7 in every time zone.

8.    **Can data be accessed via the Internet? If so, provide an overview of the various methods such as FTP or HTTP.**

Yes. Stationary Engineers can download account information into Excel or any other application for further analysis. Data formats include:

- Ad-hoc reports are created from formatted report templates in INFORM. You have the option of setting/selecting certain parameters, i.e., account number, date ranges, etc. The reports can be generated in INFORM and either printed out in hard copy or exported as data into Excel or other third party software.

- Ad-hoc queries are developed from data sources and data elements you select from drop-down lists. Data files can be exported to either a Hyper Text Markup Language (HTML) format (which can be automatically converted to a spreadsheet format), comma-delimited format, or Acrobat file.

- Raw portfolio data - daily and monthly (audited) files can be downloaded from our system. These can be imported into Access, or any other relational database (Oracle, Sybase) to support internal trading, cash, transaction processing, portfolio management and reconciliation systems. Additionally, interface files can be automatically downloaded.

In addition, The Bank of New York provides Internet File Transfer Protocol (iFTP) to enhance your relationship with the Bank. With iFTP, you can harness the Internet to promote the efficient information flow that is essential to numerous business needs, such as securities trade instruction, securities settlement, clearing, accounting, and cash management. One Tool for All File Transfer Needs means that you only need to setup one mailbox on iFTP to service all of your file transfer needs.



The BANK of NEW YORK

**9.     What enhancements are planned for on-line access?**

The Bank's progressive and inventive use of technology is central to our ability to help
institutions navigate the complexities of the global markets with unmatched ease, efficiency
and confidence. To that end, the following enhancements are planned for INFORM in 2005.

- **Personalized Homepage**. Users can subscribe to selected services which are displayed
on their INFORM homepage to facilitate global navigation for the services they use.

- **Alerts** features will display the results that you set on a report parameter

- **My Reports** is a persistent view of your information needs located on the Homepage for
immediate access. You can determine to store as many reports or queries that you
determine as set by you're my Profile - reporting preferences.

- **Simple Query Tool**. Users are able to enter simple queries to sort information.

- **Drill Down Reporting**. Users are able to expand and collapse the detail under each
security type held in their accounts.

- **Desktop Publishing for Reports**. Users are able to create Board Room quality reports
that can include graphics, custom headers/footers and logos.

- **On-Line History**. Users can subscribe to purchase longer than the standard 18 months
of on-line history.

- **Customized Reporting Preferences**. Users can select date formats and local time zone
tailored to their location. User can share the information within the user community as
well as fax and email information to others.

**10.     Does your organization plan to undergo any significant system changes within the next
three years?**

The Bank of New York is planning no major system changes over the next three years.



The BANK
of NEW YORK

# Securities Processing:

**1.** **Describe your settlement process for domestic securities transactions, including depositories used and your involvement with them. If you use a central depository, is your firm a direct participant in that depository?**

### Trade Communication

We encourage our clients and their managers to use standard message formats to communicate trade instructions for more timely settlements and fewer fails. Interfaces include sending and receiving trade instructions using SWIFT or Omgeo. The Bank of New York is completely compliant with ISO 15022. We are live accepting 15022 54x trade notification messages (Omgeo, CTM). We also seek to enhance STP for non-SWIFT clients by providing them the capability to automate trade instructions through INFORM Instruction Capture (IIC) or through vendor links such as Bloomberg, DTCHUB, FMCNET, etc.

### Trade Processing/Settlement

Upon receipt of your instructions, our system automatically validates each trade to ensure required fields such as security number matching security description, quantity, pricing, etc., are complete and correct. The system is also programmed to verify the fields for accuracy of instructions (and good position for delivery). When validated the transaction is automatically processed dependent upon security type, including same day cash trades.

Our securities processing engine incorporates a unique capability called Transaction Pathing, a system generated security movement process that controls the routing of the securities from instruction entry to final disposition. Based on a number of factors including transaction type (i.e., buy, sell, transfer), security type, and depository eligibility, the securities processing engine automatically determines the proper path and controls the movement of each security throughout the processing cycle. These procedures substantially reduce the potential for clerical error, which in turn results in more timely settlements with fewer claims and reconciliation problems. The securities processing engine provides full securities movement and control capabilities, incorporates specialized features for mortgage-backed and other difficult to process securities, and handles the cash side of all securities transactions in U.S. or multiple base currencies. Our subcustodians are linked to our core processing engine via the SWIFT telecommunications network. Trade instructions, settlement affirmations and confirmations, income items and corporate action information are exchanged through this network utilizing SWIFT formats.

Our automation supports high STP rates with actual rates dependent solely on the quality of instructions delivered by our clients. There are few market or instrument-specific barriers to high STP rates. Most instructions bridge electronically into our custody system, but remain in a repair queue for a variety of reasons, including missing trade information from Stationary Engineers or missing security codes on our system. In such cases, repairs are made on-line, with only the missing/incorrect information being updated before authorization and transmission to the market. This reduces the scope for keying errors.



*The* BANK
*of* NEW YORK

In addition, we place a strong emphasis on working with our subcustodians to improve the quality of our own SWIFT instructions, such that they obtain high STP rates into their own processing systems and onwards to the local depository or clearing system. In this way, we aim to ensure that client instructions reach the market as soon as possible in order to take advantage of local market matching conventions.

### Trade Matching

Except for same-day settlements, our standard trade instruction deadlines allow time for pre-matching in those markets where it is standard practice. Our subcustodians are contractually required to perform pre-settlement matching in all markets where it is standard practice to do so and/or where pre-matching facilities have been established by the local industry. The Bank's subcustodians verify and actively pre-match instructions in order to detect settlement problems prior to settlement date. In countries where pre-matching is not market practice, our Operations Centers work proactively to validate trade facts and prevent failed trades by keeping in contact with subcustodians.

For Stationary Engineers, there is no closed period. The Bank of New York accepts electronic transmissions 24 hours a day and we would expect high levels of STP, direct to our subcustodians. Where instructions require repair and the repair is on the Bank's side, we will dispatch them the same day as received, where instructions are received prior to 5:00 p.m. ET.



### Same Day Turnaround Trades

Our securities processing engine supports simultaneous receive and delivery instructions for settlement of same day book entry or physical turnaround transactions. The engine automatically generates a redelivery instruction as items are received. We settle same day trades in any of markets within our global custody network when instructions are received according to our instruction deadlines. There are numerous factors that impact our ability to process international same day trades. This includes: settlement deadlines, individual markets, securities types, foreign exchange deadlines, foreign currency cash transfer deadlines and the client's ability to transmit trade information within the deadlines.



The BANK
of NEW YORK.

**Book Entry Trade Settlements**

Our securities processing engine is electronically linked to the DTC, FRB, Euroclear, Clearstream, and CREST enabling us to settle book entry securities in a totally automated environment. Our position files are updated on a real-time basis and our securities processing engine continuously checks for available position to complete deliveries automatically. For deliveries, the engine will transmit the instruction to the applicable depository on settlement date. For receives, our securities processing engine will hold the instruction pending notification of the receipt of the securities, verify the transaction and release it for posting to the appropriate account.

**Physical Settlements**

The Bank of New York's safekeeping facilities include primary vaults in New York and London. In addition, the Bank maintains, through our global safekeeping network, the ability to hold securities physically in any marketplace where market conventions allow. Our system controls all facets of the registration process, from automated client instruction input via INFORM through the maintenance of transfer agent name and address files and automated preparation of transfer fanfolds. The system tracks the aging of all open transfer items and generates daily reports reflecting the status of open transfer items.

**Settlement Activity Reporting**

Information regarding securities settlement (pending trade information, settled trades, and failed trades), is available on-line via INFORM real-time. Ad-hoc queries, reports and inquiries are also generated using INFORM.

The Bank of New York is a direct member of all major central securities clearing and depository facilities. They include:

- The Depository Trust Company (DTC)
- Federal Reserve Bank (FRB)

2.    **Are purchases and sales normally charged or credited on an actual or contractual settlement date basis? Can you accommodate both? What is the preferred settlement option?**

We offer maximum flexibility to Stationary Engineers by offering two methods of settlement for assets held in custody. Depending on Stationary Engineers's preference, you can operate under an actual or contractual settlement program. For international securities, we offer contractual settlement in every market permissible.

> *We recommend that Stationary Engineers employ contractual settlement date for both U.S. and international trades to take advantage of the timely crediting of transactions such as income and corporate actions associated with specific trades.*

Under contractual settlement, sale proceeds are available for investment on contractual settlement date. Purchases are also charged to the account on the contractual date of the trade. The Bank reserves the right to reverse with appropriate pre-advise any contractually


*The* **BANK**
*of* **NEW YORK**

posted transactions that subsequently fail to settle. Under actual settlement, sales are credited on actual settlement date regardless of whether this is on or past the contractual settlement date of the original trade. Proceeds of sales will be credited in same day funds. Purchases are also charged on the actual settlement date.

For not-in-bank assets, we offer actual settlement.

**3.    What are your policies and procedures for investing daily surplus cash balances that are not used by investment managers?**

The Bank of New York's automated cash management procedures ensure that accounts are swept daily and your account is managed to ensure that no money is left uninvested. Cash balances are automatically invested in the Bank's Collective Short-Term Investment Fund or Collective Government Trust Fund. The daily sweep is always the last transaction of the day so there are no uninvested cash balances.

**4.    Please include a description of all available cash management vehicles for qualified benefit plans. Describe the investment guidelines of your short-term investment funds.**

The Bank of New York's Collective Trusts consists of a series of commingled funds that offer opportunities to invest in a wide range of debt and equity securities. ERISA-qualified pension and profit-sharing trusts may participate in one or any combination of these funds to achieve a degree of diversification and flexibility not otherwise feasible for them.

**U.S. Collective Trust Short-Term Investment Fund: (qualified funds)** The primary investment objectives of the Fund are capital preservation, liquidity and a competitive rate of return consistent with a conservative investment approach. The fund is managed using the full range of high quality money market instruments. The Fund is compliant with OCC Reg. 9. Any cash balances are automatically swept into these funds to the penny at the end of each business day.

**U.S. Collective Trust Government Short-Term Investment Funds: (qualified funds)** The primary investment objectives of the Fund are capital preservation, liquidity and a competitive rate of return consistent with a conservative investment approach. The fund is managed using the full range of high quality money market instruments. Eligible investments are limited to U.S. Treasury and Agency Securities and repurchase agreements collateralized with these instruments. The Fund is compliant with OCC Reg. 9. Any cash balances are automatically swept into these funds to the penny at the end of each business day.

Please refer to Tab V for more information on these funds

**5.    Have any of your short-term investment funds defaulted during the past two years? If so, please explain the circumstances of the default, recovery of investment, allocation of loss, etc. Did any participants incur a loss? Were any adjustments made to your investment guidelines/policies to avoid a similar problem?**

No. The Bank of New York's short term investment funds have never defaulted.


The BANK of NEW YORK

**6. What is the daily notification deadline for outgoing wire transfers?**

The Bank of New York accepts payment instructions for processing until the Fed's closing. We guarantee processing of properly formatted and funded wire transfers up to 5:30 p.m. (ET). Payment instructions received after 5:30 p.m. (ET), or those that require operator intervention are processed on a reasonable efforts basis. The Bank of New York will extend its payment processing deadline when the Federal Reserve extends their deadline.

**7. What is the daily deadline for receiving incoming wire transfers in order to ensure same-day investment?**

The funds offered by the Bank have various cut-off times, with some being as late as 4:30 p.m. (ET). If unexpected funds are received after the respective cut-off times, Stationary Engineers's cash may be swept into the Bank's end-of-day sweep, Bank's Collective Short-Term Investment Fund or Collective Government Trust Fund.

**8. Will accounts be credited on the payable date in fed funds for cash divideuds, bond interest payments and matured bond proceeds?**

The Bank of New York automatically credits dividend and interest income to client accounts on payable date on a contractual settlement or "pre-post" basis in every market of our network where market conditions allow us to do so. In situations where there is no guarantee as to payment date, income is credited by the system upon collection.

Income and maturity proceeds for virtually all U.S. assets are advanced to your account on the morning of paydate in fed funds. The only exception to this policy pertains to occasional asset backed or private placement security income in which the factor information is not available to the industry on a timely basis. For non U.S. currencies, income is credited in the currency of payment. We offer an exceptional "standing instructions" service that allows Stationary Engineers to designate at the portfolio, currency or event level, how you would like the income proceeds dispersed.

**9. How do you handle information ou corporate activities (i.e., tender offers, exchange offers, etc.)?**

Corporate action processing takes place in a highly automated environment that controls and reduces the risks associated with corporate events. We receive data feeds of notices from our vendors that our system matches to the position file, automatically generating a list of holders. We then send corporate action notifications to clients and their investment managers via INFORM or SWIFT. A special response screen on INFORM facilitates the transmission of corporate action instructions from clients and their investment managers. INFORM also allows clients and their managers to review the status of corporate action positions (i.e., full response, partial response, not responded) providing a further measure of control. If we do not receive client/manager instructions two days prior to the Bank's expiration date, a "reminder" will be sent automatically.



*The* **BANK** *of* **NEW YORK**

Our corporate action staff provide another level of review to protect our clients' interests. As instructions are received, all items are logged-in and assigned to our Corporate Action Review Officers who actively track each corporate action through completion. They also coordinate with brokers on failing or pending trades to ensure your interests are protected. If an event requires urgent action as identified by one of our Review Officers, we will contact Stationary Engineers to address and resolve. The Review Officers will also scan all documentation, ensuring that all letters of transmittal, consents, waivers, releases and other essential reorganization documentation are properly executed and retained. Review Officers will also scan the files for all expiring actions to insure all instructions were executed correctly and all required documentation is in order. This greatly reduces the risk of undetected errors which can result in a loss to the client or Bank.

### U.S. Corporate Actions

#### *Sources*

- J.J. Kenny - on-line
- FII notices - on-line
- Xcitek notices - on-line
- DTC Notices - on-line
- *Wall Street Journal* - Eastern Edition
- *New York Times*
- New York Stock Exchange notices
- Company correspondence

#### *Notification*

- *Corporate Action Notice* - sent out via INFORM or SWIFT within 24 hours following the Bank's receipt of information. Divided into two categories on INFORM, Mandatory events, such as mergers, name change and stock splits, and Non-Mandatory (Voluntary) events, including purchase offers, rights offers or optional dividends. All information for voluntary actions is confirmed prior to release. We will send preliminary information on Mandatory events.

- Prospectus and/or offering circulars - forwarded to each holder within 24 hours of receipt along with a hard copy of the corporate action notice

- Partial calls - a notice is sent initially informing clients that they may be involved in a "call. Once the lottery results are known, another notification is sent to clients informing them of the called "position" or stating they are not involved in the call


*The* BANK
*of* NEW YORK

### *Controls*

- *Corporate Action Notice* - simultaneously forwarded to your Client Service Representative and the Reorganization Processing Department for positive control and follow-up.

- Special features (e.g., puts or early tender dates) - System coded to identify securities that require future servicing. Our automated "referral system" prompts our Servicing staff to provide notification to our clients approximately 30 days prior to an expiration date.

### Non-U.S. Corporate Actions

### *Sources*

- Subcustodians (via SWIFT messages)
- EXTEL
- Reuters
- Topic
- Bloomberg
- CREST on-line
- Financial Times Interactive Data
- Stock Exchange Situation Notices
- Stock Exchange Weekly Official Intelligence
- Company Documentation

### *Notification*

- *Preliminary Notice* (INFORM or SWIFT) - initial information stating all known details about the event sent out within 48 hours following the Bank's receipt of information

- *Interim Notice* (INFORM or SWIFT) - available details regarding the corporate action and client's holding

- *Definitive Notice* (INFORM or SWIFT) - issued immediately upon receipt of full details regarding clients' entitled positions (reconciled with subcustodians' statements), options available (where applicable) and the steps that must be taken by clients including the deadline for a response to be sent

### *Controls*

- Follow-up notification - sent two business days prior to the client deadline when no response or a partial response has been received three business days prior to the deadline

- •Second reminder - sent on the client deadline date if still no response or a partial response has been received



*The* BANK *of* NEW YORK

**10.    Describe how you distribute proxy information.  What controls, if any, are in place to ensure receipt and timely distribution?**

We provide our clients with global, web-based proxy voting services to support corporate governance requirements. Our services, offered through Automatic Data Processing's (ADP®) ProxyEdge®, streamline and simplify the proxy voting process with electronic communications and consolidated status reporting, eliminating excess paperwork and manual ballot processing.  Though ProxyEdge you can receive meeting notifications, cast your vote and access reporting for proxies in over 70 markets. INFORM users are able to access these proxy voting services via a hyperlink.

**Notification**

Our local market subcustodians forward all meeting announcements to ADP which prioritizes all notices by meeting date to ensure that the meetings are covered. An exception to this is the U.S. market where the announcement is sent to ADP by the issuers. The Bank sends portfolio information to ADP daily, enabling them to check all current and future meeting announcements on equities against clients' holdings.

Using this information, ADP creates proxy notices upon receipt of the complete agenda within the timeframe defined by ADP's Global Steering Committee Guidelines. In the U.S., the timing of releasing of the announcement is governed by SEC rules and corresponds to a turnaround time of five days after receipt of the announcement from the issuer.  These notices are delivered to you via ProxyEdge which uses a standard format for consistency and ease of comprehension across all markets covered.

| ADP's Global Steering Committee Timing Notification Guidelines | |
|---|---|
| **Measurement** | **Criteria** |
| Complete agenda notification received within 10 days of Vote Deadline Date | 75% within 1 business day 100% within 2 business days |
| Complete agenda notification received within 11-20 days of Vote Deadline Date | 40% within 1 business day 100% within 3 business days |
| Complete agenda notification received within 21-29 days of Vote Deadline Date | 40% within 2 business days 100% within 4 business days |
| Complete agenda notification received 30 days or more of Vote Deadline Date | 40% within 3 business days 100% within 5 business days |



The **BANK** of **NEW YORK**.

## Voting

With the Bank focusing on delivering and processing vote information and instructions, you can address the question of how to vote. You communicate your voting instructions on ProxyEdge, and ADP forwards these voting instructions to the local market. To further streamline the proxy voting process, you can establish standing instructions, vote identically across multiple accounts with the same holding and vote entire holdings or a specific number of shares. Standing instructions can always be overridden with a new vote submission.

These services are supported by market information on local proxy voting practices provided by the Bank's Global Network Management team as well as additional market information that ADP makes available on ProxyEdge.

ProxyEdge includes electronic links to a select number of independent researchers for those clients who require assistance with their voting decisions and have entered into a direct arrangement with one these research providers. In addition, you have direct access to the issuing company website and company report, where available.

## Reporting

**Email Alert Service**



ProxyEdge's reports help you track proxy status from notification to lodgement to the local market and summarize voting activities. You have the option of receiving daily e-mail alerts that inform you of new proxy information and contain all meetings that have been affected as well as the change that occurred.

**Vote Summary Report**



The *Vote Summary Report* is a detailed summary of votes cast as well as ballot information for a selected date range. Where clients use multiple custodians, ProxyEdge offers consolidated voting and reporting across custodian clients of ADP.



*The* BANK *of* NEW YORK.

**Graphical Presentation of Data**



You can also customize reports and use on-screen, user-friendly tools to conduct auditing and analysis tasks.

## Supporting Good Corporate Governance

We recognize your vital role and responsibilities in voting proxies and are committed to providing the tools for your active participation in proxy events. We leverage ADP's web tools for electronic, global, proxy voting notification, response and reporting, as well as their links to research providers' websites. Our services help you to transform an important corporate responsibility into an effective demonstration of good corporate governance.



*The* BANK
*of* NEW YORK

# Accounting & Reporting:

**1.    Describe your system of quality control to ensure reporting accuracy. Are reports audited before they are delivered to clients? Who audits and corrects reports?**

> *Internal systems and procedures help to minimize risk, eliminate inconsistencies in transactions and ensure the accuracy and swift distribution of accounting reports.*

The Bank of New York's state-of-the-art month-to-date proof accounting facility automatically identifies any out of proof condition as it occurs. This ensures that corrections, when necessary, can be made to the upstream system on a daily basis rather then having to wait until the end of the month. Accountants review positions and transactions for their assigned accounts daily. The Bank's accounting system facilitates this validation process by identifying out-of-proof conditions, transaction exceptions and asset classification problems through the month-to-date audit feature. The Accountants also communicate, as necessary, with the appropriate areas within the Bank to identify and resolve potential problems prior to releasing reports.

In addition to edit checks on transactions at the point of entry to the system (pricing tolerance checks, trade entry validations, etc.) accountants use system tools to validate opening positions with the closing positions from a previous reporting period (monthly, quarterly, and annual). A fully automated reconciliation with our clients' investment managers further validates this review.

The Client Service Management and the Investment Manager Services (IMS) Groups perform callbacks to assist external investment managers to reconcile their accounts daily.    An automated reconciliation with our clients' investment managers further validates this review.

Controls for routine processing are substantially similar to controls for non-routine processing i.e., all transactions are checked back to original sources to ensure they are accounted for properly and accurately. In the case of routine transactions (trade settlements) accountants are working directly from data on our securities processing platform. In the case of non-routine processing, transactions have to be verified against external documents (client directives for plan allocations, manager statements for venture capital investments).

**2.    Provide a schedule indicating the delivery timeframes for unaudited and audited accounting reports.**

The Bank of New York's standard report package is comprehensive, detailed and available via INFORM, our Internet portal around the clock. Using portal technology, Stationary Engineers can easily customize, on screen, standard report templates to reflect the data fields you require.



*The* BANK *of* NEW YORK.

INFORM provides on demand, real-time access to critical information and reports regarding your portfolio. Most importantly, data can be sorted by any selection criteria available in our client data warehouse and securities master database. Since information is stored in its most elemental form in our system, you can query information and upload the data in virtually any format required. The methods of retrieval include:

**Standard Reports**: These are reports, generated by the back-office and client support facility of BNY, can be scheduled and delivered through INFORM in PDF format.

**Accounting**

Our INFORM Accounting engine provides multi-purpose schedules available by individual manager, by fund, and in consolidated or combined/roll-up reporting. Reports are available on a monthly, quarterly, semi-annual and/or annual basis, which can be scheduled on a calendar or fiscal year cycle. Daily, unaudited information is also available. Fully audited accounting reports are available 3-7 business days after month- or quarter end and 30 business days after year-end. Accounting information is presented via a selection of schedules sorted by such characteristics as asset class, cash balance, country, industry, transaction, etc. Additional reports such as Broker Commissions may be added to the standard package upon request. Reports are distributed via INFORM, CD-ROM, or hardcopy.

Please refer to the Sample Accounting Report Book in Tab VI for descriptions and samples of these reports.

Custody/Settlement/Corporate Actions/Tax Reclaims

Custody and other settlement reports are provided daily via INFORM – either intra-day or end-of-day (market close), depending upon the information. Please refer to the Sample INFORM Custody Report Book in Tab VII for descriptions and samples of these reports.

**Portfolio Analytics**

The Bank of New York offers a myriad of performance measurement, portfolio analytics, universe/index comparisons, portfolio attribution, compliance monitoring, value-at-risk analyses and alternative asset investment reporting via INFORM. Please refer to the sample Performance Measurement Report Book in Tab VIII.

Performance measurement and compliance monitoring data is available daily, unaudited. Fully audited monthly or quarterly reports are available two business days after the accounting reports are released. The universe/index comparison reports available quarterly with the delivery date determined by client requirements. We often prepare an Executive Summary report for clients which is a fully customized report summarizing various aspects of their plans' performance; these are available monthly and quarterly with the delivery data determined by client requirements. The VaR reports are produced monthly with a delivery date established by individual client requirements.



*The* **BANK**
*of* **NEW YORK**

| **Ad-hoc Reports:** | These are formatted report templates that are available through INFORM. Clients have the option of setting/selecting certain parameters, such as acconnt number, date ranges, etc. The reports can be generated in INFORM and either printed out as a hard-copy or exported as data into Excel or other third party software. |
| **Ad-hoc Queries:** | Clients can select the data source and select the data elements from drop-down lists. Clients are provided with extensive choices for sorting and selecting records. The data output can be exported in either HTML or comma delimited format to Excel or other third party software. |
| **Raw Data:** | INFORM can execute daily and monthly audited uploads of selected data from our system. These can be imported into Access or any other relational database (Oracle, Sybase) to support clients' iuternal trading, cash, transaction processing, portfolio accounting aud reconciliation systems. We can also generate automated general ledger interface files that match to your internal general ledger system. |

## 3.   What types of commission/transaction cost reports are available?

Brokerage commission reports can be produced for the current reporting period or on a year-to-date basis. These reports indicate the amount of broker commissions paid on an itemized and aggregate basis. Our reports are available in the following formats:

- Trade date or settlement date
- Summary of detail by individual manager and fund
- Commission trades or non-commission trades

In addition, we have a broker "non-commission" report that identifies all transactions by broker for which no commissions were paid during the reporting period and on a year-to-date basis.

## 4.   What schedules are included in accounting reports?  Please provide sample reports.

Accounting information is presented via a selection of schedules sorted by such characteristics as asset class, cash balance, country, industry, transaction, etc.

