1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
Charles E. Davidow (admitted *pro hac vice*)
2001 K Street, NW
Washington, District of Columbia 20006
Telephone: (202) 223-7300
Facsimile: (202) 223-7420
Email: cdavidow@paulweiss.com

BINGHAM MCCUTCHEN LLP
David M. Balabanian (SBN 37368)
Frank Busch (SBN 258288)
3 Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000
Facsimile: (415) 393-2286
Email: david.balabanian@bingham.com

*Attorneys for Defendants*

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
Michele Hirshman (admitted *pro hac vice*)
Robyn F. Tarnofsky (admitted *pro hac vice*)
Matthew J. Moses (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
Email: mhirshman@paulweiss.com
Email: rtarnofsky@paulweiss.com
Email: mmoses@paulweiss.com

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

INTERNATIONAL UNION OF OPERATING
ENGINEERS, STATIONARY ENGINEERS
LOCAL 39 PENSION TRUST FUND,
individually and on behalf of all others similarly
situated,

Plaintiff,

v.

THE BANK OF NEW YORK MELLON
CORPORATION, THE BANK OF NEW YORK
MELLON, THE BANK OF NEW YORK
COMPANY, INC., THE BANK OF NEW
YORK, and THE BANK OF NEW YORK
MELLON TRUST COMPANY, N.A.,

Defendants.

No. 3:11-CV-03620-WHA

Judge: Hon. William H. Alsup
Date:   February 23, 2012
Time:   8:00 am

**DEFENDANTS' NOTICE OF MOTION
AND MOTION TO DISMISS AND
MEMORANDUM OF LAW IN
SUPPORT OF THE MOTION TO
DISMISS THE AMENDED CLASS
ACTION COMPLAINT**

1

## <u>NOTICE OF MOTION AND MOTION TO DISMISS</u>

2

3          PLEASE TAKE NOTICE that on February 23, 2012 at 8:00 a.m., or as soon

4 thereafter as may be heard, at the U.S. District Court, Northern District of California, located at

5 450 Golden Gate Avenue, San Francisco, California, before the Honorable William Alsup,

6 Defendants will and hereby move for an Order dismissing the Amended Class Action Complaint

7 ("Complaint" or "AC") filed by Plaintiff, pursuant to Federal Rule of Civil Procedure 12(b)(6), and

8 applicable law.  This motion is based on this Notice of Motion and Motion; the accompanying

9 Memorandum of Law; the Declaration of Matthew J. Moses and the exhibits thereto; and all other

10 matters properly before this Court.

          Defendants bring this motion to dismiss all of Plaintiff's claims with prejudice.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................iv

PRELIMINARY STATEMENT...........................................................................................1

I.     STATEMENT OF FACTS. ...........................................................................................2

     A.     The Global Custody Agreement and BNYM's Foreign Exchange Procedures.......3

     B.     Response to Plaintiff's Initial Request for Proposals and Welcome Packages........6

     C.     Procedural History and the Allegations in the Complaint ......................................7

ARGUMENT ........................................................................................................................8

II.     PLAINTIFF FAILS TO STATE A CLAIM FOR BREACH OF CONTRACT ................9

     A.     BNYM's Alleged Pricing Method Was Consistent with the Parties' Contract. ......9

          1.     BNYM Did Not Provide Fictitious Exchange Rates. ..................................9

          2.     Plaintiff Never Alleges that BNYM Provided Better Rates To Any Other Client in a Transaction Comparable to One of Plaintiff's. .............10

          3.     Plaintiff Fails Adequately To Allege that BNYM Breached a Contractual Obligation To Provide IUOE with "Better" Rates. ................12

     B.     Plaintiff's Claim for Breach of Contract Is Precluded By the Parties' Fully Integrated and Unambiguous Written Agreement. ..................................................12

III.     PLAINTIFF FAILS TO STATE A CLAIM FOR BREACH OF AN IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING................................................18

IV.     PLAINTIFF FAILS TO STATE A CLAIM UNDER THE UCL OR FAL. .....................18

     A.     Plaintiff Fails Adequately To Plead that the FX Transactions Were Fraudulent. ..........................................................................................................19

     B.     Plaintiff Fails Adequately To Plead that the FX Transactions Were Illegal..........20

     C.     Plaintiff Fails Adequately To Plead that the FX Transactions Were Unfair..........21

V.     PLAINTIFF FAILS TO STATE A CLAIM UNDER THE NEW YORK UNFAIR BUSINESS PRACTICES STATUTE. .............................................................................22

VI.     THE CLAIMS ARE BARRED BY THE APPLICABLE LIMITATIONS PERIODS. ....................................................................................................................24

VII.     PLAINTIFF FAILS TO STATE CLAIMS AGAINST THE BANK OF NEW YORK MELLON CORP. AND THE BANK OF NEW YORK CO., INC.......................25

1

CONCLUSION ...................................................................................................................... 25

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

<u>**TABLE OF AUTHORITIES**</u>

3

**Page(s)**

4

**CASES**

5

*Ahmadzai* v. *Metully*,
   No. CIVS-05-1091LKKJFMPS, 2005 WL 2219215 (E.D. Cal. Sept. 12, 2005),

6

   *adopted in full*, No. S-05-1091 LKK JFM PS, 2006 WL 20793 (E.D. Cal. Jan. 3, 2006) ..... 24

7

*Altanta-One, Inc.* v. *S.E.C.*,

8

   100 F.3d 105 (9th Cir. 1996)................................................................................................ 14

9

*Ammirato* v. *Duraclean Int'l, Inc.*,
   687 F. Supp. 2d 210 (E.D.N.Y. 2010) ................................................................................ 22

10

*Andre Strishak & Assocs., P.C.* v. *Hewlett Packard Co.*,

11

   752 N.Y.S.2d 400 (N.Y. App. Div. 2002) .......................................................................... 24

12

*Aryeh* v. *Canon Bus. Solutions*,
   185 Cal. App. 4th 1159 (2010), *review granted*, 240 P.3d 823 (Cal. 2010).......................... 24

13

14

*Brooklyn Navy Yard Cogeneration Partners, L.P.* v. *Superior Court*,
   60 Cal. App. 4th 248 (1997) ............................................................................................... 25

15

*Buller* v. *Sutter Health*,

16

   160 Cal. App. 4th 981 (2008) ............................................................................................. 20

17

*Calvert* v. *Huckins*,
   875 F. Supp. 674 (E.D. Cal. 1995)...................................................................................... 25

18

19

*Christakis* v. *Mark Burnett Prods.*,
   No. CV 08-6864-GW(JTLx), 2009 WL 1248947 (C.D. Cal. Apr. 27, 2009)........................ 24

20

*Comm. on Children's T.V., Inc.* v. *Gen. Foods Corp.*,

21

   35 Cal. 3d 197 (1983) ......................................................................................................... 19

22

*Cook* v. *Brewer*,
   637 F.3d 1002 (9th Cir. 2011).............................................................................................. 11

23

*Daugherty* v. *Am. Honda Motor Co., Inc.*,

24

   144 Cal. App. 4th 824 (2006) ............................................................................................. 21

25

*Dean Witter Reynolds, Inc .*v. *Sup. Ct.*,

26

   211 Cal. App. 3d 758 (1989)............................................................................................... 21

27

*In re Enron Corp. Sec. Derivative & "ERISA" Litig.*,
   540 F. Supp. 2d 759 (S.D. Tex. 2007) .................................................................................. 3

28

*EPA Real Estate P'ship* v. *Kang*,
12 Cal. App. 4th 171 (1992) ........................................................................ 12

*ExxonMobil Inter-Am., Inc.* v. *Advanced Info. Eng'g Servs., Inc.*,
328 F. Supp. 2d 443 (S.D.N.Y. 2004) ...................................................... 22

*Gristede's Foods, Inc.* v. *Unkechauge Nation*,
532 F. Supp. 2d 439 (E.D.N.Y. 2007) ...................................................... 24

*Gurfein* v. *Ameritrade, Inc.*,
312 F. App'x 410 (2d Cir. 2009) .............................................................. 14

*Gutierrez* v. *Wells Fargo Bank, N.A.*,
730 F. Supp. 2d 1080 (N.D. Cal. 2010) .............................................. 19, 22

*Guz* v. *Bechtel Nat'l, Inc.*,
24 Cal. 4th 317 (2000) ............................................................................ 18

*Hervey* v. *Mercury Cas. Co.*,
185 Cal. App. 4th 954 (2010) .................................................................. 13

*Hofstetter* v. *Chase Home Fin., LLC*,
No. 10-cv-01313, 2010 WL 3259773 (N.D. Cal. Aug. 16, 2010) ............ 22

*Knievel* v. *ESPN*,
393 F.3d 1068 (9th Cir. 2005) ................................................................... 4

*La Jolla Village H'owners' Ass'n* v. *Sup. Ct.*,
212 Cal. App. 3d 1131 (1989) .................................................................. 20

*Lavie* v. *Procter & Gamble Co.*,
105 Cal. App. 4th 496 (2003) .................................................................. 19

*Lee* v. *Capital One Bank*,
No. 07-cv-4599, 2008 WL 648177 (N.D. Cal. Mar. 5, 2008) .................. 21

*Logan* v. *Resmae Mortg. Corp.*,
2:09-cv-01632, 2009 WL 5206716 (E.D. Cal. Dec. 24, 2009) ................ 17

*McCann* v. *Lucky Money, Inc.*,
129 Cal. App. 4th 1382 (2005) ...................................................... 15, 20, 21

