1

2

3

4

5

6               IN THE UNITED STATES DISTRICT COURT

7

8               FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10   INTERNATIONAL UNION OF OPERATING
     ENGINEERS, STATIONARY ENGINEERS
11   LOCAL 39 PENSION TRUST FUND, individually
     and on behalf of all others similarly situated,
12                                                        No. C 11-03620 WHA

13               Plaintiff,

14        v.

15   THE BANK OF NEW YORK MELLON
     CORPORATION, THE BANK OF NEW YORK          **ORDER DENYING**
16   MELLON, THE BANK OF NEW YORK                **MOTION TO DISMISS**
     COMPANY, INC., THE BANK OF NEW YORK,        **AND VACATING**
17   and THE BANK OF NEW YORK MELLON             **HEARING**
     TRUST COMPANY,
18   NATIONAL ASSOCIATION,

19               Defendants.
     _____/
20

21                           **INTRODUCTION**

22        In this action for breach of contract and related claims, defendants move to dismiss.

23   For the following reasons, defendants' motion is **DENIED**.

24                            **STATEMENT**

25        Plaintiff's complaint alleges the following.  Plaintiff International Union of Operating

26   Engineers, Stationary Engineers Local 39 Pension Trust Fund is an employee benefit plan

27   covered by ERISA that provides retirement and survivor benefits to approximately 17,000

28   members.  Defendants The Bank of New York Mellon Corporation, The Bank of New York

1    Mellon, The Bank of New York Company, Inc., The Bank of New York, and The Bank of

2    New York Mellon Trust Company, N.A., provided "custodial services" on plaintiff's behalf.

3    A custodian is a "fiduciary institution responsible for safeguarding the property of another

4    person or identity."  Responsibilities included:  (1) guarding and safekeeping securities;

5    (2) delivering or accepting traded securities; and (3) collecting principal, interest, and dividend

6    payments on held securities (First Amd. Compl. ¶¶ 10–17).

7         Over the last decade, plaintiff increasingly looked toward overseas investments

8    to diversify its holdings.  Because foreign investments are purchased and sold in the currencies

9    of the nation in which they are issued, plaintiff had to buy and sell those foreign currencies

10   in order to complete its transactions.  As a part of their services, defendants undertook the

11   foreign exchange ("FX") transactions necessary to facilitate plaintiff's purchases of foreign

12   securities and the repatriation of interest and dividends that resulted from these investments

13   (*id*. at ¶¶ 19–20).

14        **1.    STANDING INSTRUCTIONS.**

15        One method by which plaintiff could choose to have defendants purchase and sell foreign

16   currency was through standing instructions FX trade services.  Under standing instructions, when

17   plaintiff bought foreign securities or received interest from those securities, defendants would,

18   without plaintiff's direct involvement, convert the necessary currency to make that transaction

19   possible.  Plaintiff paid a flat annual fee that included standing instructions services, and could

20   opt out of this system for any particular trade by informing defendants that it would like to

21   negotiate with their traders directly.  Defendants advertised that such standing instructions

22   services were "free of charge," aside from the flat fee for custodial services, and that the

23   transactions were done under "best execution standards" to "maximize the proceeds of each

24   trade" (*id*. at ¶¶ 24, 31).

25        In handling its standing instructions trades, defendants were bound by the Foreign

26   Exchange Policies and Procedures for ERISA Plans, incorporated into the Global Custody

27   Agreement between plaintiff and defendant Bank of New York Trust Company.  The Procedures

28   guaranteed that "[t]he terms of FX Transactions with any Plan shall not be less favorable to

the Plan than terms offered by BNY to unrelated parties in a comparable arm's length

FX Transaction" (IUOE Exh. C). This language echoed Section 408(b)(18) of ERISA.

The Procedures also stated:

> The method for determining the rates at which FX Transactions will be executed under standing instructions will be provided to Plan fiduciaries as follows:
>
> a. Orders will be transmitted . . . to the . . . "Brussels Desk" in the case of income items or the "NY Desk" for purchases or sales . . . The range of rates at which the Brussels Desk will transact income item conversions . . . will be posted on BNY's website, and independent Plan fiduciaries are hereby given notice to such effect. Rates will be posted at 9:00 a.m., 11:00 a.m. and 3:00 p.m. New York time. A buy and sell rate establishing the range will be posted for each unrestricted currency.
>
> b. All income item conversions will be bundled . . . and executed . . . at or within the range of buy/sell rates in effect at 11:00 a.m. New York time and posted on the website.