Reports can be consolidated linking one or more portfolios (sub accounts) to the master (parent) account for combined or "roll up" reporting. At a glance, this provides Stationary Engineers with an overview of your entire portfolio with corresponding transactions and asset holdings.

Please refer to Tab VI for our Sample INFORM Accounting Report Book, which provides samples and a description of each standard schedule.



The BANK
of NEW YORK.

**5.     Are you able to provide statements on an accrual/trade date basis showing both realized and unrealized capital gains and including pending transactions?**

Yes. Our policy dictates that all accounts use a trade date reporting method reflect all transactions to conform to these standards. The Bank of New York's accounting and reporting engine is a fully accrued trade date system offering true multi-currency capabilities. All accounting statements are fully priced and accrued, showing all pending payable and receivable items such as transactions, income, and expenses.

Trade date accounting is per industry standards and includes pending settlement and failed trade status on all reports. We can provide trade date accounting including accrued income on a monthly basis for all separately managed domestic equity and fixed income portfolios.

Gains and losses are calculated on a daily basis and are also part of the monthly, audited reporting process. All gains and losses are calculated for each asset held and are represented in both base and local currency.

Our reports segregate capital gains from income. Individual gains and losses on security transactions are reported in summary and detailed form (detailed trade) in the accounting reports. We provide realized/unrealized information by investment manager on a monthly, quarterly and/or annual basis.

**6.     How long do you retain historical information/statements (asset values and transactions)?**

Through INFORM's central report archive, accounting reports are retained on-line for ten years for ongoing reference. Audited monthly data is retained for eleven months. Custody reports are available for one year, month-end data is available for five months and 90 days of transactions are immediately available. Historical data is generally kept in hard copy for two years. Audited performance information is available for all month-end periods.

**7.     What is your source of securities prices? What procedures ensure accurate pricing? What procedures do you have in effect, if any, to flag and investigate unusual or significant pricing changes from the previous day? Describe your procedures for reconciling prices with investment managers.**

The following table represents The Bank of New York's pricing sources:



The BANK
of NEW YORK

## Pricing Vendors for Publicly Traded Securities

*The Bank of New York subscribes to a number of pricing sources. Below is one example for pricing selections and comparison, as per automated business rules on its strategic security master for the Bank's global custody and investment accounting systems.*

*Please note, however, that the methodology used by the client may be determined by their requirements and subscription to the vendors indicated.*

| Asset Classification | Frequency | Primary | Secondary | Tertiary |
|---|---|---|---|---|
| Equities (U.S./Canada) | Daily | FT Interactive Data | Bloomberg | Market Makers |
| Bonds (U.S./Canada) | Daily | FT Interactive Data | Bloomberg | Market Makers |
| Rights Offerings | Daily | Extel | FT Interactive Data | Bloomberg |
| Non-US Securities | Daily | Extel | Telekurs | Bloomberg, Euroclear/EUCLID from subcustodians |
| U.S. Treasury Bills, Notes, Bonds | Daily | FT Interactive Data | Bloomberg | |
| Spot Currency Rates | Daily | WM Company- via FT Interactive Data | Internal, Reuters | Internal |
| Forward Currency Rates | Daily | WM Company- via FT Interactive Data | Internal, Reuters | Internal |
| U.S. Government and Agency Securities | Daily | FT Interactive Data | Bloomberg | |
| Futures; Options on Futures | Daily | Bridge CRB (Knight Ridder) | Bloomberg | FT Interactive Data |
| Index and Equity Options | Daily | FT Interactive Data | Bloomberg | |
| Swaps, Options on Swaps | Monthly | Bear Stearns | Gifford Fong Associates | |
| Mortgage-Backed Securities | Daily | FT Interactive Data | Bloomberg | Prudential American |
| Agency Mortgages | Daily | FT Interactive Data | Bloomberg | Prudential American |
| Asset-backed Securities | Daily | FT Interactive Data | Bloomberg | Prudential American |
| Medium-Term Notes | Daily | FT Interactive Data | Bloomberg | |
| Municipal Bonds | Daily | FT Interactive Data | Bloomberg | |
| Collateralized Mortgage Obligations | Daily | FT Interactive Data | Bear Stearns STSC | Prudential-American |
| Variable-Rate Notes | Daily | FT Interactive Data | Bloomberg | Prudential-American |
| Private Placements | Daily | FT Interactive Data | Prudential American | |
| Warrants | Daily | FT Interactive Data | Bloomberg | |
| Convertible Bonds | Daily | FT Interactive Data | Bloomberg | Prudential American |
| Mutual Funds | Daily | FT Interactive Data | Bloomberg | Funds' Transfer Agent/Customer Service Agent |
| Commercial Paper | Daily | Internal algorithm, via market yields provided by FT Interactive Data | | |
| Real Estate Funds | As Required | Internal | Internal | Internal |
| Venture Capital | As Required | Internal | Internal | Internal |
| ADRs | Daily | FT Interactive Data | Bloomberg | Telekurs |



*The* BANK *of* NEW YORK.

To ensure accurate pricing at the end of each reporting period, the Accountant conducts a full audit of all activity and holdings of the designated accounts. Part of their checks and balances include comparing market prices for each security held in your accounts to the prior month's prices to identify any unusual variances. Our dedicated pricing unit researches any price discrepancy to establish a correct price.

Our comprehensive pricing system compares multiple vendor pricing sources for the greater majority of exchange traded issues. Prices are compared to the previous day's price to assure that they are within an acceptable tolerance range. Outside of the exchange traded, we use multiple vendor pricing sources for various issue types, typically debt instruments (i.e., municipal, straight debt, and derivative debt). Our procedure calls for a comparative review of representative yield curves for each debt type; additionally, a comparison of prices for identical securities from various vendors is reviewed as necessary.

In the event of any discrepancy with an external investment manager, an immediate inquiry is initiated. All asset variances are immediately researched and the appropriate party corrects the valuation. Price differences are noted and our sources are contacted to validate the price. If we cannot reconcile a price difference with the manager, your Relationship Manager notifies you. The circumstances are reviewed and a pricing source established.

**8.    How do you price securities that are not available from your pricing services, such as private placements?  Describe your process of pricing derivative securities and non-traditional fixed income securities.**

Where minimal or no vendor coverage exists, such as for venture capital, private placements, or very thinly traded or restricted securities, we currently work with a wide variety of consultants with whom we have established procedures for obtaining valuations. Where appropriate, we may apply theoretical pricing models.

If, at this point, we are still unable to locate pricing, we will contact the investment manager to ascertain if they can recommend an independent market maker or suitable pricing source.

### Derivate Securities Pricing

We price securities, forward foreign exchange and exchange traded derivatives automatically with feeds from external pricing sources on a daily basis. Exchange traded contracts are priced by our primary vendors daily. Over the counter contracts are priced either by a broker provided quote or by Gifford Fong & Associates through a prearranged agreement. For Broker quotes the client needs to introduce us to the broker to assure quotes will be received on a timely basis. Swaps are also priced by Gifford Fong & Associates. Assets are priced from a selection of vendors which includes: Extel, Financial Times Interactive Data , Muller Data, and Bloomberg. Matrix or Yield Curve spread pricing is also available for short term and fixed income securities. We work to accommodate alternative sources and would source data as appropriate if our existing sources did not cover all your investments.

### Non-Traditional Fixed Income Securities

Matrix or Yield Curve spread pricing is also available for short term and fixed income securities. Should a client require a source we do not currently support, we work to accommodate alternative sources.



The BANK of NEW YORK.

# Global Custody:

**1.    Do you provide global custody services?  When did you first offer this service?  Are your global custody services provided in-house or subcontracted through another global custodian?**

Yes.  The Bank of New York began offering global custody services in 1968.

The Bank of New York does not subcontract our global custody services to another provider. We use a network of subcustodians in 96 markets, outside the U.S., U.K., the Cayman Islands, the Channel Islands and Ireland, to provide the local presence and local services required in the various markets.  We continually review our network to ensure that it reflects the changing global investment decisions of our clients.  The Bank's dedicated, regional network management team monitors local economic, political, regulatory, and industry-related events, and keeps clients apprised of changes in the investment climate of each market.

**2.    Briefly describe your global custody service capabilities including those items which set you apart from your competition.**

The Bank of New York is one of the largest global custodians in the world with worldwide assets of $10.3 trillion under custody and administration.  The Bank of New York offers complete custody services in 101 markets and offers the most comprehensive array of value-added services to complement our core custody product.  Cross-border assets serviced total $2.9 trillion.

It is not our size alone that distinguishes our Global Custody product, it is more importantly the Bank's comprehensive range of global services that sets us apart from our competitors. Our servicing capabilities include: Internet reporting, straight through processing, real-time cash and transaction reporting, investment of currency balances, multi-currency portfolio accounting and reporting, tax reclamations, foreign exchange, income collection, corporate action and proxy handling, performance measurement, compliance monitoring and derivatives processing in developed and emerging markets.

Highlights of our capabilities include:

| International Expertise | Our operations centers and offices in 32 countries service clients and investment managers in their local markets and local languages.  Our offices are staffed by professionals who speak over 27 different languages.  Additionally, our staff's understanding of different markets and their credit risks, global regulatory issues, and local tax laws, and our ability to manage a growing subcustodian network are critical to ensuring that we achieve consistent standards worldwide. |
| --- | --- |


The BANK of NEW YORK

| Network Management | Our network of subcustodians is the largest offered by any custodian, extending to 101 markets. We continually review our network to ensure that it reflects the changing global investment decisions of our clients. Our regional Network Management teams monitor local economic, political, regulatory, and industry-related events, and keep clients apprised of changes in the investment climate of each market via INFORM. |
|---|---|
| Tax Reclamation Services | The Bank seeks to eliminate standard reclaims, either by at-source tax relief or by accelerated refund procedures. Reduced rates are obtained by treaties or tax exemption, otherwise we will file tax reclaims. |
| Foreign Exchange Services | Our foreign exchange execution services allow clients to execute spot and forward foreign exchange trades 24-hours-a-day in order to settle securities trades, repatriate income, or apply simple, short-term currency hedges against their international portfolios. iFX Manager, Our Internet-based FX order management and trade execution system, makes FX management a truly integrated feature of our global custody services. |
| Currency Risk Management | BNY Overlay Associates is a specialist currency management group, providing financial managers with both risk management solutions and alternative investment opportunities. Our proprietary currency overlay strategies concentrate on the management of risk, as opposed to yield enhancement, or trading currency as a separate asset class, and are designed to reduce risk factors while maximizing the possibility of reward. |
| Market Expertise and Global Reach | We are poised to quickly enter new markets as Stationary Engineers's business needs require. Contractual settlement is provided in 61 markets, one of the broadest offerings in the industry. We also offer one of the best contractual income and interest crediting profiles available, with pay-date crediting in 50 markets. The Bank of New York utilizes the most aggressive and responsive tax reclaim practices and procedures of any global custodian; and where reclaims must be filed, our recovery rate averages 98%. Global Proxy services are offered in over 70 markets. |



The BANK of NEW YORK.

**3.    Indicate the number of acconnts and market value of all securities for which you act as global custodian.**

The Bank of New York services a worldwide client base of over 7,000 institutions with $10.3 trillion in assets under custody and administration, the majority of whom invest outside their local market. As global custodian, The Bank of New York services over 3,500 clients whose crossborder (international) assets under custody total $2.9 trillion.

**4.    With how mauy countries does your bank cnrrently have sub-agent agreements? Describe and provide a list of yonr sub-agcnt relationships (inclnde locations and date relationships initiated).**

The Bank of New York's subcustodian network extends to 101 markets worldwide. Please refer to Tab IX for a list of our agent banks and BNY offices by market.

**a.  What is your sub-agent selection criteria?**

The Bank of New York constantly monitors and evaluates markets which may provide new investment opportunities for our clients. When the opening of a market looks eminent, this evaluation turns into active research and we begin the process of selecting a subcustodian for the market.

Our objective in selecting a subcustodian is to choose the one that best suits our clients' requirements. The subcustodian must meet the highest level of fiduciary standards and controls as required by our clients and our regulatory and compliance obligations. We look for subcustodians who are leaders in the securities processing industry in their respective countries. Our Network Management Group thoroughly researches and reviews each institution before considering them for inclusion in our network. Each prospective subcustodian submits a comprehensive proposal and a Service Level Agreement. Based upon our analysis of the responses received, coupled with a clearance from our Credit Department, we select finalists who are visited by our Country Specialists. The final approval of the new subcustodian is made by a committee of senior executives of The Bank of New York.

The Bank of New York's subcustodian selection process is as follows:

- Identify potential providers. The banks are identified through discussions with The Bank of New York's International Banking Sector executives, the research obtained during the course of Global Network Management's monitoring of the market, and from our Credit Department.
- Complete service level agreement. Each potential provider is invited to complete our comprehensive service level agreement and review our form custody agreement.
- On-site due diligence review. Based on our analysis of the responses received, coupled with a clearance from our Credit Department to proceed, we create a "short-list" of banks that we visit for an on-site due diligence of their full capabilities.



*The* BANK
*of* NEW YORK.

- Recommendation. A comparative analysis and recommendation is made in a detailed Recommendation Memo. This document forms the basis for a presentation to the Agent Bank Review Committee, consisting of the most senior executives of the Bank.
- Appointment. Approval by this Committee formalizes the appointment of our subcustodian.

Subcustodians must meet the highest level of fiduciary standards and controls as required by our clients and our regulatory and compliance obligations. We look for subcustodians who are leaders in the securities processing industry in their respective countries. The main criteria for selecting our agents are:

**Securities Processing and Operational Capabilities** - We evaluate the ability of a subcustodian to meet the stringent service requirements in our RFP and service level agreement. We further assess the level of automation and flexibility of the candidate's systems and services. We also conduct a detailed review of the subcustodian's practices, procedures, and internal controls, its method of keeping custodial records, and its security and data protection practices.

**Financial Strength** – The Bank's Credit Department performs a financial evaluation of the subcustodian. In reviewing the relative financial strength of the subcustodian, we review the bank's ownership structure, shareholder equity, total assets, and credit ratings.

**General Reputation and Market Standing** - We consider the subcustodian's history, depth of involvement in the local market, its experience in providing services to foreign investors and its references. During visits to the market, we ask the local regulatory bodies and other market participants to assess the candidate's reputation as well. If a local branch of an international bank is selected, we obtain the strategic plans for the branch from its head office.

**Willingness to Execute The Bank of New York's Legal Agreement** - To best protect our clients' assets, we ensure that the agreement with our subcustodian contains specific provisions. These provisions include, but are not limited to, those found in Sections (c)(1)(iv) and (c)(2) of Rule 17f-5. A subcustodian will not be selected unless it executes an agreement with BNY that contains the protections we have deemed necessary to fulfill our obligation to our worldwide client base.

**Expertise of Personnel** - We carefully assess the experience and expertise of the subcustodian's staff. We consider not only years of service in the industry, but involvement in industry groups, relationships with local regulators and other market participants, and knowledge of a global custodian's requirements. We likewise attempt to assess service culture, depth of knowledgeable staff, and staff language skills.


*The* BANK
*of* NEW YORK

**Provision of Timely, Accurate, and Insightful Market Information -** We request samples of informational bulletins sent previously by the candidate and review the distribution process of this information. We also re-assess the same segments noted previously, such as the subcustodian's ties to local market participants, expertise of staff, and service culture, as these factors often play a significant part in creating meaningful market information.

**Technology/Systems -** We assess the candidate's ability to produce fully automated SWIFT messages across the complete range of transaction types, including all reporting and reconciliation messages.

**Price -** Each candidate must provide a fee structure that is competitive compared to other custodians within the country and to the quality of services provided.

### b. How frequently do you review your sub-agent relationships and what type of process is involved?

Our Global Network Management Group consistently reviews our subcustodians' performance throughout the year to ensure that they maintain the highest level of service and comply with our clients' regulatory requirements. We monitor daily and throughout the year, the subcustodians' operations, local market activity, financial strength, regulatory compliance and overall service performance.

**Daily -** Our Country Specialists obtain pertinent market news that affect the processing or safety of our clients' assets. We analyze and email this information automatically to clients via our *NetInfo*® service, which provides newsworthy bulletins and pertinent service updates via the Internet.

**Monthly -** The Credit Risk Policy Officers continually monitor all subcustodians' financial strength and hold a monthly credit overview meeting to update senior management on their findings. These are the same criteria used to monitor our commercial banking relationships. Our Global Network Management Group also monitors subcustodian credit ratings. We conduct monthly STP (straight-through processing) reviews with our subcustodians, to measure our STP efficiency with each agent.

**Quarterly -** We publish a quarterly *Global Network Management* and *Foreign Custody Manager Report* that details changes and updates in our network in respect to subcustodians, depositories and summarizes other market events.

**Semi-Annually -** Semi-annual assessments / report cards evaluate subcustodians against agreed-upon standards established in the service level agreements. We measure performance in terms of settlements, cash reconciliation, asset reconciliation, income collection, corporate action processing and tax reclaims. We measure the settlement efficiencies of our subcustodians, as well as the quality and consistency of communications and reporting and compare the results to standards in the market. We share our assessment with the agent. In the case of unsatisfactory performance, we define and implement corrective action.



*The* BANK
*of* NEW YORK.

We regularly review and update service level agreements. We conduct a full Credit Risk review and presentation of ratings and ranking of subcustodians semi-annually. This review includes a review of changes in bank credit ratings and asset levels that may have occurred. We also review the exposure of our clients' assets in "poorly rated" countries.

**Annually** - The Network Management Group visits each subcustodian regularly and will visit potential new markets for inclusion in our network. These visits include meetings with local regulators, local market participants, registrars, Central Securities Depositories and other subcustodians. Meetings with our subcustodian include; reviews of the previous report cards, STP rates, completion of our operational risk audit questionnaire, review, service level agreement updates, regulatory and market updates. Detailed reviews of the visit are circulated to our senior management and operation groups.

Legal counsel provides an annual legal opinion in each of our markets that addresses whether local law changes affect the protection of client assets. Each year we also update and review the due diligence documentation we require of our agents for compliance with Rule 17f-5 and compliance by subcustodians and depositories for Rule 17f-7of the Investment Company Act of 1940.

**5.      Do you use international central depositories for clearing and/or holding?**

Yes. The Bank of New York is a direct member of all major central securities depositories and clearing facilities and an indirect member of local market depositories and clearing agencies through our subcustodians.

**6.      How frequently do you reconcile your records with depositories and your sub-agents for cash, securities, and corporate actions?**

The Bank of New York, in compliance with internal audit policies and for the protection of both Stationary Engineers and The Bank of New York, may only act upon written or secure electronic direction. We adhere to established processes to reconcile positions daily with the appropriate depository, subcustodian and/or vault. These proofs ensure the integrity of our records resulting in fewer errors in income collection, maturities, corporate actions and related activities.

### Depository Reconciliations

All positions held in DTC, the Federal Reserve Book Entry System, Euroclear, Clearstream, and CREST are reconciled daily. Each night we receive an automated position reconciliation file from these depositories and compare those files with our books and records. We immediately research any breaks or exceptions and initiate appropriate corrective action, thereby ensuring the integrity of our records. All discrepancies are reconciled within 24 hours. Administrative and operations management monitor all open inquiries/claims daily to ensure rapid responses/resolution.



*The* **BANK**
*of* **NEW YORK** .

## Subcustodian Reconciliations

We reconcile settlement activity with all subcustodians through daily and monthly SWIFT messages and real-time updates to our system of settlement status and trade mismatch information. The Bank receives MT 950 statements daily, for which an automatic matching process then occurs using selected criteria (e.g., value date, amount and our reference number) against details of the entries we have processed to our internal records. All exceptions are automatically distributed via the system reports to the operations area responsible for generating the original transaction.

## Control Procedures

Dedicated units within our Operations Division maintain primary responsibility for identifying, tracking, auditing and resolving items as well as investigating items referred for research. Weekly division management reviews an outstanding items report during weekly operation risk review meetings to ensure prompt action to resolve issues. Monthly, senior management in operations, audit and risk management receive an outstanding items report for review.

7.   **How do clients or investment managers communicate trade instructions to you for settlement? What are your instruction deadlines?**

We encourage our clients and investment managers to use standard message formats for communication of trade instructions for more timely settlements and fewer fails. Interfaces include sending and receiving trade instructions using SWIFT or Omgeo. The Bank of New York is completely compliant with ISO 15022. We are live accepting 15022 54x trade notification messages (Omgeo CTM).

We seek to enhance straight-through processing for non-SWIFT users by providing them the capability to automate trade instructions through INFORM Instruction Capture (IIC) or through vendor links such as Bloomberg, DTCHUB, FMCNET, etc.

Instructions received via any of these straight-through processing methods automatically verify and post to The Bank of New York's system and route automatically to local market systems for pre-matching and settlement. We monitor trade transmissions daily in an attempt to increase straight-through processing rates and achieve STP for both domestic and global trades. We can accommodate client requests for customized communication methods.

The Bank of New York guarantees the settlement of all deliveries if the securities are in our possession, are in good deliverable form, and instructions are received in accordauce with our Cash and Securities Instruction Deadlines as detailed in Tab X.



The BANK of NEW YORK

**8.    What are your income collection and income crediting policies, by country?**

Income and maturity proceeds for virtually all U.S. assets are advanced to your account on the morning of paydate in fed funds. The only exception to this policy pertains to occasional asset backed or private placement security income in which the factor information is not available to the industry on a timely basis. For non U.S. currencies, income is credited in the currency of payment. We offer an exceptional "standing instructions" service that allows Stationary Engineers to designate at the portfolio, currency or event level, how you would like the income proceeds dispersed.

Please refer to Tab XI for a country-by country list.

**9.    Describe your tax reclaim policy and procedures.  Do you have schedules detailing the status of outstanding reclaims?**

> *The Bank of New York is renown for having the most aggressive and responsive tax reclaim policies and procedures of any global custodian.*

We actively seek to eliminate standard reclaims, either by at-source tax relief or by accelerated refund procedures. Clients can obtain reduced rates according to treaties or tax exemption, based on the status and the residency of the beneficial owner. We provide an electronic tax reclaim filing service in several countries in order to further accelerate the tax reclaim refund process. These policies and procedures expedite our clients' receipt of funds from international investments.

### Tax Reclaim Processing

Where a reclaim must be processed, our Tax staff will prepare the reclaim and send the reclaim forms to our subcustodian who will lodge the reclaims with the appropriate tax authorities. Treaty rate tables, client tax status, reclaim form numbers, and special exemptions are maintained on The Bank of New York's securities processing system. Reclaims are automatically created and prepared as soon as possible after paydate, provided the tax regulations or market practices allow us to do so.

### Tax Reclaim Status Reporting / Tax Change Notifications

Each filed reclaim is given an individual number and automated procedures track its progress. Tax reclaim details are reported daily via INFORM. The Bank also produces management control reports for outstanding reclaims.  Our staff continuously monitors tax reclaim status and actively pursues reclaims with the subcustodian or the local tax authority as appropriate.

Outstanding tax reclamations are reconciled monthly to our control ledgers and the acconnting reports. We review tax reclaims received versus our ledgers' ontstanding reclaims for the accurate and timely processing of these funds.


*The* BANK
*of* NEW YORK.

We send clients notification of tax changes and market news via our *NetInfo®* service.
*NetInfo®* messages can be sent by fax or e-mail. They are also available through INFORM, on the Country Profiles icon.

### Tax Reclaim Reporting

INFORM provides tax reclaim information. The status of any outstanding reclaim is reported on a daily basis. A hardcopy report can be provided on a monthly basis. The Bank will credit reclaim proceeds to the appropriate client account. Tax refunds are credited on a collection basis.

The *Tax Reclaim Report* lists:

- Security details
- Income paydate
- Net income
- Amount of tax withheld
- Reclaim amount
- Status of the claim
- Dates of lodging of the claim and date of credit

### Monitoring Tax Treaties / Documentation

Required tax documentation is tracked via an automated system called Documentation Organizer System (DOORS), which serves as a central monitoring mechanism for all client tax documents. We update DOORS after we have verified the documentation. DOORS generates an Outstanding Tax Documentation List, which the Client Service Team retains for their review.

We monitor the status of current international tax treaties between countries, relative to our clients' securities activities and maintain this information in matrix format by investor type. The matrix details applicable tax rates, availability of exemptions, reclaims and double taxation treaties in each market. We continually review our matrices and tax regulations with our subcustodians to ensure that they are up-to-date. Additional sources of tax treaty information include publications from PricewaterhouseCoopers, E&Y, IBFD and FT.

Tax reclaim rate applications and processing procedures by market are available through INFORM. Clients cau also use INFORM to retrieve the required documentation, and related information/instructions, for receiving reduced tax rates on dividend and interest payments.

The Bank also offers a tax documentatiou completion service, to help clients receive tax relief at source. This service includes completing and filing the required documentation to obtaiu certification of resideucy and tax status, following up with the local tax authorities until the certification process is complete and filing the certificatiou with the local tax authorities to obtain relief at source.



*The* BANK
*of* NEW YORK

**10.    Describe your foreign exchange transaction capabilities.**

With The Bank of New York as your foreign exchange partner, Stationary Engineers has direct access to the multiple products and experience of our skilled professionals. Operating on a 24-hour basis, we serve FX clients out of seven financial centers in North America, Europe, and Asia.