*McKelvey* v. *Boeing N. American, Inc.*,
74 Cal. App. 4th 151 (1999) .................................................................... 24

*In re Mexico Money Transfer Litig. (W. Union & Valuta)*,
164 F. Supp. 2d 1002 (N.D. Ill. 2000), *aff'd*, 267 F.3d 743 (7th Cir. 2001) .......... 15

*In re Mexico Money Transfer Litig.*,
267 F.3d 743 (7th Cir. 2001) ............................................................ 10, 14

*Miller* v. *Wash. Mut. Bank FA*,
　　776 F. Supp. 2d 1064 (N.D. Cal. 2011) ................................................................. 25

*N.Y. Univ.* v. *Cont'l Cas. Ins. Co.*,
　　87 N.Y.2d 308 (1995) ............................................................................................. 23

*Oswego Laborers' Local 214 Pension Fund* v. *Marine Midland Bank, N.A.*,
　　85 N.Y.2d 20 (1995) ............................................................................................... 23

*Parris* v. *Nat'l Football League Players Assn.*,
　　534 F. Supp. 2d 1081 (N.D. Cal. 2007) ................................................................. 20

*Parsons* v. *Tickner*,
　　31 Cal. App. 4th 1513 (1995) ................................................................................. 24

*PB Ams., Inc.* v. *Cont'l Cas. Co.*,
　　690 F. Supp. 2d 242 (S.D.N.Y. 2010).................................................................... 22

*Sanchez* v. *Giromex, Inc.*,
　　No. D042459, 2004 WL 2750332 (Cal. App. Dec. 2, 2004) .......................... 15, 20

*Shadoan* v. *World Sav. & Loan Assn.*,
　　219 Cal. App. 3d 97 (1990)..................................................................................... 21

*Shorrock* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
　　No. 74-24, 1977 WL 1064 (D. Or. Nov. 18, 1977)................................................ 15

*Shovak* v. *Long Isl. Comm'l Bank*,
　　858 N.Y.S.2d 660 (N.Y. App. Div. 2008) ............................................................. 24

*Shvarts* v. *Budget Gp., Inc.*,
　　81 Cal. App. 4th 1153 (2000) ........................................................................... 19, 21

*In re Sony Grand Wega KDF-E A10/A20 Series Rear Projection HDTV Television Litig.*,
　　758 F. Supp. 2d 1077 (S.D. Cal. 2010) .................................................................. 21

*Storek & Storek, Inc.* v. *Citicorp Real Estate, Inc.*,
　　100 Cal. App. 4th 44 (2002) ................................................................................... 18

*StreamCast Networks, Inc.* v. *Skype Techs, S.A.*,
　　No. CV 06-391 FMC (Ex), 2006 WL 5441237 (C.D. Cal. Sept. 14, 2006) .......... 24

*Supervalu, Inc.* v. *Wexford Underwriting Managers, Inc.*,
　　175 Cal. App. 4th 64 (2009) ................................................................................... 13

*Wsol* v. *Fiduciary Mgmt. Assocs., Inc.*,
　　266 F.3d 654 (7th Cir. 2001)................................................................................... 14

*Zalkind* v. *Ceradyne, Inc.*,
　　194 Cal. App. 4th 1010 (2011) ............................................................................... 12

1

**STATUTES**

2

7 U.S.C. 2(c) ........................................................................................................................ 14

3

15 U.S.C. 77b(a)(1)............................................................................................................. 14

4

C.P.L.R. § 214(2) ................................................................................................................ 24

5

Cal. Bus. & Prof. Code §§ 17200, *et seq.* .................................................................... 19

6

Cal. Bus. & Prof. Code § 17208 ....................................................................................... 24

7

Cal. Bus. & Prof. Code §§ 17500, *et seq.* .................................................................... 19

8

Cal. Civ. Proc. Code § 337................................................................................................. 24

9

Cal. Civ. Proc. Code § 338(a) ........................................................................................... 24

10

N.Y. General Business Law § 349 ............................................................................ 22, 23, 24

11

**OTHER AUTHORITIES**

12

14A CAL. JUR. 3D CONTRACTS § 372 ............................................................................ 18

13

Fed. R. Civ. P. 9(b) ............................................................................................................. 19

14

NASD Rule 2320(a)............................................................................................................ 13

15

NASD Rule 2320(a)(1) ....................................................................................................... 14

16

NASD Rule 2320(e)............................................................................................................ 14

17

18

19

20

21

22

23

24

25

26

27

28

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

Defendants (collectively, "BNYM") submit this memorandum of law in support of this motion to dismiss the Amended Class Action Complaint (the "Complaint" or "AC").

**PRELIMINARY STATEMENT**

After two tries and nearly 100 pages, Plaintiff International Union of Operating Engineers, Stationary Engineers Local 39 Pension Trust Fund ("IUOE") has not managed to allege that BNYM breached any provision of the parties' written contract when the bank priced "standing instruction" foreign exchange ("FX") transactions or that the bank engaged in any deceptive business practices.  IUOE's claims disregard and seek to impose obligations that are entirely inconsistent with the express terms of the parties' agreement.

The parties' agreement gave IUOE three choices on each occasion it wished to exchange currencies: using the standing instruction service, negotiating rates with the bank, or negotiating rates with another counterparty.  The standing instruction program, which is the service at issue in this case, effectively established a "floor" for conducting foreign exchange.  Every day, BNYM would post currency exchange rates, which it would honor (or better) for any customer electing to conduct a standing instruction currency exchange.  These posted rates provided customers with several advantages including convenience, certainty of execution, and reduction of risk.  Until the agreement was revised in 2008, it provided that the rates would be no less favorable than those offered to unrelated parties in a "comparable" transaction.  After the revision in 2008, the agreement no longer contained a comparable transaction provision, stating instead that the rates could deviate up to three percent (300 basis points) from specified exchange rate benchmarks.  The agreement also specified the trade information that BNYM would provide to Plaintiff in its account statements; there is no dispute that the bank provided that information.  Under the contract, if IUOE's investment manager found the rates for the standing instructions to be unacceptable, it could negotiate with the bank or conduct the transaction with any other provider of FX services.

Notwithstanding the terms of the contract, Plaintiff now contends that the bank was required to exchange currency pursuant to standing instructions at more favorable rates – which at

times Plaintiff contends were the rates the bank received on its own currency trades and at times Plaintiff asserts were hypothetical "market" rates, at least equivalent to rates provided for negotiated foreign exchange transactions, which Plaintiff says typically were within two or three basis points of interbank rates.  (AC ¶¶ 30-31, 41, 75, 82.)  IUOE's agreement with BNYM, however, states that BNYM will act "on a principal basis" and may execute FX transactions at up to three percent outside the prevailing interbank rates.  Indeed, at oral argument on BNYM's motion to dismiss the original complaint, Plaintiff's counsel – apparently appreciating that Plaintiff was not entitled to negotiated rates – explicitly said that IUOE was not alleging that it was entitled to negotiated rates in standing instruction transactions.  Yet the Complaint continues to allege just that.  Similarly, despite that the contract says nothing about BNYM disclosing its earnings on its standing instruction foreign currency exchanges, Plaintiff alleges that BNYM breached their agreement by failing to provide that information.  For the reasons set out below, each of the five claims of the Complaint fails.

## I.     STATEMENT OF FACTS

IUOE alleges that BNYM began providing custodial services to IUOE in February 2006 pursuant to a Global Custody Agreement dated February 14, 2006 ("the "GCA").  (AC ¶ 80 n.12 & Ex. A.)[1]  These services principally entail holding assets placed in its custody, settling purchases and sales of securities through outside broker-dealer firms as directed by IUOE and its authorized outside investment manager, and receiving interest payments and dividends in respect of IUOE's securities holdings.  (AC ¶¶ 17, GCA §§ 2, 6.)  They do not involve making investment decisions.

Because IUOE includes foreign securities among its investments, it needs from time to time to convert U.S. dollars to foreign currencies to buy and to convert foreign currencies to U.S. dollars when it sells foreign assets.  (AC ¶ 20.)  Separate from its core custodial business, BNYM will, if

---

[1]   The Bank of New York Mellon Corporation is, and The Bank of New York Company, Inc. was, a holding company that is not alleged to have provided services to Plaintiff; thus, these two defendants do not belong in this case.  *See infra* Part VII.  The Bank of New York Trust Company, N.A., The Bank of New York and now The Bank of New York Mellon (a subsidiary of The Bank of New York Mellon Corp.) provided the custodial and FX services at issue.

requested, exchange foreign currency with clients.  Clients may also negotiate these foreign

exchange transactions with other counterparties.  The pricing of FX transactions is governed by the

GCA and by written Foreign Exchange Procedures incorporated into the parties' contract.

      A.      The Global Custody Agreement and BNYM's Foreign Exchange Procedures.

      The bank's duties are expressly limited to those specified in the GCA, which has an

integration clause (GCA § 15), or otherwise specifically agreed in writing.  (*Id.* § 6(f.).)  The duty

of arranging for the exchange of foreign currency on IUOE's behalf is that of *IUOE's appointed

third-party investment managers*, and not BNYM.  (*Id.* § 10.)  The GCA states that BNYM may

offer FX services to IUOE with BNYM "acting as principal" – not an agent – and that BNYM

"may retain any profits from such FX Transactions."  (*Id.* § 3(d).)  Thus, the GCA makes clear that

the bank may buy or sell for its own account the currency that IUOE and its investment manager

wish to exchange; and that BNYM can do so at a profit.[2]  The GCA also permits BNYM to

"establish rules or limitations concerning any foreign exchange facility made available to

Customer."  (*Id.*)  These rules are contained in a series of "Foreign Exchange Procedures," which

IUOE acknowledges are part of the parties' contract.  (AC ¶¶ 24, 147.)