In 2008, defendants implemented a program called FX Program for Trade Requests

Processed through BNY Mellon Custody, which governed standing instructions trades and

included ERISA accounts (BNYM Exh. 1). Under these procedures:

> Unless a manager instructs BNYM otherwise . . . prior to 11:00 a.m. Eastern Time, all FX transaction requests received by the BNYM Foreign Exchange group on a given day will be executed that day with BNYM on a principal basis at rates that will not deviate by more or less than three (3) percent from the relevant Interbank bid or ask rates and will not be less favorable to the account than the corresponding rates indicated on the Daily Schedule for that day.

Plaintiff received and relied on monthly reports summarizing defendants'

FX transactions. The monthly reports recorded the date, amount, and price of the

FX transactions, but did not give the times at which such trades were executed. It was therefore

impossible for plaintiff to know the exact rate at which defendants traded (First Amd. Compl.

¶ 33).

### 2. THE ALLEGED SCHEME.

Defendants engaged in a scheme through a series of deceptive acts dating back at least

ten years. Upon receiving a request from plaintiff for a purchase or sale of a foreign security

pursuant to standing instructions, defendants would execute a trade at the FX rate available close

to the time of receiving that request.  They would then watch the market fluctuation on FX rates related to the transaction over the course of the day and charge plaintiff a rate less favorable to plaintiff than the one at which defendants actually traded.  Defendants would then keep the difference between the true cost of the trade and the fictitious FX rate defendants claimed to have paid and charged plaintiff, creating a windfall in profits (*id*. at ¶¶ 51–52).

Through a daily "Reconciliation" call, defendants coordinated the false rates between multiple trading desks to make discovery less likely.  The monthly reports issued to plaintiff listed the fictitious FX rate at which defendants claimed to have paid, but not the rate at which they actually paid.  Defendants thus acquired profits at plaintiff's expense by consistently charging plaintiff for purchases and sales of a foreign currency that incorporated hidden and excessive markups relative to the actual market FX rate applicable at the time of the trade (*id*. at ¶¶ 56, 66).

Plaintiff was unaware of defendants' deceptive practices until the recent unsealing of several whistleblower complaints filed by defendants' employees in 2011.  This was because nothing in the FX rates reported to plaintiff indicated that the rates were false and included hidden markups (*id*. at ¶ 96).

The whistleblowers also claimed that not all standing instructions clients were treated identically.  Certain high-value clients had the ability to "opt out" of the standing instructions channel and negotiate their FX prices every afternoon with defendants' traders directly.  Similarly, according to a pending action by the New York Attorney General's office, defendants reached secret agreements with at least 62 favored clients to set a pre-negotiated fixed markup, called "benchmark pricing," on all standing instructions trades rather than the larger markups made on plaintiff's trades.  Some clients therefore received better standing instructions terms than plaintiff (*id*. at ¶¶ 68, 70).

Plaintiff commenced this action in July 2011 on behalf of all similarly affected employee benefit plans for whom defendants provided custodial FX services to recover proceeds improperly obtained through defendants' deceptive and unfair FX trading practices.  The class includes ERISA plans to which defendant provided services from January 1999 to present.

1    Plaintiff asserts the following claims for relief:  (1) violation of California Business and

2    Professions Code Section 17200; (2) violation of California Business and Professions Code

3    Section 17500; (3) breach of contract; (4) breach of the implied covenant of good faith and fair

4    dealing; and (5) violation of New York General Business Law Section 349.  The first two claims

5    are on behalf of all California-based investors, the third and fourth claims are on behalf of all

6    California-based employees covered by ERISA, and the fifth claim is on behalf of all investors

7    whose standing instructions were executed in New York by defendants' New York FX desk.

8    After a hearing on a previously filed motion to dismiss on December 15, 2011, plaintiff

9    filed an amended complaint to incorporate new theories that arose out of oral argument.

10   Defendants move to dismiss the first amended complaint for failure to state a claim.  This order

11   follows full briefing and a hearing.

**ANALYSIS**

12   **1.    STANDARD OF REVIEW.**

13   To survive a motion to dismiss, a complaint must contain sufficient factual matter,

14   accepted as true, to state a claim for relief that is plausible on its face.  *Ashcroft v. Iqbal*,

15   556 U.S. 662, 129 S. Ct. 1937, 1949 (2009).  A claim is facially plausible when there are

16   sufficient factual allegations to draw a reasonable inference that defendants are liable for the

17   misconduct alleged. While a court "must take all of the factual allegations in the complaint as

18   true," it is "not bound to accept as true a legal conclusion couched as a factual allegation."