> *Our competitive advantage results in improved efficiency providing*
> *Stationary Engineers complete control of the execution process.*

## FX Execution

Stationary Engineers can communicate FX instructions to The Bank of New York via SWIFT, CPU-CPU interface, INFORM, tested telex, telefax, or telephone (subject to written authenticated confirmation). We can also confirm the deal via ETC (e.g., using FXMatch) with the third party and, if desired, a copy of the confirmation is sent to Stationary Engineers.

Our custody-related FX execution ranges from income conversion to trade settlement to simple exposure hedging. We can execute FX transactions in every market within our global custody network, and as a major FX market participant, the Bank actively makes markets in the currencies that support our custody clients' needs, regularly running positions in many of these currencies.

We offer the following options for executing FX with The Bank of New York to settle underlying custody activity:

**1. Deal direct with our FX desk.** Our FX desks operate locally, in seven financial centers, and are staffed with sales professionals who cover various major market participants such as multinational corporations, insurance companies, fund managers, and central banks. Maintaining such a rich and important client base requires superior service and competitive rates as a FX provider.

**2. Client Service Team handles FX.** Your Client Service Representative can support Stationary Engineers's FX needs and communicates investment managers' instructions to the local Bank of New York FX desk to settle custody activity on your behalf. Client Service Team staff dealing on behalf of investment managers receive the same service and pricing from the FX desk as clients do by dealing direct.

**3. Standing instructions.** Standing instructions automate the execution of FX transactions related to funding of securities purchases, repatriation of securities sales proceeds, income/redemption conversions, tax reclaims and corporate actions. Small FX activity such as income conversion can be handled automatically by custody operations personnel in New York or Brussels with the local FX desk for standing instructions.

**4. Internet-based FX trading platform, iFX Manager^℠.** iFX ManagerSM is our proprietary Internet-based, fully automated FX trade order management and execution system. It is a complete solution to overseeing FX spot, forward outright, and swap transactions real-time, whether for a single fund account or across a block of multiple fund accounts.



*The* BANK
*of* NEW YORK.

iFX Manager provides end-to-end automated trading, industry standard proven technology, and superior functionality. Our clients can trade manually and electronically using one system, as well as automate the entire workflow process - from preparation of trade requests to order management, trade execution, reporting and ticket input. The system also offers auditing and recordkeeping advantages, saves time and minimizes trade input errors.

> *iFX Manager is designed specifically for the sophisticated needs of fund managers who oversee numerous accounts with foreign exchange investment activities.*

## Market Intelligence for Currency Management

We also operate the world's first real-time, interactive, online global capital flows research tool - Interactive Portfolio Flow Monitor (iPFM). Simple and easy to use, iPFM is an Internet-based tool that provides real-time illustrations of cross-border capital flows, categorized by investment classes, which can be mapped against published market data such as FX rates, equity-market indices, and fixed-income government benchmark issues. Cross-border capital flow data is updated daily, as are FX rates and other market data.

> *We offer the most comprehensive suite of FX services available from a single provider. Our iFX products are available at gm.bankofny.com.*

Lastly, we offer a currency overlay product for custody clients who prefer to isolate currency exposure management from the asset investment process. The Bank of New York Overlay Associates offers Stationary Engineers a rigorous hedging solution that works iu tandem with asset allocation decisions to protect the value of returns earned in a home- or benchmark-currency.

**11.    Do you have multi-currency accounting and reporting capabilities? If yes, are reports available for the entire account as well as individual manager portfolios?**

Yes. Our multicurrency reports are available by individual manager, by fund, and in consolidated form for the entire relationship, and can be generated on either a trade-date or settlement-date basis as specified by Stationary Engineers. Accounting information is presented via a selection of schedules sorted by such characteristics as country, industry, asset class, transaction, etc. Reports reflect both base and local currency for all assets and transactions.

**12.    What enhancements have you recently made or plan to make to your global custody system?**

Kurt Woetzel, the Bank's Chief Information Officer, was named to IDG's Computerworld 100 IT Leaders List for 2005. Mr. Woetzel was selected from a pool of 600 candidates that represented a broad spectrum of industries and included many of the nation's top technologists. Mr. Woetzel's recognition as a Premier 100 IT Leader is testament to the success of our strategy and his position as a leader in the field of information technology.



*The* **BANK**
*of* **NEW YORK.**

The Bank is Capability Maturity Model (CMM) Level II and III certified. This is an important industry certification standard established by The Software Engineering Institute (SEI) at Carnegie Mellon University which measures improvements in firms' software engineering capabilities and fosters an adoption and sustained use of standards of excellence. It is testament to our technology application staff's implementation of exceptional capabilities for our clients.

The following are major technology enhancements implemented in the past three years:

| Year | System Enhancements |
|------|---------------------|
| 2005 | ▪ Launched online access to the TUCS database via INFORM. The Bank of New York is the only custodian that offers this capability; a product development from our strategic alliance with Wilshire Associates. |
|      | ▪ Established a partnership with London based Netik, LLC to provide integrated data warehousing and consolidated reporting technology and data management services. |
|      | ▪ Enhanced INFORM (the Bank's Internet portal) with a new homepage design, more intuitive global navigation for streamlined maneuverability, expanded documentation library, and instant notifications in the message center. |
|      | ▪ Completed conversion to SWIFTNet FIN. Introduced SWIFTNet FileAct for incoming iustructions. |
| 2004 | ▪ Introduced web-based proxy voting services through Automatic Data Processing's (ADP) ProxyEdge® to streamline and simplify the proxy voting process with electronic communications and consolidated status reporting, eliminating excess paperwork and manual ballot processing. |
|      | ▪ Enhanced class action status reporting via INFORM, (the Bank's Internet portal) enabling clients to monitor class actions and includes information such as the filing deadline date, claim status and the settlement amount received. |
|      | ▪ Launched commercial paper trading capabilities via our short-term investing website, MoneyFundsDIRECT.com, giving institutional investors a direct, single-source link to a broad selection of commercial paper programs and providing additional options for short-term investments, including several well-known money market funds. |
| 2003 | ▪ Enhanced INFORM reporting functionality for clients with improved report selection and screen displays, enhanced report creation and modification options, intuitive, contemporary screen design and navigation, and flexible customization and preference choices |
|      | ▪ Enhanced INFORM's Internet File Transfer Protocol to accept 15022 formatted instruction files. |



The BANK
of NEW YORK.

**13. What quality controls are in place to ensure the integrity of your operations?**

### Internal Auditing

The Bank's Internal Audit Division follows a risk based approach to its audit of risk in the operational, compliance, regulatory, technology, fraud, processing and other key risk areas of the Bank. Key risk categories are considered in each examination and we then establish the audit objectives and test to address components of these key risks and their corresponding controls. The Internal Audit Division is a separate division with unrestricted access to the Bank. It operates on a continual audit plan to conduct audits in every area of the Bank throughout the year. All findings and recommendations from these examinations are documented and presented to internal management and made available to external auditors and regulators.

There are three tracks for monitoring audit recommendations:

1) The Audit Division and Audit Committee, who ensure a consistent evaluation and reporting to Executive Management;

2) The Compliance Division, who works as a consultant to business managers to evaluate potential risks and to develop new business policies and procedures with appropriate operational controls; and,

3) Business Management, who is responsible for responding to the audit recommendations and for establishing target dates for implementing any necessary corrective action or policy or procedural changes.

Internal controls include:

- A Bankwide proving & aging system designed to provide a continuous monitoring to assure management that the Bank's internal control structure over financial reporting is functioning as designed. It also provides a continuous managerial tool to ensure that the Bank is in compliance with the Federal Deposit Insurance Corporation Improvement Act of 1991 (FDICIA).

- Trained and experienced custody professionals assigned to the Client Service Teams who are fully familiar with applicable regulations and approved and audited procedures.

- Built in controls throughout custody operations to track activity, reconcile transactions, validate transactions, track adherence to client predefined rules and provide management information reports.

- Regular audits of custody operations to ensure that approved procedures are consistently and properly followed.

- Regular reviews with the Client Service Team by Relationship Managers, covering such topics as timeliness and accuracy of reports, level of outstanding inquiries, or other specific indicators. Issues or comments from the client are discussed and action steps are developed to resolve outstanding issues.



*The* BANK
*of* NEW YORK.

- Review of subcustodians through our Subcustodian Control and Audit Questionnaire, which address, among other issues, the procedures for authenticating physical certificates and the recourse for lost and stolen securities.
- Risk management and oversight by the Board of Directors and two key Board Committees: the Audit and Examining Committee and the Risk Committee.

### External Auditing

Our independent public auditor, Ernst & Young conducts audits on a revolving basis. Ernst & Young maintains a staff at our headquarters to review procedures, financial reports and consult in the design of controls and policies.

In addition to reviewing the audits performed by our own internal auditing staff, Ernst & Young also conducts test counts of securities in our operating and vault areas, tracking transactions from the time they are initiated to completion, as well as the review of debits and credits passed to accounts to ensure proper authorization. Ernst &Young also audits our London, Brussels and Singapore operations.

Audits of the custody services areas are performed based on a risk based methodology over a three year cycle, however, all of the controls highlighted in the annual SAS 70 report are examined annually by internal audit to assist Ernst & Young. Exams performed over the last three-year cycle include the various operations support units for settlement and servicing processing, as well as the Administrative services areas supporting the client accounts on a daily basis.

As previously stated, the audit methodology is risk-based; therefore the scope of the examinations include risk areas appropriate to each function/process.



The BANK
of NEW YORK

# Securities Lending:

**1.    Do you provide a securities lending program? If so, for how long? Please provide a brief description of your services.**

Yes. The Bank of New York has been providing Securities Lending for over 28 years.

As one of the world's largest securities lenders, The Bank of New York is a powerful partner in the pursuit of incremental returns. The Bank of New York's securities lending services are uniquely positioned with a premiere custodial securities lending program and a major boutique style third-party lending program.    This combination has yielded program performance that is unsurpassed in the industry, while providing the flexibility that securities lending clients require. We customize an ongoing program for each client to optimize portfolio utilization against the intrinsic value opportunities available in the marketplace.

Securities Lending services are delivered by a self-contained business unit that provides all requisite capabilities, including trading, operations, collateral investment, administration and systems support. This approach eliminates interdepartmental "hand-offs", maximizing asset utilization and positioning the entire scope of the process to be delivered by a single operating unit. Our securities lending operation includes trading desks located in New York, London and Hong Kong to provide 24-hour worldwide market coverage to maximize loan opportunities.

Expertise, experience, professionalism and flexibility are the characteristics that best describe our securities lending services. We balance consistent earnings for our clients' portfolios while maintaining the highest risk management standards. The hallmark of our program is a disciplined approach to borrower risk as well as cash collateral investment management. Our methods are time tested and successful as demonstrated by a spotless record on borrower insolvency and a steady earnings stream to our lending clients.

As the leading securities clearing agent for broker/dealers worldwide, The Bank of New York's securities lending desks are often the first and last "call" for securities borrowers around the globe, thereby enhancing the lendability and potential earnings of our clients' portfolios.

There is no better evidence of our ability to deliver for our clients than our top rankings in independent surveys. These reflect the endorsement of our clients and their confidence in our ability to help them succeed. The Bank of New York ranked:

- #1 Overall Lender and #1 rankings in Income Generated, Settlements and Responsiveness to Recalls, Handling of Corporate Actions and Dividends, and Costs (Fees) (2005 *International Securities Finance/Global Investor*'s survey of beneficial owners)

- #1 overall in Securities Lending in *Global Custodian's* 2005 Global Custody Survey for the second consecutive year. Highest in client satisfaction among the major custodian securities lending programs in the annual survey for the last six consecutive years (*Global Custodian Magazine* 2000-2005).



*The* **BANK**
*of* **NEW YORK**

**2.      How many clients currently participate in your program?**

Today, 277 client relationships participate in The Bank of New York's securities lending program.

**3.      What is the total dollar amount of assets currently available for lending?**

The total dollar amount of assets available for lending 2005 ytd is $1.4 trillion

**4.      What type of assets do you accept as collateral, and what amounts of collateral are required?**

The Bank of New York accepts cash and U.S. Government securities as eligible collateral. High quality, Letters of Credit are accepted for only the 2% margin requirement when your guidelines permit their use. These forms of collateral became industry standard in 1985 under the recommendations of the Federal Financial Institutions Examination Council.

The Bank of New York's collateral requirements are in strict compliance with applicable regulatory as well as Stationary Engineers's guidelines. This enables Stationary Engineers to manage the level of risk taken in their lending activities according to their own parameters and requirements.

Stationary Engineers is permitted to customize its cash collateral investment guidelines within our program. Most clients permit the use of cash, securities and Letters of Credit as collateral for securities loans.

## U.S. Securities

We require 102% of market value plus accrued interest for fixed income securities and 102% for equities. The Bank of New York accepts cash and U.S. Government securities as eligible collateral. High quality, Letters of Credit are accepted for only the 2% margin requirement when your guidelines permit their use.

## Non-U.S. Securities

For non-U.S. securities, we require 105% when collateral is denominated in a currency other than that of the borrowed securities, protecting you against possible currency fluctuations, and 102% for like collateral (e.g., yen loans vs. yen collateral).



5. **How often do you adjust the level of collateral due to changes in the market value of borrowed securities?**

   Mark-to-market evaluations are performed daily, based upon the closing prices of the prior business day. Each day's mark-to-market shortfalls must be received from the borrower on a same day basis.

   All loans are marked-to-market daily using an independent pricing source (i.e., IDC - Interactive Data Corporation, Street Software - Matrix Priced Asset Backed and Collateralized Mortgage Obligations not priced by IDC, FT Interactive Data, Telerate, Bloomberg, Mueller and Extel) to ensure that the margin is properly maintained for the duration of your loan. For fixed income securities, accrued interest is always included in the valuation. We mark loans both at the aggregate level, as well as at the client and individual loan level.

   Daily marks-to-market are maintained at Stationary Engineers's account level by individual borrowers for U.S. Government loans and at the individual loan level for U.S. Corporate and Equity securities. If the value of the collateral falls below the minimum margin, a mark call is issued against the borrower either to terminate the loan(s) or to increase the collateral value. Margin is constantly monitored, thereby reducing marginal price risk.

   Non-U.S. loans on your behalf can be collateralized with cash (USD or other currencies, U.S. Governments or OECD central government securities depending on your preference). Letters of Credit may be used to cover the 2%/5% collateral margin. The advantage of denominating the underlying collateral in the same currency as the lent securities is that it eliminates the foreign exchange fluctuation risk and provides borrowers with a broader range of acceptable collateral.

   In all markets, mark-to-market evaluations are based upon the previous business day's closing price.

6. **What systems and procedures are in place to ensure that cash collateral is managed in conformance with the client's investment policy? Please provide investment objectives for any collateral investment pool.**

   All of The Bank of New York's securities lending systems are designed to require strict adherence to investment guidelines, borrower limits, lending limits, credit limits, and all other bank or client defined limits or restrictions. These guidelines parameters are developed jointly between The Bank of New York and Stationary Engineers, and would be incorporated into an investment strategy designed to give proper balance between maximizing returns and minimizing risk. The Bank of New York's portfolio management system maintains all client-approved investment parameters on a direct control basis and prohibits the booking of an investment which falls outside your approved guidelines. Any transaction, which is rejected by the system from your account, is immediately routed to a compliance officer for a complete review. In addition, your account officer reviews the investments in your portfolio on a daily basis for appropriateness.



*The* **BANK**
*of* **NEW YORK**

Additionally, through the proprietary INFORM Compliance Monitoring software, the Bank is able to monitor portfolio manager's adherence to the plan's investment objectives on a daily, weekly, or monthly basis. This information is generated post-trade. The product is guidelines driven to reflect the plan specific rules. The guidelines can be paired to individual portfolio or groups of accounts as needed. Stationary Engineers can schedule detailed or summary reports as needed, along with e-mail notification to specified addresses for violation notification. A sample is provided in Tab XII for your review.

We invest separately for each client in our program. Our clients set their own investment objectives.

**7. How many brokers (borrowers) are approved for participation in the program? How is credit worthiness evaluated? How often is this information reviewed?**

The Bank of New York has over 100 approved borrowers for securities lending in its program, all of which are active.

> *As one of the largest sources of bank credit to the global securities industry, we believe our Credit Evaluation and Approval process is second to none in the world. The Bank of New York's long Wall Street history, our unique position as a major dealer clearance bank, and our experience with the broker/dealer community positions the Bank with preeminent credit expertise related to the securities industry.*

### Credit Review

We perform credit reviews on an ongoing basis, in some cases as frequently as monthly, since the firms involved have various facilities and services with us. The Securities Industry Banking Division is responsible for credit analysis and borrower approval. The Division is staffed with 12 experienced Credit Officers who perform all credit reviews, establish lending limits by borrower and constantly monitor the Bank's exposure to the dealer community. This Division operates independently from our Securities Lending Division. Credit reviews include an analysis of the broker's financial statements and FOCUS reports, centering on capital adequacy, quality of earnings, assessment of management and business reputation. In addition, the Bank's Securities Industry Banking Division and the Financial Institution Credit Committee review all borrower limits formally on a quarterly basis or as circumstances dictate. Credit limit usage is monitored daily to ensure compliance with established limits.

The Bank of New York's Financial Institutions Credit Committee sets pre-established limits for each broker upon recommendation from the Securities Industry Banking Division. Our limits vary depending on the type of loan and collateral pledged and a borrower may have various limits for each type of lending program it participates in at the Bank (i.e., U.S. treasury, corporate, non-U.S.D. fixed income). Under the Bank's program, you can choose to select specific borrowers from our approved list and set your own lending limits for each borrower. We will then operate within yonr pre-established lending limits. This feature enables you to control overall exposure to a given borrower totally independent of the Bank or any other participant in the program. Since The Bank of New York provides extensive indemnification, virtually all clients permit use of all approved borrowers to maximize lending opportunities.



*The* BANK
*of* NEW YORK.

Brokers have been removed from the approved list when their financial stability did not meet the Bank's credit standards.

**8.      How are borrowers' lending limits determined?  What is the maximum value of assets that can be lent to a single approved borrower?**

Our Financial Institutions Credit Committee sets pre-established limits for each borrower upon recommendation from the Securities Industry Banking Division. Those limits vary depending on the type of loan and collateral pledged, and a borrower may have various limits for each type of lending program it participates in at the Bank (i.e., U.S. treasury, corporate, non-USD fixed income).

Under the Bank's program, you can choose to select specific borrowers from the Bank's approved list and set your own lending limits for each borrower. We will then operate within your pre-established lending limits. This feature enables you to control overall exposure to a given borrower totally independent of the Bank or any other participant in the program. Since The Bank of New York provides extensive indemnification, virtually all clients permit use of all approved borrowers to maximize lending opportunities.

**9.      Have any collateral investments entered into default in your securities lending program during the past five years?  If so, please explain the circumstances of the default, recovery of investment, allocation of loss, etc.  Did any participants incur a loss?  Were there any adjustments made to your investment guidelines/policies to avoid a similar problem?**

During the past five years we have never experienced a situation where an investment we purchased on behalf of a client defaulted.

**10.     Does your organization offer indemnification against losses to lending participants?  If so, please describe.**

The Bank of New York offers full protection from borrower insolvency and default. If insolvency renders a borrower unable to return your securities, the Bank, at its own risk and expense, will pay the difference between the cost to purchase the loaned securities and the value of the borrower's collateral. This insulates you from any direct credit/insolvency risk to the borrower of its securities. We have never experienced a situation where a borrower default caused the Bank to invoke this indemnification.

The Bank of New York offers protection to you from the direct expenses related to those events of simple default, which may develop from the tardy delivery of a security that you have sold. In such agreements, The Bank of New York agrees to be responsible for the sale proceeds and buy-in expenses, if any, directly attributable to the borrower's tardy return of a security.



*The* BANK *of* NEW YORK.

Additionally The Bank of New York is responsible for performing daily marks-to-market, ensuring proper eollateralization (both percent of market value and type of collateral), and compliance with your reinvestment guidelines.

The types of indemnification described would apply to both domestic and international securities lending.

**11.    Describe any additional safeguards of your program.**

Within our Securities Lending Services offering, a dedicated Risk Management and Compliance Team establishes and enforces risk management and compliance guidelines. Policies and procedures and control metrics are presented daily to management to ensure activities are within established operating standards. Additional groups that monitor our securities lending activities are the *Risk Management & Oversight Committee* (which monitors compliance) and the *Securities Industry Group* (which evaluates and approves borrowers and borrower credit limits). The Bank's *Asset Liability Committee* (ALCO), comprised of the Bank's Chairman and Chief Executive Officer, President, Chief Financial Officer, Chief Credit Officer, and other executive members of the Management Committee are responsible for monitoring the Bank's exposures worldwide.

For the management of cash collateral, to ensure that all of the Bank's internal credit and market expertise is properly coordinated with the information available from S&P, Moody's, Reuters, and Bloomberg that supports our investing process, there is an Investment Research Group dedicated to the oversight, review and monitoring of the cash investments utilized for our securities lending clients, housed within the Bank's Portfolio Risk Management area, which reports to the Bank's Chief Risk Policy Officer. This Group is well versed in the measurement and management of diverse credit risk and incorporates leading edge quantitative analysis in the day-to-day monitoring of the client investment portfolio.

On a weekly basis, the Division presents the current interest rate and credit risk position of the overall securities lending portfolio and reviews current market conditions and investments made with the cash collateral on behalf of our client base. This enables us to evaluate asset and liability GAP and to use Value-at-Risk (VaR) Analysis to measure the risk profile of the Program.

The Bank of New York also actively monitors local international lending risks through the expertise of its Global Network Management resources. Country experts provide comprehensive tax, legal, regulatory and settlement information prior to approval of a new country. Local counsel or consultants are utilized when appropriate

In trading the Stationary Engineers portfolio, any market with a high fail rate or restrictive buy-in practices will not be approved for lending. Additionally, lenders are protected by our ability to reallocate loans amongst other participants, and the maintenance of country-specific buffers to optimize liquidity for timely delivery of sales.



*The* BANK
*of* NEW YORK.

If a security is failing to be returned as a result of a sale, the Bank will initiate a buy-in order in accordance with the terms of the Lender's and or Borrower's Agreement, and is responsihle for all buy-in expenses directly attrihutahle to the borrower's late return of securities.

**12.     What reports do clients receive, and how often are reports provided?**

The Bank of New York's client reporting capabilities are second to none. As a demonstration of our ability to successfully deliver information to our clients, the Bank ranked #1 in reporting overall in *Global Custodian's* 2005 and 2004 Global Custody surveys. The Bank ranked #1 and #2 for Transparency/Client Reporting in the 2004 and 2005 *Institutional Securities Finance/Global Investor* ranking of securities lending agents, respectively.

Our state-of-the-art client reporting engine consolidates information from our lending and investment systems and provides clients with the most comprehensive, detailed reporting in the industry. These reports are designed to provide clients with information to monitor the performance of their program and are available on-line through INFORM, our Internet based reporting platform. This gives you control over the monitoring process in order to review returns, track loans and collateral reinvestment, monitor risk exposure and ensure compliance with your guidelines.

With INFORM you can upload key data elements to customize reporting and populate your internal securities lending database. Information is provided daily and monthly as well as annually for clients required to file under GASB.

The following list represents the most commonly used reports by our clients. Monthly securities lending reports are available on the first day of the following month, with the exception of earnings statements, which are available by the 10th business day.

| Securities Lending Reports | | | |
|---|---|---|---|
| **Report** | **Frequency / Update** | **Medium** | **Content** |
| Asset/Liability Report | Daily | INFORM | Summary comparison of loans to reinvestments displaying liquidity of cash collateral portfolio as well as interest rate risk. |
| Client Collateral-Summary by Broker Report | Daily | INFORM | Summarizes value of collateral versus loans at borrower level and total portfolio. |
| Loan Summary Report | Daily | INFORM | Loan information displayed by borrower includes CUSIP, security description, quantity, date loan was initiated, if term return date, Nominal Value lent, current price and market value, total collateral value and collateral percentages. |



*The* BANK
*of* NEW YORK.

| | | | **Securities Lending Reports** |
| --- | --- | --- | --- |
| **Report** | **Frequency / Update** | **Medium** | **Content** |
| Non-Cash Collateral Report | Daily | INFORM | Summarizes loans at borrower level, providing loan & collateral information; loan ID, settlement currency, CUSIP, security description, price, quantity, and market value. Summary shows total loan exposnre and total collateral and collateral percentage. |
| Asset Analysis | Daily | INFORM | Summarizes cash collateral investments posture on a mark-to-market basis and provides weighted average reset/matnrity. |
| Investment Details Report | Daily | INFORM | Displays the specific cash collateral investments made within an asset class. (Time Deposits, Commercial Paper, etc.) Provides elements snch as purchase cost, amortized cost, par/face amount, ratings, maturity, reset dates and yield. |
| Utilization Reports (Detail or Summary Versions) | Daily | INFORM | Daily and month-to-date report displaying utilization by asset class (corporate, equity, government, global) and snmmarizing overall portfolio utilization percentages and values. |
| Customer Income Summary Reports | Daily | INFORM | Daily and month to date report displaying unaudited earnings/outstandings/spreads by asset classes. |
| Client Issuer Percentages | Daily | INFORM | Evidences compliance of any diversification requirements and displays issuer exposure. |
| Management Summary | Monthly | Electronic | One-Page Snapshot Summarizing Earnings by Asset Type, Ontstanding Loans, & Spreads in Chart Format. |

Please refer to Tab XIII for our sample INFORM Securities Lending Reports.