      The Complaint attaches as Exhibit C a document captioned "Foreign Exchange Policies and

Procedures for ERISA Plans," dated July 23, 2003 ("2003 FX Procedures"), on which it relies

throughout.  These procedures set forth two different options for exchanging currency with

BNYM:  (1) a negotiated transaction in which the client's outside investment manager negotiates

the specific terms of a currency exchange, and (2) a standing instruction transaction in which the

investment manager shifts the cost and settlement risk of arranging the currency exchange to

BNYM.  The 2003 FX Procedures provide that they may be amended by BNYM.  (2003 FX

Procedures at 2.)  The Complaint neglects to attach the current amendment, which went into effect

in July 2008 ("2008 FX Procedures"), although it does refer to it (AC ¶¶ 26, 150).  (Moses Decl.

Ex. 1.)  While IUOE fails to state a claim under *any* of the iterations of the FX Procedures, the

---

[2]    *See, e.g.*, *In re Enron Corp. Sec. Derivative & "ERISA" Litig.*, 540 F. Supp. 2d 759, 784 (S.D. Tex. 2007) (dealer acts as a principal in selling from its own account).

1   Court may consider the 2008 FX Procedures, which make the failure to state a claim even clearer.[3]

2           The precise terms of the FX Procedures varied, but each iteration sets out a similar process:

3   •   Every day at set times, BNYM establishes and posts a guaranteed rate for each of the

4       currencies in which it deals.  (2003 FX Procedures at 4; 2008 FX Procedures at 1.)

5   •   If IUOE's investment manager wishes to engage in an FX transaction, it can choose among

6       three options:  (1) electing to do its transaction with an FX service provider other than BNYM,

7       (2) directly negotiating the transaction with BNYM (known as a "direct transaction"), or (3)

8       going forward with a "standing instruction" transaction with BNYM.  If it elects a standing

9       instruction transaction, the FX Procedures provide that it receives a rate equal to or better than

10      the posted rate.  (*See* 2003 FX Procedures at 2-4; 2008 FX Procedures at 1-2.)

11  In sum, BNYM guarantees that it will price standing instruction transactions at rates equal to or

12  better than those it publishes, regardless of how the market moves.  The investment manager for

13  IUOE can consider that price in light of other factors, such as the nature and size of the transaction

14  and prices then available from competing FX providers.  Understanding that it can count on

15  receiving the rate posted by the bank but not necessarily a better one, the investment manager

16  decides whether to transact with the bank or with another counterparty.

17          *2003 FX Procedures.*  Focusing on the 2003 FX Procedures on which IUOE relies, BNYM

18  posts buy and sell rates at specified times each day.  (2003 FX Procedures at 4.)  The rates are

19  tested daily to ensure they are no more than three percent outside an exchange rate benchmark (the

20  "WM Fixing Rate") for the time of the posting, and the bank investigates any rates falling outside

21  that range.  (*Id.* at 5.)  The 2003 FX Procedures also provide that the "terms of FX Transactions

22  with any Plan shall not be less favorable to the Plan than terms offered by BNY to unrelated parties

23  in a comparable arm's length FX Transaction" (*id.* at 2); and all FX transactions on a given day

24  would be "bundled" together to "achieve better rates for the benefit of clients."  (*Id.* at 4.)

25          The 2003 FX Procedures specify the information that BNYM is to provide with respect to

26  _____

27  [3]   The Court may consider the 2008 FX Procedures on this motion to dismiss even though the
    document is only mentioned in but is not attached to the Complaint under the incorporation by

28  reference doctrine.  *Knievel* v. *ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).

FX transactions:  account name, transaction date, settlement date, exchange rate, and amount and identity of currencies involved.  (*Id.* at 3.)  IUOE objects that BNYM should have disclosed the time at which standing instruction FX trades were executed on outside markets (AC ¶¶ 66-67), but the 2003 FX Procedures do not call for this disclosure and, in any event, it makes little sense because BNYM need not execute the trade on any outside market; it acts as a principal under the GCA and trades from its own inventory of currency.  IUOE also objects that BNYM should have disclosed the fact or size of profits it earned on standing instruction FX trades.  (AC ¶ 33.)  The 2003 FX Procedures do not call for this disclosure either.

*2008 FX Procedures.*  Under the 2008 FX Procedures, which came into effect shortly after IUOE suggests it first began using BNYM's FX services and which currently govern currency exchanges,[4] BNYM posts its guaranteed rates for each currency by 9 a.m.  (2008 FX Procedures at 1.)  IUOE has until 11 a.m. to decide whether it wishes to use BNYM for that day's FX transactions and, if so, whether it wants the transaction executed under the standing instruction program.  If IUOE's investment manager elects to use the standing instruction services, it receives an exchange rate at least as favorable as the posted rate and that is within three percent of the interbank rate for the currency pair being exchanged.  (*Id.* at 1-2.)

The 2008 FX Procedures (reiterating the GCA) note that BNYM acts "on a principal basis." (*Id.* at 1.)  The 2008 FX Procedures do not include the language from the 2003 FX Procedures stating that the terms of FX Transactions shall not be less favorable than the terms offered to unrelated parties in comparable arm's-length FX transactions, or the statement in the 2003 FX Procedures that all FX transactions on a given day would be "bundled" together to "achieve better rates for the benefit of clients."  (AC ¶ 27.)

*          *          *

The critical point, for purposes of this motion, is that all versions of the FX Procedures established a specific pricing mechanism by which IUOE's investment manager could compare

---

[4]   The Complaint alleges no standing instruction transactions prior to June 2008.  (AC ¶¶ 76, 77, 80).  Rather, it merely includes a carefully worded allegation that BNYM "began providing FX services to Plaintiff in 2006."  (*Id.* ¶ 80 n.12.)

BNYM's posted rates with those available elsewhere and decide whether to accept those rates or not.  It is the job of IUOE's investment manager to determine whether BNYM's rates are advantageous (taking into account convenience, risks, and negotiating costs) relative to alternatives, and not BNYM's legal obligation to make them so.  There is no allegation that BNYM ever executed an FX transaction at a rate inferior to that posted, or more than three percent outside the relevant exchange rate benchmark.  (AC ¶¶ 34, 41, 75-76, 82, 84.)  And there is no allegation that BNYM failed to provide IUOE with any data required by the FX Procedures.

B.     Response to Plaintiff's Initial Request for Proposals and Welcome Packages

Before entering into the GCA with Plaintiff, BNYM issued a response to Plaintiff's request for a proposal ("RFP Response").  (AC Ex. B.)  The RFP Response addresses various aspects of BNYM's custodial services, although it does not constitute an agreement – the GCA is the parties' operative contract.  The RFP Response refers in several places to the availability of FX services (*id.* at 6-7, 22, 43), and contains a page-long description of those services.  (*Id.* at 51-52.)  With respect to standing instructions, this description states, in part:

> **3.  Standing instructions.**  Standing instructions automate the execution of FX transactions related to funding of securities purchases, repatriation of securities sales proceeds, income/redemption conversions, tax reclaims and corporate actions. Small FX activity such as income conversion can be handled automatically . . . .

There is no discussion whatever of the pricing of standing instruction transactions, and thus there is nothing in the RFP Response that could modify the GCA, even if the GCA had not included an integration clause.  The Complaint also lists purportedly "false and misleading responses to RFPs" allegedly made by BNYM.  (AC ¶¶ 98-99 & Ex. L.)  Notably, *not one* of these alleged misrepresentations appears in the RFP Response to IUOE attached to the Complaint.

BNYM also issued "Welcome Packages" to the investment managers of its custodial clients.  (AC ¶¶ 27, 45.)  The Complaint attaches what it calls a "generic" Welcome Package dated April 2007 (*id.* ¶ 45 & Ex. D) (the "2007 Generic Welcome Package") – more than a year after IUOE engaged BNYM as custodian.  However, it does not allege that IUOE or its investment manager received or saw the document.  The 2007 Generic Welcome Package provides technical information to investment managers about how to utilize BNYM's custody services, and in a

section relating to foreign exchange, it includes the full text of the 2003 FX Procedures.  (AC Ex. D § V(B)(4).)  It also has one sentence saying that standing instructions are "operationally simple," "free of charge," and "integrated" with clients' trading of securities.  (*Id.* § V(B)(1).)

C.        Procedural History and the Allegations in the Complaint

On July 22, 2011, Plaintiff filed a Class Action Complaint in this Court.  BNYM filed a motion to dismiss on October 7, 2011.  Subsequent to oral argument on December 15, 2011, the Court issued an Order to Elect allowing Plaintiff either to file an amended complaint incorporating new theories Plaintiff had articulated and charts it had offered at oral argument – stating its best case once and for all – or to have the Court rule on the actual pleadings.  Plaintiff elected to file an amended complaint, alleging the same claims and seeking the same relief as it did in the original complaint on behalf of an expanded putative class.[5]  The Complaint contains most of the same internal inconsistencies and other flaws of the original complaint.