19   *Iqbal*, 129 S. Ct. at 1949–50 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

20   "[C]onclusory allegations of law and unwarranted inferences are insufficient to defeat a motion

21   to dismiss for failure to state a claim."  *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140

22   (9th Cir. 1996).

23   **2.    FIRST CLAIM:  VIOLATION OF BUSINESS AND
         PROFESSIONS CODE SECTION 17200.**

24   Under California's Unfair Competition Law, "unfair competition shall mean and include

25   any unlawful, unfair, or fraudulent business act or practice."  CAL. BUS. & PROF. CODE 17200.

26   This law establishes three varieties of unfair competition — acts or practices which are unlawful,

27   or unfair, or fraudulent.  *Cel Tech Commc'ns, Inc. v. Los Angeles Cellular Telephone Co.*,

28

1    20 Cal. 4th 180, 183 (1999).  The "unfair" standard is intentionally broad, allowing courts

2    maximum discretion to prohibit new schemes to defraud.  *Motors, Inc. v. Times Mirror Co.*,

3    102 Cal. 3d 735, 740 (1980).  California courts have articulated three separate tests to assess the

4    unfairness of a particular business practice:  (1) if the conduct is tethered to a specific statutory

5    provision; (2) the utility of the conduct weighed against the gravity of the alleged victim's harm;

6    and (3) the possible countervailing benefits to consumers or competition.  *Drum v. San Fernando*

7    *Valley Bar Ass'n*, 182 Cal. App. 4th 247, 257 (2010).

8        Defendants' conduct was unfair under Section 17200 using all three tests.  *First*, the

9    requirement that the standing instructions trades be "not less favorable to the plan than terms

10   generally available in comparable arm's length transactions" was tethered to the ERISA

11   provision allowing standing instructions transactions.  *Second*, under a cost-benefit analysis, the

12   harm to plaintiff and other class members of losing potentially millions of dollars in revenues

13   was not outweighed by the financial gain accomplished by defendants.  *Third*, there appear

14   to be no countervailing benefits to the consumer or to competition from defendants' actions.

15   Defendants argue that plaintiff and similarly situated clients received the convenience of not

16   having to make trades themselves, yet the extreme financial cost of doing so, along with the loss

17   of trust between defendants and their clients, do not show defendants' conduct to be beneficial.

18       Defendants further argue that their actions were not unfair because no reasonable

19   consumer would have thought that defendants had agreed to provide rates for standing

20   instructions FX trades that were comparable to trade-by-trade negotiated transactions, and

21   plaintiff could have opted out of the standing instructions option at any time.  Yet plaintiff has

22   sufficiently alleged that defendants misrepresented the FX rates at which they were transacting

23   on their clients' behalf, and therefore plaintiff would have no reason to believe — until

24   whistleblowers came forward — that they were getting a deal far worse than was being reported.

25       Accordingly, subject to a summary judgment or a trial on the merits, defendants'

26   motion to dismiss plaintiff's claims under Section 17200 of the Business and Professions Code

27   is **DENIED**.

28

**3.    SECOND CLAIM: VIOLATION OF BUSINESS AND PROFESSIONS CODE SECTION 17500.**

California's False Advertising Law states: "It is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement concerning the property or services "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." CAL. BUS. & PROF. CODE 17500. A plaintiff's claim is governed by the "reasonable consumer" test, and must show that "members of the public are likely to be deceived." *Freeman v. Time, Inc*., 68 F.3d 285, 289 (9th Cir. 1995). Like Section 17200, Section 17500 prohibits "not only advertising which is false, but also advertising which, although true, is either actually misleading or which has a capacity, likelihood, or tendency to deceive or confuse the public." *Comm. on Children's Television, Inc. v. Gen. Foods Corp*., 35 Cal. 3d 197, 210 (1983).

Plaintiff sufficiently alleges that defendants' conduct was false advertising under Section 17500. In their written FX procedures and on their respective websites, defendants stated that the terms given to plaintiff would not be less favorable than terms offered to "unrelated parties in a comparable arm's length FX Transaction," that standing instructions FX trading was "free of charge," and that defendants would abide by "best execution standards" when executing standing instructions FX trades. Yet defendants charged plaintiff a hidden markup that made standing instructions trades far less favorable than comparable FX transactions, including the "opt out" and "benchmark pricing" standing instructions trades. Trading was not done according to "best execution standards" as understood by the financial services industry, which according to plaintiff requires that a service provider seek to obtain for its customers the most favorable terms reasonably available under the circumstances.