13. **How are loans apportioned between client accounts?**

Loans are allocated to our clients via a single automated queuing system. However, the queue is largely immaterial to lending U.S. Treasury securities in our program, as we typically achieve 85-95% utilization for those accounts with no restriction on the amount of those securities on loan.



*The* BANK *of* NEW YORK.

### Loan Allocation Methodology (Queue Processing)

The Bank of New York utilizes an industry-accepted standard to allocate loans equally among its lending clients. This method, known as the "Day Dollar Allocation," provides for equitable distribution of loan opportunities and earnings potential among holders of securities. This allocation process has been reviewed by the Bank's internal and external auditors, as well as the Federal Reserve Bank, and has been deemed to provide fair treatment for all participating clients. The basis for this allocation is the entry into a "queue," which systematically determines how you will participate in loan activity. The Bank of New York's single automated queuing system will determine entitlement, and assign your position in the queue. Your position in the queue is determined by the following factors:

- Separate "queue" for each business line (government/corporate).

- "Entitlement" is determined by your percentage in a given CUSIP/ISIN and totaled to the portfolio (custody account level).

- "On Loan" is determined by your holding of the security and position in the queue.

- A "Queue Factor" is calculated and this factor is then sorted in ascending order (\$ amount) - largest negative to zero - smallest positive to largest positive. This process is only accomplished through the nightly batch cycle.

- Cumulative totals are maintained for each day a loan is outstanding for a given CUSIP/ISIN.

- Loan limits are not part of the "queue" creation. They are invoked when a loan is being processed.

### 14. Please provide three securities lending client references.

**Masters, Mates & Pilots**
700 Maritime Boulevard
Linthicum Heights, MD 21090
Contact: Ms. Valerie Verrechio, Administrator
Phone: 410.850.8600

**PACE Industry Union -Management Pension Fund**
3320 Perimeter Hill Drive
Nashville, TN.
Contact: Ms. Maria F. Wieck, CPA, CEBS
Administrative Officer
Phone: 615.333.5762

**Sheet Metal Workers' National Pension Fund**
601 North Fairfax Street - Suite 500
Alexandria, VA 22314
Contact: Mr. Mark Patrick, Director of Finance
Phone: 703.739.7001



The BANK of NEW YORK.

**15.    Please provide an estimate of the yearly gross income that your firm could be expected to generate from the lending of securities held in the Trusts' portfolios.**

We would be happy to provide an earnings estimate upon receipt of a list of eligible securities in excel format.

**16.    What percentage of lending revenue identified in the previous answer would be received by the client?**

Earnings split are determined after a review of the eligible securities and your cash collateral investment guidelines.



The BANK
of NEW YORK.

# Transition Management:

1. **What dedicated resources (personnel, consultants, etc.), procedures and controls will you provide or recommend in the transition/conversion period to ensure that the transition process is completed successfully?**

An organized approach complemented by documented procedures and proven practices that ensure the timely, and controlled conversion of trustee/custodial responsibilities and the smooth transfer of assets to The Bank of New York. They include the following:

Stationary Engineers's Client Service Team that is responsible for the transition's project management. They manage the planning and execution of the conversion so they can more effectively engineer client-specific solutions from the start of your relationship with BNY. More importantly, because your Client Service Team manages the conversion and is responsible for its results, our approach provides you the advantage of a team whose knowledge, understanding and insight about your needs from day one continues ongoing in daily servicing on the effective date. We have found that this approach is the most beneficial to both of our organizations and fits with our philosophy of truly partnering with clients.

A Client Service Team supported by experienced and seasoned professionals from Client Service Management, Network Management, Global Risk Services, Investment Manager Services, and our Client Technology Team to ensure we address all portfolio servicing, training and equipment requirements, and electronic interface requirements for your staff and any third parties.

Pre-conversion meetings and plans with Stationary Engineers include a thorough review identifying all personnel affected, their involvement in the development of procedures, equipment requirements, and the orientation and training required.

A detailed transition project plan is presented to you for approval prior to the conversion, and a mutually agreed upon strategy is developed. The finalized plan includes all conversion tasks, completion dates and responsible parties for each event. We include any consultants and money managers in conversion planning to establish relationships and fully evaluate reporting and service needs.

Exception reports and status meetings keep management in both organizations apprised of the progress in meeting each task throughout the conversion planning and execution. This includes a follow-up meeting to ensure all conversion activities are completed.

Careful monitoring of all activity, review of reports, and constant communication with Stationary Engineers, prior trustee/custodian and any third parties during the transition period. As a result of extensive planning prior to conversion date, we have been able to prevent problems with transactions and claims in process.



*The* BANK
*of* NEW YORK.

Specifically, we will:

- Establish the dates when BNY is legal trustee/custodian and securities processing responsibilities for the assets to be transitioned to BNY.

- Agree with Stationary Engineers to settle all trades at BNY on and after that date (for the assets to be transitioned, prior trades settle at the incumbent trustee/custodian). Any purchases settling on conversion date will settle at BNY, any sales settling on conversion date will settle at the incumbent trustee/custodian.

- Ensure timely receipt of all principal and income payments from the incumbent trustee/custodian due Stationary Engineers during the conversion month for all securities where there is a delay between entitlement and payment, such as mortgage-backed securities.

- Verify (match-off) all transactions established on BNY's core processing platform verses the actual securities transferred from the incumbent custodian.

- Monitor pending transactions for accurate settlement at BNY.

- Communicate between Stationary Engineers's staff/incumbent trustee/custodian/investment managers and BNY to ensure full investment of cash balances.

- Review daily transaction statements from the incumbent trustee/custodian for at least 30 days before and after conversion date to ensure that all incoming cash is properly reported on BNY's system.

- Undertake an audit of the incumbent trustee/custodian's audited accounting reports for the month-end prior to conversion date, to the transaction and position information posted onto BNY's system and investigate and resolve discrepancies.

## 2. Describe any training you would provide to the client's staff during the transition.

### Initial Training

Every new client receives comprehensive training to orient them to the Bank's on-line and Internet-based services as well as operating procedures. Training is scheduled to ensure a comfortable knowledge level of procedures, reports and on-line services. The Client Technology Team provides assistance, training and consulting during the course of the relationship, as required.

Your Custody Relationship Manager will work with you to schedule a comprehensive training session on INFORM by our Client Technology Team at a time that is convenient to you after the initial transition of assets. Most clients prefer to conduct the training session at the same time as the on site post-transition review, which is conducted by the Custody Relationship Manager seven to eight weeks after the assets have been transferred to The Bank of New York.



The BANK
of NEW YORK

Our Client Technology Team provides complete on-site installation and training for all technology implementation. There is no cost associated with these training services. Training is provided in the following areas:

- Functionality of our Internet portal, INFORM (e.g., what it does and how it is used)
- Advanced applications- (e.g., querying, custom report creation, export function raw data file extracts)
- On-line instruction entry

### Ongoing Training

Ensuring our clients are kept informed of new industry practices, techniques and other trends, as well as market issues, new products/services and enhancements, is a top priority. We will share information with Stationary Engineers in several forms, including regular meetings, training sessions, client conferences, publications and information available on the Bank's Web site.

Through The Bank of New York Learning and Development Center, we offer **customized training sessions** in either our offices or yours. A typical session might highlight industry initiatives and economic trends or specific service offerings of interest to our existing and prospective custody clients. These training sessions allow us to bring product experts, Custody Relationship Managers and Senior Management to our local client base. Adding further value to these sessions, The New York State Board of Public Accountancy recently gave the Bank approval to award CPE credits to Certified Public Accountants and Public Accountants upon completion of certain Bank-sponsored courses.

The Client Technology Team offers **systems training**, from the navigational basics to the sophisticated query and ReportWriter techniques of INFORM. We also provide training for other applications and related technology consulting to address your specific information delivery needs.

We also educate and inform our clients through a series of **publications** designed to update clients on current issues, operating procedures in the markets, product enhancements and economic research.

Our Investment Manager Services (IMS) Group supports your external investment managers to ensure that they are familiar using INFORM. The IMS Group also customizes overall reporting packages and provides ongoing support as your managers' information and staff training needs change.



The BANK
of NEW YORK

**3.    How do you ensure sufficient control during the transition period to assure that the process is successfully completed in both an accurate and timely manner?**

Stationary Engineers's timeframe and service requirements govern our conversion approach. The planning process begins upon appointment as successor custodian. Careful planning, an accountable migration strategy, on-site resources, consistent communication and key deliverables ensure a smooth conversion.

> *The involvement of Stationary Engineers's Client Service Team during the conversion is critical to ensure complete familiarity with your organization from the onset and to create a framework for long-term continuity of service.*

### Conversion Project Management

Your Relationship Manager and Client Service Team work closely with the Bank's dedicated Transition Team to manage the process to ensure a smooth conversion and reconcilement of activity. Other participants include specialists from Client Service Management, Network Management, Global Risk Services, Investment Manager Services, Securities Lending, and our Client Technology Team to ensure all service and interface requirements are established.

Your Client Service Team is responsible for the conversion's results, which provides you the advantage of a team whose knowledge, understanding and insight about your needs continues ongoing in daily servicing on the effective date. This also enables them to more effectively engineer client-specific solutions from the start of your relationship with BNY.

We meet with you to discuss your specific servicing needs and then define and develop the conversion project plan to address all portfolio servicing and electronic interface requirements. The conversion project plan is client specific, carefully detailing required services and tasks unique to your relationship. The plan outlines an accountable migration strategy to denote major milestones, identify key deliverables and mitigate any operational risks that may result during a conversion.

The ability of the Stationary Engineers to continue trading throughout the process is paramount and the conversion project plan outlines specific procedures to ensure trading and settlement continues in a controlled environment. We reconcile all assets received with the Stationary Engineers's and prior custodian's records for exception processing and resolution. All income due from the prior trustee/custodian from previous record dates is reconciled by asset as it is received.

**4.    Please provide a sample transition schedule.**

Please refer to Tab XIV for a Sample Transition Schedule



*The* BANK
*of* NEW YORK.

# **Fees:**

**1.     Please provide a detailed annual fee quote for custody services (domestic and global), including a securities lending income estimate.**

Please refer to Tab III for our proposed custody fee. We would be happy to provide an earnings estimate upon receipt of a list of eligible securities in excel format.

**2.     Please provide a detailed monthly fee quote for commercial banking services. (A copy of our most recent Account Analysis statement is attached.)**

We no longer offer this service, but we would be willing to work with any commercial bank The Plans are currently using.

**3.     How long do you typically guarantee custodial and commercial banking fee quotes?**

We typically guarantee the structure of our fee schedules for a period of three years from the effective date.



*The* BANK *of* NEW YORK.

# EXHIBIT C

# THE BANK OF NEW YORK

## FOREIGN EXCHANGE POLICIES AND PROCEDURES
## FOR ERISA PLANS

These Policies and Procedures apply to foreign exchange ("FX") transactions between The Bank of New York or any of its affiliates ("BNY") and any employee benefit plan (a "Plan") covered by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), where BNY acts as a trustee, custodian, or fiduciary for the Plan, or other party-in-interest under ERISA ("FX Transactions").

These Policies and Procedures are issued pursuant to U.S. Department of Labor Prohibited Transaction Class Exemptions 94-20 and 98-54, which established requirements for certain directed FX Transactions and FX Transactions pursuant to standing instructions.

Subject to the Legal Department's approval of the use of any other exemption from ERISA's prohibited transaction rules, these Policies and Procedures are the exclusive means by which BNY may enter into an FX Transaction with a Plan.

These Policies and Procedures apply to:

1. <u>Directed Transactions</u>.  An FX Transaction will be considered a directed transaction where an independent Plan fiduciary that has not been appointed by BNY directs BNY to effect an FX Transaction relating to the exchange of a specific amount of currency of one nation for the currency of another nation at a specific exchange rate in connection with a transaction involving the assets of a Plan.  For avoidance of doubt, directed transactions will, in addition to transactions executed through such traditional means as the telephone, include (i) any such FX Transaction initiated and executed by a Plan fiduciary through an electronic service provided by BNY if it otherwise meets the criteria for directed FX Transactions; and (ii) any such FX Transaction initiated and executed by a Plan fiduciary in excess of $300,000 which might otherwise be construed as a Standing Instruction transaction provided that BNY has displayed a rate on its website concurrent with each fixing time at which a Standing Instruction transaction may be executed, and the Plan fiduciary has not exercised its option to cancel such FX transaction within one hour of the respective fixing time as allowed by these Policies and Procedures.  These Policies and Procedures will be delivered to the Plan fiduciary for the purpose of advising the Plan that such trades shall be deemed directed transactions, and obtaining approval of the Policy and Procedures with respect to the mechanism by which the Plan fiduciary can assess a pending transaction and renegotiate its terms if desired.

2. <u>Standing Instructions for Income Item Conversions Equal to or Less than $300,000</u>.  An FX Transaction may be effected pursuant to standing instructions of an independent Plan fiduciary for purposes of income item conversions in an amount of no more than US $300,000 or the equivalent thereof.  An income item conversion means the conversion into US dollars or other currency of any amount of interest, dividends or other distributions or payments with respect to a security, tax reclaims, proceeds from dispositions of rights,

1

fractional shares or other similar items denominated in the currency of another nation that are received by BNY on behalf of the Plan from the Plan's foreign investment portfolio. All FX transactions executed by a Plan fiduciary in excess of $300,000 should be handled as directed transactions.

3. <u>Standing Instructions for "de minimis" Purchase or Sale FX Transactions</u>.  An FX Transaction may be effected pursuant to standing instructions of an independent Plan fiduciary for the purchase or sale of foreign securities in an amount of no more than US $300,000 or the equivalent thereof in connection with the purchase or sale of foreign securities by a Plan.

The procedures applicable to FX Transactions with a Plan are as follows:

**General Provisions**

1. Directed FX Transactions must be authorized by an independent Plan fiduciary not appointed by BNY on a transaction by transaction basis.

2. BNY may not engage in FX Transactions in any instance when BNY has discretionary investment authority or control with respect to the investment of Plan assets, or when it renders investment advice with respect to Plan assets.

3. A list of all Plans for which BNY may provide FX services shall be available to all FX traders.

4. The terms of FX Transactions with any Plan shall not be less favorable to the Plan than terms offered by BNY to unrelated parties in a comparable arm's length FX Transaction.

5. BNY shall provide a copy of these Policies and Procedures to all Plan investment fiduciaries that require FX services.  In order to provide FX trading under standing instructions, as provided below, the investment fiduciary must specifically approve these Policies in writing. Once given, such approval shall continue in force until these Policies are materially amended as to FX rates or availability or the investment fiduciary revokes the approval in writing. Amendments to these Policies and Procedures may be made at any time by BNY and will be provided in writing to those fiduciaries that have previously approved the Policies and Procedures in writing.

6. Investment fiduciaries are hereby advised, by receipt of these Policies and Procedures, that Plans may obtain foreign exchange services from sources other than BNY.

7. Records sufficient to track compliance with these Policies will be maintained within the jurisdiction of the United States government for a period of at least six years from the date of the transactions and will be available for examination, on reasonable notice, to:

   a. Plan fiduciaries with authority over the assets involved in the FX Transaction, or any authorized employee or representative of the Plan;

  b. Authorized representatives of employers contributing to the Plan involved in the FX Transaction; and

  c. Authorized representatives of the Department of Labor or the Internal Revenue Service.  Records to be kept shall include information provided in confirmations.

(Standing instructions will be maintained for so long as the account is active.)

## Directed Transactions

The independent Plan fiduciary usually issues directions by calling the FX Transaction Desk directly.  It may also issue directions to BNY for FX Transactions with BNY through the relevant custody/fiduciary area, however.  If a transaction is effected through that area, all essential terms must be communicated by the area to the BNY FX Transaction Desk. The Plan fiduciary will have access to the range of rates that would be applicable to the anticipated transaction and have the opportunity to renegotiate it within a reasonable period of time, as determined by the Transaction Desk.  FX Transactions conducted through the relevant custody/fiduciary area will be subject to operational time restraints as communicated by the BNY FX Transaction Desk.

### Directed Transaction Confirmations

BNY shall issue a written confirmation for every directed FX Transaction with a Plan to the independent Plan fiduciary that directed the transaction within five business days of contract execution.  Each such confirmation shall contain the following information:

  a. account name;
  b. transaction date;
  c. settlement date;
  d. exchange rate(s);
  e. currencies exchanged, including:

    (i) identity of currency sold
    (ii) amount sold (or, in the case of income conversions, amount of currency received);
    (iii) identity of currency purchased
    (iv) amount of currency purchased

## Standing Instructions

When required by an independent Plan fiduciary, BNY provides FX services pursuant to standing instructions to benefit Plans and Plan participants through income item conversions and de minimis purchases and sales.  A "de minimis" purchase or sale means currency purchased or sold valued (as of the execution date) at US $300,000 or less.  Income item conversions are also subject to this limitation as to amount.

3

Additional requirements for standing instructions are as follows:

1. All standing instructions to transact income item conversions or "de minimis" purchases or sales must be in writing from an independent Plan fiduciary and must identify the currencies from which FX Transactions may be executed (which shall include only currencies for assets which BNY acts as custodian, including through a subcustodian).  Such written instructions shall continue in force until terminated by either BNY or the fiduciary without penalty upon up to 10 days prior notice.

2. The method for determining the rates at which FX Transactions will be executed under standing instructions will be provided to Plan fiduciaries as follows:

   a. Orders will be transmitted by the custody/fiduciary area through an internal system, which will identify the transaction to the BNY FX Transaction Desk (the "Brussels Desk in the case of income items, the Brussels Desk or the "NY Desk" for purchases or sales) as an "ERISA transaction" (or to this effect).  The range of rates at which the Brussels Desk will transact income item conversions (which transactions will usually occur on the business day prior to the settlement date for the income items) and either Desk will transact purchase/sale transactions (which transactions will usually occur on the business day received by the Desk) will be posted in BNY's website, and independent Plan fiduciaries are hereby given notice to such effect.  Rates will be posted at 9:00 a.m., 11:00 a.m. and 3:00 p.m. New York time.  A buy and sell rate establishing the range will be posted for each unrestricted currency.

   b. All income item conversions will be bundled by the relevant custody/fiduciary area with other like FX Transactions and executed by the Brussels Desk at 5:00 p.m. Brussels time (11:00 a.m. New York time) at or within the range of buy/sell rates in effect at 11:00 a.m. New York time and posted on the website. The bundling of FX Transactions is done to achieve better rates for the benefit of clients.  (For short periods during the year, there may be changes to the timing above as the result of daylight savings time changeover mismatches.)

   c. Orders relating to purchases and sales will be executed by the Brussels Desk or the NY Desk, as selected by the relevant custody/fiduciary area.  If the order is received by the relevant Desk at least one-half hour prior to a fixing, it will be executed at or within the range established by such buy/sell rates next in effect. Independent Plan fiduciaries will be allowed to cancel such executions if the relevant Desk receives the cancellation order no later than one hour after the fixing (and there remains enough time to execute the cancellation prior to expiration of the one hour grace period).  (This right to cancel is not available for income items because of the manner in which they are executed.)

   d. Rates will not be published for restricted currencies, which do not freely trade. Instead, such currencies will simply be listed in the website, and transactions in such currencies will be executed according to market practice.

3. In all cases actual rates for FX Transactions will be tested by the daily run flagging Transactions with rates more than 3% over or under the WM Fixing Rate for each applicable fixing time (9:00am, 11:00am and 3:00pm).  Transactions so flagged will be investigated and any action deemed necessary will be taken to assure compliance with these Policies and Procedures.

4. In all cases, BNY reserves the right to advise independent Plan fiduciaries in a timely manner during, or in advance of, a business day that it will not provide FX for a particular currency or in a particular market under standing instructions.  In such cases, FX may be provided pursuant to direction or by third parties selected by the fiduciary.

5. In the case of income item conversions, the execution date depends on the posting date of the relevant income.  In "as collected" markets, the execution date is the date the funds are received.  The FX Transaction is usually executed on that day (at the rate at 11:00 a.m. New York time), but in the case of restricted currencies, execution may take place the following day.  Purchase/sale transactions will be executed on the day of receipt if received early enough in the day (local time) by the relevant Desk.

6. With respect to FX Transactions provided under standing instructions, a confirmation, ticket, or advice of receipt (written or in electronic form) will be issued to the independent Plan fiduciary within five business days of the date the FX Transaction was executed, and will contain the same information as that for directed transactions.

# EXHIBIT D

**SECURITIES SERVICING**

CUSTODY SERVICES

Investment Manager Services Welcome Package
for U.S. Investment Managers

Global Custody

APRIL 2007

**Table of Contents**

| Section | | Page |
|---|---|---|
| I. | Introduction | 1 |
| II. | Organization/Account Information | 2 |
| III. | Required Documentation | 4 |
| IV. | Receive And Deliver Instructions | 19 |
| V. | Treasury Services | 24 |
| VI. | Pricing Services | 39 |
| VII. | Corporate Actions and Proxy Voting | 41 |
| VIII. | Tax Reclamation | 43 |
| IX. | Electronic Interfaces and On-Line Services | 44 |
| X. | Reporting | 47 |
| XI. | Global Network | 49 |
| XII. | Appendices | 52 |

# I.  Introduction

The Bank of New York has been appointed custodian for the accounts listed in Section II.  The following welcome package provides Bank of New York contact information, required documentation that must be completed and signed by an authorized individual at your firm, trade instructions and other important information.

Your primary contact at The Bank of New York is the Investment Manager Services (IMS) Account Officer; contact information is listed in Section II.

As market information contained in this package changes, updates will be distributed.  The information contained in this package supersedes all previous editions.  If you manage money for multiple accounts, please list each account name and corresponding account number on all standard letters and purchase/sale orders.

We look forward to working with you and your representatives.

## II.   Organization/Account Information

### The Bank of New York
### Investment Manager Services (IMS) Team

| | |
|---|---|
| **IMS Relationship Manager** | Name, *Title* <br> Street address <br> City, state  zip code <br> Phone:  Fax: <br> Email: |
| **IMS Group Manager** | Name, *Title* <br> Street address <br> City, state  zip code <br> Phone:  Fax: <br> Email: |
| **IMS Team Manager** | Name, *Title* <br> Street address <br> City, state  zip code <br> Phone:  Fax: <br> Email: |
| **IMS Account Officer** | Name, *Title* <br> Street address <br> City, state  zip code <br> Phone:  Fax: <br> Email: |
| **Technology Services Officer** | Name, *Title* <br> Street address <br> City, state  zip code <br> Phone:  Fax: <br> Email: |
| **Corporate Actions Officer** | Name, *Title* <br> Street address <br> City, state  zip code <br> Phone:  Fax: <br> Email: |
| **Foreign Exchange Trading Desk in New York** | Robert Ryan, *Managing Director* <br> Email : rryan@bankofny.com <br> David Babbitt, *Vice President* <br> email: dbabbitt@bankofny.com <br> phone: 212.804.2260 <br> fax: 212.495.0111 |

## ACCOUNT INFORMATION

| Account Name: | Account Number(s) | Tax/Trust ID Number(s) |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

*Note: All correspondences must clearly indicate the account title and number. It is important to note that the six (6) digits in the account number must not be hyphenated or have any spaces between digits. Kindly instruct your brokers to use this information when communicating with us.*

# III. Required Documentation

Please complete and return originals of the following legal documentation to The Bank of New York on your letterhead. Each document must be signed by an authorized representative of your firm.

INCUMBENCY AND SIGNATURE CERTIFICATE ....................... 5

STANDARD LETTER OF AGREEMENT .......................................... 6

ERISA LETTER ................................................................................ 8

U.S. DOLLAR SHORT TERM INVESTMENTS ............................. 11

TRADE NOTIFICATION ................................................................ 12

CORPORATE ACTIONS PROCESSING .......................................... 13

PROXY PROCESSING ..................................................................... 14

ACCOUNT REPORTING ................................................................. 15

INFORM HARDWARE SURVEY ....**Error! Bookmark not defined.**

SWIFT REPORTING ....................................................................... 18

## *INCUMBENCY AND SIGNATURE CERTIFICATE*

*(Produce on your letterhead)*

[Date]

To: The Bank of New York

Re: _____ (Account Name)

_____ (Account Number)

The undersigned hereby certifies to The Bank of New York that I am a senior official of
_____ ("Investment Manager"), a [corporation/partnership/limited
liability company] (Include applicable description) established pursuant to the laws of _____,
and that as such I am duly authorized to execute this Certificate on behalf of the Investment Manager, and
further certifies that each of the following persons, as of the date hereof, is duly authorized to issue
instructions, and otherwise direct you in respect to the above referenced account and that the signature of
each such person appearing opposite such person's name below is such person's own true signature.

| **Name** | **Title** | **Signature** |
|----------|-----------|---------------|
|          |           |               |
|          |           |               |
|          |           |               |
|          |           |               |

The undersigned hereby confirms such Certificate on the date hereof.