The crux of the Complaint is that BNYM was obligated to do better than merely price standing instruction FX transactions in accordance with the requirements of the FX Procedures, at rates equal to or better than the daily guaranteed rates and within three hundred basis points of interbank rates.  Plaintiff goes back and forth when describing what rates it contends it should have received.  At times, it says that the bank was required to exchange currency pursuant to standing instructions at more favorable hypothetical "market" rates or rates that clients could "reasonably expect" (AC ¶ 5); at other times, Plaintiff defines "market" rates as rates for negotiated foreign exchange transactions, which Plaintiff says are within two or three basis points of interbank rates (*id.* ¶¶ 30-31, 41, 44, 75, 77, 82), even though at oral argument Plaintiff conceded that negotiated and standing instruction transactions are not comparable, *infra* note 8; and at still other times Plaintiff claims it was entitled to the same rates that the bank received on currency exchanges (*id.* ¶ 52).  Because the GCA and FX Procedures plainly contain no such pricing obligations (indeed,

---

[5]   Plaintiff proposes three subclasses: (1) a California Class, alleging California statutory claims, comprising the bank's California-based non-public institutional clients; (2) an ERISA Class, alleging common law claims, comprising the bank's California-based ERISA plan clients; and (3) a New York Class, alleging a New York statutory claim, comprising the bank's non-public institutional clients whose standing instruction transactions were executed in N.Y.  (AC ¶ 115.)

1    Plaintiff's proffered pricing requirements are inconsistent with the terms of the FX Procedures),

2    Plaintiff attempts to override the terms of the agreement through reference to general language

3    such as "best execution" or "free of charge," most of it outside the operative agreements in

4    disclosures it does not claim it ever saw.

5          Plaintiff asserts that BNYM, *in determining daily how much better the rates it would

6    provide than those it was obligated to provide under the contract*, took into account the day's

7    movement of interbank rates, and tended to use rates that were not only within the required 300

8    basis points of interbank rates but that were within the *actual* range of interbank rates that day,

9    though toward the end of that range most favorable to BNYM.  (AC ¶¶ 6, 44, 65.)  Because the

10   rates BNYM provided were not (and were not required or represented to be) actual interbank rates

11   or rates obtained by BNYM in trades with outside parties, the Complaint labels them "fictitious."

12   (*Id.* ¶¶ 1-3, 34, 52, 54, 64, 66, 83, 129, 152, 156.)  But Plaintiff does not contend that those rates

13   were ever inferior to the daily guaranteed rates, or more than three hundred basis points outside

14   interbank rates.  The Complaint also alleges that standing instruction services were very profitable

15   for BNYM and that BNYM was obligated to disclose the profits it earned (although Plaintiff does

16   not allege any contractual basis for this supposed requirement).  (*See, e.g.*, *id.* ¶ 72.)

17                                        **ARGUMENT**

18         The Complaint invents obligations inconsistent with those to which the parties agreed.

19   With respect to FX transactions, BNYM acted as principal – it was Plaintiff's counterparty, not its

20   agent, and was expressly entitled to profit from such transactions.  BNYM was required, if asked,

21   to exchange currency at a rate equal to or better than a daily posted rate and consistent with the

22   terms of the FX Procedures.  The Complaint attempts to supplant this agreed-to obligation with

23   fictitious ones in which BNYM was required, as an agent, to execute Plaintiff's FX transactions

24   with third parties and pass on to Plaintiff the rates it got (perhaps with a two or three basis point

25   markup).  None of the statutory provisions or common law principles on which Plaintiff relies

26   provides a basis for liability for the bank's failure to comply with these invented obligations.

27

28

## II.  PLAINTIFF FAILS TO STATE A CLAIM FOR BREACH OF CONTRACT

Plaintiff's breach of contract claim should be dismissed with prejudice because the Complaint fails to allege a breach of the actual terms of the parties' agreement.

### A.  BNYM's Alleged Pricing Method Was Consistent with the Parties' Contract.

The parties' contract required BNYM to do two things with respect to pricing: (1) offer a guaranteed rate each morning; and (2) if IUOE's investment manager elected to proceed with an FX trade with BNYM, execute the trade, as principal, at a price that is no worse than the guaranteed rate and within 300 basis points of interbank rates.  That was the deal.  There is no allegation in the Complaint that BNYM ever executed an FX trade at a price worse than that day's guaranteed rate or more than 300 basis points from interbank rates.

#### 1.  BNYM Did Not Provide Fictitious Exchange Rates.

The Complaint repeatedly alleges that BNYM assigned "fictitious rates" to standing instruction FX transactions  in violation of the parties' agreement.  (AC ¶¶ 1-3, 34, 52, 54, 64, 66, 83, 129, 152, 156.)  Notably, the Complaint does *not* allege that the rates were fictitious in that BNYM said that it applied one rate to a particular transaction when in fact it used a different rate. Instead, the Complaint – without identifying any specific basis in the contract – asserts that the rates were fictitious because they bore "no relation" to the price at which the bank allegedly acquired the currency it exchanged, which Plaintiff speculates was the interbank rate in the late morning on the days of the standing instruction FX transactions with Plaintiff.  (AC ¶ 2.)  Even assuming the truth of this allegation, for the sake of argument, exchanging currency at a rate bearing no relation to the price at which the bank acquired the currency would not violate any provision of the parties' written contract.  As Judge Easterbrook explained in a similar context, where the defendant had undertaken to send remittances to Mexico for a flat fee, without disclosing that it would also profit from the spread in exchange rates:

> Neiman Marcus does not tell customers what it paid for the clothes they buy . . . . This is true in financial markets no less than markets for physical goods.  The customer of a bank's foreign-exchange section . . . is quoted a retail rate, not a wholesale rate, and must turn to the newspapers or the Internet to determine how much the bank has marked up its Swiss Francs or Indian Rupees. . . . Each customer [of defendants] was told how many dollars in the United States would result in how many pesos delivered in Mexico.  Nothing in this transaction smacks of fraud . . . .

*In re Mexico Money Transfer Litig.*, 267 F.3d 743, 749 (7th Cir. 2001).  The FX Procedures did not require BNYM to provide rates any better than those it posted.  Rather, it was the job of IUOE's investment manager, after considering competitive alternatives (including assessing interbank rates) to decide whether to use BNYM for the day's FX transactions.

Indeed, Plaintiff's own charts demonstrate that IUOE and its investment manager had at all times the information necessary to understand BNYM's contractually delineated pricing procedure.  They knew or had access to:  the times of the rate fixing (2003 FX Procedures at 4); the times they authorized the transactions or declined to countermand them (2003 FX Procedures at 4; 2008 FX Procedures at 2); the publicly available interbank rates (Moses Decl. Ex. 2, Tr. at 54:13-18); and the rates BNYM actually charged on each transaction.  If BNYM had, as the Complaint alleges, been gouging Plaintiff, IUOE's investment manager should have seen that.  (Indeed, the straightforward analysis in the Complaint makes that point clear.)  The factual allegations in the Complaint are not reasonably susceptible of Plaintiff's interpretation that IUOE and its sophisticated investment manager were "lulled" into using the standing instruction service.  (AC ¶ 43.)  The only plausible inference to be drawn from the election by IUOE's investment manager to proceed with BNYM (at least on the occasions that could give rise to liability) is that IUOE's investment manager believed BNYM's service to be better (and cheaper) than the available alternatives.

> ### 2.      Plaintiff Never Alleges that BNYM Provided Better Rates To Any Other Client in a Transaction Comparable to One of Plaintiff's.

Plaintiff alleges the BNYM breached the parties' contract by failing to provide IUOE with FX rates in standing instruction transactions that were, as the pre-2008 FX Procedures provided, as favorable as the terms offered by Defendants or generally available to unrelated parties in comparable arm's-length FX transactions.[6]  This theory fails for two reasons:

*First*, to support such a claim Plaintiff would need to allege facts showing that BNYM offered some other client a rate better than it offered Plaintiff on a comparable transaction.  Plaintiff does not even attempt to do so.  IUOE asserts it is "typical," "expected," or "traditional[]"

---

[6]   This language is similar to a provision in ERISA, but Plaintiff does not allege an ERISA claim.

for FX providers to charge a spread of two-to-three basis points off interbank rates at the time the transaction was executed (AC ¶¶ 30, 75, 82, 84), and therefore concludes that BNYM violated the parties' agreement on any occasion when it charged more than that. (*Id.* ¶¶ 34, 44, 66.) But this is not the contractual test – the test is whether BNYM actually offered a better rate to another customer in a specific, comparable transaction. Plaintiff makes no such factual allegation, and a complaint based on speculation cannot survive a motion to dismiss. *Cook* v. *Brewer*, 637 F.3d 1002, 1006 (9th Cir. 2011).