Defendants contend that pension funds are less likely to have been misled than the general public, and thus should not be placed under the "reasonable consumer" test. There is no authority showing that a heightened "reasonable pension fund" standard is necessary, but if so, the criteria of this standard would be an inquiry for the trier of fact.

7

1   Accordingly, defendants' motion to dismiss plaintiff's claim under Section 17500 of the

2   Business and Professions Code is **DENIED**.

3       **4.**       **THIRD CLAIM:  BREACH OF CONTRACT.**

4       To state a claim for breach of contract, a plaintiff must plead sufficient facts to

5   establish:  (1) the existence of a contract; (2) the plaintiff's performance under the contract;

6   (3) that the defendant breached the contract; and (4) the breach resulted in damage to the

7   plaintiff.  *Walsh v. W. Valley Mission Cmty. Coll. Dist.*, 66 Cal. App. 4th 1532, 1545 (1998).

8       Plaintiff has sufficiently pled breach of contract.  *First*, plaintiff entered into a Global

9   Custody Agreement with defendants in 2006, and members of the class entered into similar

10   contracts.  The contract incorporated the FX Procedures as the "exclusive means by which"

11   defendants could "enter into FX transactions with a[n ERISA] plan."  *Second*, plaintiff

12   performed all or substantially all of the duties imposed on them by the contract.

13   *Third*, defendants breached the Procedures and the contract by selecting fictitious FX rates

14   to report and charge to plaintiff for standing instructions trades and failing to offer plaintiff

15   terms that were not less favorable than terms offered in comparable arm's lengths transactions,

16   including the "opt out" and "benchmark pricing" trades conducted for favored clients.

17   *Fourth*, plaintiff was damaged by paying the inflated rates.

18       Defendants dispute the breach element of this claim.  Three theories of breach are

19   advanced in association with language in the contract or FX Procedures:  (1) defendants failed

20   to offer terms on standing instructions FX trades that were not "less favorable to the Plan

21   than terms offered by BNY to unrelated parties in a comparable arm's length FX transaction";

22   (2) defendants failed to execute standing instructions FX transactions "free of charge"; and

23   (3) defendants did not act according to "best execution standards."

24       Defendants argue that transactions conducted for other customers were of a different

25   kind than those offered plaintiff, and cannot be called "comparable."  Defendants also note that

26   the FX Program for Trade Requests Processed through BNY Mellon Custody, which governed

27   standing instructions trades, allowed defendants to act "as principal," and thus to retain any

28   profits from the standing instructions transactions.  Plaintiff, however, correctly notes that the

construction of a disputed contract term such as "comparable" is best left to a motion for summary judgment after discovery has been conducted.  The same is true of "free of charge," "best execution standards," and "as principal," the meanings of which are also disputed by the parties. Thus, defendants' motion to dismiss plaintiff's claim for breach of contract is **DENIED**.

### 5. FOURTH CLAIM: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.

"Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."  *Carma Developers, Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 371 (1992).  In essence, "The covenant is implied as a supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract."  *Love v. Fire Ins. Exch.*, 221 Cal. App. 3d 1136, 1153 (1990). Moreover, "[t]he covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another.  Such power must be exercised in good faith."  *Carma Developers*, 2 Cal. 4th at 372.

Defendants were required to exercise this discretionary power in a fair and good faith manner, and plaintiff sufficiently alleges that defendants did not.  It is not enough for defendants to point to a provision in the contract that may permit the allegedly nefarious conduct, for if this was enough to avoid a breach of the implied covenant, the implied covenant would cease to have its own meaning as it would always require a breach of the underlying contract itself. *IndyMac Federal Bank, F.S.B. ex rel. F.D.I.C. v. PMI Mortg. Ins. Co.*, 2009 WL 331451 (N.D. Cal. Feb. 11, 2009) (Alsup, J.).  The implied covenant can be violated by expressly permitted conduct done in bad faith.  *Ibid*.  As there are still factual issues to be resolved in conjunction with the legal question of contract interpretation, dismissal is improper.  Taken in the light most favorable to plaintiff, the complaint sufficiently alleges a cause of action for breach of the implied covenant of good faith and fair dealing.  Thus, defendants' motion to dismiss that claim is **DENIED**.

**6.      FIFTH CLAIM:  VIOLATION OF NEW YORK**
**GENERAL BUSINESS LAW SECTION 349.**

Section 349 of New York's General Business Law prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."  In order to state a prima facie case, a plaintiff must show:  (1) the defendant's deceptive acts were directed at consumers, (2) the acts were misleading in a material way, and (3) the plaintiff has been injured as a result.  *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000).  "Deceptive acts" are those that "likely mislead a reasonable consumer acting reasonably under the circumstances."  *Ibid*.