_____

Name:
Title:

Attest:

_____

Name

## *STANDARD LETTER OF AGREEMENT*

*(Produce on your letterhead)*

*[Date]*

IMS Team Manager
The Bank of New York
2 Hanson Place, 7th Floor
Brooklyn, New York 11217

Re:                    Account Name:

                       Account #:

                       ID Agent Bank # 93034

Dear IMS Team Manager:

The undersigned has been appointed Investment Manager with respect to assets of those accounts referenced above for which you act as Master Trustee/Custodian. Under the terms of the arrangements, whereby you act as such Master Trustee/Custodian you are required to act in accordance with our written instructions regarding investment of such assets, unless a different method of instruction is agreed upon by us.

We have agreed to use an institutional delivery system that will provide us with electronic broker trade confirmations of securities and/or financial transactions that we have entered into on behalf of those accounts referenced above. After comparing our trade data with each confirmation, we shall affirm to an institutional delivery system, as soon after receipt of the confirmation as possible, but no later than trade date plus one (12 Noon Eastern time on trade date plus two for cancellations and corrections only), through an acknowledgement procedure acceptable to an institutional delivery system, all trades whose confirmations accurately reflect the trades that we have entered into, such affirmations constituting our deliver and/or receive instructions. Alternatively, we may choose to use the matching facilities of an institutional delivery system, which will affect an automatic comparison of our " institutional instructions" with the broker trade confirmations. All trades whose confirmations accurately match the trades we have entered into, as evidenced by our institution instructions, or fall within the tolerance parameters we have set in the institutional delivery system's standing instructions database, shall be affirmed, such matched affirmations constituting our delivery and/or receive instructions. Upon receipt of our affirmations through the said acknowledgement or matching procedures, an institutional delivery system shall send deliver and/or receive instructions to you in the form of an affirmed or matched affirmed confirmation.

In the event an institutional delivery system broker trade confirmation does not accurately reflect the transaction in question, we shall not affirm, nor will the institutional delivery system match, the transaction in question and the institutional delivery system shall not send you our deliver and/or receive instructions.

Accordingly, this letter is to confirm our understanding and agreement with you that you are authorized to act in accordance with, and shall be entitled to rely on, and be protected in acting on, those deliver and/or receive instructions received by you as affirmed confirmations or matched affirmed confirmations through an institutional delivery system that contain one of the above-referenced bank account numbers in the defined "agent internal account number" field, to the same extent as if the information contained in such instructions was given in written form, signed by us. In the event that an institutional delivery system for any reason does not furnish you with an affirmed or matched affirmed confirmation, we shall provide you with instructions in written form as to trades that said confirmation would otherwise have contained. This letter will constitute written instructions to you in accordance with the terms of the arrangements referenced in the first paragraph above.

The agreement shall not preclude our use of written instructions for security transactions and/or other matters when we deem them necessary or advisable. You are authorized to act in accordance with, and shall be entitled to rely on, and be protected in acting on, such written instructions. However, in the event a broker trade confirmation is affirmed or an institutional instruction is matched affirmed by the institutional delivery system, said affirmation shall take precedent over the written authorization received for that trade.

This agreement shall become effective with the transactions entered into by us on ___/___/___

(Trade Date).

This letter is not intended to preclude the investment manager's use of written or any other form of Instructions when such Instructions cannot be delivered by way of the System. The Bank of New York is authorized to act in accordance with, shall be entitled to rely on, and shall be protected in acting on, any such Instructions. However, the investment manager will not communicate a transaction by any other form of Instruction that has already been communicated to The Bank of New York through the System. As long as the System is operational and furnishing affirmed confirmations, IM agrees that it will not deliver Instructions via any other method to affirm the same trade. Therefore, The Bank of New York is authorized to act on any Instruction as a distinct and separate Instruction, whether or not the Instruction has also been delivered to The Bank of New York through the System. The Bank of New York will act on all such Instructions and will bear no liability for acting on all as Instructions."

If the foregoing is acceptable to you, please execute and return a copy of this letter agreement, upon which it shall become effective. This agreement may be cancelled by either party upon written notice to the other party.

[your firm's name]          The Bank of New York

By:_____          By:_____

    Authorized Signature                IMS Team Manager
                                        Title

## *ERISA LETTER*

*(Produce on your letterhead)*

*[Date]*

Team Manager
The Bank of New York
One Wall Street – 12th Floor
New York, NY 10286

Re:                Account Name:
                    Account Number:

Dear Team Manager:

The undersigned investment manager ("Investment Manager") is a duly appointed investment manager
with discretionary authority to manage and control the investment of certain assets of the *(Insert Name of
Plan)* ("Plan") for which (Proper BNY Entity Name such as The Bank of New York, or The Bank of New
York Trust Company, N.A. )("BNY") acts as trustee pursuant to a trust agreement or custodian pursuant
to a custody or global custody agreement between The Bank of New York and the plan sponsor. The
assets for which the Investment Manager has been given investment responsibility are described in
Schedule A hereto. BNY shall establish an Account ("Account") to record the amount of Plan assets for
which Investment Manager has investment responsibility.

The Investment Manager represents and warrants to BNY:

*(check those that may apply)*

[ __ ]    1. with respect to the Plan assets allocated to the Account, (i) the Investment Manager is an
"investment manager" within the meaning of Section 3(38) of the Employee Retirement Income
Security Act of 1974, as amended ("ERISA"); (ii) the Investment Manager is a corporation or
partnership organized under the laws of the United States or a State that has its principal place of
business within the United States, and that is--

(A) a bank as defined in section 202 (a)(2) of the Investment Advisers Act of 1940
that has, as of the last day of its most recent fiscal year, equity capital in excess of
$1,000,000;

(B) an insurance company that is qualified under the laws of more than one State to
manage, acquire, or dispose of any asset of a plan, which company has, as of the last
day of its most recent fiscal year, net worth in excess of $1,000,000 and which is
subject to supervision and examination by the State authority having supervision over
insurance companies; or

(C) an investment adviser registered under the Investment Advisers Act of 1940 that
has, as of the last day of its most recent fiscal year, total client assets under its
management and control in excess of $85,000,000 and either (1) shareholders' or
partners' equity in excess of $1,000,000 or (2) all of its obligations and liabilities
assumed or guaranteed by a bank or insurance company described in (A) or (B)
above, by a registered investment advisor described in this paragraph (C) and meeting
the requirement of clause (1) hereof, or by a broker or dealer registered under the

Securities Exchange Act of 1934 that has, as of the last day of its most recent fiscal year, net worth in excess of $1,000,000.

[ __ ]   2. The Investment Manager is a Qualified Professional Asset Manager as such term is defined in Prohibited Transaction Class Exemption 84-14, as amended (the "Exemption"). The Investment Manager may from time to time engage in transactions on behalf of "investment funds" (as defined in the Exemption) in which one or more employee benefit plans have an interest with you, your affiliates or other parties that may be "parties in interest" (as defined in ERISA). In such event, the Investment Manager certifies to you that it will effect such transactions, if they are not otherwise authorized or permitted by an applicable statutory or administrative exemption under ERISA, in compliance with the requirements of the Exemption.

[ __ ]   3. Investment Manager may direct that the indicia of ownership of all or part of the Plan assets allocated to the Account shall be maintained outside of the jurisdiction of the district courts of the United States. In such circumstances, Investment Manager agrees that such indicia of ownership shall be maintained in a manner that complies with the requirements of Department of Labor Regulation Section 2550.404b-1.

[ __ ]   4. The assets allocated to the Account do not constitute "plan assets" within the meaning of Department of Labor Regulation Section 2510.3-101(a).

Investment Manager understands that BNY is relying upon the foregoing representations and warranties and will notify BNY immediately should any of the foregoing representations and warranties no longer be true.

Submitted herewith is an Authorized Signature List containing the names of the individuals authorized to give instructions on behalf of Investment Manager and specimen signatures of such individuals, as well as an Incumbency Certificate certifying that such individuals are authorized to act on behalf of Investment Manager. Investment Manager will provide an updated Authorized Signature List to BNY no less than annually and an amended Authorized Signature List if any individual is to be added to or deleted from the list in the interim, it being understood that, until such time as BNY actually receives an amended Authorized Signature List, BNY shall continue to rely upon and comply with instructions from only those individuals on the then current Authorized Signature List. (We understand, however, that an Incumbency Certificate needs to be provided to BNY only when individuals are added to the Authorized Signature List.)

*Investment Manager*

By: _____

Authorized Signatory

# SCHEDULE A

Description of Plan assets to be Managed by Investment Manager

## *U.S. DOLLAR SHORT TERM INVESTMENTS*

*(Produce on your letterhead)*

*[Date]*

IMS Team Manager
The Bank of New York
2 Hanson Place, 7th Floor
Brooklyn, New York 11217

Re:  Account Name:
     Account #:

Dear IMS Team Manager:

The Bank of New York has been directed by our mutual client to invest or disinvest in the following funds unless notified otherwise in writing.

_____

_____

_____

[your firm's name]

By: _____

Authorized Signature

## *TRADE NOTIFICATION*

*(Produce on your letterhead)*

*[Date]*

IMS Team Manager
The Bank of New York
2 Hanson Place, 7th Floor
Brooklyn, New York 11217


Re:     Account Name:
        Account #:

Dear IMS Team Manager:

[your firm's name]  will notify The Bank of New York of trade instructions as indicated
below (please check)

☐     DTC Affirmation

☐     SWIFT

☐     Trade Transmission

☐     Telex

☐     Fax

☐     Other (list) _____


[your firm's name]


By: _____

                    Authorized Signature

## *CORPORATE ACTIONS PROCESSING*

*(Produce on your letterhead)*

*[Date]*

IMS Team Manager
The Bank of New York
2 Hanson Place, 7th Floor
Brooklyn, New York 11217

Re:  Account Name:
     Account #:

Dear IMS Team Manager:

**CORPORATE
ACTION
INSTRUCTIONS**

For corporate actions where the investment manager has discretion, The Bank of
New York is authorized to receive instructions for the above account from
individuals on the attached authorized signature list and shall be entitled to rely
on such instructions unless notified otherwise in writing.

Corporate action instructions should be sent via INFORM. If fax is supported,
send Corporate Action Notification Forms to:

Name: _____
Phone Number: _____
Primary Fax Number: _____
Secondary Fax Number: _____

In the event the above individual is not immediately available, please notify:

Name: _____
Phone Number: _____
Primary Fax Number: _____

**OTHER
CORPORATE
ACTIONS**

The Bank of New York is directed to act on Stock/Cash, Scrip
Dividend Options, Dividend Reinvestments as indicated below:

☐  Take Cash Always

☐  Take Stock Always

☐     Consult Always

By: _____

Authorized Signature

## *PROXY PROCESSING*

*(Produce on your letterhead)*

*[Date]*

IMS Team Manager
The Bank of New York
2 Hanson Place, 7th Floor
Brooklyn, New York 11217

Re:   Account Name:
      Account #:

Dear IMS Team Manager:

**PROXIES**          Proxy material should be sent to*:

Name: _____

Phone Number: _____

Primary Fax Number: _____

Address_____
_____
_____

*\* To be completed by investment managers only if client grants discretionary voting rights.*

**SPECIAL**          _____
**INSTRUCTIONS**     _____
                     _____
                     _____
                     _____

[your firm's name]

By: _____
_____

Authorized Signature

## *ACCOUNT REPORTING*

*(Produce on your letterhead)*

*[Date]*

IMS Team Manager
The Bank of New York
2 Hanson Place, 7th Floor
Brooklyn, New York 11217

Re:  Account Name:
     Account #:

Dear IMS Team Manager:

| **REPORTS** | The Bank of New York is directed to send a copy of monthly transaction summary and a monthly priced list of holdings for the above account to: |
|---|---|

Name & Title: _____

Phone Number: _____

Address_____

_____

_____

| **TRANSACTION REPORTING** | Daily reports detailing trade settlement, failed trades, pending trades, FX rates, registration, cash activity and availability and other portfolio activity are available via INFORM. |
|---|---|

If interested, complete the INFORM reporting page.

[your firm's name]

By: _____

Authorized Signature

 *The* BANK *of* NEW YORK.

# INFORM HARDWARE SURVEY

**Company Name:** _____

**Technical Contact:** _____     **Phone:** _____
                                           **Fax:** _____

**Number of users:** _____       **Number of PCs:** _____
**Network Environment:** _____    **Release:** _____

Connectivity: Network / PC:

- Is port 443 open?  (Required for INFORM)
- Is the download of JAVA applets permitted?  (Required for INFORM Mainframe Services)
- Is the download of Active X Controls permitted?  (Required for Software Distribution, Outpost, Apollo)
- Does your organization use a proxy server?
    Name type of proxy server:
    Is user-authentication enabled on the proxy server?
        What type of user-authentication?  (if NTLM, proxy or firewall client may be needed)
        Can the user-authentication be deactivated?
- Can Internet URLs / external DNS names be resolved internally in your organization?

If you answered "No" to the previous question, the following hostnames and IP addresses must be entered at your
firewall or internal DNS server(s):    inform.bankofny.com      160.254.119.37   for INFORM
                                       informmfs.bankofny.com   160.254.119.72   for INFORM Mainframe Services

## PLEASE COMPLETE THE FOLLOWING FOR EACH USER:
(SEE THE NEXT PAGE FOR MINIMUM PC REQUIREMENTS FOR INFORM)

|  | User 1 | User 2 | User 3 |
|---|---|---|---|
| Name: | | | |
| PC Brand: | | | |
| Processor Type: | | | |
| Processor Speed: | | | |
| PC RAM Memory: | | | |
| Available Disk Space: | | | |
| Connectivity: (LAN, Cable, DSL, ISDN, Dial-Up) | | | |
| Video Card Memory: | | | |
| Screen Resolution: | | | |
| Operating System & Version: | | | |
| Internet Explorer Version: | | | |
| Microsoft JVM or SUN JRE Version (Required for INFORM Mainframe Services only): | | | |
| Adobe Acrobat Reader Version: | | | |
| Can the PC connect to http://ii.bnyinform.com? | | | |

## PLEASE COPY THIS FORM FOR ADDITIONAL USER'S DATA

 *The* **BANK** *of* **NEW YORK** **INFORM HARDWARE SURVEY**

## PC Requirements for INFORM:

| Supported Operating Systems: | Supported Browser & Versions: | Comments: |
|---|---|---|
| MS Windows NT 4.0<br>MS Windows 2000<br>MS Windows XP | MS Internet Explorer 5.5 SP2<br>MS Internet Explorer 6.0 SP1 | **High Encryption** - 128Bit encryption is required on all browser versions.<br><br>**IE Patch Q832894 Required** - All browser versions. |

- 500MHz processor or equivalent minimum requirement. Better performance achieved with higher processors.

- Screen resolution should be set at 1024 x 768 with 64K colors and a minimum of a 2 MB video graphics card is needed for proper viewing.

- 128 MB RAM memory minimum requirement (**256 MB preferably for IIC**).

- JAVA Runtime Environment required on each PC for **INFORM Mainframe Services**. SUN JRE (versions 1.4.2_05, _06, _07, _08, _09, _10, _11) or Microsoft JAVA Virtual Machine (versions 5.00.3810, 5.00.3805, 5.00.3802) supported.

- Internet access required, fast connection preferred. Dial-up solutions can be used but should be for contingency purposes. Access times may be longer depending on the amount of data that is transferred at this rate.

- Adobe Acrobat 7.0 (6.0 and 5.0 still supported).

- For IIC, an estimated 22MB of free disk space is needed for the setup files. The installation requires an additional 40MB of free disk space. Once installed, the setup executables can be deleted or moved to a shared location for future use.

- The **Apollo** application pushes both DLL and OCX files down to the user workstation. Microsoft JAVA Virtual Machine (version 5.00.3810, 5.00.3805, or 5.00.3802) required. The following browser settings are needed to use Apollo:

    *Within the ActiveX Controls and plugins section make sure the following settings are correct in the Internet Zone under the Security tab of the Internet Explorer browser properties:*

    *Script ActiveX controls market safe for scripting – Enable*
    *Run ActiveX controls and plugins – Enable*
    *Download signed ActiveX controls – Prompt*
    *Download unsigned ActiveX controls – Prompt*
    *Initialize and script ActiveX controls not marked as safe – Enable*

### NOTE: HARDWARE REQUIREMENTS ABOVE THE MINIMUM WILL IMPROVE PERFORMANCE AT THE LOCAL DESKTOP.

## *SWIFT REPORTING*

### *(Produce on your letterhead)*

*[Date]*

Re:  Account Name:
        Account #:

**SWIFT**

Investment Manager: _____

A.  Interested in SWIFT Outbound reconciliations reporting service.

☐     YES (please complete section B below)

☐     NO, I AM NOT INTERESTED AT THIS TIME

B.  If you are interested in receiving SWIFT Outbound reconciliation
information, please provide the information below.

Name (Technical Contact): _____
Phone Number: _____
Address_____
_____
_____
_____

Email Address: _____

BIC Code (ex: BICCODEXXXX): _____

Please check message type, frequency & reporting period for above referenced
account(s).

| Message Type | Frequency | Report Period |
|---|---|---|
| ☐  MT535 a (MT535 Holdings/Acctg version) | ☐ Daily (or) <br> ☐ Monthly | ☐ Current (or) <br> ☐ Prior |
| ☐  MT535a (MT535 Holdings/Custody version) | ☐ Daily (or) <br> ☐ Monthly | ☐ Current (or) |
| ☐  MT950 (MT950 Cash Statement) | ☐ Daily (or) | |
| ☐  Other | | |

# IV.  Receive And Deliver Instructions

## A.  Securities Transactions

Please transmit to The Bank of New York, by fax, telex, SWIFT or ISITC/SWIFT formats, or through our electronic interfaces all trade information, complete with trade number and proper settlement instructions.  See the sample *Trade Instruction Worksheet* on the following page for transmission of such information via fax.  Instructions must be received by the deadlines presented in the Securities and Cash Deadlines matrix in the Appendices.  Any trades not meeting these deadlines may be subject to delayed settlement and will be processed on a "best efforts" basis.  Instructions for the purchase, sale or other disposition of foreign currency should accompany trade instructions.

Exceptions to this policy include situations where the:

- Client sells shares that are not owned (e.g., performance shares instead of ordinary shares).
- Client sells securities that are not available at the time of sale for reasons outside the control of The Bank of New York (e.g., Japanese bonus shares that may not be available for up to three months, Global Notes).
- Client purchases securities on a "free" basis and the securities have not yet been received.
- Client sells securities in a location different from which they are held.
- Client sells shares that have not yet returned from registrar or have not actually been received at the subcustodian.

U.S market transactions should be initiated through the DTC-ID System, by the investment manager if the security is DTC eligible, and directed to The Bank of New York, DTC Number 901. Where DTC Standard Letter of Agreements are executed, the investment manager will affirm all correct transactions directly.  The Bank will require proper notification of instruction.  The Bank of New York should be notified of any corrections or amendments to trades as soon as possible.

If a foreign exchange is executed for securities settlement, The Bank of New York should be notified of the FX details along with the security transaction instruction.

Please instruct your brokers not to send The Bank of New York paper confirms.

THE BANK OF NEW YORK TRADE INSTRUCTION WORKSHEET

**Account Name** _____

**Account #** _____

**Type:** RVP  RF  DVP  DF  (Circle one)          **Trade Ref. #** _____

**Trade Date** _____          **S/D** _____

**Security Amount** _____          **Security** _____

**ISIN/SEDOL/SEC. #** _____

**Currency** _____          **Price** _____

**Local Price** _____          **Commission** _____

**Tax** _____          **Accrued Interest** _____

**Other** _____

**Net** _____

**Trading Broker** _____

**Clearing Broker** _____

**FOREX –**

Please execute necessary FX

*Buy* _____  *Curr* _____  *T/D* _____  *V/D*

*Sell* _____  *Curr* _____

FX Completed, Details to Follow

| *The Bank of New York Use Only* | |
|---|---|
| Rate | _____ |
| Trader | _____ |
| Time | _____ |

Special Instructions

_____

_____

_____

_____

*Preparer:* _____

**Authorized Signature:**
_____

**Purchase Flows**

Please instruct brokers to deliver securities to the agents and accounts as noted in the Securities and Cash Deadlines matrix in the Appendices.

Arrangements will be made to settle securities on the contractual settlement date, if The Bank of New York established settlement timeframes are followed. The Bank will debit the account and the investment manager will ensure that good funds are made available to cover all purchases. Securities must be delivered to our subcustodian in each local market. They may not be left at the local broker.

Settlement and payment of securities will be effected in accordance with the established market practices of each particular exchange. Any deviation from standard practices, such as free receives, must be communicated in detail to the Bank and may be subject to approval by your IMS Team. We do not wire funds for a free receive prior to the security's arrival at our agent.

**Sale Flows**

Investment managers should instruct brokers to receive securities from the appropriate Bank of New York agent bank designated in the Settlement Details Matrix in the Appendices. Securities will be delivered on settlement date when the settlement timetable is followed.

**Market Settlement Cycles**

Also included in in the Securities and Cash Deadlines matrix in the Appendices, by market, are the standard timeframes for processing transactions. The Bank undertakes to pass all cash, debits and credits for securities transactions on the agreed upon settlement date, provided there are no external impediments to settling the transaction.

In countries with a settlement cycle shorter than T+3 it is often possible to instruct your broker to settle on T+3. Doing this ensures that the trades settle without overdraft charges. Please consider this in your share purchasing processes. (Hong Kong exemplifies this procedure.)

**DTC Institutional Delivery (ID) System Trades**

The trade instructions for using DTC's ID system are as follows:

- The Bank of New York DTC #          901
- The Bank of New York Agent Bank #   See US Settlement Instructions
- The Bank of New York Global Account #   Client's six digit account number

If you are affirming your own trades through DTC or via INFORM, the affirmation will act as your instruction to us to settle the trade. Therefore, hardcopy communications will not be necessary. However, if you wish to forward copies of these instructions to us for verification purposes, they must specify "for confirmations only". If The Bank of New York is to affirm your trades, then we must receive an authenticated trade instruction indicating that you wish

your IMS Account Officer to affirm the trade. It is imperative that these instructions pertain to global portfolios only. DTC ID trades for U.S. accounts should be processed in the same manner.

### Cash Policy for Payments & Receipts

All instructions must be received by The Bank of New York's published deadlines for each currency. Any amendments and cancellations should be received on the day prior to value date. Where the currency deadline is on the value date (e.g. GBP), amendments and cancellations may be instructed on value date up until the deadline, but the original payment instruction may already have been executed in the market. In this case, the client's cash account will be debited and the funds returned from the market with a later value date.

All authenticated instructions received within The Bank of New York's published deadlines for each currency will be posted to a client's account on value date.

### Securities Lending Transactions

The Bank of New York requires notification on trade date, via fax, of all sale trades. Proper implementation of these guidelines will ensure that The Bank of New York is given adequate notification to recall securities out on loan. The result will be a reduction in the potential for failed trades.

The information required by our lending desk is as follows:

- a. Security description
- b. ISIN #
- c. # of shares
- d. Trade date
- e. Settlement date
- f. Account name and number

All information must be received by 10:30 a.m. ET on trade date and sent to your IMS Account Officer.

The Bank of New York Lending desk should be notified immediately of any corrections or amendments.

## B. Claims

### Claims related to Contractual Settlements

Sale transactions that fail in contractually settling accounts in certain countries may incur overdraft charges. Claims will be presented in the following instances:

- Late instructions or incorrect instructions from the manager/client (outside of our published guidelines.)

▪ The broker has no instructions in place with the local custodian delivering securities to our agent. We are not in a position to claim the broker, thus we must ask for the client/manager to do so.

**Buy-In Instructions**

It is required that you notify your IMS Account Officer of any potential or actual buy-ins. The notification of potential or actual buy-ins allows the Bank the opportunity to take all possible preventive actions and limit exposure to the customer account.

### *Buy-In Instructions for the United States Market*

• **Notice of Potential Buy-In**

The Bank of New York requires a written confirmation two business days prior to a buy-in in the U.S. market. Written confirmation must include the following details so that the Bank can identify the original trade for which a buy-in is being considered:

- Account name & account number
- Security name
- Asset identifier
- Shares
- Net amount
- Original trade date
- Anticipated buy-in date

If this notice is not acted upon on the proposed buy-in date as stated on the notification, the notice becomes null and void. Once the notice is void, any further consideration of a buy-in of the same security will require a new written notification.

• **Notice of Executed Buy-In**

The Bank of New York requires a written confirmation by 4:00 p.m. Eastern Time on execution date of a buy-in. Written confirmation must include the same trade details as noted above, so that the Bank can identify the trade. Written confirmation must also include the share amount, price, net amount and settlement date of the actual buy-in.

### *Buy-In Instructions for International Markets*

▪ For non-U.S. markets it is essential that the Bank receive written confirmation of any potential or actual buy-in on the same day as you are informed.

▪ The Bank will not accept liability that may result from your failure to follow the above procedures.

# V. Treasury Services

## A. Income

Dividend and interest income is credited to client accounts according to the following schedule - "pre-post" basis in every market of our network where market conditions allow us to do so. In situations where there is no guarantee as to payment date, income is credited by the system upon collection.

Income is credited in the currency of payment. A foreign exchange transaction to the chosen base currency may be initiated based on standing instructions and will normally settle two business days after posting date. All income is subject to correct payment from the issuer, paying agent or counterparty. The Bank of New York will not assume the credit risk of an issuer, paying agent or counterparty failing to pay income due. Income postings are provisional and may be reversed if the income is not received. We offer an exceptional "standing instructions" service that allows clients to designate at the portfolio, currency or event level, how they would like the income proceeds dispersed.

| Multicurrency Dividend and Interest Payment Schedule | | |
| --- | --- | --- |
| Country/Market | Posting Date | Currency |
| Argentina | As Collected | Argentinian Peso |
| Australia | Payable Date | Australian Dollar |
| Austria | Payable Date | Euro |
| Bahrain | Payable Date** | Bahraini Dinar |
| Bangladesh | As Collected | Bangladesh Taka |
| Belgium | Payable Date | Euro |
| Benin | As Collected | Central African Franc |
| Bermuda | Payable Date** | Bermudian Dollar |
| Botswana | As Collected | Botswana Pula |
| Brazil | As Collected | Brazilian Real |
| Bulgaria | Payable Date** | Bulgarian Lev |
| Burkina Faso | As Collected | Central African Franc |
| Canada | Payable Date | Canadian Dollar |
| Cayman Islands | Depends on where the security is traded | |
| Channel Islands | Depends on where the security is traded | |
| Chile | As Collected | Chilean Peso |
| China- Shanghai | Payable Date | US Dollar / Hong Kong Dollar |
| China - Shenzhen | Payable Date | US Dollar / Hong Kong Dollar |
| Colombia | As Collected | Colombian Peso |
| Costa Rica | Payable Date** | Costa Rican Colon |
| Croatia | As Collected | Croatian Kuna |
| Cyprus | As Collected | Cyprus Pound |
| Czech Republic | Payable Date** | Czech Koruna |

| Country/Market | Posting Date | Currency |
| --- | --- | --- |
| Denmark | Payable Date | Danish Krone |
| Ecuador | As Collected | Ecuadorean Sucre |
| Egypt | As Collected | Egyptian Pound |
| Estonia | Payable Date** | Estonian Kroon |
| Euromarket: | | |
| Clearstream Luxembourg | Payable Date | All Eligible Currencies |
| Euroclear | Payable Date | All Eligible Currencies |
| Finland | Payable Date | Euro |
| France | Payable Date | Euro |
| Germany | Payable Date | Euro |
| Ghana | As Collected | Ghanaian Cedi |
| Greece | Payable Date | Euro |
| Guinea Bissau | As Collected | Central African Franc |
| Hong Kong | Payable Date | Hong Kong Dollar |
| Hungary | Payable Date | Hungarian Forint |
| Iceland | Payable Date** | Icelandic Krona |
| India | As Collected | Indian Rupee |
| Indonesia | As Collected | Indonesian Rupiah |
| Ireland | Payable Date | Euro |
| Israel | Payable Date | Israeli Shekel |
| Italy | Payable Date | Euro |
| Ivory Coast | As Collected | Central African Franc |
| Jamaica | Payable Date** | Jamaican Dollar |
| Japan | Payable Date | Japanese Yen |
| Jordan | As Collected | Jordanian Dinar |
| Kazakhstan | As Collected | Kazakhstany Tenge |
| Kenya | As Collected | Kenyan Shilling |
| Korea South | As Collected | Korean Won |
| Latvia | Payable Date** | Latvian Lats |
| Lebanon | As Collected | Lebanese Pound |
| Lithuania | Payable Date** | Lithuanian Litas |
| Luxembourg | Payable Date | Euro |
| Malaysia | Payable Date 1 | Malaysian Ringgit |
| Mali | As Collected | Central African Franc |
| Malta | Payable Date** | Maltese Lira |
| Mauritius | Payable Date | Mauritius Rupee |
| Mexico | Payable Date | New Mexican Peso |
| Morocco | As Collected | Moroccan Dirham |
| Namibia | As Collected | Namibian Dollar |

[1] Standing instruction to convert to another currency will delay payment because of currency restrictions within this market.

| Country/Market | Posting Date | Currency |
|---|---|---|
| Netherlands | Payable Date | Euro |
| New Zealand | Payable Date | New Zealand Dollar |
| Niger | As Collected | Central African Franc |
| Nigeria | As Collected | Nigerian Naira |
| Norway | Payable Date | Norwegian Krone |
| Oman | As Collected | Omani Rial |
| Pakistan | As Collected | Pakistani Rupee |
| Palestinian Autonomous Area | As Collected | Jordanian Dinar |
| Panama | As Collected | U.S.Dollar |
| Peru | Payable Date | Peruvian Nuevo Sol |
| Philippines | As Collected | Philippine Peso |
| Poland | Payable Date | Polish Zloty |
| Portugal | Payable Date | Euro |
| Qatar | As Collected | Qatari Riyal |
| Romania | As Collected | Romanian Leu |
| Russia | As Collected | U.S. Dollar |
| Senegal | As Collected | Central African Franc |
| Singapore | Payable Date | Singapore Dollar |
| Slovakia | Payable Date** | Slovakian Koruna |
| Slovenia | As Collected | Slovenian Tolar |
| South Africa | Payable Date | South African Rand |
| Spain | Payable Date | Euro |
| Sri Lanka | As Collected | Sri Lankan Rupee |
| Swaziland | As Collected | Swazi Lilangeni |
| Sweden | Payable Date | Swedish Krona |
| Switzerland | Payable Date | Swiss Franc |
| Taiwan | As Collected | New Taiwan Dollar |
| Thailand | Payable Date | Thai Baht |
| Togo | As Collected | Central African Franc |
| Trinidad & Tobago | As Collected | Trinidad and Tobago Dollar |
| Tunisia | As Collected | Tunisian Dinar |
| Turkey | Payable Date | Turkish Lira |
| Ukraine | As Collected | Ukrainian Hryvnia |
| United Arab Emirates | As Collected | United Arab Emirates Dirham |
| United Kingdom | Payable Date | Pound Sterling |
| The Depository and Clearing Centre (DCC) | As Collected | All Eligible Currencies |
| United States | Payable Date | U.S. Dollar |
| Uruguay | Payable Date | Uruguayan Peso |
| Venezuela | As Collected | Venezuelan Bolivar |
| Vietnam | As Collected | Vietnamese Dong |
| Zambia | As Collected | Zambian Kwacha |

| Zimbabwe | As Collected | Zimbabwean Dollar |
|---|---|---|

*NB: The contractual posting of incomes only applies to securities held in their home country and paid in the country's currency.*

**Only for income from debt. Posting date for income from equities is as collected.*

## B. Foreign Exchange

The Bank of New York's FX services accommodate all dealing styles and include the following methods:

- **(1)** INFORM (standing and embedded instructions)
- **(2)** iFX Manager e-commerce platform
- **(3)** direct dealing with the Bank's Foreign Exchange Trading Desks
- **(4)** third party

We can accept standing instructions or individual instructions for each transaction.

A foreign exchange request must be included at the time a securities instruction is sent to the Bank via telex, SWIFT including ISITC tag words, or our Internet based trading system. A sample FX fax format is included on the following page. Should you choose to conduct your foreign exchange through a third party, we will need to be advised of all relevant data.

### 1. INFORM

#### FX Standing Instructions (Automated solution)

FX Standing Instructions are supported via INFORM's Internet Instruction Capture (IIC). This service automates all types of foreign exchange, including securities trade settlement, income conversions, corporate actions, tax reclaims, interest postings and residual balances. FX Standing Instructions is operationally simple, free of charge and integrated with our mutual client's activity on the various securities markets.

#### FX Embedded Instructions (FX managed by the client)

Clients that prefer to manage foreign exchange related to individual securities trades may embed their FX requests into securities settlement instructions, and also benefit from The Bank of New York's automated FX execution capabilities.

## FX TRADE INSTRUCTION

❏        Please execute the following Forex

❏        Completed Forex Details

ACCOUNT NAME_____          DATE_____

ACCOUNT #_____

BUY_____          CURR_____

SELL_____          CURR_____

T/D_____        S/D_____          RATE_____

COUNTERPARTY_____

RECEIVED FROM_____

DELIVER TO_____

RELATED TRADE OR REF. #_____

_____

**Bank of New York USE ONLY**

**Trader**_____

**Time**_____

## 2. iFX Manager<sup>SM</sup> e-commerce platform – Internet-based electronic trading

*iFX* Manager<sup>SM</sup>, our foreign exchange **t**rade order management and execution system, gives clients both the flexibility and control they need to manage the entire FX trading process: from preparation of trade requirements, to order management, to trade execution, to post-trade messaging, all available via Internet. It is the cornerstone of The Bank of New York's multiple offerings for on-line FX trading, which also include iFX Express, Internet-based 'two-click' electronic trading system with real-time quotes and charts.

*iFX* Manager integrates all elements of straight-through processing (STP) to help clients eliminate some of the time, cost and risks associated with FX trading. It is a complete solution to overseeing FX spot, forward outright, and swap transactions on a real-time basis, whether for a single fund account or across a block of multiple accounts. The system also offers auditing and recordkeeping advantages, saves time and minimizes trade-input. Key to this is *iFX* Manager's focus on comprehensive order management, allowing clients to manage trade execution activities with *all* their counterparty banks, not just those with The Bank of New York.

*Please contact your IMS Relationship Manager if you are interested in iFX Manager.*

## 3. Direct Dealing with FX Desk – Consultative involvement of a foreign exchange professional

Deal directly with the trading desks in New York, London, Brussels, Tokyo, Hong Kong, Seoul and Taipei.

To execute foreign exchange transactions directly with our Foreign Exchange Trading Desk in New York, please contact Robert Ryan or David Babbitt at (212) 804-2260. The following information is required:

- Currency to be bought/sold
- Amount of currency to be bought or sold
- Rate reference number or order number
- Currency to be used in the settlement of the trade
- Type of transaction: forward or spot. If a forward contract, the value dates to be used to settle the trade

The trader will quote the rate and provide the caller with the settlement amount. You must then provide the IMS Account Officer the following foreign currency details:

- Currencies Traded

- ▪ Quantity
- ▪ Rates Quoted
- ▪ Trade and Value Dates
- ▪ Security Trade Reference Number
- ▪ Settlement Amount
- ▪ Currency Trade Reference Number (if applicable)

### 4. Foreign Exchange through a Third Party

If you perform foreign exchange transactions through a third party, we must be advised of all the same details. These should be provided to your IMS Account Officer. Correspondent banks are listed in the Appendices. Please advise your contra party of the name and account number of our cash correspondent. In addition to the information that would normally be provided to your administrator, we also require the following:

- · Name and location of institution delivering/receiving currency
- · Identification number of institution delivering/receiving currency
- · Name of broker/dealer buying/selling currency

The same detail listed above should be given to your IMS Account Officer upon executing the trade. If the third party executes a spot trade, then instructions must be sent to the Bank on trade date, at least two days prior to settlement date, no later than 10:00 a.m.ET.

### Foreign Exchange Activity Reports – *Flexibility and Timeliness*

Regardless of the method used to initiate foreign exchange, The Bank of New York offers a variety of reporting tools to assist clients and their managers. Through our standard reporting facilities (SWIFT or INFORM), clients and their managers can manage intra-day foreign exchange exposure.

Sample INFORM reports include, among others:

- · Future Foreign Exchange Transactions – detailed list of all future foreign exchange transactions
- · Pending Trades by Currency with FX Detail – detailed list of all securities transactions by account in currency order with FX details attached

Sample SWIFT reports include, amongst other:

- · MT300 – FX execution confirmation messages

- MT950 – cash statement messages

## Foreign Exchange Policies and Procedures For ERISA Plans

These Policies and Procedures apply to foreign exchange ("FX") transactions between The Bank of New York or any of its affiliates ("the Bank") and any employee benefit plan (a "Plan") covered by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), where The Bank of New York acts as a trustee, custodian, or fiduciary for the Plan, or other party-in-interest under ERISA ("FX Transactions").

These Policies and Procedures are issued pursuant to U.S. Department of Labor Prohibited Transaction Class Exemptions 94-20 and 98-54, which established requirements for certain directed FX Transactions and FX Transactions pursuant to standing instructions.

Subject to the Legal Department's approval of the use of any other exemption from ERISA's prohibited transaction rules, these Policies and Procedures are the exclusive means by which The Bank of New York may enter into an FX Transaction with a Plan.

These Policies and Procedures apply to:

1. Directed Transactions. An FX Transaction will be considered a directed transaction where an independent Plan fiduciary that has not been appointed by The Bank of New York directs the Bank to effect an FX Transaction relating to the exchange of a specific amount of currency of one nation for the currency of another nation at a specific exchange rate in connection with a transaction involving the assets of a Plan. For avoidance of doubt, directed transactions will, in addition to transactions executed through such traditional means as the telephone, include (i) any such FX Transaction initiated and executed by a Plan fiduciary through an electronic service provided by The Bank of New York if it otherwise meets the criteria for directed FX Transactions; and (ii) any such FX Transaction initiated and executed by a Plan fiduciary in excess of $300,000 which might otherwise be construed as a Standing Instruction transaction provided that The Bank of New York has displayed a rate on its website concurrent with each fixing time at which a Standing Instruction transaction may be executed, and the Plan fiduciary has not exercised its option to cancel such FX transaction within one hour of the respective fixing time as allowed by these Policies and Procedures. These Policies and Procedures will be delivered to the Plan fiduciary for the purpose of advising the Plan that such trades shall be deemed directed transactions, and obtaining approval of the Policy and Procedures with respect to the mechanism by which the Plan fiduciary can assess a pending transaction and renegotiate its terms if desired.

2. Standing Instructions for Income Item Conversions Equal to or Less than $300,000. An FX Transaction may be effected pursuant to standing instructions of an independent Plan fiduciary for purposes of income item conversions in an amount of no more than US $300,000 or the equivalent thereof. An income item conversion means the conversion into US dollars or other currency of any amount of interest, dividends or other distributions or payments with respect to a security, tax reclaims, proceeds from dispositions of rights, fractional shares or other similar items denominated in the currency of another nation that are received by the Bank on behalf of the Plan from the Plan's foreign investment portfolio. All FX transactions executed by a Plan fiduciary in excess of $300,000 should be handled as directed transactions.

3. Standing Instructions for "de minimis" Purchase or Sale FX Transactions. An FX Transaction may be effected pursuant to standing instructions of an independent Plan fiduciary for the purchase or sale of foreign securities in an amount of no more than US $300,000 or the equivalent thereof in connection with the purchase or sale of foreign securities by a Plan.

The procedures applicable to FX Transactions with a Plan are as follows:

### General Provisions

1. Directed FX Transactions must be authorized by an independent Plan fiduciary not appointed by The Bank of New York on a transaction by transaction basis.

2. The Bank of New York may not engage in FX Transactions in any instance when the Bank has discretionary investment authority or control with respect to the investment of Plan assets, or when it renders investment advice with respect to Plan assets.

3. A list of all Plans for which the Bank may provide FX services shall be available to all FX traders.

4. The terms of FX Transactions with any Plan shall not be less favorable to the Plan than terms offered by The Bank of New York to unrelated parties in a comparable arm's length FX Transaction.

5. The Bank of New York shall provide a copy of these Policies and Procedures to all Plan investment fiduciaries that require FX services. In order to provide FX trading under standing instructions, as provided below, the investment fiduciary must specifically approve these Policies in writing. Once given, such approval shall continue in force until these Policies are materially amended as to FX rates or availability or the investment fiduciary revokes the approval in writing. Amendments

to these Policies and Procedures may be made at any time by the Bank and will be provided in writing to those fiduciaries that have previously approved the Policies and Procedures in writing.

6. Investment fiduciaries are hereby advised, by receipt of these Policies and Procedures, that Plans may obtain foreign exchange services from sources other than the Bank.

7. Records sufficient to track compliance with these Policies will be maintained within the jurisdiction of the United States government for a period of at least six years from the date of the transactions and will be available for examination, on reasonable notice, to:

   a. Plan fiduciaries with authority over the assets involved in the FX Transaction, or any authorized employee or representative of the Plan;

   b. Authorized representatives of employers contributing to the Plan involved in the FX Transaction; and

   c. Authorized representatives of the Department of Labor or the Internal Revenue Service. Records to be kept shall include information provided in confirmations.

(Standing instructions will be maintained for so long as the account is active.)

### Directed Transactions

The independent Plan fiduciary usually issues directions by calling the FX Transaction Desk directly. It may also issue directions to The Bank of New York for FX Transactions with the Bank through the relevant custody/fiduciary area, however. If a transaction is effected through that area, all essential terms must be communicated by the area to The Bank of New York's FX Transaction Desk. The Plan fiduciary will have access to the range of rates that would be applicable to the anticipated transaction and have the opportunity to renegotiate it within a reasonable period of time, as determined by the Transaction Desk. FX Transactions conducted through the relevant custody/fiduciary area will be subject to operational time restraints as communicated by the Bank's FX Transaction Desk.

Directed Transaction Confirmations

The Bank of New York shall issue a written confirmation for every directed FX Transaction with a Plan to the independent Plan fiduciary that directed the transaction within five business days of contract execution. Each such confirmation shall contain the following information:

a. account name;
b. transaction date;

c. settlement date;

d. exchange rate(s);

e. currencies exchanged, including:
   (i) identity of currency sold
   (ii) amount sold (or, in the case of income conversions, amount of currency received);
   (iii) identity of currency purchased
   (iv) amount of currency purchased

Standing Instructions

When required by an independent Plan fiduciary, The Bank of New York provides FX services pursuant to standing instructions to benefit Plans and Plan participants through income item conversions and de minimis purchases and sales. A "de minimis" purchase or sale means currency purchased or sold valued (as of the execution date) at US $300,000 or less. Income item conversions are also subject to this limitation as to amount.

Additional requirements for standing instructions are as follows:

1. All standing instructions to transact income item conversions or "de minimis" purchases or sales must be in writing from an independent Plan fiduciary and must identify the currencies from which FX Transactions may be executed (which shall include only currencies for assets which the Bank acts as custodian, including through a subcustodian). Such written instructions shall continue in force until terminated by either the Bank or the fiduciary without penalty upon up to 10 days prior notice.

2. The method for determining the rates at which FX Transactions will be executed under standing instructions will be provided to Plan fiduciaries as follows:

   a. Orders will be transmitted by the custody/fiduciary area through an internal system, which will identify the transaction to the Bank's FX Transaction Desk (the "Brussels Desk in the case of income items, the Brussels Desk or the "NY Desk" for purchases or sales) as an "ERISA transaction" (or to this effect). The range of rates at which the Brussels Desk will transact income item conversions (which transactions will usually occur on the business day prior to the settlement date for the income items) and either Desk will transact purchase/sale transactions (which transactions will usually occur on the business day received by the Desk) will be posted in The Bank of New York's website, and independent Plan fiduciaries are hereby given notice to such effect. Rates will be posted at 9:00 a.m., 11:00 a.m. and 3:00 p.m. New York

time. A buy and sell rate establishing the range will be posted for each unrestricted currency.

b. All income item conversions will be bundled by the relevant custody/fiduciary area with other like FX Transactions and executed by the Brussels Desk at 5:00 p.m. Brussels time (11:00 a.m. New York time) at or within the range of buy/sell rates in effect at 11:00 a.m. New York time and posted on the website. The bundling of FX Transactions is done to achieve better rates for the benefit of clients. (For short periods during the year, there may be changes to the timing above as the result of daylight savings time changeover mismatches.)

c. Orders relating to purchases and sales will be executed by the Brussels Desk or the NY Desk, as selected by the relevant custody/fiduciary area. If the order is received by the relevant Desk at least one-half hour prior to a fixing, it will be executed at or within the range established by such buy/sell rates next in effect. Independent Plan fiduciaries will be allowed to cancel such executions if the relevant Desk receives the cancellation order no later than one hour after the fixing (and there remains enough time to execute the cancellation prior to expiration of the one hour grace period). (This right to cancel is not available for income items because of the manner in which they are executed.)

d. Rates will not be published for restricted currencies, which do not freely trade. Instead, such currencies will simply be listed in the website, and transactions in such currencies will be executed according to market practice.

3. In all cases actual rates for FX Transactions will be tested by the daily run flagging Transactions with rates more than 3% over or under the WM Fixing Rate for each applicable fixing time (9:00am, 11:00am and 3:00pm). Transactions so flagged will be investigated and any action deemed necessary will be taken to assure compliance with these Policies and Procedures.

4. In all cases, The Bank of New York reserves the right to advise independent Plan fiduciaries in a timely manner during, or in advance of, a business day that it will not provide FX for a particular currency or in a particular market under standing instructions. In such cases, FX may be provided pursuant to direction or by third parties selected by the fiduciary.

5. In the case of income item conversions, the execution date depends on the posting date of the relevant income. In "as collected" markets, the execution date is the date the funds are received. The FX Transaction is usually executed on that day (at the

rate at 11:00 a.m. New York time), but in the ease of restricted currencies, execution may take place the following day. Purchase/sale transactions will be executed on the day of receipt if received early enough in the day (local time) by the relevant Desk.

6. With respect to FX Transactions provided under standing instructions, a confirmation, ticket, or advice of receipt (written or in electronic form) will be issued to the independent Plan fiduciary within five business days of the date the FX Transaction was executed, and will contain the same information as that for directed transactions.

## C. Investment of Cash Balances

The Bank of New York provides cash management services for all major currencies as well as many less actively traded currencies. Our FX trading staff provides foreign exchange at very competitive rates. We also pay interest on most currency balances on deposit with the Bank.

For new or additional funds to be eligible to earn interest on the date of receipt we must position the currency for investment prior to its actual receipt. Therefore, you must notify your IMS Account Officer for incoming cash by noon of the third bnsiness day prior to the date of receipt.

As long as we have FX instructions or security sale instructions by these deadlines, the cash involved will begin to earn interest upon receipt. In any event, currencies already on deposit will continue to earn interest.

You must also notify the IMS Account Officer of withdrawals by the same deadlines. Settlement amounts for purchases will be taken out of the interest bearing currency account on contractual settlement date.

### Short Term Investment Funds for U.S. Dollar Balances

We offer a variety of overnight investment funds for U.S. dollars.

- **MoneyFundsDIRECT.com** - MoneyFundsDIRECT.com is a unique, Bank of New York proprietary transaction-based Website that directly links institutional investors to an extensive range of short-term investment vehicles, including over 20 well-known fund families. This interactive Website takes the Bank's unique global liquidity program, MoneyFunds DIRECTsm, a step further by offering a direct Internet link to multiple funds through a single source. Investors can

research fund information, download reports, buy and redeem funds; check daily balances and transfer funds.

- **The The Bank of New York Hamilton Money Market Mutual Funds:**
Comprised of the AAA rated The Bank of New York Hamilton Money Fund, The Bank of New York Hamilton Treasury Money Fund, and the The Bank of New York Liquid Reserve Fund, the objectives of these funds are to achieve a high rate of return consistent with safety of principal and liquidity while investing in only the highest quality money market instruments meeting the requirements of SEC Regulation 2(A) 7. The Funds attempt to maintain a Net Asset Value of $1.00. Both ERISA and Non-ERSIA funds are eligible for investment in the The Bank of New York Hamilton Money Market Funds.

- **The Bank of New York Collective Short Term Investment Funds (qualified money):** Consisting of the Short Term Investment Fund ("STIF") and Government Short Term Investment Fund ("GSTIF"), the objectives of these funds is to achieve a high rate of return consistent with safety of principal and liquidity, while investing in the highest quality money market instruments. The final maturity of any investment in these funds may not exceed 13 months. The funds attempt to maintain a Net Asset Value of $1.00. Only ERISA funds are eligible for investment in the The Bank of New York Collective Short Term Investment Funds.

- **Cash Reserve** - is an end of day cash sweep where cash balances are automatically invested. The daily sweep mechanism automatically liquidates or invests in Cash Reserve to meet daily cash requirements. The sweep to Cash Reserve is always the last transaction of the day and is designed to assist in the management and investment of residual cash balances in your account(s). The Cash Reserve offers a rate that is based on the targeted Fed Funds rate. Interest accrues daily and is credited on the second business day of each month. These assets comprise a separate Demand Deposit Account backed by the Bank. All deposits are insured by the FDIC in accordance with regulations.

### Short Term Investment Funds for non-U.S. Dollar Balances

Any cash balances left in the account at the end of the day will earn a competitive rate of interest for selected currencies in the Bank's interest-bearing accounts. There are no fees or transaction costs associated with these accounts, and no minimums are required. Movements of cash in or out of these accounts are subject to our normal cut-off times. Please contact your IMS Account Officer for more details.

Time deposits and call accounts for major currencies are also available. We require 48 hours notice for the placement or termination of a call. Short-term debt instruments, such as BAs and CDs, are also available in a number of markets.

For all currencies except USD, GBP, JPY, CHF, and DEM, we require two full London business days notice for deposits and withdrawals. If your request is made to a New York IMS Account Officer you must notify us by noon of the third business day prior to deposit or withdrawal.

# VI. Pricing Services

**Pricing Vendors for Publicly Traded Securities**

*The Bank of New York subscribes to a number of pricing sources. Below is one example for pricing selections and comparison, as per automated business rules on its strategic security master database for the Bank's global custody and investment accounting systems.*

| Asset Classification | Frequency | Primary | Secondary | Tertiary |
|---|---|---|---|---|
| Equities (U.S./Canada) | Daily | FT Interactive Data | Bloomberg | Telekurs |
| Bonds (U.S./Canada) | Daily | FT Interactive Data | Bloomberg | Telekurs |
| Rights Offering (U.S.) | Daily | FT Interactive Data | Bloomberg | Telekurs |
| Rights Offerings (non-U.S.) | Daily | Extel | Bloomberg | Telekurs |
| Non-US Securities | Daily | Extel | Telekurs | Bloomberg, Euroclear/EUCLID from subcustodians |
| U.S. Treasury Bills, Notes, Bonds | Daily | FT Interactive Data | Bloomberg | Telekurs |
| Spot Currency Rates | Daily | WM Company- via FT Interactive Data | Bloomberg | |
| Forward Currency Rates | Daily | WM Company- via FT Interactive Data | Bloomberg | |
| U.S. Government and Agency Securities | Daily | FT Interactive Data | Bloomberg | Prudential-American |
| Exchange Traded Futures and Futures Options | Daily | Reuters Commodities Research Bureau (Knight Ridder) | Bloomberg | |
| Exchange Traded Equity and Index Options | Daily | FT Interactive Data | Bloomberg | |
| Over-the-Counter Derivatives, including Swaps, Swaptions and Currency Options | Monthly | Bear Stearns | Markit | Gifford Fong Associates |
| Mortgage-Backed Securities | Daily | FT Interactive Data | Bloomberg | Prudential-American |
| Agency Mortgages | Daily | FT Interactive Data | Bloomberg | Prudential-American |
| Asset-backed Securities | Daily | FT Interactive Data | Bloomberg | Prudential-American |
| Medium-Term Notes | Daily | FT Interactive Data | Bloomberg | Prudential-American |
| Municipal Bonds | Daily | FT Interactive Data | Bloomberg | Prudential-American |
| Collateralized Mortgage Obligations | Daily | FT Interactive Data | Bear Stearns STSC | Bloomberg |
| Variable-Rate Notes | Daily | FT Interactive Data | Bloomberg | Prudential-American |
| Private Placements | Daily | FT Interactive Data | Bloomberg | Prudential-American |

| Pricing Vendors for Publicly Traded Securities | | | | |
|---|---|---|---|---|
| **Asset Classification** | **Frequency** | **Primary** | **Secondary** | **Tertiary** |
| Warrants | Daily | FT Interactive Data | Bloomberg | Prudential-American |
| Convertible Bonds | Daily | FT Interactive Data | Bloomberg | Prudential-American |
| Mutual Funds | Daily | FT Interactive Data | Bloomberg | Funds' Transfer Agent/Customer Service Agent |
| Discounted Commercial Paper and Banker's Acceptance | Daily | Internal algorithm, via market yields provided by Bloomberg | FT Interactive Data | |
| Certificates of Deposit | Daily | Internal algorithm, via market yields provided by Bloomberg | FT Interactive Data | |
| ADRs | Daily | FT Interactive Data | Bloomberg | Telekurs |

We use the following hierarchy, in order of preference, to select the most accurate price from the various prices made available to us. Wherever possible we use the "bid-price"; if not available, we use the "mid-price."

- Financial Times Interactive Data
- Bloomberg
- Extel
- Telekurs
- Euroclear
- Reuters
- Broker
- Financial Times
- Subcustodian

If a price cannot be obtained from our primary pricing sources, an accurate price will be established using other sources available to us in the market.

# VII. Corporate Actions and Proxy Voting

We send corporate action notifications to clients and their investment managers via INFORM or SWIFT. INFORM's drop down menus facilitate transmission of your instructions, and partial and full responses can be entered for multiple accounts using one click. INFORM also allows you to review the status of corporate action positions (i.e., full response, partial response, not responded) providing a further measure of control. If we do not receive your instructions two days prior to The Bank of New York's expiration date, a "reminder" will be sent automatically. You can also fax corporate action instructions.

### Notification

For U.S. mandatory actions, we forward a preliminary notice within one to two business days of our receipt of the information. In the case of U.S. voluntary events, all information is confirmed prior to release of the notification, and we guarantee turnaround within one to two business days of our receipt of the confirmed information. A definitive notice follows when complete information is available.

For non-U.S. mandatory and voluntary actions, the first notification is a *New Advice*, stating all known details of a new corporate action, and this is issued within 48 hours of our receipt of information. The *New Advice* will also include your current holding information. Subsequent corporate action messages can include *Replacement/Update*, *Replacement with Entitlement*, and *Withdrawal* notifications. On entitlement date, we will issue an *Entitlement* message confirming your base holding for entitlement. We will also report any updates to your eligibility or entitlement after entitlement date

### Responses to Corporate Actions must include the following:

- Account Name and Number
- Position
- Security Name and Number
- Type of offer (tender, exchange, etc.)
- Action to be taken

### Dividend Reinvestment Plans

If you wish to participate in an established Dividend Reinvestment Plan (DRIP), we must be notified in writing clearly specifying the name of the issue involved and your current holding in each account. We will acknowledge receipt of the instruction and confirm the holdings.

### Japanese Odd Lots

We automatically sell Japanese odd lots when received in a corporate action.

*Response must be received by the Bank deadline as indicated on our notice. All responses received past the Bank of New York expiration date are processed on a "Best Effort" basis. Corporate actions not responded to will not be the liability of The Bank of New York.*

### Proxy Voting

The Bank of New York provides Web-based, global proxy voting in the U.S and over 75 foreign markets through ProxyEdge®, a product offered by Broadridge Financial Solutions, Inc., a market leader in proxy processing. (Broadridge Financial Solutions, Inc. was spun off from Automatic Data Processing (ADP) in April 2007.) You communicate your voting instructions on ProxyEdge, and Broadridge forwards these voting instructions to the appropriate subcustodian or issuer. To further streamline the proxy voting process, you can establish standing instructions, vote identically across multiple accounts with the same holding, and vote entire holdings or a specific number-of shares. You can always override standing instructions with a new vote submission. You can track proxy status from notification to submission and summarize voting activities using ProxyEdge's reports.

# VIII. Tax Reclamation

Tax reclaims will be filed and collected in the environment where the income has been received if your client subscribes to the Bank's Tax Reclaim Service. Please check with your client to determine if they are enrolled in the Bank's Tax Reclaim Service. If so, contact your IMS Relationship Manager for further information including availability of documentation and reporting via INFORM.

# IX. Electronic Interfaces and On-Line Services

We have designed our technology to be as flexible as possible and offer a number of
instruction entry, on-line access and reporting/data transmissions options.

## INFORM

INFORM is The Bank of New York's
proprietary Internet portal with on-line tools for
queries, reporting, accounting, file export,
performance measurement, compliance
monitoring, and trade execution. Through a
highly secure distribution network, INFORM
creates a single gateway to The Bank of New
York's products and services, thereby
enhancing straight-through processing. Users
can review the latest product and system
developments and connect to other Bank of
New York websites.



INFORM provides real-time, intraday status of trade settlement and cash availability.
INFORM provides a series of pre-formatted trade settlement, cash clearing reports, detailing
cash activity by account and by currency. The system provides end-of-day status for cash
projections that are available each morning by 3:00 a.m. (ET).

You can relay information to The Bank of New York on current day cash needs via
INFORM, SWIFT, or fax.

## SWIFT

The Bank of New York is one of the largest users of SWIFT and has made a major
commitment to the SWIFT message formats. Our objective is to facilitate communications
for securities message types, trades, reports, income and corporate actions.

### Message Processing

#### Intraday Processing

We offer intraday outbound processing for MT554, MT555, MT556, MT563 messages,
MT53x message series and real-time processing for inbound trade instructions. The
Bank polls the SWIFT network every half hour for inbound messages and processes

settlements immediately after each inbound transmission to execute clients' trade instructions and transaction reports timely and efficiently.

### Reporting

All MT57x statements arc offered daily, weekly or monthly. This includes the Statement of Positions, MT571, Statement of Settled Transactions, MT572, and Statement of Pending Transactions, MT573. Due to its length, the MT571 report is offered daily at an additional cost to clients.

### Third-party Message Delivery

For non-SWIFT participants and where volumes are appropriate, the Bank accepts SWIFT-formatted messages on electronic file. This gives clients the flexibility to communicate vital trade information with the Bank using alternative means of communication. The messages must be SWIFT- formatted for compatibility with the Bank's systems.

At the end of this automatic validation process, instructions are automatically sent through SWIFT to The Bank of New York's local network. For pending trades for which the market executes automatic matching Bank of New York reports intraday, the matching results through SWIFT MT534. The SWIFT MT573 statement of pending transaction also reports any matching results collected.

Should any problem be identified for the trade, our subcustodian reports this through an agreed list of reason codes via SWIFT MT534, which The Bank of New York relays intraday through SWIFT MT534 messages until the expected settlement date (ESD). In addition, SWIFT MT573 statement of pending transactions reports pre-matching results for trades for which we received the information until ESD. On or after ESD, trades either settle or are updated with a fail code.

### Industry Standardization for Insititutional Trade Communications – International Operations Association (ISITC-IOA)

ISITC–IOA is a global working committee of securities operations professionals representing custodian banks, investment managers, brokers and vendors. The groups mission is to foster alliances and advocate standards that promote straight through processing (STP) of securities transactions.

Please contact your IMS Account Officer if you are interested in providing or receiving ISITC-IOA messages.

**NetInfo Messages for Market Development Information**

We send "NetInfo" messages, which detail crucial settlement information and important events in the local markets. Information includes changes in settlement procedures, repatriation and foreign exchange regulations, tax treaties, and subcustodians, and developments in local markets (i.e., registration change, documentation requirements for foreign investors change notice, new market opening for investment, etc.). NetInfos are provided to clients electronically through INFORM or e-mail.

# X. Reporting

## Daily Reports

INFORM provides real-time, intraday status of trade settlement and cash availability. INFORM provides a series of pre-formatted trade settlement, cash clearing reports, detailing cash activity by account and by currency. The system provides end-of-day status for cash projections that are available each morning by 3:00 a.m. (ET). End-of-day reporting provides the latest status of positions, accruals, projections, registration status, asset valuations, redemptions, income transactions, foreign exchange transactions in a selection of summary and detail formats. These reports facilitate reconciliation of daily transaction activity. Data available includes the following:

- asset holdings
- asset valuations
- settlement transactions
- (settled and pending)
- cash availability
- cash projections
- failed trades
- registration status
- corporate action notifications
- corporate action transactions
- income notifications
- tax reclaim transactions
- redemption transactions
- (settled and pending)
- foreign exchange transactions

## Monthly/Annual Reports

The following reports will be distributed to investment managers at the indicated frequency:

*Monthly Statement of Transactions:* Monthly listing of all principal and income transactions, including opening and closing cash balances.

*Monthly Report:* The monthly report package is dependent upon client specifications.

*Annual Accounting:*  Comprehensive annual report, including all of the schedules provided monthly as well as various reports required depending upon the type of account (e.g., tax exempt plan sponsor or taxable). Any other reporting requirements should be discussed with your IMS Relationship Manager.

## XI. Global Network

| Subcustodian Banks | | |
|---|---|---|
| Country | Agent | Year |
| Argentina | Citibank, N.A | 2002 |
| Australia | National Australia Bank Limited | 1997 |
| Austria | Bank Austria Creditanstalt AG | 1996 |
| Bahrain | HSBC Bank Middle East Limited | 1998 |
| Bangladesh | The Hongkong & Shanghai Banking Corp. Ltd. | 2003 |
| Belgium | ING Belgium SA/NV | 2003 |
| Benin | Société Générale de Banques en Côte d'Ivoire | 2000 |
| Bermuda | Butterfield Trust Bermuda Limited | 2004 |
| Botswana | Barclays Bank of Botswana Ltd. | 2000 |
| Brazil | BankBoston, N.A. | 1992 |
| Bulgaria | ING Bank N.V. | 1997 |
| Burkina Faso | Société Générale de Banques en Côte d'Ivoire | 2000 |
| Canada | Royal Bank of Canada | 1993 |
| Channel Islands | The Bank of New York | 2003 |
| Cayman Islands | The Bank of New York | 2003 |
| Chile | BankBoston, N.A. | 1993 |
| China- Shanghai | The Hongkong & Shanghai Banking Corp. Ltd. | 2003 |
| China - Shenzhen | The Hongkong & Shanghai Banking Corp. Ltd. | 2003 |
| Colombia | Cititrust S.A. | 1993 |
| Costa Rica | Banco BCT | 1997 |
| Croatia | Privredna banka Zagreb d.d. | 1997 |
| Cyprus | BNP Paribas Securities Services - Athens | 2006 |
| Czech Republic | ING Bank N.V. Prague | 2004 |
| Denmark | Danske Bank | 1989 |
| Ecuador | Banco de la Produccion S.A. (Produbanco) | 2004 |
| Egypt | Citibank, N.A. | 1995 |
| Estonia | Hansabank Ltd Estonia | 1996 |
| Euromarket | Clearstream Banking Luxembourg | 1990 |
| Euromarket | Euroclear Bank | 1977 |
| Finland | Nordea Bank Finland plc | 1989 |
| France | BNP Paribas Securities Services / | 1988 |
| | CACEIS Bank | 2000 |
| Germany | BHF-BANK AG | 2004 |
| Ghana | Barclays Bank of Ghana Ltd. | 2000 |
| Greece | BNP Paribas Securities Services | 1999 |
| Guinea Bissau | Société Générale de Banques en Côte d'Ivoire | 2000 |
| Hong Kong | The Hongkong & Shanghai Banking Corp. Ltd. | 1989 |
| Hungary | ING Bank (Hungary) Rt. | 2005 |
| Iceland | Landsbanki Islands | 1998 |
| India | The Hongkong & Shanghai Banking Corp. Ltd. | 1992 |
| Indonesia | The Hongkong & Shanghai Banking Corp. Ltd. | 1990 |
| Ireland | The Bank of New York | 2004 |
| Israel | Bank Leumi, LE – Israel B.M. | 1996 |

| Subcustodian Banks | | |
|---|---|---|
| Country | Agent | Year |
| Italy | Intesa Sanpaolo S.p.A. | 1994 |
| Ivory Coast | Société Générale de Banques en Côte d'Ivoire | 1997 |
| Jamaica | FirstCaribbean International Securities Limited | 1998 |
| Japan | The Bank of Tokyo-Mistubishi UFJ Ltd. / | 1996 |
| | Mizuho Corporate Bank Ltd. | 1993 |
| Jordan | HSBC Bank Middle East Limited | 1996 |
| Kazakhstan | The Hongkong & Shanghai Banking Corp. Ltd. | 2003 |
| Kenya | Barclays Bank of Kenya Limited | 2000 |
| Latvia | A/S Hansabanka | 1999 |
| Lebanon | HSBC Bank Middle East Limited | 1997 |
| Lithuania | SEB Vilníaus Bankas AB | 1996 |
| Luxembourg | Banque et Caisse d'Epargne de l'Etat | 1998 |
| Malaysia | HSBC Bank Malaysia Berhad | 1994 |
| Mali | Société Générale de Banques en Côte d'Ivoire | 2000 |
| Malta | HSBC Bank Malta p.l.c. | 1998 |
| Mauritius | The Hongkong & Shanghai Banking Corp. Ltd. | 1996 |
| Mexico | Banco Nacional de Mexico | 1993 |
| Morocco | Attijariwafa Bank | 1994 |
| Namibia | Standard Bank Namibia Ltd. | 1995 |
| Netherlands | ING Bank | 2004 |
| New Zealand | National Australia Bank Limited | 2000 |
| Niger | Société Générale de Banques en Côte d'Ivoire | 2000 |
| Nigeria | Stanbic Bank Nigeria Ltd. | 1995 |
| Norway | DnB NOR Bank ASA | 1989 |
| Oman | HSBC Bank Middle East Limited | 1998 |
| Pakistan | Standard Chartered Bank | 1992 |
| Palestinian Autonomous Area | HSBC Bank Middle East Limited | 2000 |
| Panama | HSBC Bank (Panama) S.A. | 2006 |
| Peru | Citibank del Perú | 1993 |
| Philippines | The Hongkong & Shanghai Banking Corp. Ltd. | 1992 |
| Poland | ING Bank Slaski | 2003 |
| Portugal | Banco Commercial Português S.A. | 1991 |
| Qatar | HSBC Bank Middle East Limited | 2000 |
| Romania | ING Bank Bucharest | 1997 |
| Russia | ING Bank (Eurasia) | 2002 |
| Senegal | Société Générale de Banques en Côte d'Ivoire | 2000 |
| Serbia | Bank Austria Creditanstalt AG | 2006 |
| Singapore | United Overseas Bank Ltd. / | 1992 |
| | DBS Bank Ltd. | 1996 |
| Slovak Republic | ING Bank N.V., pobocka zahranicnej banky | 2005 |
| Slovenia | Bank Austria Creditanstalt d.d. Ljubljana | 1997 |
| South Africa | Standard Bank of South Africa Limited | 1995 |
| South Korea | The Hongkong & Shanghai Banking Corp. Ltd. | 2003 |
| Spain | Banco Bilbao Vizcaya Argentaria S.A. / | 1989 |
| | Santander Investment S.A. | 2000 |

| Subcustodian Banks | | |
|---|---|---|
| Country | Agent | Year |
| Sri Lanka | The Hongkong & Shanghai Banking Corp. Ltd. | 2003 |
| Swaziland | Standard Bank Swaziland Ltd | 1995 |
| Sweden | Skandinaviska Enskilda Banken | 1989 |
| Switzerland | Credit Suisse, Zurich | 1991 |
| Taiwan | The Hongkong & Shanghai Banking Corp. Ltd. | 1993 |
| Thailand | The Hongkong & Shanghai Banking Corp. Ltd. / Bangkok Bank Public Company Limited | 2003 1996 |
| Togo | Société Générale de Banques en Côte d'Ivoire | 2000 |
| Trinidad & Tobago | The Republic Bank Ltd. | 1999 |
| Tunisia | Banque Internationale Arabe de Tunisie | 1996 |
| Turkey | Türkye Garanti Bankasi A.S. | 1996 |
| Ukraine | ING Bank Ukraine | 1998 |
| United Arab Emirates | HSBC Bank Middle East Limited | 2001 |
| United Kingdom | The Bank of New York / The Depository & Clearing Centre (DCC) | 1965 1997 |
| United States | The Bank of New York | 1910 |
| Uruguay | BankBoston, N.A. – Uruguay Branch | 1993 |
| Venezuela | Citibank, N.A. | 1992 |
| Vietnam | The Hongkong & Shanghai Banking Corp. Ltd. | 2001 |
| Zambia | Barclays Bank of Zambia Ltd. | 2000 |
| Zimbabwe | Barclays Bank of Zimbabwe Ltd. | 2000 |

# XII.  Appendices

## 1. Settlement Details

## 2. Registration Details

## 3. Securities and Cash Deadlines

## 4.  Cash Correspondent List

# EXHIBIT E



## THE BANK OF NEW YORK MELLON

> HOME > FOREIGN EXCHANGE > Trade Execution > Standing Instruction

## Standing Instruction

To meet clients' foreign exchange requirements and help them focus on their core competencies, The Bank of New York Mellon offers FX Standing Instruction capabilities.

### Standing Instructions

Standing Instruction provides a simple, flexible, and complete service solution that automates the capture of all types of custody-related foreign exchange, including securities trade settlement, income conversions, corporate actions, tax reclaims, interest postings and residual balances. Operationally simple, free of charge and integrated with the client's activity on the various securities markets, FX standing instruction is designed to help clients minimize risks and costs related to the foreign exchange and concentrate on their core business.

### Clients benefit from:

Automatic capture of FX trade requirements from underlying custody activity.

Pre-trade administration associated with regulated markets.

Aggregation and netting of trades based on guidelines tailored to client needs.

FX execution according to best execution standards.

Settlement of cash to accounts.

Automated sweeps of residual local currency balances into base currency.

Automatic reporting of trade details to investment accounting systems.

Report on FX execution in a timely and flexible fashion.

Standing instruction enables clients to automatically:

Repatriate securities sales proceeds or fund securities purchases in all markets.

Repatriate cash dividends and income proceeds in all markets.

Convert interest in multi-currency cash accounts to the base currency.

Repatriate tax reclaim proceeds.

# EXHIBIT F



## THE BANK OF NEW YORK MELLON

> HOME > FOREIGN EXCHANGE > Trade Execution > Standing Instruction

# Standing Instruction

To meet clients' foreign exchange requirements and help them focus on their core competencies, The Bank of New York Mellon offers FX Standing Instruction capabilities.

### Standing Instructions

Standing Instructions captures of all types of custody-related foreign exchange funding needs and automates the currency execution and settlement. Transaction types include: securities trade settlement, income conversions, corporate actions, tax reclaims, interest postings, and residual balances. Standing instructions provides a complete FX solution allowing clients to concentrate on their core businesses.

#### Clients benefit from:

Automatic capture of FX trade requirements from underlying custody activity.

Pre-trade administration associated with regulated markets.

Aggregation and netting of trades based on guidelines tailored to client needs.

FX execution according to best execution standards.

Settlement of cash to accounts.

Automated sweeps of residual local currency balances into base currency.

Automatic reporting of trade details to investment accounting systems.

Report on FX execution in a timely and flexible fashion.

#### Standing instruction enables clients to automatically:

Repatriate securities sales proceeds or fund securities purchases in all markets.

Repatriate cash dividends and income proceeds in all markets.

Convert interest in multi-currency cash accounts to the base currency.

Repatriate tax reclaim proceeds.

# EXHIBIT G

| From: | Jorge Rodriguez/ |
| To: | Richard Mahoney/ |
| CC: | David Almeida/ ████████ David K. Nichols ██████████, Robert Ryan/██ |
| BCC: | ████████ |
| Sent: | 2/1/2008 8:10:44 PM |
| Subject: | the negative inpact of e-commerce |

Rich,

As we all know, Standing Instruction FX is the most profitable form of
business. It offers the traders a free intra-day option to time its currency
execution in the marketplace knowing it does not have to get back to the
customer immediately with the deal price. Business of this type also allows us
to take advantage of increased market volatility and wide intra-day trading
ranges. All these pricing advantages disappear when a client trades via an
e-commerce platform and full transparency is achieved. Based on our actual
records, in 2007, non-negotiated business generated an average profit of 9
basis points.

When a client shifts buyer behavior and its channel of communication, this is
generally due to the client:

1) getting pressure from their internal and/or external regulators to
demonstrate best execution
2) thinking they can obtain more competitive pricing by pro-actively managing
their own FX execution, negotiating all deals
3) desiring a more efficient straight through processing solution to conduct
their business, reducing error rates and staff costs

E-commerce helps a client accomplish all of the above, by allowing a customer
the ability to integrate their existing systems with an e-commerce execution
platform. Third party multi-bank systems do all this as well plus give the
client the flexibility to simultaneously secure for each respective
transaction, at their discretion, 1-10 price quotes from their list of approved
FX providers .

Our experience has demonstrated that when a non-negotiated (ultra friendly)
client converts to a multi-bank e-commerce platform (competitive price
shopper) margins greatly decline as the free intra-day option feature
perviously enjoyed disappears, the competitive pressure of going up against as
many as 10 banks at a time, and the client's ability to carefully monitor each
and every trade at the time of execution reduces margins dramatically. Recent
examples of this are ████████████, where in 2007, BNY Mellon generated
revenue of approximately $12MM, on business averaging a 7 basis point margin.
Since converting over to a negotiated status, margins have compressed to 1
basis point and are possibly headed lower. ████████ is an example of reason #2
above. Another noteworthy example, is ████████████████, where margins in
2007 went from two basis points on swaps business to one-tenth of that spread
today based on reason #1 above. ████████████████ is yet a third example of
what was once a very good FX high margin client who upon moving to FXall
squeezed margins so much that it was more cost effective for us to earn third
party FX fees (TPFX) than to compete for their FX business.

At the end of the day, FX is a pure commodity and it is up to the sales
professional to pro-active mange a client relationship with a goal of
identifying ways to add value and generate a fair return in the process. The
problem is that in these cases, a fair return is only a fraction of what it
could be if the business where awarded to BNY Mellon in a non-negotiated
capacity.

Regards,
JORGE

Jorge A. Rodriguez, Managing Director⅚ z The Bank of New York Mellon

**CONFIDENTIAL TREATMENT REQUESTED**

BNYM-MASD-0025981

Corporation
GLOBAL MARKETS z Tel ███████████ z Fax ██████████ z ███████████████████

CONFIDENTIAL TREATMENT REQUESTED

# EXHIBIT H

From: CN=Richard Mahoney
To: CN=Bob P Kelly
Sent: 02/01/2008 09:15:44 PM
Cc: CN=Bruce Van
Saun
Subject: FX Channel Mix
Attachments: iFX Express client 3.bmp

Hi Bob,

Thanks for the question...

In the context of our foreign exchange business, the term "E-Commerce" refers generally to electronic trade initiation via the Internet, rather than dealing via the telephone or on a standing instruction ("internals" in Mellon-speak) basis.

The greater rate transparency available through these systems, and the ability to access multiple banks simultaneously for price quotes, has resulted in material compression of customer spreads across the entire FX industry, as banks bid against each other in real time for trades.

At BNYM, E-commerce is divided into two principal channels:

1.  **The Bank of New York Mellon's proprietary applications.** These include legacy BNY systems, **iFX Manager** and **iFX Express**, and legacy Mellon systems, **IDeal Forex** and **e-IDeal Forex**. iFX Manager has certain pre-trade order management features and post-trade allocation and messaging tools specifically designed for the needs of fund managers. IDeal Forex is designed to meet the needs of corporate customers, particularly with respect to international mulitcurrency payments.
2.  **Multi-bank Portals.** There are two market leading multibank portals: **FXall** and **FX Connect** (the latter owned by State Street). Each platform has roughly 50 of the world's largest banks connected, allowing customers to access multiple counterparties for price quotes, sometimes in direct competition. Legacy BNY and Mellon both participated on FXall and FX Connect. The auction based pricing mechanisms featured on these sites, and the resultant change in customer buying behavior, has adversely affected margins. (STT spent $560 million last Feb to buy another e-Commerce platform, Currinex; I believe revenues (fees) from this investment are included in their FX earnings...)
3.  **Other:** in fact, there are many other flavors of electronic execution channels, such as Bloomberg, 360T, FX MarketSpace, Lava, Hotspot, EBS Prime and more.....These are not relevant to our business at BNYM at the present time, as they serve other non- core (to us) market segments.

Although e-commerce systems include many features to offer rate transparency, increase productivity and improve straight through processing, in simple terms they do nothing more than emulate direct dealing over the telephone. In this sense, the pricing offered to customers trading electronically is not materially different than what we would offer over the phone...

The real impact to our business is felt when a customer migrates from standing instruction execution to electronic trading. Standing instruction margins are higher because we provide value-added services surrounding trade execution, such as determining the trade requirements, handling pre-trade administration for regulated market trades, aggregating and netting trade amounts, and assuring settlement. Standing instruction also offers the traders a free intra-day option to time the currency execution in the marketplace knowing we don't have to get back to the customer immediately with the deal price. Business of this type also allows us to take advantage of increased market volatility and wide intra-day trading ranges. All these pricing advantages disappear when a client trades via an e-commerce platform and full transparency is achieved. (comparison pricing, execution, and confirmation in real time)..

The secular trend favoring adoption of e-commerce trading solutions has been unfolding over many years; we can't put the smoke back in the cigarette. On the contrary, we have embraced these new technologies and now use the proprietary features of iFX Manager and IDeal Forex, as well as our active participation on multibank platforms, to attract new customers.

BNYM-MASD-0031314

This shifts the "terms of trade" in custody... buying currency at razor- thin interbank margins compels us to more dynamic "cover or carry" risk decisions - essentially shifting the balance between markup (sales) to risk-positioning (trading).

When a client shifts buyer behavior and its channel of execution, this is generally because the client is:

- getting pressure from their internal and/or external regulators to demonstrate best execution;
- thinking they can obtain more competitive pricing by pro-actively managing their own FX execution, negotiating all deals;
- desiring a more efficient straight through processing solution to conduct their business, reducing error rates and staff costs.

Some anecdotes will help illustrate the impact to our business when a client moves from standing instruction to e-commerce.

- ████████████████ generated revenue of approximately $11MM in 2007 on business with an average margin of 8 basis points. Since converting to a negotiated basis via a e-commerce solution in late 2007, margins have compressed to 1 basis point and are possibly headed lower.
- ██████████ is another example of what was once a very good FX high margin client who upon moving to FXall squeezed margins so much that it was more cost effective for us to earn third party FX fees (TPFX) than to compete for their FX business. ████████████ had previously been a $1.2MM per year client.
- Third party e-Commerce platforms such as FXall and FX Connect are toll roads - we have to pay brokerage fees to deal with clients through these platforms... in addition to spread compression, current run rates (at these volumes) indicate we will pay about $2mio in fees in 2008.

If you have any further questions regarding the e-commerce channel, our proprietary platforms, or our strategy to address these market challenges, please contact me...

*or, if all this sounds like too much market jargon and double talk, I'll walk over at your convenience and try to answer your questions directly.*

Rich

Attached below is a screenshot from iFX:

iFX Express client 3.bmp

# EXHIBIT I

From: CN=Antonio M Garcia-Meitin/O=Mellon
To: CN=Antonio M Garcia-Meitin/O=Mellon;CN=Jorge
Rodriguez/████████████=Robert
Near/█████████████Joseph F.
Keenan,█████████████Michael Solo/OU██████████████=Dave
DiNardo/O=Mellon
Sent: 04/11/2008 03:43:30 PM
Subject: RE: Transparency
Attachments: Transparency - Top 5 Impacts Template_Rev and Fee.doc

```
Hi Everyone,
Let's use the attached for our review at Noon.  In general transparency
adversely impacts our revenue stream and any product to distribute fee
information would hurt us many times over in reduced revenue. Nothing like a
rock and a hard place.
Thanks
Tony
 <<Transparency - Top 5 Impacts Template_Rev and Fee.doc>>
Antonio M. Garcia-Meitin, Jr.
Bank of New York Mellon
Asset Servicing - Global Strategy
AIM - 024-0111
antonio.garcia-████████████
```

-----Original Appointment-----
From: Garcia-Meitin Antonio M
Sent: Thursday, April 10, 2008 4:24 PM
To: Garcia-Meitin Antonio M; Rodriguez Jorge (BNY); Near Robert (BNY); Keenan Joseph F. (BNY); Solo
Michael (BNY); DiNardo Dave
Subject: Transparency
When: Friday, April 11, 2008 12:00 PM-12:30 PM (GMT-05:00) Eastern Time (US & Canada).
Where: Teleconference instructions below
 << File: Transparency – Top 5 Impacts Template_Rev and Fee.doc >>
**For members of the Revenue/Fee Disclosure Team:**
Antonio M Garcia-Meitin
Dave DiNardo
Joe Keenan
Mike Solo
Bob Near
Here are the dial-in details for tomorrow's 1:00 PM meeting:

Can you review and get back to me any changes by 11 AM (let me know if the attachment came
through okay, multiple e-mail systems can create havoc).  We can meet quickly for final run
through. With any luck we work out any final changes and get to Stephanie by 1 PM deadline.

- Transparency - Top 5 Impacts Template_Rev and Fee.doc

# EXHIBIT J



**From:** CN=Robert Near/
**To:** CN=Jorge Rodriguez/
**Sent:** 07/21/2010 03:19:42 PM
**Cc:** CN=Angela Hampton- 'Colleen. Carrol"
CN=David

Almeida/ =David K.
Nichols/ George B
Gilmer/ CN=Grant W.
Wilson/ egory M.
Wildgrube/ =Kevin J.
Lawrie/ Lynn
Taylor/ Regina Meredith-
Carpeni/ Richard
Mahoney/ =Shaina S
Jusine/ Susanna
Klein/

**Subject:** Re: FX Peer Comparison

While difficult to quantify, and only having a 'couple' of data points, I think BNYM has been more successful in maintaining spreads in the SI space compared to these peers. Another way to say this is BNYM is 'late' to the transparency space. We are hearing from our clients that our competitors are offering time stamping and fixed spreads across all currencies.

Robert C. H. Near, Managing Director    BNY Mellon Global Markets
Global Markets Website · Tel           · Fax

*This message and its content is not a confirmation (which is provided under separate cover). Sender believes this information to be accurate, but disclaims liability for reliance thereon. This message is not a solicitation of any transaction. The Bank of New York Mellon, member FDIC.*



**From:** Jorge Rodriguez/
**To:** David Almeida/ K:
**Cc:** Angela Hampton-
Nichols/ George B Gilmer/CorpUS/
Grant W. Wilson/ , Gregory M.
Wildgrube/ Kevin J. Lawrie/PA/DOMESTIC
Lynn Taylor/ , Regina Meredith-
Carpeni/NY/ Richard Mahoney/NY/DOMESTIC
Shaina S Jusine/ Susanna
Klein/ 'Colleen. Carrol"



**Date:** 07/21/2010 11:12 AM
**Subject:** Re: FX Peer Comparison

For sake of clarification, Dave Almeida is referring to historical Custody FX clients, where we have lost the

custody mandate and the business has transitioned to our competitors. These are the clients that have been appearing on our Lost Business Report. Please let me know if you have not seen this report and would like a copy?

In 2010, high order sales has added many new clients throughout 2010. In fact, FX Sales volumes from the FX Sales force for the first half of 2010 verses the same period last year are up over $1 Trillion, an amazing 24% growth over the same period last year.

Regards,
JORGE



Jorge Rodriguez, EVP · BNY Mellon Global Markets
Global Markets - Sales · Tel ███████ · Fax ███████



| From: | David Almeida/ |
| To: | Lynn Taylor/PA/DOMESTIC |
| Cc: | Angela Hampton-Frisby/ |
| | George B Gilmer/ ... David K. Nichols/NY ... |
| | Wildgruber/ ... Grant W. Wilson ... Gregory M. |
| | Lawrie/ ... Jorge Rodriguez ... Kevin J. |
| | Mahoney ... Regina Meredith-Carpent/ ... Richard |
| | Klein/ ... Shaina S Jusino/ ... Susanna |
| Date: | 07/21/2010 09:43 AM |
| Subject: | Re: FX Peer Comparison |

I would just point out that our performance versus the group will suffer if trading doesn't make up for lost customers.



| From: | Lynn Taylor/PA/DOMESTIC/BNY |
| To: | Richard Mahoney/ ... David Almeida/NY ... , Jorge |
| | Rodriguez/ ... David K. Nichols/ ... Gregory M. |
| | Wildgruber/ ... Regina Meredith-Carpent/ ... Kevin J. |
| | Lawrie/ ... Grant W. Wilson ... George B |
| | Gilmer/CorpUS/BNYMellon@BNYMellon |
| Cc: | Susanna Klein/ ... Shaina S Jusino/ ... Angela Hampton- |
| Date: | 07/21/2010 09:32 AM |
| Subject: | FX Peer Comparison |

The FX peer comparison has been updated with NTRS results:

| | | | | 2Q10 vs. | |
| | 2Q10 | 1Q10 | 2Q09 | 1Q10 | 2Q09 |
|---|---|---|---|---|---|
| BK | $ 244 | $ 175 | $ 240 | 39% | 2% |
| NTRS | 115 | 80 | 134 | 45% | (14)% |
| STT | 185 | 134 | 190 | 38% | (3)% |

**Highlights** - BNYM maintains largest FX market share among fiduciary banks
- Peer group is up more than 35% vs linked quarter; and
  competitors are down vs prior year, while BNYM is up slightly
- Results for all fiduciary banks have remained clustered in same trend, suggesting peer group
  is being impacted similarly by external market factors and volatility trend



Peer Analysis: Fiduciary Banks
Foreign Exchange Revenue
(1Q'05 - 2Q'10)

\*Source:    Northern Trust Financial Supplements (from www.northerntrust.com - Investor Relations)
\*\*Source:   State Street Financial Trends (from www.statestreet.com - Investor Relations)
\*\*\*Source:  2005-2Q 2007: Proforma additions of historical heritage Mellon and heritage Bank of New York GMD FX Reve
           Q2 2007-Q4 2007: BNYM Global Markets FX revenue (non-public information)
           Q1 2008 - present: Total BNYM FX Trading Revenue

[attachment "Peer Review 2Q10.xls" deleted by Jorge Rodriguez/NY/DOMESTIC/BNY]

CONFIDENTIAL TREATMENT REQUESTED                                     BNYM-MASD-0058438

# EXHIBIT K





March 29, 2011

Pamela Jo Bondi
Florida Attorney General
State of Florida
The Capital, PL-0
Tallahassee, FL 32399-1050

Dear Ms. Bondi,

My name is ▮▮▮▮▮▮▮▮ I was a Corporate Foreign Exchange Salesperson with BNY Mellon. My BNY Mellon Employee Number was ▮▮▮▮▮▮ I was based in Pittsburgh, Pennsylvania and reported to ▮▮▮▮▮▮ I was part of Jorge Rodriguez's team and Richard Mahoney who was Head of Global Markets.

The reason why I am writing to you is to inform you that you can use me as a witness in your present lawsuit against BNY Mellon relating to false foreign currency trades.

I was with the bank from ▮▮▮▮ to ▮▮▮▮▮▮ I used many of the organization's foreign currency systems including Charlie, Wall Street Systems and iDealForex. I was also trained in committing fraud using various strategies and to the bank's corporate foreign exchange clients. These were mainly large Fortune 500 corporations based in the United States. I have 15 years of Corporate Foreign Exchange Sales experience with half of that coming from ▮▮▮▮▮▮ I can tell you firsthand and without any hesitation that the fraud is prevalent throughout BNY Mellon's Foreign Exchange Group. I can also share with you that top management was aware of the fraud the entire time.

It is rare opportunity for you to have someone like me on your side. BNY Mellon's foreign exchange group was very small. I was only 1 of 3 people in the entire bank who focused exclusively on the corporate client segment. We used the same systems and fraudulent strategies on the corporate clients as was used on the pension fund clients.

You are welcome to pass this information along to other parties.

Thank you.

Sincerely,



# EXHIBIT L

## BNY Mellon  RFP Misrepresentation Log

**Key**

| |
|---|
| **1.** Best rate of the day |
| **2.** Best execution |
| **3.** We price foreign exchange at levels generally reflecting the interbank market at the time the trade is executed by the foreign exchange desk. |
| **4.** The Bank discloses all conflicts of interest. |
| **5.** Market rate |
| **6.** Custody service representatives executing on behalf of custody clients receive the same attention and competitive pricing that Investment Advisors receive from our foreign exchange desks. |
| **7.** If [the client] has standing income exchange instructions with us, our system automates the conversion process based on the current foreign exchange rate input. |

| RFP Recipient | Date | Misrep | Other Misrep |
|---|---|---|---|
| Duke University | March 2000 | 7 | |
| Andrew W. Mellon Foundation | February 2001 | 1, 6 | |
| William M. Mercer Investment Consulting | March 2001 | 1 | Being a market making participant in the FX market requires that the bank always offers the best available price in any FX transaction. |
| Marshall & Ilsley Trust Company | April 2001 | | If the client chooses to have standing instructions to repatriate, the time involved is on a spot basis after receipt of funds." |
| Washington State Investment Board | November 2001 | 6 | |
| Nuveen Investments | August 2001 | 7 | |
| WesCorp Federal Credit Union | December 2001 | 7 | |
| Cambridge Associates | February 2001 | 7 | |
| Fire and Police Pension Association of Colorado | October 2002 | 1, 2 | |
| Rice University | February 2002 | 1, 2 | |
| Summit Mutual Funds | July 2002 | 1, 7 | |
| Ohio Public Employees' Retirement System | April 2002 | 1, 6 | |
| Client of Merrill Lynch | July 2002 | 1, 6 | |
| Ameren Corporation | April 2002 | 1, 7 | |
| First Energy | July 2002 | 6 | |
| Iowa | February 2002 | 6 | |
| New York State Deferred Compensation Board | February 2002 | 7 | |
| MCIC Ltd./MCIC Vermont Inc. | April 2002 | 6 | |
| Indiana State Teachers' Retirement Fund | September 2002 | | |

| | | | |
|---|---|---|---|
| Arizona State Retirement System | March 2002 | 6,7 | |
| YMCA Retirement Fund | September 2002 | 6,7 | |
| Univeristy of New Hampshire | June 2002 | 7 | |
| United Water Resources | December 2002 | 7 | |
| Southern Nevada Carpenters Trust Funds | July 2002 | 7 | |
| Ownes Corning | May 2002 | 7 | |
| Local 6 Club Employees Pension Fund | July 2002 | 6 | |
| American Psychiatric Association | December 2002 | 7 | |
| Walt Disney Company | April 2003 | 1, 2 | |
| TIAA Cref Institutional Asset Management | January 2004 | 1, 2 | |
| Julius Baer Investment Management | December 2003 | 1, 2 | |
| Detroit Police and Firemen | January 2003 | 1, 6 | |
| Walt Disney Company Master Trust | April 2003 | 1 | |
| Sears, Roebuck & Co. | July 2003 | 1 | |
| Idaho Endowment Fund Investment Board | October 2003 | 1, 6 | |
| State of New Mexico Board of Finance | May 2003 | 6 | |
| Plumbers Local Union No. 1 | August 2003 | 6 | |
| City of Jacksonville Florida | March 2003 | 7 | |
| City of Fresno Retirement Services | January 2003 | 6 | |
| Borg Warner | November 2003 | 7 | |
| United Church of Christ - Pension Board | August 2004 | 1, 2 | |
| TIAA Cref Institutional Asset Management | January 2004 | 1, 2 | |
| Hewlett-Packard Co. | June 2004 | 1, 2 | |
| Bank of Oklahoma | April 2004 | 1 | |
| NYC Ret. Sys. | October 2003 | 1, 4 | |
| State of Florida Department of Financial Services | August 2004 | 1, 6 | |

| | | | |
|---|---|---|---|
| Oklahoma State Employees Retirement System | April 2004 | 1 | This differentiates BNY from other custodians who tend to provide less competitive rates for income related FX transactions since they are too small to receive the more competitive commercial FX rates. |
| YMCA of Metropolitan Los Angeles | May 2004 | 2, | |
| State Board of Administration of Florida | September 2004 | 2, 6, 7 | The Bank of New York is a major participant in the global FX markets . . . . This reach enables BNY to provide the most competitive rates to our clients. |
| Avaya | April 2004 | 2 | |
| ABN Amro | November 2004 | 2 | |
| PNC Bank | September 2004 | 5 | Arrangements can be made to automatically process all or select (income) transactions in U.S. dollars. Upon payment of income, we will execute a spot contract to sell the currency on your behalf." 0259926 |
| World Bank | October 2004 | | BNY determines the rates used for conversions as the prevailing market rates at the time of the client instruction to execute the FX. |
| State of Connecticut | 2004 | 4 | |
| SCANA Corporation | June 2004 | 7 | |
| Saudi Arabian Oil Company | August 2004 | 6 | |
| North Ottawa Community Hospital | November 2004 | 7 | |
| Norfolk Southern Corporation | June 2004 | 7 | |
| New Covenant Funds | July 2004 | 5 | |
| Harris Trust & Savings Bank | April 2004 | | Arrangements can be made to automatically process all or select (income) transactions in U.S. dollars. Upon payment of income, we will execute a spot contract to sell the currency on your behalf. A standing instruction to convert tax reclaims to a specific currency can be set up by account. |
| FBL Financial Group, Inc. | March 2004 | 6 | |
| Constellation Energy Group, Inc. | October 2004 | 7 | |

| | | | |
|---|---|---|---|
| Columbia Galaxy and Nations Funds | May 2004 | | At The Bank of New York we do not take competitive or potentially conflicting positions with our clients.  Rather, we align our interests with theirs. |
| CIGNA | October 2004 | 7 | |
| Callan Associates | 2004 | 6 | |
| United Nations - Procurement Division | October 2004 | 6 | |
| Stratford Advisory Group | April 2004 | 7 | |
| Trustees of Princeton University | March 2005 | 1, 2 | |
| Manville Personal Injury Settlement Trust | December 2005 | 1, 2, 7 | |
| Employees Retirement System of Texas | September 2005 | 1, 2, 4 | |
| Dimensional Fund Advisors | March 2005 | 1, 2 | |
| State University of New York | August 2005 | 1 | There are no fees or other transaction costs associated with foreign exchange services provided by The Bank of New York. |
| City of Richmond Virginia Retirement System | October 2005 | 1, 7 | |
| Baker Hughes Inc. | June 2005 | 1 | |
| Citigroup Asset Management | August 2005 | 2 | |
| California Public Employees Retirement System | October 2005 | 2 | We do not foresee any actual or potential conflicts of interest in providing the services requested in this RFP |
| Pacific Gas & Electric Corporation | May 2005 | 3, 5 | |
| Allianz of America, Inc. | March 2005 | 3 | |
| Stationary Engineers Local 39 Pension Trust Fund | September 2005 | 6 | |
| University of Florida Foundation, Inc. | 2005 | 7 | |
| State of New Mexico Board of Finance | August 2005 | 7 | |
| RV Kuhns and Associates, Inc. | January 2005 | | BNY determines the rates used for conversions as the prevailing market rates at the time of the client instruction to execute the FX. |
| Oregon/Washington Carpenters Employers Pension Trust Fund | June 2004 | 5, 7 | |
| United Technologies Corporation | May 2006 | 1, 2, 3, 5 | |

| | | | |
|---|---|---|---|
| Deluxe Corporation | October 2006 | 1, 2, 3, 5 | |
| Alabama Trust Fund | March 2006 | 1, 2 | |
| Pinncle West Capital Corporation | April 2006 | 1, 2, 4 | |
| State of Wisconsin Investment Board | December 2006 | 1,3, 5 | |
| Washington State Investment Board | 2006 | 1, 7 | |
| North Carolina Dept. of the State Treasurer | March 2006 | 1 | We give our clients the most competitive/attractive FX rate available to us. |
| Electrical Workers Local No. 26 Pension Trust Fund | February 2006 | 1, 7 | |
| Boilermakers National Annuity Trust | April 2006 | 1, 4, 5 | |
| Ohio Police and Fire Pension Fund and State Teachers Retirement System | September 2006 | 2,3 | |
| Microsoft Corporation | August 2006 | 2,3 | |
| MFS Investment Manager | January 2006 | 2,3, 5 | |
| Hoag Memorial Hospital Presbyterian and Hoag Hospital Foundation | May 2006 | 2,3 | |
| Best Buy | August 2006 | 2,3 | |
| Key Bank National Association | February 2006 | 2, 6 | The Bank of New York does not charge any fee or any other transaction costs for its foreign exchange services, except for third party foreign exchange transactions |
| Old Mutual Fund Advisors | May 2006 | 2 | |
| Retail Wholesale and Department Store International Union and Industry Benefit and Pension Funds | August 2006 | 2 | |
| Resilient Floor Covering Pension Fund | July 2006 | 2 | |
| Pension Benefit Guaranty Corporation | August 2006 | 2 | |
| HSBC Investor Funds | February 2006 | 2 | |
| GE Funds | July 2006 | 2 | |

| | | | |
|---|---|---|---|
| Fidelity Investments | April 2006 | | The Bank of New York acts as agent for FX transactions. Our FX department receives a daily currency execution report from our sub-custodians in markets with restricted currencies, (the report indicates the trading range for the day). BNY FX uses this report to ensure competitve rates and timely execution. |
| PowerShares Global Exchange-Traded Fund Trust | December 2006 | 6 | |
| Oakland County Employee Retirement System and Voluntary Employee Benefit Association | January 2006 | 6 | |
| Fifth Third Bank for Oakland County | January 2006 | 5, 6 | |
| Vermont Pension Investment Committee | September 2006 | 6 | Conversions to base currency are performed at the appropriate spot rates on trade date. |
| Scottish Re Group Limited | March 2006 | 6 | |
| New Castle County Employees' Pension Fund | September 2006 | 6 | |
| Mercantile Funds, Inc. | June 2006 | 6, 7 | |
| Matthews Asian Funds | July 2006 | 6 | |
| Financial Risk Management LTD | February 2006 | 6, 7 | |
| Corporate Defined Benefit Plan Client of New England Pension Consultants | February 2006 | 6 | |
| Client of New England Pension Consultants | June 2006 | 6 | Conversions to base currency are performed at the appropriate spot rates on trade date. |
| City of Los Angeles Employees' Retirement System | October 2006 | 6 | |
| City of Boston | June 2006 | 6 | |
| Central Latinoamericana de Valores, S.A. Latin Clear | July 2006 | 7 | |
| BB&T Asset Management | February 2006 | 5, 7 | |
| A Corporate Defined Benefit Plan Client of New England Pension Consultants | February 2006 | 6 | |
| Puerto Rico Teachers Ret. Sys. | March 2007 | 1, 2, 3,4 | |

| Kaiser Permanente | April 2007 | 1, 2, 4 | |
| CTWW Trust/Custody Search | March 2007 | 1, 2, 4 | BNY Discloses the "explicit and implicit costs of processing foreign exchange to the client." |
| City of Philadelphia Board of Pensions and Retirement | March 2007 | 1, 6 | |
| MCERA | May 2007 | 1,4 | BNY Global Markets Division processes foreign exchange transactions at no fee for Bank of New York custody, cash management or private banking clients. |
| Opera Solutions | March 2007 | 2 | |
| General Motors Asset Management | September 2007 | 3, 5 | |
| Pension Benefit Guaranty Corporation | January 2007 | 4 | We do not execute any trades for clients using The Bank of New York as Foreign Exchange counterparty, because we take a fiduciary responsibility for our clients.  We want to ensure that there can be no appearance of conflict of interests. |
| FOGAFIN | January 2007 | | Purchases, sales, income and expenses in foreign currency are converted to base currency at the closing rate on the transaction date. |
| William Blair Funds | April 2007 | 6 | |
| W.R. Berkley Corporation | May 2007 | | * The FX rate applied to the disposal of the currency is the FX rate of the day as determined for closing market FXs. |
| State of Tennessee Treasury Department | February 2007 | 6 | |
| Ecopetrol, S.A. | May 2007 | | Purchases, sales, income and expenses in foreign currency are converted to base currency at the closing rate on the transaction date. The assets and liabilities of our clients are converted to base currency at the closing rate on the reporting date |
| American Century Investments | January 2007 | 7 | |
| Project Oak | February 2008 | 2 | |
| Turner Funds | April 2008 | 3 | |
| Iowa | | 1 | |