*Second*, even for the limited period of time during which the pre-2008 FX Procedures were in effect while Plaintiff was engaging in standing instruction FX transactions, this claim fails because Plaintiff ignores the requirement that the transactions be "comparable." The "comparable" transactions are other standing instruction currency exchanges on the same day in the same currency, and with regard to such transactions, Plaintiff alleges that BNYM used the *same* exchange rates. (AC ¶ 57.) Thus, Plaintiff treats negotiated (and often much larger) transactions as "comparable" to standing instruction transactions, notwithstanding that the parties' agreement treats the two types of transactions as different and that, given the choice between them, Plaintiff elected to use standing instructions. Plaintiff similarly categorizes BNYM's currency exchanges with "opt-out" or "benchmark pricing" clients – clients who negotiated agreements with BNYM to exchange currency at a benchmark rate (for example, the midpoint of the bid-ask spread on the interbank market, as reported by a public service, at the time of execution) plus a previously defined spread – as comparable to its standing instruction transactions. (*Id.* ¶¶ 68-72.) But as the Complaint itself acknowledges, clients negotiated with the bank for benchmark pricing (*id.*), which therefore was a type of negotiated rate. Accordingly, benchmark transactions are not comparable ones.[7]

---

[7]   IUOE does not allege that any specific client received benchmarked rates until 2009 (AC ¶ 71), some time after the 2008 FX Procedures came into effect. That version of the FX Procedures did not require the bank to provide rates in standing instruction transactions that were no less favorable than those offered to unrelated parties in "comparable" transactions. Thus, even if benchmarked transactions were comparable to standing instructions  – they are not – Plaintiff's claim that BNYM breached its contract by offering benchmarked rates fails because the agreement between

1       Significantly, the Complaint offers no basis for assuming, contrary to the architecture of the

2   parties' agreement, that negotiated or benchmarked FX transactions are comparable to standing

3   instruction transactions.  Much of the structure of the FX Procedures with respect to standing

4   instruction transactions – for example, the minimum rate guarantees – would be surplusage if such

5   transactions were instead required to be priced as negotiated or benchmarked transactions, let alone

6   within two-to-three basis points of the interbank rates, as Plaintiff "expected."  (AC ¶ 75.)  *See,*

7   *e.g.*, *Zalkind* v. *Ceradyne, Inc.*, 194 Cal. App. 4th 1010, 1027 (2011).[8]

8         3.     Plaintiff Fails Adequately To Allege that BNYM
                Breached a Contractual Obligation To Provide IUOE with "Better" Rates.

9       Plaintiff's reference to a statement in the 2003 FX Procedures (but not in any later versions)

10  that all FX transactions on a given day would be "bundled" together to "achieve better rates for the

11  benefit of clients" (AC ¶ 27) cannot salvage the breach of contract claim.  This descriptive

12  statement does not purport to impose any obligations on BNYM.  In addition, it does not identify

13  the rates to which the bundled rates are supposed to be superior.  The most logical comparison

14  would be to the rates Plaintiff would have been able to secure if it had independently negotiated the

15  currency exchanges with other FX providers.  But Plaintiff does not allege any concrete facts

16  showing that BNYM did not provide better exchange rates than IUOE would have been able to

17  secure on its own.  And assuming IUOE's investment manager was carrying out its fiduciary

18  duties, it was comparing BNYM's rates with those available elsewhere and opting to execute

19  standing instruction FX transactions only when the standing instruction service was superior.

20      B.     Plaintiff's Claim for Breach of Contract Is Precluded
              By the Parties' Fully Integrated and Unambiguous Written Agreement.

21

22       Unable to allege any facts suggesting that BNYM violated any of the terms of either the

23  GCA or the FX Procedures, Plaintiff attempts to rewrite BNYM's pricing obligations principally

24  using general language extrinsic to the agreement.  But terms plucked from these extrinsic sources

25  do not impose any obligations on the bank.  *See, e.g.*, *EPA Real Estate P'ship* v. *Kang*, 12 Cal.

26  the parties at that time did not require that the two types of transactions receive the same rates.

27  [8]   At oral argument, Plaintiff's counsel admitted that negotiated and standing instruction
transactions are not comparable.  (Tr. at 41:5-11.)  Yet the Complaint continues to allege that

28  Plaintiff was entitled to negotiated rates on standing instruction transactions.  (AC ¶¶ 30, 75.)

App. 4th 171, 176-77 (1992).[9]  Even if the extra-contractual language were part of the parties'

agreement, established rules of contract interpretation provide that the express terms of the contract

relating to pricing would prevail.  Where, as here, a plaintiff attempts to read general language to

conflict with express contract terms, California law precludes the claim.  *See Supervalu, Inc.* v.

*Wexford Underwriting Managers, Inc.,* 175 Cal. App. 4th 64, 75 (2009).  Moreover, when those

terms are understood in context, it is clear that Plaintiff has not alleged that the bank's actions were

inconsistent with them.

   *Best execution*.  Plaintiff contends that the pricing terms of the FX Procedures were

modified by a phrase that appeared at unspecified times on BNYM's website and that it does not

allege it ever saw or considered in entering its agreement with BNYM:  "best execution."  It argues

that this general phrase revises the agreement of the parties so that, rather than requiring pricing

within 300 basis points of interbank rates as the FX Procedures required by its express terms,

BNYM was obligated to price FX transactions within two or three basis points of interbank rates.

(AC ¶¶ 24, 30, 41, 75, 82.)  This argument fails for many reasons.

   To begin with, none of the requisite elements of contract is present.  The term does not

appear in, and (as interpreted by Plaintiff) is inconsistent with, the fully integrated contract

documents.  Nor is there any allegation that Plaintiff saw or considered it in entering the contract or

that Plaintiff had any understanding of it other than the after-the-fact invention in its legal claim.

   Additionally, Plaintiff is attempting to apply to foreign exchange trading a definition of

"best execution" that has application only in the context of regulated securities transactions.

Plaintiff derives its proffered definition of best execution from regulations and case law governing

trading on centralized stock exchanges.[10]  There is, however, no comparable rule or regulation

governing pricing in FX trading.  And there are differences between the securities markets and the

---

[9]   Nor can Plaintiff look to these terms to "clarify" the contract terms relating to pricing.  Those
terms are unambiguous.  Even more fundamentally, Plaintiff's proffered interpretations of the
terms are wholly inconsistent with the express contract provisions and cannot be used to alter the
parties' agreement.  *Hervey* v. *Mercury Cas. Co.*, 185 Cal. App. 4th 954, 967-68 (2010).

[10]   Nat'l Ass'n of Sec. Dealers ("NASD") Rule 2320(a).

1   spot markets for foreign currency exchange that make it inappropriate to import law from one of

2   those contexts to the other. [11]   Most significantly, the securities markets, unlike the spot markets for

3   foreign currency exchange, are characterized by trading through centralized clearinghouses that

4   provide trade-by-trade pricing information; that information is not available for currency trades.

5         And Plaintiff's proffered definition of "best execution" is wrong even under the securities

6   laws.  While the term may include an assessment of pricing, it is not synonymous with best price:

7   "numerous factors are relevant to [best] execution, including (in addition to speed) price, clearing

8   costs, convenience, and others," and falling "short of a hypothetical ideal market on one particular

9   dimension" does not entail a breach of the duty of best execution.  *Gurfein* v. *Ameritrade, Inc.*, 312

10  F. App'x 410, 412 (2d Cir. 2009).[12]  And under governing securities regulations, broker-dealers

11  can charge a mark-up consistent with "best execution," and NASD guidelines consider mark-ups of

12  five percent – nearly ten times the spreads alleged here – to be permissible.[13]

13        Read in context, it is clear that BNYM used the term best execution to describe standing

14  instruction *processes* and not standing instruction *prices*.  The statement regarding "best execution"

15  on BNYM's website in recent years makes clear that the term refers to administration, not price:

16       We consider best execution, as it relates to the Standing Instruction process, as
         providing a consistent, accurate and efficient means of facilitating pre-trade, trade
17       and post-trade activities.  These activities include identification of trade
         requirements, pre-trade administration associated with regulated markets, arranging
18       settlement, reconciling discrepancies, posting cash to accounts and reporting all
         relevant transaction details to investment accounting systems.

19

20

21   _____

22   [11]   While securities trading is heavily regulated, foreign currency does not fall within the definition
     of a "security."  *See* 15 U.S.C. 77b(a)(1); *In re Mexico Money Transfer Litig.*, 267 F.3d 743, 749
23   (7th Cir. 2001).  The CFTC regulates certain types of commodities trading, but Congress exempts
     foreign exchange transactions from *any* regulation by the CFTC.  *See* 7 U.S.C. 2(c).

24   [12]   *See also* NASD Rule 2320(a)(1) (broker-dealer assessing best execution should consider
25   several factors in addition to price); *Wsol* v. *Fiduciary Mgmt. Assocs., Inc.*, 266 F.3d 654, 657 (7th
     Cir. 2001) ("[B]est execution has multiple dimensions that tend to be in conflict.").

26   [13]   *See* NASD Rule 2320(e) (best execution duties "do not relate to the reasonableness of
27   commission rates, markups or markdowns").  NASD IM-2440-1, which interprets the mark-up
     standards, sets a guideline of up to 5% as a permissible markup on securities transactions.  *See*
28   *Atlanta-One, Inc.* v. *S.E.C.*, 100 F.3d 105, 108 (9th Cir. 1996).

(Moses Decl. Ex. 3, BNYM Website Dec. 19, 2011.)[14]  A general reference on BNYM's website to "best execution" cannot impose specific pricing obligations inconsistent with the terms of the parties' express agreement.

_Free of Charge_.  Plaintiff also seeks to base its breach of contract claim on a statement from the bank's website and in the Generic 2007 Welcome Package that the standing instruction FX service was "free of charge," arguing that because BNYM's earned profits on standing instruction currency exchanges, the bank's execution of those transactions was not free of charge.  As with the best execution language, this extra-contractual term does not appear in, and IUOE's interpretation of it is inconsistent with, the fully integrated contract documents.  For example, the GCA expressly permits BNYM to "retain any profits from . . . FX Transactions."  GCA § 3(d). The GCA also explicitly authorizes BNYM to "act[] as principal" when exchanging currency.  _Id._[15]  And the 2008 FX Procedures provide that BNYM assigns rates in standing instruction transactions that are within 3% of the relevant interbank rates, making clear that the bank's rates reflect a premium relative to the contemporaneous interbank rates.  (2008 FX Procedures at 1.)  Also, Plaintiff does not allege that it saw or relied on the language.

As numerous courts have recognized, a "charge" refers to a separate, per-transaction fee or commission, and that is the only plausible interpretation of it, read in context here.  A "spread" over the seller's cost is not a "charge."  _See In re Mexico Money Transfer Litig. (W. Union & Valuta)_, 164 F. Supp. 2d 1002, 1024 (N.D. Ill. 2000) ("[T]he exchange rate is not to be understood as a commission or fee," even though rate included a spread), _aff'd_, 267 F.3d 743 (7th Cir. 2001).[16]

---

[14]  Exhibit 3 is a page from BNYM's Global Markets website that summarized standing instruction services as referenced in the Complaint at ¶ 110.  The Court may consider this document on this motion to dismiss.  _See supra_ note 3.

[15]  A principal may always earn a profit on its trades.  _See Shorrock_ v. _Merrill Lynch, Pierce, Fenner & Smith, Inc._, No. 74-24, 1977 WL 1064, at *6 (D. Or. Nov. 18, 1977) (approving broker's explanation that when one buys shares from a firm acting as a principal, "no commission is charged, but the firm's compensation is included in the price").

[16]  _See also McCann_ v. _Lucky Money, Inc._, 129 Cal. App. 4th 1382, 1398 (2005) (spread earned from currency exchange is not a fee, cost, or charge under California disclosure statute); _Sanchez_ v. _Giromex, Inc._, No. D042459, 2004 WL 2750332, at *11-*14 (Cal. App. Dec. 2, 2004) (unpub.).

1   BNYM thus did provide standing instruction FX services free of charge, notwithstanding that it

2   sought to earn a profit on those transactions:  BNYM did not charge its clients any commission or

3   other per transaction amount on standing instruction transactions.  By contrast, BNYM did charge

4   flat per-transaction fees on third-party FX transactions (*i.e.*, where a custody client elected to

5   execute an FX transaction with a party other than BNYM), and BNYM therefore appropriately

6   advised customers that it did not impose such a fee for standing instruction transactions.

7           Indeed, Plaintiff's reliance on the free of charge language cannot even be reconciled with

8   other allegations in the Complaint.  Specifically, Plaintiff alleges that, in addition to standing

9   instruction transactions, some BNYM clients negotiated FX transactions in which they agreed to

10   exchange rates that included spreads on top of the prevailing interbank rates.  (AC ¶ 30.)  But no

11   custody client would ever enter into a negotiated transaction with a spread of two or three basis

12   points if it could exchange the same amount of currency in a standing instruction transaction

13   without any mark up at all from the interbank rate at the time of execution of the transaction.  The

14   very existence of "direct" trades – on which Plaintiff alleges the Bank earned two to three basis

15   points – disproves the "free of charge" allegation.

16           *Aggregation and Netting Based on Guidelines Tailored to Client Needs.*  Relying on a

17   statement on the bank's website offering to provide clients with "aggregation and netting" of FX

18   transactions "based on guidelines tailored to client needs" (AC ¶ 103), Plaintiff alleges that BNYM

19   breached the parties' contract by failing to aggregate and net standing instruction FX transactions

20   whenever possible.  Once again, none of the requisite elements of a contract is present.  This

21   language is not a part of, and Plaintiff's reading is inconsistent with, the fully integrated contract

22   documents.  Plaintiff never alleges that it saw or considered this language in entering the contract,

23   or had any understanding of its application aside from the post-hoc assertions in the Complaint – or

24   even that it entered into any transactions that should have been aggregated or netted.

25           And once again, Plaintiff's desired interpretation of the statement is inconsistent with the

26   plain language.  In light of the reference to tailoring guidelines to client needs, which on its face is

27   an invitation to clients to discuss their netting preferences with BNYM, the aggregation and netting

28

language is not reasonably susceptible of Plaintiff's interpretation:  that the bank was promising it would automatically aggregate and net all standing instruction transactions for all clients.

*Minimizing Costs Related to Foreign Currency Exchange.*  Plaintiff also points to language on BNYM's website stating that "FX standing instruction is designed to help clients . . . minimize costs related to the foreign [currency] exchange . . . " to support the claim for breach of contract. This language too is not part of the parties' integrated written agreement; and Plaintiff does not allege that it relied on or even saw the statement before entering into a contract with BNYM.  And California law does not permit a breach of contract claim based on such vague language.  *Logan* v. *Resmae Mortg. Corp.*, 2:09-cv-01632, 2009 WL 5206716, at *4 (E.D. Cal. Dec. 24, 2009).

The claim based on this language fails on the merits as well.  The statement, evaluated in the context of the entire package of services provided by BNYM, is indisputably true.  The standing instruction service indeed minimized costs by allowing Plaintiff and its investment manager to avoid investing in the personnel and technology needed to negotiate currency transactions routinely; that investment would be particularly substantial in connection with trading in restricted currencies.  Minimizing a client's costs did not require BNYM to forgo a profit.

*Providing Time Stamps and Spreads for Standing Instruction Transactions.*  Finally, Plaintiff contends that BNYM breached the parties' contract claim by failing to include on the account statements that were sent to Plaintiff and/or its investment manager stamps showing the exact time of each FX transaction and the spread earned by the bank.  (AC ¶¶ 66-67,  81.)  This theory is perhaps flimsiest of all of Plaintiff's articulated bases for alleging breach of contract, because Plaintiff cannot tie a purported obligation to provide time stamps and spreads to any statement by BNYM at all – Plaintiff does not allege that the bank ever said anything about providing time stamps or spreads, even in extra-contractual materials.  It is basic hornbook law that there can be no breach of contract where, as here, there was no contract addressing this issue.

Moreover, the FX Procedures specifically itemize the information that BNYM will provide in connection with completed transactions.  (2003 FX Procedures at 3, 5.)  They contain no requirement that BNYM provide the time of the trade or the spread off the interbank rate at the

time the transaction was executed.  Nor does the GCA.  In the absence of such a requirement,
Plaintiff has no basis to argue that the failure to provide time stamps and spreads breached the
parties' contract.  *See* 14A CAL. JUR. 3D CONTRACTS § 372; *supra*.

In addition, the contention that BNYM breached a contractual, implied, or statutory
obligation by failing to provide time stamped execution prices makes little sense given that IUOE,
or its investment manager, could have compared the price it received with the market prices on any
given day and determined whether it wanted to continue making use of BNYM's standing
instruction services or try to get a better deal elsewhere.  Indeed, it is notable that the analysis
performed by Plaintiff that purports to show that BNYM's FX rates were unfair (AC ¶¶ 79-85) was
done without the benefit of time stamps or any other information that was not either provided by
the bank on a regular basis or publicly available.[17]

### III.   PLAINTIFF FAILS TO STATE A CLAIM FOR BREACH OF AN IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.

A claim for breach of an implied covenant of good faith and fair dealing must be dismissed
if it would impose obligations beyond those incorporated into the specific terms of the contract,
*Guz* v. *Bechtel Nat'l, Inc*., 24 Cal. 4th 317, 327, 349-50 (2000), or would contradict the contract
terms.  *Storek & Storek, Inc.* v. *Citicorp Real Estate, Inc*., 100 Cal. App. 4th 44, 55 (2002).
Plaintiff alleges that BNYM breached an implied covenant by providing supposedly sub-optimal
rates in standing instruction FX transactions, but the parties' express contract explicitly addresses
pricing of FX transactions.  Plaintiff seeks to use an implied covenant to create a different pricing
mechanism.  This claim impermissibly imposes duties on the bank in addition to and inconsistent
with the terms of the parties' contract.

### IV.   PLAINTIFF FAILS TO STATE A CLAIM UNDER THE UCL OR FAL.

California Unfair Competition Law ("UCL") prohibits fraudulent, illegal, or unfair business

---

[17] Plaintiff's suggestion that the fact that the rates were at the outer boundaries of the  rate range did
not raise suspicions because the rates could be explained by infelicitous timing (AC ¶¶ 64-67)
might be plausible for one or two trades, but IUOE also alleges that the rates for most of Plaintiff's
transactions were at the outer boundaries of the interbank rates.  (*Id.* ¶ 112.)

practices, Cal. Bus. & Prof. Code §§ 17200, *et seq.*  Plaintiff fails to plead that the bank's practices fall into any of those categories.  California False Advertising Law ("FAL") prohibits dissemination of promotional materials that the advertiser knew or should have known were untrue or misleading, Cal. Bus. & Prof. Code §§ 17500, *et seq.*  Plaintiff's claim similarly fails for the same reasons the UCL claim fails because California courts, in determining whether advertising is untrue or misleading, have adopted the standard used in reviewing "fraud" claims brought under the UCL.  *See, e.g.*, *Comm. on Children's T.V., Inc.* v. *Gen. Foods Corp.*, 35 Cal. 3d 197, 211 (1983) (superseded by statute).[18]  The defenses to these claims are set forth below.

      A.      <u>Plaintiff Fails Adequately To Plead that the FX Transactions Were Fraudulent</u>.

      Plaintiff's allegations do not meet the requirements under the UCL for pleading that a business practice is "fraudulent," which obligates a plaintiff to assert that "members of the public are likely to be deceived."  *Gutierrez* v. *Wells Fargo Bank, N.A.*, 730 F. Supp. 2d 1080, 1126 (N.D. Cal. 2010) (Alsup, J.) (internal citations and quotation marks omitted).[19]  Plaintiff contends the standing instruction transactions were fraudulent because: (i) the actual rates provided purportedly were inconsistent with statements in promotional materials (AC ¶¶ 5, 23-24, 28, 30-31, 34, 41, 45-46, 48-50, 75, 100, 105, 110); (ii) the bank did not disclose the amount it earned on standing instruction FX transactions (*id.* ¶¶ 33, 44); and (iii) by allegedly providing a range of guaranteed rates, BNYM supposedly lulled Plaintiff into believing it would get more favorable rates than the extremes of that range (*id.* ¶ 43).  None of these allegations is sufficient to plead fraud:[20]

---

[18]   The question whether advertising is misleading is viewed from the perspective of the group to which it is directed.  *Lavie* v. *Procter & Gamble Co.*, 105 Cal. App. 4th 496, 512 (2003).  Pension funds and their investment managers are less likely to have been misled than the general public.

[19]   *See also Shvarts* v. *Budget Gp., Inc.*, 81 Cal. App. 4th 1153, 1159-60 (2000) (affirming dismissal on demurrer because customers were not likely to be deceived).

[20]   In addition to the allegations below, the Complaint alleges new misrepresentations (including a purported "Misrepresentation Log") lifted from complaints in other matters and hearsay newspaper articles.  These allegations lack the specificity required by Rule 9(b):  Plaintiff does not allege who made the statements, when and to whom.  Plaintiff never alleges that it ever saw or heard any of these statements before this lawsuit, let alone relied on them – and IUOE would have had no reason to have seen many of them, since they purport to be addressed to other BNYM clients.

- In light of BNYM's numerous disclosures and the basic distinction in the FX Procedures between standing instruction and direct currency exchanges, no reasonable consumer (let alone a financially sophisticated entity such as Plaintiff and its investment manager) could have thought the bank had agreed to provide negotiated rates for standing instruction exchanges, or have been lulled into persisting in that mistaken belief.

- Plaintiff does not allege that it relied upon any of the supposedly misleading promotional materials. *See, e.g.*, *Parris* v. *Nat'l Football League Players Assn.*, 534 F. Supp. 2d 1081, 1093-94 (N.D. Cal. 2007) (Alsup, J.) (claim under fraud prong of UCL did not meet heightened pleading standard because it failed to allege that plaintiffs saw defendants' statements).

- Plaintiff does not allege any basis for requiring the bank to reveal its foreign currency spread or provide time stamps, and there is ordinarily no claim for fraud based on non-disclosure in the absence of a contractual or other legal obligation to disclose. *La Jolla Village H'owners' Ass'n* v. *Sup. Ct.*, 212 Cal. App. 3d 1131, 1151 (1989). Also, the failure to disclose margins is not deceptive since the bank gave Plaintiff the benefit of the published rates. *Sanchez*, 2004 WL 2750332 at *10, *13.[21]

B.    Plaintiff Fails Adequately To Plead that the FX Transactions Were Illegal.

Nor do Plaintiff's allegations meet the requirements under the UCL for pleading that a business practice is illegal. While Plaintiff refers to a provision in ERISA containing language similar to the "not less favorable" provision in the 2003 FX Procedures (AC ¶¶ 24, 25, 26, 38) – and summarily claims that BNYM's standing instruction FX transactions violated both the contract and the statute (*id.*¶ 130) – Plaintiff alleges no concrete supporting facts.[22] Similarly, to the extent that Plaintiff relies on a common law cause of action or an alleged statutory violation as a predicate to the unlawful prong of the UCL, these other claims, for the reasons stated in this motion, fail as a

---

[21]  *See also McCann*, 129 Cal. App. 4th at 1392-99 (non-disclosure of FX spread does not violate the UCL absent an independent duty to make such disclosure); *Buller* v. *Sutter Health*, 160 Cal. App. 4th 981, 987 (2008) ("[A] consumer is not 'likely to be deceived' by the omission of a fact that was not required to be disclosed in the first place.").

[22]  The FX transactions executed by non-pension plan members of the putative California Class could not be ERISA-prohibited transactions because those entities are not governed by ERISA.

matter of law and thus cannot support the UCL claim.[23]

      C.     Plaintiff Fails Adequately To Plead that the FX Transactions Were Unfair.

Plaintiff's claim under the "unfair" prong of the UCL is likewise deficient. "An act or practice is unfair if the consumer injury is substantial, is not outweighed by any countervailing benefit to consumers or to competition, and is not an injury the consumers themselves could reasonably have avoided." *Daugherty* v. *Am. Honda Motor Co., Inc.*, 144 Cal. App. 4th 824, 839 (2006). Plaintiff fails to plead any of these elements.

Plaintiff does not adequately allege injury because it does not plead facts showing that it failed to receive the benefit of its bargain. *Lee* v. *Capital One Bank*, No. 07-cv-4599, 2008 WL 648177, at *4 (N.D. Cal. Mar. 5, 2008). Plaintiff contends it was harmed because BNYM did not charge negotiated rates in standing instruction currency exchanges as expected (AC ¶¶ 28, 30, 34, 41, 44, 49, 75), but the bank never agreed to charge negotiated rates for standing instruction transactions. *See supra* Part II.A.2. Plaintiff also says it was harmed because the bank did not disclose its profits on standing instruction FX transactions. (AC ¶¶ 33, 44.) But the bank was under no obligation to do so. *See, e.g., McCann*, 129 Cal. App. 4th at 1395 (holding that defendants' failure "to disclose their own costs or profit margins is not, on its face, unfair.").

Additionally, a practice cannot threaten competition if the plaintiff has a reasonably available alternative source of supply for the allegedly unfair service. *See, e.g.*, *Shvarts*, 81 Cal. App. 4th at 1159.[24] Here, Plaintiff was free to opt out of standing instruction transactions, either by negotiating with the bank or by exchanging currency with another counterparty. The parties' contract explicitly reminds IUOE of these alternatives. (2003 FX Procedures at 2; 2008 FX Procedures at 2.) And the bank provided Plaintiff with the actual exchange rates for each FX transaction, which is all the information Plaintiff and its investment manager needed to determine

---

[23] Also, Plaintiff never links the alleged statutory violations and common law breaches with the UCL claim, which is fatal to that claim. *See, e.g., In re Sony Grand Wega KDF-E A10/A20 Series Rear Projection HDTV Television Litig.*, 758 F. Supp. 2d 1077, 1091 (S.D. Cal. 2010).

[24] *See also Dean Witter Reynolds, Inc .*v. *Sup. Ct.*, 211 Cal. App. 3d 758, 770-72, 774-75 (1989) (availability of alternative sources precluded finding that fee was unconscionable); *Shadoan* v. *World Sav. & Loan Assn.*, 219 Cal. App. 3d 97, 102-06 (1990).

1    if Plaintiff should continue to transact with BNYM or if it could get a better deal elsewhere.

2         Plaintiff also attempts to state a claim under the unfair prong of the UCL based on the

3    alternative standard for pleading unfairness, which requires a plaintiff to "(1) identify an unfair

4    policy or practice *tethered to a legislatively declared policy* or (2) show an actual or threatened

5    impact on competition."  *Gutierrez*, 730 F. Supp. 2d at 1120; *Hofstetter* v. *Chase Home Fin., LLC*,

6    No. 10-cv-01313, 2010 WL 3259773, at *14 (N.D. Cal. Aug. 16, 2010) (Alsup, J.) (tethering test

7    applies to consumer UCL cases).  This effort fails as well.  The absence of competitive harm is

8    discussed above.  And Plaintiff fails adequately to allege any unfair practices tethered to the

9    identified legislative policy of protecting ERISA plans; because Plaintiff got precisely what it

10   bargained for in its agreement with BNYM, the standing instruction FX services were not unfair.[25]

11   **V.    PLAINTIFF FAILS TO STATE A CLAIM**
12   **      UNDER THE NEW YORK UNFAIR BUSINESS PRACTICES STATUTE.**

13        To state a claim under the New York unfair business practices statute, General Business

14   Law § 349, Plaintiff must allege that: (1) the act or practice in question was "consumer oriented";

15   (2) it was materially misleading; and (3) Plaintiff suffered injury.  *See, e.g.*, *Ammirato* v.

16   *Duraclean Int'l, Inc.*, 687 F. Supp. 2d 210, 221 (E.D.N.Y. 2010).  Plaintiff fails to allege facts that

17   meet either the first or the second prong of the test.

18        *First*, Plaintiff has not alleged and cannot allege that the bank's standing instruction

19   services are "consumer oriented" within the meaning of the New York statute.  *See, Ammirato*, 687

20   F. Supp. 2d 210 at 221.  New York courts have narrowly defined "consumer" to mean those "who

21   purchase . . . services for personal, family, or household use," *PB Ams., Inc.* v. *Cont'l Cas. Co.*,

22   690 F. Supp. 2d 242, 252 (S.D.N.Y. 2010) (citation omitted).  Plaintiff is not such a consumer and

23   admits that it, like many of BNYM's other clients, is an *institutional* investor that engaged in

24   sophisticated commercial dealings.  (*See, e.g.,* AC ¶¶ 7, 115.)  Courts "severely limit" the

25   application of  GBL § 349 in instances where the plaintiff, like IUOE, is a business.  *ExxonMobil*

26   ─────────────────────

27   [25]  Nor is BNYM's purportedly unfair provision of FX services tethered to the purported
     legislative policy of protecting ERISA plans.  Plaintiff's argument proves too much, as it would
28   bring most any claim of any sort by any ERISA plan within the ambit of the UCL.

1   *Inter-Am., Inc.* v. *Advanced Info. Eng'g Servs., Inc.*, 328 F. Supp. 2d 443, 449-50 (S.D.N.Y. 2004).

2   Also, the standing instruction FX transactions were carried out pursuant to the an individually

3   negotiated contract, and there is no liability under GBL § 349 in that circumstance.  *Id.*

4       *Oswego Laborers' Local 214 Pension Fund* v. *Marine Midland Bank, N.A.,* 85 N.Y.2d 20

5   (1995), demonstrates that Plaintiff's allegation does not fall within the ambit of GBL § 349.  While

6   the *Oswego* plaintiff, like IUOE, was a pension fund, the similarities between the two cases end

7   there.  The acts complained of by the *Oswego* plaintiff, unlike the conduct at issue here, were

8   "consumer oriented" in the sense that they "potentially affect[ed] similarly situated consumers,"

9   and the bank in *Oswego* "dealt with plaintiffs' representative as any customer entering the bank to

10  open a savings account."  *Oswego,* 85 N.Y.2d at 27.  Here, by contrast, Plaintiff fails to allege any

11  facts suggesting that it was treated like an ordinary consumer, for instance that BNYM offered

12  standing instruction services to the general public for "personal, family, or household use"; instead,

13  it admits precisely the opposite:  that BNYM offered standing instruction services to highly

14  sophisticated business entities.  (AC ¶ 19; *see also id.* ¶ 20.)  Thus, Plaintiff fails to allege that the

15  bank's standing instruction services have an impact on "consumers" as defined in § 349 –

16  generally.  *Oswego,* 85 N.Y.2d at 26-27.

17      This conclusion is confirmed by the reasoning in *N.Y. Univ.* v. *Cont'l Cas. Ins. Co.*, 87

18  N.Y.2d 308 (1995) ("*NYU*"), in which New York's highest court clarified *Oswego* and held that the

19  plaintiff university had failed to state a claim under GBL § 349 because defendants' sale to it of an

20  insurance policy and their handling of claims were not "consumer-oriented conduct."

21      [T]his transaction is wholly unlike that in Oswego, which involved a bank customer
        receiving the standard forms and advice supplied to the consuming public at large . .
22      . . The case before us involves complex insurance coverage and proof of loss in
        which each side was knowledgeable and received expert representation and advice. .
23      . . [T]his was not the "modest" type of transaction the statute was primarily
        intended to reach.  It is essentially a "private" contract dispute . . . which is unique
24      to these parties, not conduct which affects the consuming public at large.

25  *Id.* at 321 (internal citations omitted).  Here, as in *NYU*, the parties are sophisticated and had expert

26  representation and advice, the transactions at issue are not the "modest" ones the statute reaches.

27      *Second*, BNYM's standing instruction FX services were not materially misleading – that is,

28

（実）

they were not "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Andre Strishak & Assocs., P.C.* v. *Hewlett Packard Co.*, 752 N.Y.S.2d 400, 403 (N.Y. App. Div. 2002). This standard is similar to the one governing claims under the fraud prong of the UCL, and Plaintiff's claim under the New York statute fails for the same reasons that the UCL claim fails. *See supra* Part IV; *Shovak* v. *Long Isl. Comm'l Bank*, 858 N.Y.S.2d 660, 662 (N.Y. App. Div. 2008) (plaintiff not misled since currency exchange spread was disclosed).

## VI.   THE CLAIMS ARE BARRED BY THE APPLICABLE LIMITATIONS PERIODS.

Plaintiff appears to be asserting its claims going back to January 12, 1999. (AC ¶ 115.) To the extent Plaintiff seeks to advance claims that are barred by their respective statutes of limitation – for breach of contract and an implied covenant of good faith and fair dealing, four years (Cal. Civ. Proc. Code § 337); for the UCL claim, four years (Cal. Bus. & Prof. Code § 17208); and for the FAL (Cal. Civ. Proc. Code § 338(a)) and the New York statutory claim, three years (C.P.L.R. § 214(2)) – the claims should be dismissed.[26]

Plaintiff's contention that it could not have discovered its claims by the exercise of reasonable diligence – thereby implicitly invoking the discovery rule (AC ¶ 127) – cannot salvage its untimely claims. Under the discovery rule, the statute of limitations begins to run "when the plaintiff has notice or information of circumstances to put a reasonable person on inquiry." *Parsons* v. *Tickner*, 31 Cal. App. 4th 1513, 1525 (1995). For the rule to apply, Plaintiff must make concrete allegations that it could not have discovered its claims by the exercise of reasonable diligence. *See, e.g.*, *McKelvey* v. *Boeing N. American, Inc.*, 74 Cal. App. 4th 151, 160 (1999) (superseded by statute on other grounds). [27] Plaintiff makes no such allegations, relying instead on

---

[26]   *Ahmadzai* v. *Metully*, No. CIVS-05-1091LKKJFMPS, 2005 WL 2219215, at *3 (E.D. Cal. Sept. 12, 2005), *adopted in full*, No. S-05-1091 LKK JFM PS, 2006 WL 20793, at *1 (E.D. Cal. Jan. 3, 2006) (breach of contract); *Christakis* v. *Mark Burnett Prods.*, No. CV 08-6864-GW(JTLx), 2009 WL 1248947, at *4 (C.D. Cal. Apr. 27, 2009) (breach of covenant of good faith); *StreamCast Networks, Inc.* v. *Skype Techs, S.A.*, No. CV 06-391 FMC (Ex), 2006 WL 5441237, at *9 & n.8 (C.D. Cal. Sept. 14, 2006) (UCL and FAL); *Gristede's Foods, Inc.* v. *Unkechauge Nation*, 532 F. Supp. 2d 439, 453 (E.D.N.Y. 2007) (GBL § 349).

[27]   Some courts have held that the discovery rule does not apply to UCL claims. *See e.g.*, *Aryeh* v. *Canon Bus. Solutions*, 185 Cal. App. 4th 1159, 1166 (2010), *review granted*, 240 P.3d 823 (Cal.

a conclusory assertion that it could not have discovered its claims before two whistleblower complaints against the bank were unsealed.  (AC ¶¶ 6, 127.)  But the Complaint and other materials properly before the Court disprove this assertion and demonstrate that, at all relevant times, IUOE had the data to perform the analysis upon which it now relies.  *See supra* Part II.A.1.

## VII.   PLAINTIFF FAILS TO STATE CLAIMS AGAINST THE BANK OF NEW YORK MELLON CORP. AND THE BANK OF NEW YORK CO., INC.

Plaintiff's claims against Defendants The Bank of New York Co., Inc. (formerly the corporate parent of The Defendant Bank of New York Co.), and The Bank of New York Mellon Corp. (currently the parent of The Defendants Bank of New York Mellon and The Bank of New York Mellon Trust Co., N.A.) – for alleged violation of California's UCL and FAL and New York's unfair business practices law – fail because Plaintiff never asserts that the holding companies provided services to IUOE.  Plaintiff merely identifies the holding companies as parties and sets out their relationship to the subsidiaries (AC ¶¶ 11-14).  This is insufficient to state claims against them.  Nor does Plaintiff plead facts showing that the holding companies should be liable for alleged acts of their subsidiaries under a veil-piercing theory.  Disregarding corporate formalities is an "extreme remedy" and there is a general presumption against piercing the corporate veil.  *Calvert* v. *Huckins*, 875 F. Supp. 674, 678 (E.D. Cal. 1995).  California courts will do so only if (1) the corporations do not have "separate personalities"; and (2) respecting corporate separateness would be unfair.  *Brooklyn Navy Yard Cogeneration Partners, L.P.* v. *Superior Court*, 60 Cal. App. 4th 248, 257-58 (1997).  Plaintiff's allegation of "substantial overlap between BNYM Corp. and BNY Mellon's leadership" (AC ¶ 12) fails to meet this standard.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed in its entirety with prejudice.  BNYM respectfully requests oral argument of this motion.

---

2010).  Others reach the opposite result.  *See, e.g.*, *Miller* v. *Wash. Mut. Bank FA*, 776 F. Supp. 2d 1064, 1070 (N.D. Cal. 2011) (Alsup, J.) (applying discovery rule where unsophisticated party alleged being misled).  The California Supreme Court granted review of *Aryeh* to resolve this issue. Unlike in *Miller*, Plaintiff is sophisticated, so the Court should not apply the discovery rule.

1    Dated:  January 19, 2011

2

                 Respectfully submitted,

3

                 /s/ David M. Balabanian

4

5                  BINGHAM MCCUTCHEN LLP
                 David M. Balabanian (SBN: 37368)

6                  Frank Busch (SBN 258288)
                 Tarek Sorensen (SBN 261528)

7                  3 Embarcadero Center
                 San Francisco, California 94111

8                  Telephone: (415) 393-2000
                 Facsimile: (415) 393-2286

9                  Email: david.balabanian@bingham.com

10                 Email: frank.busch@bingham.com
                 Email: tarek.sorensen@bingham.com

11

12                  PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
                 Charles E. Davidow (admitted *pro hac vice*)

13                 2001 K Street, NW

14                 Washington, District of Columbia 20006
                 Telephone: (202) 223-7300

15                 Facsimile: (202) 223-7420
                 Email: cdavidow@paulweiss.com

16

17                 Michele Hirshman (admitted *pro hac vice*)
                 Robyn F. Tarnofsky (admitted *pro hac vice*)

18                 Matthew J. Moses (admitted *pro hac vice*)
                 1285 Avenue of the Americas

19                 New York, New York 10019
                 Telephone: (212) 373-3000

20                 Facsimile: (212) 757-3990
                 Email: mhirshman@paulweiss.com

21                 Email: rtarnofsky@paulweiss.com

22                 Email: mmoses@paulweiss.com

23                 *Attorneys for Defendant*

24

25

26

27

28