Plaintiff successfully alleges that defendants' actions constitute deceptive trade practices under Section 349.  As discussed above, plaintiff pleads sufficient facts to make it plausible that they were misled to believe they would be getting services "free of charge," according to "best execution standards," and at terms as favorable as those offered in comparable transactions.  This is enough to meet the "misleading" prong of Section 349.

Defendants argue that the services provided were not "consumer-oriented" within the meaning of the New York statute.  The "typical violation contemplated" by the General Business Law "involves an individual or natural person who purchases goods, services, or property for personal, family, or household purposes."  *Cruz v. NYNEX Information Resources*, 263 A.D. 2d 285, 289 (N.Y. 2000).  Yet the New York Court of Appeals has held that Section 349's consumer orientation does not preclude its application to suits by pension funds against a bank.  *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20 (1995).  In *Oswego*, the threshold requirements were whether the bank's practices had a broader impact on consumers at large and if the pension fund clients were treated "as any customer entering the bank" as opposed to entering into a private, unique contract.  *Ibid*.  Defendants' standing instructions contract was offered to any customer purchasing custodial services (except for favored clients), and defendants' practice of using hidden markups to earn profits affected all of these consumers.  Defendants' services were therefore "consumer-oriented" under Section 349, and defendants' motion to dismiss plaintiff's claim for violation of that statute is **DENIED**.

10

7.   **STATUTES OF LIMITATION.**

Defendants contend that each of plaintiff's claims are barred by their respective statutes of limitation.  Where an injury has been "difficult for the plaintiff to detect," the defendant is in a "far superior position to comprehend" it, or the defendant "had reason to believe that plaintiff remained ignorant [that] he had been wronged," the discovery rule tolls a plaintiff's breach of contract claim.  *El Pollo Loco, Inc. v. Hashim*, 316 F.3d 1032, 1039 (9th Cir. 2003).  The same rational applies to the California and New York actions.  *Miller v. Wash. Mut. Bank FA*, 776 F. Supp. 2d 1064 (N.D. Cal. 2011) (Alsup, J.); *M&T Mortg. Corp. v. White*, 736 F. Supp. 2d 538, 555 (E.D.N.Y. 2010) (Garaufis, J.).

Plaintiff pleads sufficient facts to establish equitable tolling of the statutes of limitation.  Plaintiff alleges that it was unaware of defendants' "deceptive practices" until the recent unsealing of several whistleblower complaints filed by defendants' employees.  Nothing in the FX rates reported to plaintiff indicated that the rates were false and included hidden and unauthorized markups or markdowns.  Accordingly, plaintiff would have had little reason to believe, prior to the unsealing of the whistleblower complaints in 2011, that it had been deceptively charged fictitious FX rates.

Plaintiff sufficiently demonstrates that to the extent their claims are foreclosed by the statutes of limitation, they did not know of the facts constituting the claims within the claims periods, could not have discovered them through reasonable diligence due to the sophistication of defendants' alleged scheme, and only recently discovered the facts constituting their claims.  Accordingly, as a pleading matter, defendants' motion to dismiss plaintiff's claims due to any limitation periods is **DENIED**.

8.   **PLAINTIFF'S CLAIMS AGAINST DEFENDANTS BANK OF NEW YORK MELLON CORPORATION AND BANK OF NEW YORK COMPANY, INC.**

Defendants argue that plaintiff fails to state a claim against defendants The Bank of New York Company, Inc. and The Bank of New York Mellon Corporation because plaintiff did not assert that these two defendants ever provided services to plaintiff.  However, plaintiff sufficiently alleges that The Bank of New York Mellon Corporation has been properly named as the parent of The Bank of New York Mellon and The Bank of New York Company, Inc. has

been properly named as the former parent — before its merger with Mellon Financial

Corporation — of The Bank of New York.  The Bank of New York Mellon and The Bank

of New York were specifically authorized to provide FX services to plaintiff.  There was

"substantial overlap" between the parents and subsidiaries in that "every current executive

officer of BNY Mellon Corp. also serves as an officer of BNY Mellon."  Furthermore, both

parent companies allegedly profited from the actions of the subsidiaries.  This is sufficient, and

defendants' motion to dismiss claims as to these two defendants is **DENIED**.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is **DENIED**.  The hearing

scheduled for February 23, 2012, is hereby **VACATED**.


**IT IS SO ORDERED.**


Dated:  February 14, 2012.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE